**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI, NORTHERN DIVISION
AT HANNIBAL**

| | |
|---|---|
| **HANNIBAL-LAGRANGE UNIVERSITY,**    **PLAINTIFF,** <br> **VS.** <br> <br> **LINDA MCMAHON, IN HER OFFICIAL CAPACITY AS UNITED STATES SECRETARY OF EDUCATION,**    **AND** <br> **THE UNITED STATES DEPARTMENT OF EDUCATION DEFENDANTS.** | **CASE NO.** |

**VERIFIED COMPLAINT**

1. Plaintiff Hannibal LaGrange University (HLGU) seeks declaratory and injunctive relief against a federal regulation that became effective near the tail end of the Biden administration; the regulation imposes an unconstitutional and unauthorized requirement on many religious colleges and universities.

2. In July 2024, the U.S. Department of Education started enforcing a new amendment to 34 C.F.R. § 668.14(a)(3); the Department now says any group with the power to name an educational institution's board must co-sign the institution's agreement with the Department (or name an agent to sign). Without the co-signed agreement, the institution cannot participate in Title IV programs. *See* Exhibit A, "Financial Responsibility,

Administrative Capability, Certification Procedures, Ability to Benefit (ATB)," 88 Federal Register 74,568 (October 31, 2023) (codified at 34 C.F.R. Part 668) ("the Regulation").

3. This "Co-Signature Mandate" unlawfully burdens Plaintiff HLGU's method of naming the leaders of this religious University, who are selected by local churches affiliated with the Missouri Baptist Convention, consistent with HLGU's Baptist beliefs.

4. Plaintiff HLGU is a private, Christian university affiliated with the Missouri Baptist Convention ("MBC"); the Convention is an incorporated association of churches that selects the University's trustees at an annual two-day meeting in late October. This allows the Churches to judge the essentially religious or spiritual qualifications of HLGU's trustee-leaders.

5. The Department now asserts that HLGU may not enter a new or amended PPA, or expand Title IV programs, unless the MBC signs—or formally designates a representative to sign—agreements with the Department.

6. The regulation, as being applied, places HLGU in an impossible position: it must (a) ask MBC to give up its rights, contrary to HLGU's religious beliefs; (b) obtain MBC's signature to a federal agreement that contradicts HLGU and MBC's Baptist beliefs and creates legal uncertainty for both; or (c) lose eligibility to participate in Title IV student aid programs, if MBC refuses.

7. The Higher Education Act does not authorize this mandate. 20 U.S.C. § 1094 allows two — and only two—parties to Participation Agreements: the Institution, and the Secretary.

2

8. Nor should the Regulation apply to HLGU, because HLGU's "member" is not an "owner" of HLGU, and the Regulation only applies to entities with "direct or indirect ownership." Yet the Department insists the MBC "owns" HLGU, contrary to settled law in Missouri and many other states.

9. The Department's interpretation not only exceeds its statutory authority, but also violates the Religious Freedom Restoration Act, the First Amendment's protections for church autonomy and free exercise, and the Fifth Amendment's guarantee of equal treatment under federal law.

10. HLGU sues to preserve its constitutional rights, to protect its religious convictions, and to ensure that it (and similarly situated institutions) may continue serving students without unlawful federal interference in the selection of university leaders by affiliated churches.

## PARTIES, VENUE, & JURISDICTION

11. This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1361, jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 & 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65, and to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and RFRA, 42 U.S.C. § 1988.

12. Venue lies in this district pursuant to 28 U.S.C. §1391(e). A substantial part of the events or omissions giving rise to the claim occurred in this district, and Plaintiff HLGU is in this district.

## IDENTIFICATION OF PARTIES

13. Plaintiff Hannibal-LaGrange University is a Missouri nonprofit corporation, which operates from its campus in Marion County, Missouri.

14. HLGU formed in 1928 as the merger of Hannibal College (1857) and LaGrange College (1858). The citizens of Hannibal pledged over $200,000 in 1928 to re-establish a Baptist college in the city, and Plaintiff's Trustees have been elected by Missouri Baptists ever since.

15. Plaintiff began granting four-year degrees in 1980 and adopted the name Hannibal-LaGrange University in 2010.

16. HLGU's eleemosynary mission is "to provide an excellent education in both liberal arts and professional disciplines in a distinctively Christian environment that integrates Christian faith and learning in preparing graduates for personal and career effectiveness."

**17.** A copy of HLGU's Articles of Incorporation is attached at Exhibit B.

18. Defendant United States Department of Education is a department of the Executive Branch; it is headquartered in Washington, D.C., and maintains a regional office in Kansas City, Missouri. Department is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the Regulation at issue.

19. Defendant Linda McMahon is the Secretary of the Department and is sued here in her official capacity.

## FACTS COMMON TO ALL COUNTS

### HLGU's History and Religious Beliefs

20. Since 1857, Plaintiff HLGU has been affiliated with Missouri Baptists.

21. Since 1928, messengers from Missouri Baptist churches have met at an annual convention, and among other business, the messengers have directly elected HLGU's Trustees.

22. The MBC-HLGU relationship reflects HLGU's religious convictions. Baptists oppose theological hierarchies; affiliated schools give Baptist churches the ultimate authority to name the Trustees of these important religious institutions.

23. While day-to-day *control* of the school remains vested in Trustees, the authority to judge the spiritual qualifications of HLGU's trustees-leaders is held by the local churches.

24. Under Baptist principles of congregationalism, the supreme earthly authority in spiritual matters is vested in local churches. Thus, these churches are best equipped to decide whether Trustees are upholding the University's mission of providing a "distinctively Christian environment," and whether the University is "integrat[ing] Christian faith and learning" consistent with Baptist beliefs.

25. While not termed "ministers" in Baptist parlance, the Trustees of HLGU are "ministers" for First Amendment purposes, as leaders of a religious institution, approved by the churches, charged with educating the next generation about the Baptist faith.

### HLGU's Participation in Title IV and Program Participation Agreements

26. In September 2023, HLGU received its latest notice from the Department that HLGU was an "eligible institution" under the Higher Education Act of 1965, and so an eligible choice for students using Title IV funds.

27. The letter from the Department stated that "Together, the Program Participation Agreement that has been signed on behalf of the Secretary and the [Eligibility and Certification Approval Report] constitute the Department's determination that the Institution has qualified to participate in programs under the Higher Education Act of 1965, as amended (HEA) and the Federal student financial assistance programs (Title IV, HEA programs)."

28. The Approval expires on June 30, 2026, unless extended.

29. At the same time, HLGU was issued a "Program Participation Agreement" signed on behalf of the Secretary and by an HLGU official.

30. The PPA is the contract between the Institution and the Department, wherein the Institution agrees to be bound by terms and conditions applicable to it as an Institution.

31. HLGU's 2023 PPA included a requirement that it must "apply for and receive approval by the Secretary for expansion or any substantial change…." Substantial changes were defined to include "establishment of

an additional location; (b) increase in the level of academic offering…; or (c) addition of any educational program."

### The Department's Regulation and New Signature Requirement

32.  In October 2023, the U.S. Department of Education finally adopted a new Regulation, "Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)," including amendments to 34 C.F.R. § 668.14. Ex. A.

33.  According to the new § 668.14(3):

> An institution's program participation agreement must be signed by—
> (i)      An authorized representative of the institution; and
> (ii)     For a proprietary or private nonprofit institution, an authorized representative of an entity with direct or indirect ownership of the institution **if** that entity has the power to exercise control over the institution…

(emphases added).

34.  Only if the Secretary determines an entity has "direct or indirect ownership," does § 668.14(3)(ii) goes on to create an in-house test for "the power to exercise control," by stating:

> The Secretary considers the following as examples of circumstances in which an entity has such power:
> (A) If the entity has at least 50 percent control over the institution through direct or indirect ownership, by voting rights, by its right to appoint board members to the institution or any other entity, whether by itself or in combination with other entities or natural persons with which it is affiliated or related, or pursuant to a proxy or voting or similar agreement.

   (B) If the entity has the power to block significant actions.
   (C) If the entity is the 100 percent direct or indirect interest holder of the institution.
   (D) If the entity provides or will provide the financial statements to meet any of the requirements of 34 C.F.R. 600.20(g) or (h) or subpart L of this part.

35. The amendment to § 668.14 was effective July 1, 2024.

36. The Department sought to impose a strikingly similar requirement on some schools before July 1, 2024, under a March 23, 2022, Guidance letter. *See* Electronic Announcement GENERAL-22-16: Updated Program Participation Agreement Public Institutions of Higher Education, Mar. 23, 2022. *See* https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education

37. According to the Department's commentary accompanying the new regulation, the requirement is intended to ensure financial accountability from entities that "own" participating institutions, including situations where corporate structures might require the government to make a heightened showing (such as improper purpose or fraud) before taking assets from related corporations. Thus, the goal was to expose more assets to Government claims.

38. The regulation applies on its face to for-profit institutions with corporate parent entities, and multi-campus networks where ownership and control are centralized. It does not explicitly address nonprofit religious institutions with member-elected boards.

39. Still, the Department has interpreted the amended regulation to apply to Plaintiff HLGU, asserting that HLGU's religious affiliation with the Missouri Baptist Convention (MBC)—a nonprofit religious association of churches that selects HLGU's trustees—creates both "indirect ownership" and "control" of HLGU by the MBC, under § 668.14(a)(3).

40. Under this interpretation, the Department has demanded that MBC (a) give up its rights to elect Trustees, (b) sign the PPA directly or (c) designate a representative—such as the President of HLGU—to sign on its behalf, thereby binding the MBC to the obligations of the agreement and other regulatory requirements.

41. The Department has made clear that without such a signature or designation, HLGU may not amend its current PPA or expand its program offerings and will not be eligible to recertify its agreement when it expires in 2026.

42. The Department's interpretation marks a significant departure from longstanding practice under the Higher Education Act, which authorizes participation agreements only between the institution and the Secretary. *See* 20 U.S.C. § 1094(a)(1).

43. The Department's application of the co-signature requirement to HLGU imposes legal obligations on a third-party religious convention that is not an "owner" of the University, does not control the operations of the University, holds no assets of HLGU, and plays an important religious role in selecting doctrinally and spiritually qualified leaders of affiliates.

44. This new mandate violates HLGU's constitutional, statutory, and procedural rights, forming the basis of the claims raised in this Complaint.

### HLGU's Attempts to Comply and Seek Clarification

45. In early 2024, HLGU began to seek the required DOE approval for new educational offerings, including a prison education program developed in partnership with the Missouri Department of Corrections. *See* ¶ 31, *supra*.

46. According to the Department, this process required an "update/addition" to the current PPA.

47. As required, HLGU first secured approval for the new program from its accreditor, the Higher Learning Commission, in February 2024.

48. Following accreditor approval, HLGU accessed the Department's online PPA submission system to begin the required application for program expansion.

49. HLGU was surprised to find new fields that required disclosure of "ownership" information. The system prompted HLGU to identify any entity with the power to appoint a majority of its board, and to provide contact information for the "CEO" and "CFO" of such entity.

50. HLGU sought clarification from the Department's Kansas City Office, telling the office that "We are a non-profit religiously affiliated institution of higher education. The only individuals who vote are our trustees."

51. On April 4, 2024, Department staff instructed HLGU: "When completing the ownership structure section please be sure to list the entity owner as 'Missouri Baptist Convention, Board of Trustees'."

52. On April 24, 2024, HLGU requested more clarification from the Department. In its correspondence, HLGU explained that under Missouri non-profit law, religious members are not "owners" of charitable corporations. HLGU cited *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579 (Mo. 2013), and other applicable authorities, which state that members of non-profits are not owners of the non-profit.

53. In its letter, HLGU also requested that it not be required to identify the MBC as an "owner" for purposes of Title IV eligibility and asked for guidance on how to proceed.

54. On May 30, 2024, the Department's Kansas City School Participation Division responded with a letter denying HLGU's request. "As the sole member of HLGU, an authorized representative of MBC will be required to sign Hannibal [sic] PPA and will remain on the application as previously required."

55. The Department acknowledged that, under Missouri law, the MBC would not be considered an "owner" of HLGU but stated that "for purposes of determining eligibility to participate in Title IV, HEA Programs, the Department is not bound by Missouri law."

56. The Department's officials told HLGU that it could not continue in its application without providing the requested data, and later obtaining a signature on an agreement from the MBC by an authorized representative.

57. The Department's letter emphasized that the MBC's power to elect trustees was sufficient, in its view, to constitute both indirect ownership and control for purposes of §668.14(a)(3), triggering the co-signature requirement.

58. Although the letter referenced various corporate governance powers attributed to the MBC (which HLGU partly contests), the Department relied on a single fact: the MBC's ability to elect and remove trustees. The Department stated, "[E]ven if MBC's powers were restricted to just electing HLGU's Trustees, as the sole member, MBC would still have indirect control over HLGU through these Trustees."

59. The letter concluded that "an authorized representative of MBC will be required to sign Hannibal['s] PPA," and further stated that the decision had been reviewed and approved by the Department's General Counsel's Office.

60. Under the then-applicable guidance, the Department claimed a signature would bind the Convention to new financial liabilities: "By co-signing the PPA, the entities (but not the individuals who sign as authorized representatives of the entities) agree to assume liability for financial losses to the federal government related to the institution's administration of the Title IV programs." https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education-updated-december-2-2024 (last accessed May 27, 2025).

61. On October 21, 2024, HLGU asked the Kansas City office whether there was any method of appealing this decision.

62. On October 22, 2024, the Kansas City office responded: "President Matz, please be aware that our office seeks advice of the Counsel's office when we are constructing letters to ensure we have the statements included correct based on law. The topic of discussion regarding the owner entity and signatures in relation to the PPA are in regulations as noted in the letter. I have submitted your questions for additional clarification and will provide additional information when I can."

63. Thereafter, HLGU received no information on any appeal process from the Department, until HLGU demanded a religious accommodation in May 2025.

## The Department Asserts a New "Designation" approach in May 2025

64. On May 2, 2025, following months of unsuccessful efforts to resolve the impasse administratively, HLGU submitted a formal request to the Department of Education seeking a religious accommodation from the signature requirement under 34 C.F.R. § 668.14(a)(3). A copy is attached as Exhibit C.

65. In its letter, HLGU explained that requiring the Missouri Baptist Convention (MBC) to sign the Program Participation Agreement would violate the University's religious commitments and internal governance

structure and would improperly entangle the federal government in ecclesiastical decision-making.

66. HLGU's letter requested that the Department refrain from enforcing the co-signature mandate against HLGU and/or MBC and allow the University to execute a PPA without requiring any action by the Convention.

67. For the reasons explained, the Signature requirement appeared to violate the law. Moreover, obtaining a signature in a timely manner would be nearly impossible.

68. The Missouri Baptist Convention is an incorporated voluntary association of churches that meets for two days each year, normally in late October. It holds no assets, apart from its relationship to other church entities. The Convention largely reserves the right to act to itself; its officers are not authorized to act without approval between annual meetings. The Convention has designated another Corporation, the Executive Board of the Missouri Baptist Convention, as the Convention's fiduciary between meetings, but outside narrow parameters has not authorized the Executive Board to take actions "for" the Convention without messenger approval.

69. Thus, HLGU could not obtain a binding signature from the Convention, outside an action at an October annual meeting. And HLGU would expect messengers, if fully informed about the consequences of the action, to decline to authorize a signature because of Baptist church-state beliefs.

70. On May 8, 2025, officials from the Department convened a videoconference with representatives from HLGU and a similarly situated Baptist-affiliated institution to discuss the request.

71. During the call, Department officials acknowledged the religious liberty concerns raised by HLGU and expressed a desire to identify a workable solution. But they explained that the Department remained bound by the regulation and could not issue a categorical exemption.

72. Instead, Department officials proposed a revised procedure through which the MBC, as the entity deemed to "own" and "control" HLGU, could designate an individual—such as the University's President—to sign the PPA on the MBC's behalf.

73. Officials suggested that this designation could be issued in the form of a letter on MBC letterhead, signed by a person authorized to act for the Convention.

74. Orally, representatives of the Department stated that the signature would not create any liability. It was unclear, however, if this was a new promise that the MBC would not incur liability, or whether this was a restatement of the position in the earlier guidance that "…the entities (but not the individuals who sign as authorized representatives of the entities) agree to assume liability …." *See* ¶60, supra.

75. On May 15, 2025, the Department issued a formal letter to HLGU confirming its revised interpretation of the regulation. A copy of the letter is attached as Exhibit D.

76. The letter reaffirmed the Department's view that the MBC "has the power to exercise control over [HLGU]" by virtue of its right to appoint and remove trustees and therefore qualifies as an entity whose authorized

representative must sign the PPA under § 668.14(a)(3) — a claim HLGU denies.

77. The Department stated that MBC could satisfy this requirement by designating an individual to sign on its behalf, and that such designation would remain effective until revoked or replaced by a subsequent designation from the entity.

78. The letter added that any prior contrary determinations had been rescinded, but that the new policy would not apply retroactively.

79. The letter did not address whether the proposed designation approach would expose the MBC to financial liability or regulatory obligations under the PPA; 34 CFR § 668.14 appears to impose additional requirements on all signatories.

80. Nor did the Department's letter clarify how such a designation would function under Missouri law, or how the MBC—an incorporated association that meets only once annually in late October—could validly act through a corporate resolution or authorized signatory in a timely manner.

81. HLGU appreciates the desire of the newly appointed Department officials to try to find a workable solution, but these officials are hemmed in by the requirements created by the Biden Administration's Department of Education.

82. While the Department's revised position avoids a direct MBC signature, it continues to insist that the MBC must take affirmative action that will result in the MBC being bound by an agreement—an action that still creates a legal relationship between the MBC and the federal government.

83. The designation approach also would impose a new burden on HLGU's religious beliefs, by requiring the President of HLGU to assume a direct agency relationship with the MBC — a relationship that HLGU's President does not currently have, and in a litigious environment, HLGU's President does not want to have.

84. The designation approach does not resolve the constitutional, statutory, or religious liberty issues raised in HLGU's accommodation request. It merely shifts the procedural form of the same substantive burden: forced participation in a civil contract that burdens decisions of church doctrine and governance.

85. At best, the Department's designation plan tries to render the MBC's participation a legal nullity, which goes to show that the Government has no compelling interest in involving the MBC in this matter at all.

86. HLGU remains unable to submit new programs for approval or to renew its PPA without a signature authorized by the MBC. The risk of regulatory noncompliance and institutional ineligibility remains.

87. As a result, HLGU must now seek judicial relief to protect its legal rights and preserve its ability to continue operating in accordance with its religious convictions.

## The Immediate Harms to HLGU's Prison Education Program

88. In 2021, HLGU launched a prison education initiative titled Freedom on the Inside, a bachelor's degree program in Christian Studies offered within the Missouri Department of Corrections.

89. The program serves incarcerated men at the Jefferson City Correctional Center in Jefferson City, Missouri, providing accredited college-level instruction grounded in the University's Christian mission.

90. The program has enrolled approximately twenty students and has been well received by both prison staff and inmates. HLGU is the only evangelical institution offering such a degree program in a Missouri prison.

91. In 2023, the Department of Education restored Pell Grant eligibility for qualified incarcerated students, under statutory changes enacted under the FAFSA Simplification Act of 2020.

92. Prison Education funding was restored because it overwhelmingly supports the governmental interests. In addition to creating safer environments for people behind bars, Prison Education Programs help ensure that people in prison can secure well-paying jobs when they return home and decrease the odds that they will return to prison.

93. HLGU's Freedom on the Inside program meets all substantive criteria for approval as a Prison Education Program under the new Pell Grant rules.

94. But to receive Pell Grant funds for students enrolled in the program, HLGU must obtain Department approval for the program as a "substantial expansion" of its existing offerings, which requires an update to its Program Participation Agreement.

95. HLGU cannot obtain the update without satisfying the Department's current signature requirement under 34 C.F.R. § 668.14(a)(3).

96. Because the Department incorrectly considers the Missouri Baptist Convention to be an "entity with ownership" and "control" over HLGU,

the Department has refused to process HLGU's application unless an authorized representative of the MBC signs or designates someone to sign the PPA.

97. The MBC has not provided a designation and may be unwilling or unable to designate a signer as it violates its ecclesiastical structure and religious convictions. Indeed, the Convention can only practically consider the matter in its short, October annual meeting. *See* ¶¶ 68-69, *supra*.

98. As a result, HLGU is unable to obtain Pell Grant approval and funds for the Freedom on the Inside program, despite being fully eligible in all other respects.

99. HLGU estimates that it has lost $500,000 in tuition revenue to date due to the Department's refusal to approve the program.

100.    The University cannot afford to scale or sustain the program without access to federal student aid, and eligible incarcerated students are being denied the opportunity to pursue higher education at HLGU because of the impasse.

101.    HLGU expects to lose an additional $250,000 per semester going forward unless the Department's co-signature mandate is enjoined or modified.

102.    This loss directly impairs the University's religious mission, which includes ministering to underserved populations through education and discipleship and further threatens its long-term financial stability.

## The Regulation Causes HLGU Religious, Financial and Constitutional Harms

103.    The Department's interpretation of 34 C.F.R. § 668.14(a)(3) imposes significant and escalating burdens on HLGU's religious beliefs, financial viability, and legal rights.

104.    HLGU is a nonprofit religious institution whose governance reflects core Baptist convictions, including congregational polity and that no religious hierarchy should be created with greater spiritual authority than local churches.

105.    HLGU has structured itself, then, such that local churches have the final say in selecting the leaders of the institution.

106.    But in giving churches the ultimate authority to select religious leaders, HLGU has not given away ownership or day-to-day control.

107.    The Missouri Baptist Convention does not "own" HLGU, does not hold assets of HLGU, and does not manage or control its daily operations.

108.    Rather, the MBC elects trustee-leaders of HLGU consistent with shared religious doctrine and historic Baptist practice. The MBC's other rights — such as the right to receive property (if the Trustees elect to dissolve), or the right to approve charter changes (so that the Trustees cannot unilaterally remove MBC's role) — are consistent and coincident with these beliefs.

109.    Baptist beliefs discourage entanglement between churches and the government and oppose government interference in private religious decisions. *See Baptist Faith and Message*, Art. XVII, Religious Liberty

("Church and State should be separate…the Church should not resort to the civil power to carry on its work…The State has no right to impose penalties for religious opinions of any kind … A free church in a free state is the Christian ideal, and this implies …the right to form and propagate opinions in the sphere of religion without interference by the civil power.") Available at https://bfm.sbc.net/bfm2000/#xvii (last accessed May 28, 2025).

110.     Many Baptist educational institutions, like HLGU, have determined that Title IV participation is not "support" or "establishment" by the government, as Title IV merely allows students of all faiths to choose any qualifying academic institution; the loans are not "government support" in the sense of establishing some religions over others. Other Baptist institutions would eschew Title IV participation to avoid state entanglement

111. Here, HLGU believes the State is imposing penalties on Baptist students, who cannot select an otherwise qualifying institution of their choice, and imposing liabilities directly on the MBC because of its religious conduct, contrary to the beliefs of most Baptists.

112.     The Department's requirement that the MBC sign, or authorize a signatory for, a federal agreement imposes civil liability and contractual obligations on a religious entity that has not voluntarily entered any federal program.

113.     The Department's May 15, 2025, proposal—allowing MBC to designate HLGU's president to function as its agent—still compels MBC to take corporate action, acknowledge "ownership" and "control" it does

not have, express assent to a federal regulatory regime, and create an agency relationship that does not exist and is disallowed by its polity.

114.    These actions conflict with HLGU's beliefs and the Convention's limited ecclesial structure, its legal status under Missouri law, and its religious commitment to autonomy from civil government in ecclesiastical matters.

115.    If HLGU were to attempt to persuade the Convention to give up its trustee-selection rights to satisfy the Department's requirement, it would violate its governing documents, its theological mission, and its religious integrity.

116.    If HLGU fails to amend its PPA before its expiration in June 2026, the University will lose access to Title IV funding, including federal student loans and grants relied on by most of its student body.

117.    Without access to Title IV programs, HLGU will be unable to operate as an accredited university and will face insolvency.

118.    The regulation thus forces upon HLGU a direct choice between religious conviction and institutional survival, a burden the Constitution and federal law do not permit.

119.    The Department applies this rule selectively. Institutions with self-perpetuating boards, hierarchical denominational oversight, or government-appointed trustees are not subject to the same signature mandate.

120.    In a similar case involving another Baptist university where a state denomination selects most trustees, the Department found that the

denomination did not have ownership, in apparent conflict with the decision about HLGU. *See* "Howard Payne Received DOE Clarification," Baptist Standard, September 25, 2024, at https://baptiststandard.com/news/texas/howard-payne-university-receives-doe-clarification/ (last accessed May 27, 2025).

121.    Religious colleges that adopt Baptist or congregational models—where leadership is selected by local churches or affiliated associations—bear the brunt of the Department's enforcement.

122.    By conditioning program eligibility on institutional governance models, the Department disfavors particular religious structures and penalizes longstanding forms of religious association.

123.    The Department has other tools available to ensure fiscal responsibility, including letters of credit, compliance audits, and statutory remedies for fraud or misuse of funds. It need not, and cannot lawfully, burden religious polity to achieve its fiscal goals.

124.    Absent judicial relief, HLGU will suffer irreparable harm to its religious exercise, its ability to serve students, and its continued existence as a religious institution of higher education.

## Legal Theories Supporting Relief

125.    The Department's interpretation and enforcement of 34 C.F.R. § 668.14(a)(3), as applied to HLGU, violates multiple provisions of federal law and the Constitution.

126.    First, the Department's requirement that HLGU obtain a signature or formal designation from the Missouri Baptist Convention exceeds the authority granted by Congress under the Higher Education Act. The statute contemplates participation agreements only between the Secretary and the institution, not third-party religious associations.

127.    Second, the Department's interpretation is inconsistent with the regulatory text, in that the Department assumes the MBC is an "owner" of HLGU without any legal basis or individualized assessment.

128.    Third, the regulation as interpreted and applied imposes a substantial burden on HLGU's religious exercise, triggering heightened scrutiny under the Religious Freedom Restoration Act (RFRA), and fails to employ the least restrictive means of achieving any compelling governmental interest.

129.    Fourth, the regulation interferes with HLGU's religious autonomy and internal governance in violation of the First Amendment's Free Exercise Clause and the ministerial exception, and discriminates against institutions based on denominational structure, in violation of both the First and Fifth Amendments.

130.    Fifth, the Department's rules and its application to HLGU are arbitrary, capricious, and procedurally defective under the Administrative Procedure Act. The Department failed to consider the impact on religious institutions and overlooked narrower alternatives already available under its existing regulations.

131.     Sixth, in violation of the "Major Questions" doctrine, the regulation intrudes into a traditional area of state law—nonprofit corporate governance—without clear congressional authorization, violating structural principles of federalism and the constitutional limits of Spending Clause legislation.

132.     HLGU seeks declaratory and injunctive relief under each of these legal theories, as explained in the following Counts.

## COUNT I — VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (ULTRA VIRES / CONTRARY TO LAW)

133.     Plaintiff re-alleges and incorporates by reference ¶¶ 1 - 132 as if fully set forth herein.

134.     The Administrative Procedure Act requires that a reviewing court "hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

135.     The Regulation is a "rule" under the APA. 5 U.S.C. § 551(4) and constitutes "final agency action" reviewable by this Court under 5 U.S.C. § 704.

136.     Under the Higher Education Act, only an "institution of higher education" and the Secretary of Education are authorized to enter into Program Participation Agreements. *See* 20 U.S.C. § 1094(a)(1).

137.     Congress did not authorize the Secretary to require additional parties—such as religious associations, corporate members, or third-party

stakeholders—to sign Program Participation Agreements or assume liability under them.

138.    The Department's regulation at 34 C.F.R. § 668.14(a)(3), as interpreted and enforced, requires Plaintiff to obtain the signature of the Missouri Baptist Convention (MBC), or a representative designated by MBC, before Plaintiff may enter or update a participation agreement.

139.    The Department's enforcement of this regulation treats the MBC— a nonprofit religious convention with no ownership interest in HLGU—as an "entity with direct or indirect ownership" that "exercises control" over the institution, despite the absence of any statutory language or congressional intent supporting such a requirement.

140.    The Missouri Baptist Convention is not a party to HLGU's operations, does not hold an ownership or proprietary interest in the assets of HLGU, and does hold assets for HLGU; the MBC expresses the collective ecclesiastical judgment of local Baptist churches with respect to spiritually qualified trustee appointments, as ministers of the work assigned to the Institution.

141.    By requiring HLGU to obtain the Convention's signature or designation, the Department has extended the statutory scheme beyond the limits set by Congress, without clear legislative authorization.

142.    The Regulation, and Defendants' enforcement of it, further violates the APA and other controlling laws, because it substantially burdens the exercise of religion without being the least restrictive means of advancing a

compelling government interest in violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, as discussed below.

143.     The Regulation, and Defendants' enforcement of it, impose impermissible burdens on the exercise of religion in violation of the First and Fifth Amendments of the U.S. Constitution, as discussed below.

144.     This interpretation disrupts longstanding principles of nonprofit governance and religious autonomy and introduces liability for entities that Congress did not intend to regulate or bind contractually.

145.     Because the Department lacks statutory authority to impose this co-signature requirement, the regulation is invalid on its face and as applied to HLGU.

146.     Accordingly, the Department's actions violate the Administrative Procedure Act and must be set aside pursuant to 5 U.S.C. § 706(2)(A) and (C).

## COUNT II — VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT (ARBITRARY AND CAPRICIOUS ACTION)

147.     Plaintiff re-alleges and incorporates by reference ¶¶ 1 - 146 as if fully set forth herein.

148.     The Administrative Procedure Act requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

149.     In promulgating and applying 34 C.F.R. § 668.14(a)(3), the Department failed to consider important aspects of the problem it

purported to address, including the impact of the regulation on religious institutions with member-based governance structures.

150.     The Department also failed to account for narrower, less burdensome alternatives already available to ensure fiscal responsibility, including letters of credit, heightened monitoring, and targeted enforcement mechanisms.

151.     In its enforcement of the regulation, the Department has treated similarly situated institutions unequally requiring co-signatures from religious associations like the Missouri Baptist Convention, while not requiring similar signatures from other parent entities, state-appointed trustees, or even similar Baptist religious bodies.

152.     The Department has provided no reasoned explanation for applying the co-signature mandate to nonprofit religious corporate "members" who do not own or operate institutions, while exempting other forms of indirect influence.

153.     The Department's evolving guidance and contradictory correspondence have further undermined the consistency and predictability of its regulatory interpretation, shifting from requiring direct signatures to conditional "designations," without formally revising the rule or publishing clear criteria.

154.     The Department's enforcement letters to HLGU acknowledged that under Missouri law, MBC is not an "owner," yet dismissed this legal framework without analysis or justification, claiming instead a self-defined

standard of "ownership" and "control" untethered to statutory text or governing corporate law.

155.     The Department failed to meaningfully engage with objections submitted by affected institutions, including HLGU's April 2024 clarification request and May 2025 accommodation letter, both of which identified the religious and structural barriers to compliance.

156.     By disregarding established nonprofit law, religious governance structures, and viable policy alternatives, the Department acted arbitrarily and capriciously in both its rulemaking and its enforcement.

157.     Accordingly, the Department's application and interpretation of 34 C.F.R. § 668.14(a)(3) must be set aside under 5 U.S.C. § 706(2)(A).

## COUNT III — VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT

158.     Plaintiff re-alleges and incorporates by reference ¶¶ 1 - 157 as if fully set forth herein.

159.     The Religious Freedom Restoration Act (RFRA) prohibits the federal government from substantially burdening a person's exercise of religion unless it demonstrates that application of the burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. §§ 2000bb-1(a)—(b).

160.     Plaintiff HLGU is a religious nonprofit institution whose mission, governance, and operations are grounded in sincerely held religious beliefs,

including the historic Baptist principle of congregational polity and local church authority.

161.     Under that polity, the Missouri Baptist Convention—a voluntary association of autonomous churches—selects HLGU's trustees as a spiritual expression of collective doctrinal alignment. The Convention neither owns nor operates the University.

162.     The University holds sincere religious beliefs that require it to submit to the judgment of its affiliated churches regarding the performance of its Trustees. These Trustees are responsible for ensuring that the University remains faithful to the tenets of the Baptist faith and for advancing those principles through its educational mission.

163.     The Department of Education now requires HLGU to obtain either (a) the MBC's signature on the Program Participation Agreement (PPA), or (b) an official designation from MBC authorizing a representative to bind the Convention to the agreement.

164.     The Department's demand that a religious convention take formal legal action to establish or acknowledge contractual liability to the federal government places a substantial burden on HLGU's religious exercise.

165.     That burden arises because the University cannot continue participating in Title IV programs—or submit new programs for approval— without compromising its religious structure or compelling ecclesiastical action from the Convention.

166.     HLGU has already lost access to Pell Grant funding for its accredited prison education program and faces further institutional harm,

including potential insolvency—if the Department's interpretation remains in effect.

167.     The Department has not identified a compelling governmental interest that justifies applying this burden to HLGU and similarly structured institutions, nor has it showed that its interpretation of 34 C.F.R. § 668.14(a)(3) is the least restrictive means of achieving any such interest.

168.     The federal government has long administered Title IV programs without requiring co-signatures from religious members or affiliates, and continues to rely on other, less burdensome tools—such as surety bonds, letters of credit, and heightened monitoring—to protect federal funds.

169.     Indeed, the government can achieve no practical benefit toward a compelling interest by obtaining MBC's agreement; the MBC normally holds no assets apart from its legal relationships to other church entities. The only "asset" the Convention has is the right to name other trustee-leaders, an ecclesiastical function which surely the Government cannot exercise.

170.     The federal government does not require third-party signatures from many other private or state institutions, providing prima facie evidence of religious discrimination.

171.     The Regulation created under the Biden administration imposes governmental coercive pressure on the University to change or violate its religious beliefs to participate in Title IV programs.

172.     The Department's actions therefore fail RFRA's strict scrutiny standard.

173.    By substantially burdening Plaintiff's religious exercise without meeting RFRA's requirements, Defendants have violated 42 U.S.C. § 2000bb-1.

174.    The Court should therefore declare that the Regulation, or in the alternative the Higher Education Act and the Department's implementing regulations, are unlawful and enjoin their application under 42 U.S.C. § 2000bb-1(c), and award damages and attorneys' fees under 42 U.S.C. § 2000bb-1(c).

## COUNT IV — VIOLATION OF THE FREE EXERCISE CLAUSE AND MINISTERIAL EXCEPTION

175.    Plaintiff re-alleges and incorporates by reference ¶¶ 1 - 174 as if fully set forth herein.

176.    The First Amendment to the United States Constitution prohibits Congress from making any law "respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

177.    The federal government may not interfere in a religious institution's internal governance, particularly in matters of doctrine, polity, or the selection of religious leaders. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).

178.    HLGU exercises its religious beliefs by allowing the Missouri Baptist Convention—an association of local churches—to elect its trustees.

179.     The Trustees are "ministers" for purposes of the First Amendment's "ministerial exception" doctrine.

180.     The Supreme Court has found that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 754, (2020).

181.     Thus, the First Amendment protects the leaders of private religious schools, especially when their role is to oversee and provide religious education to students. The ministerial exception applies to "any employee who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith." *Id*.

182.     HLGU's mission is to provide a Christian education, including teaching the faith. In order that its leaders be spiritually qualified, Baptists and Baptist institutions have long allowed churches to select the Trustees who carry out the Baptist educational mission of the University.

183.     The Department's interpretation of 34 C.F.R. § 668.14(a)(3) substantially burdens this religious exercise. It conditions Title IV eligibility on the Convention's willingness to sign or designate a party to the University's Program Participation Agreement.

184.     This forces the University to choose between preserving its religious structure or maintaining access to essential federal financial aid programs.

185.     The Regulation imposes a unique burden on religious governance and discourages associations between religious bodies and affiliated schools.

186.     The Department's policy chills the University's religious expression by penalizing its structure of church accountability—an expression of its doctrinal commitments.

187.     This burden is neither neutral nor generally applicable. The Department:

   a.   Permits secular and religious exemptions in other contexts;

   b.   Exempts similarly situated institutions with self-perpetuating boards;

   c.   Applies the regulation through discretionary, case-by-case determinations.

188.     As applied, the Regulation discriminates among religious institutions by favoring certain denominational models over others.

189.     The Department's inconsistent enforcement and discretionary exemptions allow it to target particular religious forms of governance and association.

190.     The Regulation is not supported by a compelling governmental interest, nor is it narrowly tailored to any such interest.

191.     The Department's enforcement infringes not only on the University's free exercise rights, but also on its right to freely associate with a body of co-believing churches.

192.     Even if the Regulation were neutral, the Department's refusal to accommodate the University's religious beliefs still violates the First Amendment.

193.     The Higher Education Act neither requires institutions to have any members at all, nor authorizes the Department to impose liability on religious associations that do not receiving federal funds under Title IV.

194.     The Department's actions exceed its lawful authority and impose unconstitutional conditions on Plaintiff's religious exercise.

195.     The Regulation, as interpreted and applied, violates the Free Exercise Clause and the church autonomy doctrine under the First Amendment.

196.     Plaintiff is entitled to declaratory and injunctive relief to prevent further infringement of its constitutional rights.

## COUNT V — DENOMINATIONAL DISCRIMINATION (FIRST AND FIFTH AMENDMENTS)

197.     Plaintiff re-alleges and incorporates by reference ¶¶ 1 - 196 as if fully set forth herein.

198.     The First Amendment to the U.S. Constitution prohibits the government from establishing religion or prohibiting the free exercise thereof. It also prohibits the government from favoring one denomination or religious structure over another. The Fifth Amendment guarantees due process and equal protection under federal law.

199.     The Department's interpretation and enforcement of 34 C.F.R. § 668.14(a)(3) discriminate among religious denominations based on their internal structures.

200.     The Department's regulations and implementation burden denominations such as Baptists—who adhere to a congregational polity in which affiliated churches select the trustees of religious colleges—while imposing no comparable burden on institutions in which trustees are self-perpetuating or government-appointed.

201.     The Department has not imposed the Co-Signature Mandate on colleges whose trustees are named by multiple religious groups, or which are self-perpetuating. In those cases, the Department does not require the denomination or the appointing entity to sign or designate a signer for the PPA.

202.     Nor has the Department imposed this mandate on religious or secular institutions whose governance structures are self-contained or lack "members," even if those institutions maintain strong religious identities and affiliations.

203.     This disparate treatment penalizes certain forms of religious association—particularly those that reflect decentralized, church-based governance structures such as that practiced by Baptist churches—and effectively rewards other religious traditions for adopting hierarchical or independent corporate models.

204.     Such denominational favoritism violates the Establishment Clause, the Free Exercise Clause, and the Equal Protection component of the Fifth

Amendment. The Department's actions are neither neutral nor generally applicable and fail to satisfy strict scrutiny under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

205.     By conditioning HLGU's eligibility for Title IV programs on the surrender of its religious polity—or by imposing on it regulatory burdens not shared by similarly situated religious institutions—the Department has violated the constitutional guarantees of religious equality and non-discrimination.

206.     Plaintiff is entitled to declaratory and injunctive relief to prevent further enforcement of this unconstitutional discrimination.

## COUNT VI — VIOLATION OF CONSTITUTIONAL STRUCTURE AND MAJOR QUESTIONS DOCTRINE (TENTH AMENDMENT AND FEDERALISM)

207.     Plaintiff re-alleges and incorporates by reference ¶¶ 1 – 206 as if fully set forth herein.

208.     The federal government is one of limited, enumerated powers. All others—including the regulation of corporate governance—are reserved to the States. *See* U.S. CONST. AMEND. X.

209.     The structure, powers, and liabilities of nonprofit corporations are created by state law. *See CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 78–81 (1987).

210.    No principle of corporate law is more established than a State's authority to regulate its own corporations, including defining member rights and fiduciary duties. *Id* at 89.

211.    "The longstanding prevalence of state regulation in [the area of corporate governance] suggests that, if Congress had intended to pre-empt all state laws on the topic, it would have said so explicitly." *Id.* at 86.

212.    The Department's enforcement of 34 C.F.R. § 668.14(a)(3)—treating a religious "member" such as the Missouri Baptist Convention as a controlling or liable party—contradicts Missouri's nonprofit governance framework.

213.    By requiring such members to designate or become parties to federal contracts, the Department intrudes upon state-defined legal relationships and overrides settled corporate and religious governance.

214.    No provision of the Higher Education Act clearly authorizes the Department to redefine nonprofit "membership" as equivalent to "ownership" or "control," or to impose federal liability on third parties not receiving federal funds.

215.    A "clear and manifest" statement is required before a federal law can preempt state corporate law or regulate in traditional areas of state concern. *CTS*, 481 U.S. at 78–79; *Bond v. United States*, 572 U.S. 844, 858 (2014).

216.    The Department's novel interpretation also implicates the major questions doctrine. Rewriting core rules of nonprofit liability and religious governance is a matter of vast political and economic significance that

Congress must clearly authorize. *See West Virginia v. EPA*, 597 U.S. 697 (2022).

217.     Because Congress has not clearly delegated such power to the Department, the enforcement of this regulation exceeds constitutional bounds.

218.     Plaintiff is entitled to declaratory and injunctive relief to prevent further federal intrusion into state-regulated nonprofit and religious governance, and to preserve the structural limits on agency authority.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Enter judgment for Plaintiff and against Defendants on all claims;

B.  Declare that 34 C.F.R. § 668.14(a)(3), as interpreted and enforced by the Department of Education to require the signature or designation of a religious "member" entity such as the Missouri Baptist Convention, exceeds the Department's statutory authority and is invalid under the Administrative Procedure Act;

C.  Declare that Defendants' interpretation and enforcement of 34 C.F.R. § 668.14(a)(3) violate the Religious Freedom Restoration Act, the First and Fifth Amendments to the U.S. Constitution, and the constitutional principles of federalism and separation of powers;

D. Issue preliminary and permanent injunctive relief prohibiting Defendants, their officers, employees, agents, successors, and all people acting in concert with them from:

    i. Enforcing or threatening to enforce 34 C.F.R. § 668.14(a)(3) against Plaintiff in a manner that requires the Missouri Baptist Convention or any similar religious affiliate to sign or designate a signatory to the Program Participation Agreement;

    ii. Conditioning Plaintiff's eligibility for Title IV funds on any action by the Missouri Baptist Convention or similar religious entity;

    iii. Taking any adverse action against Plaintiff based on its refusal or inability to comply with the challenged requirement;

E. Require Defendants to take all actions necessary to restore Plaintiff, to the extent practicable, to the position it would have occupied but for the unlawful conduct, including prompt approval of pending program amendments submitted by Plaintiff;

F. Upon proper proof, award Plaintiff the lost Pell Grant revenue of $500,000;

G. Award Plaintiff nominal damages for the violation of its rights under the Religious Freedom Restoration Act and the Constitution;

H. Award Plaintiff its reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and the applicable provisions of the Religious Freedom Restoration Act;

I. Retain jurisdiction over this matter to ensure compliance with the Court's orders and to address any future disputes arising under the judgment; and

J.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

LAW OFFICES OF JONATHAN R. WHITEHEAD LLC

____/s/Jonathan R. Whitehead_____

Jonathan R. Whitehead Mo. 56848

229 S.E. Douglas St., Ste. 210

Lee's Summit, Mo 64063

816.398.8305 - Phone

816.278.9131 - Fax

ATTORNEY FOR PLAINTIFF HANNIBAL-LAGRANGE UNIVERSITY