# DEPARTMENT OF EDUCATION

## 34 CFR Part 668

[Docket ID ED–2023–OPE–0089]

RIN 1840–AD51, 1840–AD65, 1840–AD67, and 1840–AD80

## Financial Responsibility, Administrative Capability, Certification Procedures, Ability To Benefit (ATB)

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary amends the regulations implementing title IV of the Higher Education Act of 1965, as amended (HEA), related to financial responsibility, administrative capability, certification procedures, and ATB. We amend the financial responsibility regulations to increase the Department of Education's (Department) ability to identify high-risk events at institutions of higher education and require financial protection as needed. We amend and add administrative capability provisions to enhance the capacity for institutions to demonstrate their ability to continue to participate in the financial assistance programs authorized under title IV of the HEA (title IV, HEA programs). Additionally, we amend the certification procedures to create a more rigorous process for certifying institutional eligibility to participate in the title IV, HEA programs. Finally, we amend the ATB regulations related to student eligibility for non-high school graduates.

**DATES:** These regulations are effective July 1, 2024. The incorporation by reference of certain publications listed in the rule is approved by the Director of the Federal Register as of July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** For financial responsibility: Kevin Campbell. Telephone: (214) 661–9488. Email: *Kevin.Campbell@ed.gov.* For administrative capability: Andrea Drew. Telephone: (202) 987–1309. Email: *Andrea.Drew@ed.gov.* For certification procedures: Vanessa Gomez. Telephone: (202) 987–0378. Email: *Vanessa.Gomez@ed.gov.* For ATB: Aaron Washington. Telephone: (202) 987–0911. Email: *Aaron.Washington@ed.gov.*

If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Incorporation by Reference*

In § 668.175(d)(2), we reference the following accounting standard: Accounting Standards Codification (ASC) 850. ASC 850 provides for accounting and reporting issues concerning related party transactions and relationships. It is already approved for incorporation by reference in § 668.23.

This standard is available at *www.fasb.org*, registration required.

*Purpose of This Regulatory Action*

These final regulations address four areas: financial responsibility, administrative capability, certification procedures, and ATB. The Institutional and Programmatic Eligibility Committee (Committee) reached consensus on ATB at its final session on March 18, 2022.

The financial responsibility regulations at §§ 668.15 668.23, 668.171, and 668.174 through 668.177 will increase our ability to identify high-risk events and require the financial protection we believe is needed to protect students and taxpayers.

We strengthened institutional requirements in the administrative capability regulations at § 668.16 to improve the administration of the title IV, HEA programs and address concerning practices that were previously unregulated.

The certification procedures regulations in §§ 668.13, 668.14, and 668.43 will create a more rigorous process for certifying institutions to participate in the title IV, HEA programs. We expect these regulations to better protect students and taxpayers through the Program Participation Agreement (PPA), our written agreement with institutions.

Finally, we amend the regulations for ATB at §§ 668.156 and 668.157 to clarify the requirements for the State process to determine eligibility for programs serving non-high school graduates and the documentation requirements for eligible career pathway programs.

Financial Responsibility

The Department amends §§ 668.15 and 668.23 and subpart L of part 668. We are removing all regulations under § 668.15 and reserving that section. We have revised the financial responsibility factors applicable to institutional changes in ownership, currently in § 668.15, and moved them to § 668.176. As a result, all financial responsibility requirements are located in subpart L.

The Department also amends § 668.23 to update references to the Office of Management and Budget's (OMB)

Circular A–133, Audits of States, Local Governments, and Non-Profit Organizations. As this circular is no longer used, we update the reference to 2 CFR part 200, subpart F. Further, we establish the submission deadline for an institution to submit its compliance audit and audited financial statements as the earlier of six months after the last day of the institution's fiscal year or 30 days after the date of the later auditor's report. This new submission deadline will not impact submission deadlines established by the Single Audit Act.

Finally, we amend regulations under subpart L of part 668 to improve our ability to assess whether institutions are able to meet their financial obligations. We establish new mandatory and discretionary triggers that will provide the Department earlier notice that an institution may not be able to meet its financial responsibilities. We revise the regulations governing our assessment of financial responsibility for institutions undergoing a change in ownership to better align with current Departmental practices and consolidate all related regulations in § 668.176.

Administrative Capability

The Department amends § 668.16 to improve our ability to evaluate the capability of institutions to participate in the title IV, HEA programs. The changes will benefit students by strengthening financial aid communications to include the institution's cost of attendance, the source and type of aid offered, whether aid must be earned or repaid, the net price, and deadlines for accepting, declining, or adjusting award amounts.

The regulations also state that administrative capability means that an institution is providing students adequate career services and clinical or externship opportunities, as applicable. Under the final regulations, administrative capability also means that an institution is making timely disbursements of funds to students and that less than half of an institution's total title IV, HEA revenue in the most recent award year comes from programs that fail to meet gainful employment (GE) requirements under the GE program accountability framework. Being administratively capable also means not: engaging in aggressive recruitment, making misrepresentations, being subject to negative action by a State or Federal agency, or losing eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

Additionally, under the final regulations, institutions must certify

when they sign the PPA that no principal or affiliate has been convicted of or committed fraud. Finally, institutions must have adequate procedures to evaluate the validity of a student's high school diploma and outline criteria to identify an invalid high school diploma.

Certification Procedures

The Department amends §§ 668.13 and 668.14 so that certification is not automatically renewed after 12 months without a decision from the Department and adds new events that cause an institution to become provisionally certified and new requirements for provisionally certified institutions. We also expand the entities that must sign a PPA to include higher level owners of institutions. Institutions must also certify that they meet additional requirements when signing the PPA, as applicable. For example, institutions must certify that their gainful employment programs are not longer than 100 percent of the length required for licensure in a recognized occupation in either the State where the institution is located or another State if the institution establishes that certain criteria apply.

Institutions must also certify that, in each State where they are located or where they enroll students through distance education, they meet applicable programmatic accreditation and licensure requirements and comply with all State laws related to closure. We also amend § 668.43 to clarify how provisions in the certification procedures section interact with existing institutional disclosure requirements related to informing students about the States in which a given program meets the educational requirements for licensure or certification.

In addition, institutions must certify that they will not withhold transcripts or take other negative actions against a student due to an error on the school's part, and that upon a student's request, they will provide an official transcript that includes all the credit or clock hours for payment periods in which the student received title IV, HEA funds and for which all institutional charges were paid at the time the request is made. Institutions must also certify that they will not maintain policies and procedures that condition institutional aid or other student benefits in a manner that induces a student to limit the amount of Federal student loans that the student receives. We also add conditions for institutions initially certified as a nonprofit or that seek to become one following a change in

ownership. These additional conditions will help address the consumer protection concerns that have occurred when some for-profit institutions converted to nonprofit status for improper benefit.

Ability To Benefit (ATB)

In §§ 668.2, 668.32, 668.156, and 668.157, the Department amends the student eligibility requirements for individuals who do not have a high school diploma or a recognized equivalent.

Specifically, in these regulations, we (1) codify the definition of an "eligible career pathway program," which largely mirrors the statutory definition, (2) make technical updates to the student eligibility regulations, (3) amend the State ATB process ("State process") to allow time for participating institutions to collect outcomes data while establishing new safeguards, (4) establish documentation requirements for institutions that want to begin or maintain eligible career pathway programs for ATB use, and (5) establish that the Secretary will verify at least one career pathway program at each postsecondary institution intending to use ATB to increase regulatory compliance.

*Summary of the Major Provisions of This Regulatory Action*

The final regulations make the following changes.

**Financial Responsibility (§§ 668.15, 668.23, 668.171, and 668.174 Through 668.177)**

• Remove and reserve § 668.15 and consolidate all financial responsibility factors, including those dealing with changes in ownership, under subpart L of part 668.

• Amend § 668.23 to require that audit reports are timely submitted, by the earlier of 30 days after the completion of the report or six months after the end of the institution's fiscal year.

• Amend § 668.23 to require that, for any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution, the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized.

• Amend § 668.171, which requires institutions to demonstrate that they are able to meet their financial obligations, by adding events that constitute a failure to do so, including failure to make debt payments for more than 90 days, failure to make payroll

obligations, or borrowing from employee retirement plans without authorization.

• Amend in § 668.171 the set of conditions that require an institution to post financial protection if certain events occur. These mandatory triggers are certain external events, financial circumstances that may not be reflected in the institution's regular financial statements, and financial circumstances that are not yet reflected in the institution's composite score.

• Amend in § 668.171 the set of conditions that may, at the discretion of the Department, require an institution to post financial protection. These discretionary triggers are external events or financial circumstances that may not appear in the institution's regular financial statements and are not yet reflected in the institution's calculated composite score.

• In § 668.174, clarify the language related to compliance audit or program review findings that lead to a liability of at least 5 percent of title IV, HEA volume at the institution, to more clearly state that the relevant reports are those issued in the two most recent years, rather than reviews conducted in the two most recent years.

• Add a new § 668.176 to consolidate the financial responsibility requirements for institutions undergoing a change in ownership in subpart L of part 668.

• Redesignate the existing § 668.176, establishing severability, as § 668.177.

**Administrative Capability (§ 668.16)**

• Amend § 668.16(h) to require institutions to provide adequate financial aid counseling to enrolled students that includes more information about the cost of attendance, sources and amounts of each type of aid separated by the type of aid, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts.

• Amend § 668.16(k) to require that an institution not have any principal or affiliate that has been subject to specified negative actions, including being convicted of or pleading nolo contendere or guilty to a crime involving governmental funds.

• Add § 668.16(n) to require that an institution has not been subject to a significant negative action by a State or Federal agency, a court, or an accrediting agency and has not lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution.

• Amend § 668.16(p) to strengthen the requirement that institutions must

develop and follow adequate procedures to evaluate the validity of a student's high school diploma.

• Add § 668.16(q) to require that institutions provide adequate career services to eligible students who receive title IV, HEA program assistance.

• Add § 668.16(r) to require institutions to provide students with geographically accessible clinical or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation, within 45 days of the completion of other required coursework.

• Add § 668.16(s) to require institutions to disburse funds to students in a timely manner consistent with the students' needs.

• Add § 668.16(t) to require that, for institutions that offer GE programs, less than half of their total title IV, HEA revenue comes from programs that are "failing" under subpart S.

• Add § 668.16(u) to require that an institution does not engage in misrepresentations or aggressive recruitment.

**Certification Procedures (§§ 668.13, 668.14, and 668.43)**

• Amend § 668.13(b)(3) to eliminate the requirement that the Department approve participation for an institution if the Department has not acted on a certification application within 12 months.

• Amend § 668.13(c)(1) to include additional events that lead to provisional certification.

• Amend § 668.13(c)(2) to require provisionally certified schools that have major consumer protection issues to recertify after three years.

• Add § 668.13(e) to establish supplementary performance measures the Secretary may consider in determining whether to certify or condition the participation of the institution.

• Amend § 668.14 to establish, in new paragraph (a)(3), the requirement for an authorized representative of any entity with direct or indirect ownership of a private institution to sign a PPA.

• Amend § 668.14(b)(17) to include all Federal agencies and State attorneys general on the list of entities that have the authority to share with each other and the Department any information pertaining to an institution's eligibility for or participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law.

• Amend § 668.14(b)(26)(ii) to limit the number of hours in a GE program to the greater of the required minimum number of clock hours, credit hours, or

the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, or the required minimum number of hours required for training in another State, if the institution provides documentation of that State meeting one of three qualifying requirements to use a State in which the institution is not located that is substantiated by the certified public accountant who prepares the institution's compliance audit report as required under § 668.23. This provision does not apply to fully online programs or where the State entry level requirements include the completion of an associate or higher-level degree.

• Add § 668.14(b)(32)(i) and (ii) to require all programs that prepare students for occupations requiring programmatic accreditation or State licensure to meet those requirements.

• Add § 668.14(b)(32)(iii) to require all programs to comply with all State laws related to closure of postsecondary institutions, including record retention, teach-out plans or agreements, and tuition recovery funds or surety bonds.

• Add § 668.14(b)(33) to provide that an institution may not withhold official transcripts or take any other negative action against a student related to a balance owed by the student that resulted from an error in the institution's administration of the title IV, HEA programs, or any fraud or misconduct by the institution or its personnel.

• Add § 668.14(b)(34) to require an institution to provide an official transcript that includes all the credit or clock hours for payment periods in which a student received title IV, HEA funds and for which all institutional charges were paid at the time the request is made.

• Add § 668.14(b)(35) to prohibit institutions from maintaining policies and procedures to encourage, or that condition institutional aid or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including Federal loan funds, that the student receives, except that the institution may provide a scholarship on the condition that a student forego borrowing if the amount of the scholarship provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow.

• Amend § 668.14 to establish, in new paragraph (e), a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions.

• Amend § 668.14 to establish, in new paragraph (f), conditions that may apply

to institutions seeking to convert from a for-profit institution to a nonprofit institution following a change in ownership.

• Amend § 668.14 to establish, in new paragraph (g), conditions that apply to any nonprofit institution or other institution seeking to convert to a nonprofit institution.

• Amend § 668.43(a)(5) to require all programs that prepare students for occupations requiring State licensure or certification to list all the States where the institution has determined, including as part of the institution's obligation under § 668.14(b)(32), that the program does and does not meet such requirements.

**Ability-To-Benefit (§§ 668.2, 668.32, 668.156, and 668.157)**

• Amend § 668.2 to codify the definition of "eligible career pathway program."

• Amend § 668.32 to differentiate between the title IV, HEA aid eligibility of non-high school graduates who enrolled in an eligible program prior to July 1, 2012, and those who enrolled after July 1, 2012.

• Amend § 668.156 to separate the State process into an initial two-year period and a subsequent period for which the State may be approved for up to five years.

• Amend § 668.156 to require, with respect to the State process, that: (1) The application contain a certification that each eligible career pathway program intended for use through the State process meets the definition of an "eligible career pathway program." (2) The application describes the criteria used to determine student eligibility for participation in the State process. (3) The withdrawal rate for a postsecondary institution listed for the first time on a State's application does not exceed 33 percent. (4) Upon initial application the State will enroll no more than the greater of 25 students or one percent of enrollment of each participating institution.

• Amend § 668.156 to remove the support services requirements from the State process, including orientation, assessment of a student's existing capabilities, tutoring, assistance in developing educational goals, counseling, and follow up by teachers and counselors, which duplicate the requirements in the definition of "eligible career pathway program."

• Amend the monitoring requirement in § 668.156 to provide a participating institution that has failed to achieve the 85 percent success rate up to three years to achieve compliance.

• Amend § 668.156 to require that the State prohibit an institution from participating in the State process for at least five years if the State terminates its participation.

• Amend § 668.156 to: clarify that the State is not subject to the success rate requirement at the time of the initial application but is subject to the requirement for the subsequent period; reduce the required success rate from 95 percent to 85 percent; require the success rate to be calculated for each participating institution; and amend the comparison groups to include the concept of "eligible career pathway programs."

• Amend § 668.156 to require that States report information on race, gender, age, economic circumstances, education attainment, and such other information that the Secretary specifies in a notice published in the **Federal Register**.

• Amend § 668.156, with respect to the Secretary's ability to revise or terminate a State's participation in the State process, by providing that the Secretary may (1) approve a State process once for a two-year period if the State is not in compliance with the regulations, and (2) lower the success rate to 75 percent if 50 percent of the participating institutions across the State do not meet the 85 percent success rate.

• Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs.

*Costs and Benefits*

As further detailed in the Regulatory Impact Analysis (RIA), this final rule provides significant benefits for the Department and students and some lesser benefits for institutions of higher education. It will create costs for institutions and some smaller costs for the Department and students.

Benefits for the Department include significantly stronger oversight tools that could help reduce the costs of discharges associated with closed schools or borrower defense to repayment. The Department will also benefit from funding fewer postsecondary credits that cannot be applied toward students' educational goals.

Benefits for students include: a greater likelihood that institutions will act more responsibly and not close or will conduct orderly closures when they occur; improved access to transcripts; greater assurances that their programs will prepare them for licensure or certification; and better information about their financial aid packages.

Benefits for institutions include a more even playing field for institutions that do not engage in risky behavior, which may assist with student recruitment.

Institutions will largely bear the costs of these regulations. The most significant cost will be to provide additional financial protection, especially if the Department collects on that protection. Institutions not currently in compliance with these rules will also have costs to come into compliance. This could include verifying that their online programs meet educational requirements for State licensure or certification, financial aid communications are clear, and they offer sufficient career services.

The Department will also have increased oversight costs. There may also be a decrease in transfers between the Federal Government and students because their prospective career pathway program may have lost or been denied title IV, HEA program eligibility based on the new documentation standards.

*Public comments:* On May 19, 2023, the Secretary published a notice of proposed rulemaking (NPRM) for these regulations in the **Federal Register**.[1] These final regulations contain changes from the NPRM, which we explain in the *Analysis of Comments and Changes* section of this document. The NPRM included proposed regulations on five topics: financial value transparency and gainful employment (GE), financial responsibility, administrative capability, certification procedures, and ATB. The Department has already published a final rule for financial value transparency and GE. This final rule contains the remaining four topics.

In response to our invitation in the NPRM, 7,583 parties submitted comments. We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address technical or other minor changes (such as renumbering paragraphs or correcting typographical errors) or recommendations that are out of the scope of this regulatory action or that would require statutory changes. We also do not address comments related to GE and financial value transparency (§§ 600.10, 600.21, 668.43, and 668.98 and subparts Q and S of part 668), which were included in the NPRM but are not included in this final rule. Comments and responses related to those topics are in the final rule published in the **Federal Register** on October 10, 2023 (88 FR 70004).

*Analysis of Public Comment and Changes*

Analysis of the comments and of any changes in the regulations since publication of the NPRM follows.

Public Comment Period

*Comments:* Several commenters asked the Department to extend the public comment period and argued that 30 days was insufficient time to properly analyze the NPRM. Commenters asked for between 15 and 60 additional days, for a total comment period between 45 and 90 days. These commenters pointed out that the length of the proposed rule required more time to review it if they were to provide an informed comment. The commenters also observed that Executive Orders 12866 and 13563 cite 60 days as the recommended length for public comment.

*Discussion:* The Department believes the public comment period was sufficient for commenters to review and provide meaningful feedback on the NPRM. In response to the NPRM we received comments from more than 7,500 individuals and entities, including many detailed and lengthy comments. Those comments have helped the Department identify many areas for improvements and clarification that result in an improved final rule.

Moreover, the negotiated rulemaking process provided significantly more opportunity for public engagement and feedback than notice-and-comment rulemaking without multiple negotiation sessions. The Department began the rulemaking process by inviting public input through a series of public hearings in June 2021. We received more than 5,300 public comments as part of the public hearing process. After the hearings, the Department sought non-Federal negotiators for the negotiated rulemaking committee who represented constituencies that would be affected by our rules. As part of these non-Federal negotiators' work on the rulemaking committee, the Department asked that they reach out to the broader constituencies for feedback during the negotiation process. During each of the three negotiated rulemaking sessions, we provided opportunities for the public to comment, including after seeing draft regulatory text, which was available prior to the second and third sessions. The Department and the non-Federal negotiators considered those comments to inform further discussion at the negotiating sessions, and we used the information to create our proposed rule. Additionally, the proposed regulations for ATB were the regulations

[1] 88 FR 32300.

**74572**   **Federal Register** / Vol. 88, No. 209 / Tuesday, October 31, 2023 / Rules and Regulations

agreed to by consensus on March 18, 2022, providing the public with additional time to review the Department's proposed regulations. The Executive orders recommend an appropriate time for public comment, but they do not require more than 30 days, nor do they consider the Department's process for regulating under the HEA.

*Changes:* None.

General Opposition

*Comments:* Some commenters said we should withdraw the entire NPRM.

*Discussion:* We disagree with the commenters. As we discuss in further detail in the sections related to the specific provisions, we believe these regulations are important for many reasons, including to protect students and taxpayers from institutions at risk of closure and other instances where there are financial risks to students and taxpayers.

*Comments:* A few commenters expressed concern that the proposed rules would create additional delays in Federal Student Aid's program review and institutional eligibility actions. They noted that the proposed rules added additional duties and review for the Department's School Eligibility and Oversight Service Group within Federal Student Aid (FSA), but there is not a prospect for additional funding necessary to expand the team and streamline the operations of the review process to offset the additional labor.

*Discussion:* We appreciate the commenters' concern. However, the Department believes that the changes in these final regulations are critical to ensure that the Department can act as a proper steward of Federal funds. Budgetary resources for the Department are a function of the annual appropriations process. The Department makes requests for additional resources through the normal budget process and has accounted for these changes in its most recent requests.

*Changes:* None.

*Comments:* Some commenters worried that the cost of the regulations would result in a need for additional staffing and resources for schools which would mean an increase in the cost of the degree for students.

*Discussion:* The regulatory impact analysis (RIA) of this final rule discusses the costs and benefits of these changes. The Department feels that any additional costs to institutions are justified by the benefits, particularly for increased protection of taxpayer funds and reduced number of students exposed to sudden closures or who are experiencing negative outcomes. The

Department also provides estimates of the additional paperwork costs from some provisions of these rules in the RIA.

*Changes:* None.

General Support

*Comments:* A few commenters pointed out that the proposed rules will strengthen our higher education system. They said these rules will also safeguard taxpayer money that goes into the title IV, HEA programs by ensuring those Federal dollars only go to schools that demonstrate positive outcomes for their students.

A few additional commenters applauded the Department for writing an NPRM that will significantly improve the outcomes for veterans and military-connected students.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

Legal Authority

*Comments:* Several commenters stated broadly that the NPRM failed to address the "major questions doctrine" and, relatedly, did not establish clear congressional authority for the proposed rules. Most of those commenters focused on the GE rules, particularly the GE accountability framework in subpart S.[2]

*Discussion:* We disagree with the commenters. For these rules, commenters did not attempt to establish the extraordinary circumstances under which courts have used the major questions doctrine to raise doubts about agency statutory authority. Commenters did not, for example, explain how any one of the regulations constitutes agency action of such exceptional economic and political significance that the doctrine should apply. Although these final rules are significant to implementing the title IV, HEA programs, none of them is a topic of widespread controversy or transforms the field of higher education. Nor did commenters show that these rules are beyond the Department's expertise, or that the relevant statutory provisions are somehow ancillary to the statutory scheme. The statutory bases for these final rules are not subtle. As we discuss elsewhere, title IV of the HEA is quite clear that, to participate in the relevant student aid programs and among other demands, institutions must complete a certification process, must meet certain

standards of administrative capability, and must meet certain standards of financial responsibility; the ATB rules likewise are grounded in the HEA provisions on that subject.[3]

Furthermore, the statutes plainly authorize the Secretary to adopt regulations pertaining to those provisions, and these rules build on the Department's experience and previous initiatives in these fields.[4] Some commenters do disagree with various details in these rules, and any set of final rules will add something to preexisting regulations. But the presence of commenter disagreement over new rules is insufficient to trigger the major questions doctrine.

*Changes:* None.

Negotiated Rulemaking

*Comments:* Several commenters expressed a concern about the lack of representation from the beauty and wellness industry during the negotiated rulemaking process which raises doubts about the adequate consideration of industry-specific interests and concerns. They stated that the proposed regulations could be potentially debilitating for the beauty and wellness industry.

Similarly, a few commenters argued that the negotiated rulemaking committee was not representative of all the stakeholders who would be impacted by the proposed rule, and it therefore violated both the Administrative Procedure Act (APA) and the Negotiated Rulemaking Act of 1996. Specifically, several commenters pointed to the fact that there were no representatives from cosmetology schools or small proprietary schools.

*Discussion:* The negotiated rulemaking committee that the Department convened represented a broad range of constituencies, including proprietary institutions, which encompasses most cosmetology institutions. Negotiators were expected to consult with members of their constituency to represent the views of a range of the stakeholders they represent. The Department's regulations must

---

[2] The Department addresses comments on the major questions doctrine related to its proposed GE regulations in a separate GE final rule published in the **Federal Register** on October 10, 2023 (88 FR 70004). By this cross-reference, we adopt that discussion here.

[3] *See, e.g.,* 20 U.S.C 1091(d); 20 U.S.C 1094; 20 U.S.C. 1099c.

[4] We address the specific provisions of the rule elsewhere in this document. To the extent that other commenters suggest that they may combine all rules in a rulemaking proceeding, or combine rules of their choosing, and then base a major questions determination on a holistic evaluation of that package, we disagree. The Department is unaware of any authority for that position, which would treat the major questions doctrine regarding statutory authority for a given agency action in this manner. Among other problems, that position offers no apparent method for selecting the appropriate bundle of rules or for analyzing agency statutory authority at an undifferentiated, wholesale level.

consider the effects on institutions and recipients of title IV, HEA aid, as well as other members of the regulatory triad (States and accreditation agencies) with whom we interact on these issues. We have no authority to regulate private employers and do not believe that would have been appropriate to include representation from the beauty and wellness industry on this negotiated rulemaking committee. In response to commenters that claimed that the Department violated the APA and the Negotiated Rulemaking Act of 1996, the Department notes that the HEA is the applicable law governing our negotiated rulemaking process. As such, under the HEA we are not required to include representatives from every conceivable type of trade school.

*Changes:* None.

*Comments:* Several commenters stated that the regulation did not include State authorization experts and argued that the issue of State authorization was embedded within the Certification Procedures discussion. They felt that the State authorization reciprocity should have been discussed as its own section in the negotiated rulemaking process. Some commenters were concerned about the language that was used in the NPRM. They urged the Department to delay any regulatory changes related to State authorization so that revisions could be addressed in the next round of negotiated rulemaking.

*Discussion:* The Department disagrees with the commenters. The provisions in question are not a negotiation around the regulatory sections that include State authorization or distance education. We did not regulate the conditions, structure, or other elements of State reciprocity agreements or the organizations that operate them, nor did we set requirements that States must follow to oversee institutions enrolling students in a State where they have no physical presence. Rather, we addressed two narrow issues related to frequently observed problems and are requiring institutions to address them.

One issue of concern for the Department is the continued challenge of sudden closures that leave students without a plan for how to continue their education. To that end, we are requiring institutions to certify that they are complying with State laws specific to issues related to closure: teach-out requirements, record retention policies, and tuition recovery funds or surety bonds, as applicable. The extent to which States have these laws, what they require, and to whom they apply them to is up to the States.

A second area of concern is that students are using Federal money to pay

for credits that they cannot use because the program lacks necessary State approval for licensure or certification. To that end, we are requiring that, for each academic program that an institution offers that is designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, institutions must provide a list of all States where it has determined that the program does and does not meet such requirements.

The Department will consider broader issues related to distance education and State authorization in future rulemaking efforts, during which we will consider the need for representation such as what the commenters requested.

*Changes:* None.

*Comments:* Several commenters expressed concern that the negotiated rulemaking session was conducted remotely, despite a lack of public health justifications for this style of session.

*Discussion:* The HEA does not require that negotiated rulemaking sessions be held in person, and we have received compliments on our use of technology and the efficiency of the virtual sessions. The sessions encompassed all necessary components of negotiated rulemaking. We considered different perspectives and received comparable or more input than during in-person sessions. The virtual sessions were much more accessible to people with disabilities and people who could not afford to or were unable to travel. The virtual sessions have also allowed a far greater number of members from the public to participate than would be possible if they had to travel to a physical location. Interested parties can more easily follow the sessions online as each speaker occupies their own space on the screen compared to a static image of a table. We display documents discussed on the screen and make them available on our website.

*Changes:* None.

*Comments:* A few commenters pointed out that the negotiated rulemaking process did not allow sufficient time for research, impact analysis, and thoughtful discussion. The commenters stated that one contributing factor was the NPRM combining negotiations for GE with six other major topics, which they deemed to be too much.

*Discussion:* The Department conducted 3 negotiated rulemaking sessions over a total of 14 days. We believe that was sufficient time for robust and thoughtful discussion. This was the fourth time we negotiated the topic of GE and the third for financial

responsibility triggers in the last few years, so two of these issues were already known to the higher education community.

*Changes:* None.

*Comments:* One commenter argued that the NPRM rule should be rescinded in favor of a more open and transparent rulemaking process that includes all key stakeholders.

*Discussion:* The Department feels that the rulemaking process was quite open and transparent. It involved many key stakeholders and allowed room for public comment during multiple steps in the process.

*Changes:* None.

### Need for Regulation

*Comments:* One commenter pointed out that oversight is important to protect student interests, but it is equally important to strike a balance with giving autonomy to schools and institutions. They stated that too much oversight can hurt an institution's ability to respond to the needs of the labor market.

*Discussion:* The Department agrees that it is important to strike a balance between oversight and giving autonomy to schools. However, the Department feels that this NPRM protects students, which is a worthwhile component of oversight.

*Changes:* None.

### Impact on Students

*Comments:* Several commenters stated that they believe this regulation will impact students at career schools who are likely to be from underserved communities.

*Discussion:* The Department believes that the NPRM regulations will help protect all individuals including students at career colleges. Most provisions of this final rule do not distinguish between private for-profit and private nonprofit institutions. Several provisions do not distinguish between institution types at all.

*Changes:* None.

*Comments:* Among the many commenters who suggested the Department move the discussion of State consumer laws and licensure and certification requirements to the next round of rulemaking, two of them suggested a few topics to include in the future rulemaking. Specifically, these commenters encouraged the Department to include the issue of professionals obtaining their original license due to severe shortages of qualified and licensed professionals in service professions and mobility and regional workforce concerns. These commenters contended that the next round of rulemaking could include discussion of

paths to State licensure that would include licensure compacts, State license portability, universal licensing, licensure by reciprocity or endorsement, and specialized or programmatic accreditation and its impact on meeting State licensure requirements. According to these commenters, institutions require the flexibility to properly educate students about these expanding licensure pathways, and regulators should collaborate with the different licensing boards to learn the various processes for professions.

*Discussion:* The Department has already held public hearings on other topics for negotiated rulemaking, which include distance education. We can consider these ideas during that regulatory process.

*Changes:* None.

## Financial Responsibility (§§ 668.15 and 668.23 and Subpart L (§§ 668.171, 668.174, 668.175, 668.176, and 668.177)) (Section 498(c) of the HEA)

### General Support

*Comments:* Several commenters expressed support for the Department's proposal to establish more safeguards in the audit submission and financial responsibility standards. These commenters asserted that the proposed regulations would provide the necessary accountability in the system to ensure the Department becomes aware of institutions suffering from financial situations that may inhibit their ability to maintain financial stability and to adequately administer the Federal student aid programs.

One commenter stated that the proposed regulations would strengthen the Department's ability to monitor institutions and protect students against precipitous school closures. Another commenter opined that the proposal would implement much stronger taxpayer protections, which are needed to prevent losses from high-risk institutions that suddenly close and incur liabilities they cannot, or will not, repay.

One commenter supported the enhanced list of financial responsibility triggering events and associated reporting requirements. That commenter believed the changes will help protect student veterans, military-connected students, and their family members from high-risk institutions.

*Discussion:* We thank these commenters for their support.

*Changes:* None.

### General Opposition

*Comments:* Many commenters opposed the overall financial responsibility regulations stating that the entire framework is unclear and should be simplified. Some of those commenters went so far as to say that institutions would need to retain legal counsel to understand the financial responsibility requirements. Those commenters also opined that the entire set of financial responsibility regulations is unworkable, and compliance would be difficult or even impossible. Along similar lines, many commenters criticized the financial responsibility regulatory package due to what they believe to be an unbearable burden to postsecondary institutions. One commenter suggested that the Department would be better served by pursuing a more discretionary approach to determining institutions' financial responsibility by evaluating the unique circumstances faced by any one institution. Other commenters pointed out that the burden on the Department, as it sought to ensure compliance with the financial responsibility regulations, would be such that the Department would not be able to fulfill its compliance obligation. Other commenters believed that this increased Department oversight would yield no positive impact on the financial health of participating institutions and that the cost incurred by the Department would waste taxpayer funds.

*Discussion:* We disagree with the commenters. We believe the financial responsibility regulations are important so that the Department can act to minimize the impact of an institution's financial decline or sudden closure, which protects students and taxpayers. We further believe that the mandatory and discretionary triggers are very clear in describing what action or event has to happen for the trigger to activate. We explain the reasons for the triggers' necessity in greater detail in response to more specific comments.

*Changes:* None.

*Comments:* Several commenters recommended that we delay implementation or withdraw the proposed financial responsibility regulations.

*Discussion:* We disagree with these commenters. The financial responsibility regulations are a critical set of changes that enable the Department to more closely monitor institutions who may be moving toward a level of financial instability or precipitous closure. We have seen numerous examples of institutional closures that harmed students, their families, and taxpayers. In many of those instances, we were hampered in our efforts to obtain information and financial protection from the impacted institution in a timely manner which would have softened the impact on students. The inability to act also has financial consequences for the Department and taxpayers, as we are often unable to offset the cost of loan discharges for closed schools or borrower defense.

*Changes:* None.

*Comments:* Individual commenters expressed a variety of concerns with the financial responsibility regulatory package. One commenter criticized the regulations as an attempt by the Department to secure the maximum number of letters of credit from institutions rather than an attempt to increase awareness of potential financial instability. Another lamented that the regulations did not address the financial scoring formula, which the commenter saw as flawed. One commenter criticized the general financial responsibility process since there is not a mechanism for an institution to provide a response before the Department determines that an institution is not financially responsible.

*Discussion:* The Department's goal is to obtain the amount of financial protection necessary to safeguard taxpayer investments and discourage risky behavior, not simply maximize letters of credit from institutions. We seek to have the tools necessary to identify at the earliest point that is reasonably possible when an institution is financially unstable or moving toward closure. Our interest is in protecting the impacted students and the taxpayers who fund the title IV, HEA programs.

Regarding the decision not to address the rules governing how to calculate the composite score, this issue was not included in the topics that were negotiated and therefore is not included in these regulations.

We disagree with the commenter who contended there was no mechanism for an institution to respond to the Department prior to a determination that the institution was not financially responsible. The Department believes that the provisions in § 668.171(f)(3) strike the balance between giving an institution an opportunity to provide additional information to the Department without creating a process where risky institutions avoid providing financial protection due to extended discussions. First, § 668.171(f)(3)(i)(A) allows the institution to show that the discretionary trigger related to creditor events need not apply if it has been waived by the creditor. Section 668.171(f)(3)(i)(B) allows the institution to show that when it reports the triggering event, it has been resolved.

Coupled with changes discussed later that give institutions 21 days to report triggering events instead of 10 days, we believe this will give institutions a larger window to show that the triggering event is no longer a concern. Finally, § 668.171(f)(3)(i)(C) notes that the institution can provide additional information for the discretionary triggers to determine if they represent a significant negative financial event. As discussed later in this final rule, we changed this language to only reference discretionary triggers.

The result of this language is that institutions will have an opportunity to show that the trigger is resolved and for discretionary triggers to provide more information to show why the situation is not of sufficient concern to merit financial protection. For mandatory triggers, institutions will have the opportunity to share additional information when they provide notification that the trigger occurred in order for the Department to determine if the triggering event has been resolved.

The Department believes this situation gives institutions the ability to swiftly raise concerns about triggers but allows the Department to act quickly if the situation warrants it. This is particularly important as several of the triggering conditions could indicate a fast and significant degradation of a school's financial situation, such as the declaration of receivership. Preserving the Department's ability to act rapidly is, therefore, critical to protecting taxpayers from potential losses.

*Changes:* None.

*Comments:* One commenter said the Department should maintain important provisions required by statute which would not be reflected if § 668.15 is removed and reserved.

*Discussion:* The Department disagrees with the commenter. This change was an effort to streamline the text and amended § 668.14(b)(5) will now refer to all factors of financial responsibility in an expanded subpart L.

*Changes:* None.

Legal Authority

*Comments:* Several commenters expressed that the Department does not have statutory authority to enact these regulations. Commenters cited 20 U.S.C. 1099c(c) (HEA section 498(c)) to support their position that the Department, in determining an institution's financial responsibility, is limited to the methods prescribed in the HEA. Commenters also asserted that the Department does not have authority under 20 U.S.C. 1099c(c) (HEA section 498(c)) or its regulations (§ 668.171(f)) to establish triggers.

*Discussion:* We disagree with the commenters. HEA section 498(c)(1) provides the authority for the Secretary to establish standards for financial responsibility. HEA section 498(c)(3) authorizes the Secretary to determine an institution to be financially responsible in certain situations if the institution has met standards of financial responsibility, prescribed by the Secretary by regulation, that indicate a level of financial strength not less than those required in paragraph (2) of the same section. It is this provision of the statute that directs the Secretary to ensure through regulation that an institution is financially responsible to protect the students attending the institution and the taxpayers who have made the funding possible for the title IV, HEA programs. Additionally, 20 U.S.C. 1099c(c)(1)(C) provides that an institution is financially responsible if it is able to meet all of its financial obligations. The mandatory triggers we have laid out are all situations that represent considerable risk to an institution's operations that might not be reported to the Department in an annual audit for over a year. These risks require financial protections and constructive engagement with an institution about plans to address and mitigate that risk. The same could potentially be true of discretionary triggers, which is why they are reviewed on a case-by-case basis. The triggers, in fact, fill an important gap that exists in the current financial responsibility regulations, which are heavily reliant upon the composite score to assess an institution's financial health. While the score provides useful information, it also inherently lags. New composite scores are only produced after a fiscal year ends and the audit finishes, and the due dates are six months (proprietary) or nine months (non-profit) after the end of the institution's fiscal year. That means the annual composite score is not adequate to provide a real-time analysis of an institution's health. The triggers, meanwhile, provide a more immediate way to assess whether something has occurred that could threaten an institution's financial viability without waiting for the next composite score calculation when it may be too late to seek financial protection.

Furthermore, HEA section 487(c)(1)(B)[5] authorizes the Secretary to issue necessary regulations to provide reasonable standards of financial responsibility for the administration of title IV, HEA programs in matters not governed by specific program provisions. The provision in the HEA

also recognizes the Secretary's authority to set financial responsibility standards that include "any matter the Secretary deems necessary to the sound administration of the financial aid programs, such as the pertinent actions of any owner, shareholder, or person exercising control over an eligible institution." As discussed above, these triggers are providing clarity to institutions about how the Department will assess whether an institution is meeting the requirements spelled out in 20 U.S.C. 1099c(c)(1). This provides protection to the Federal Government against unpaid financial liabilities. These triggers are not addressing matters that are governed by existing statutory program provisions, which is how we interpret the language in 20 U.S.C. 1094(c)(1)(B). For instance, the matter addressed by the program provisions for the 90/10 rule is the maximum share of revenue a proprietary institution may receive from Federal educational assistance programs. The matter addressed by cohort default rates is the percentage of borrowers who default on their loans. The matter addressed by institutional refunds in 20 U.S.C. 1091 is how an institution calculates amounts to be returned. None of those program provisions address the overall threat to an institution's financial health and the prospect that it cannot fulfill the provisions in 20 U.S.C. 1099c(c)(1) due to the program non-compliance. The program provisions referenced in in 20 U.S.C. 1094(c)(1)(B) do not limit the Department from addressing risks to the overall financial health of the institution that are not directly dealt with in the statutory program requirements.

By contrast, we view the language in 20 U.S.C. 1094(c)(1)(B) as preventing the Department from creating provisions that duplicate or contradict statutory program provisions. This would include changes such as establishing a maximum threshold for the share of revenue coming from Federal educational assistance programs that is lower than the 90/10 test, or a cohort default rate threshold that is below the 30 percent one established in the HEA.

*Changes:* None.

*Comments:* Commenters argued that the concept of a trigger that immediately results in the request for financial protection is contradicted by 20 U.S.C. 1099c(c)(3), which lays out four conditions in which an institution may still show that it is financially responsible even if it does not meet the requirements in subsection (c)(1) of that same section. They argued that at the very least an institution that shows it meets one of the criteria in 20 U.S.C.

---

[5] 20 U.S.C. 1094(c)(1)(B).

1099c(c)(3) should not be subject to a trigger.

*Discussion:* The Department believes the structure of the triggers in this final rule comports with the requirements in 20 U.S.C. 1099c(c)(3). For one, institutions that are subject to a trigger still have the option under 20 U.S.C. 1099c(c)(3)(A) to demonstrate that they meet the financial responsibility standards by providing a larger letter of credit. Those that provide such a letter of credit would not be subject to the trigger but instead would have to provide a larger amount of financial protection to mitigate the risks associated with the reported activity. Second, as discussed elsewhere in this final rule, we are not applying the financial protection requirements stemming from a trigger for institutions that have full faith and credit backing as described in 20 U.S.C. 1099c(c)(3)(B). Third, the provision in 20 U.S.C. 1099c(c)(3)(C) is one of the issues the Department is seeking to address. The triggers allow us to capture situations that occur in between the submission of such financial statements. The Department does not believe it is acceptable to wait the potentially extended period in between an event that could put an institution out of business and the submission of another round of financial statements. For instance, if an institution enters receivership two months after the submission of its financial statements, then it could be a year or more before the Department receives financial statements that would meet the requirements of this paragraph. Other reporting directly addresses instances where funds may have been temporarily held by an entity to bolster its composite ratio for the annual financial statement audit but subsequently removed. Similarly, an institution that is at risk of losing access to financial aid due to high default rates or a high 90/10 ratio or that has significant revenue tied to failing GE programs could lose eligibility for those programs before it submits another financial statement. These time lags are also why the Department believes it is appropriate to maintain the financial protection from a trigger for at least two years, so it is possible to ensure we receive updated financial statements to assess the institution's situation. The reporting includes significant financial events that may happen during the two-year window following a change in ownership for an institution where additional financial protections can mitigate risks from unforeseen events during that period. The reporting

provisions and accompanying requirements also constitute an alternative standard of financial responsibility under 20 U.S.C. 1099c(c)(2)(D) that considers information that will in most cases be reported more promptly than available under the financial statement audits that are submitted at least half a year after the end of the fiscal year being used for the institution.

*Changes:* None.

*Comments:* Several commenters argued that HEA section 487 (20 U.S.C. 1094(c)(1)(B)), must be considered alongside section 498 of the HEA and that this former section prohibits the use of triggers. Paragraph (c) of that section states "[n]otwithstanding any other provisions of this subchapter, the Secretary shall prescribe such regulations as may be necessary to provide for . . . "(B) in matters not governed by specific program provisions, the establishment of reasonable standards of financial responsibility and appropriate institutional capability for the administration by an eligible institution of a program of student financial aid under this subchapter, including any matter the Secretary deems necessary to the sound administration of the financial aid programs." The commenters argued that there are specific program provisions for the elements of the composite score, cash reserves, institutional refunds and return of title IV funds, borrower defense claims, change in ownership, gainful employment, teach-out plans, State actions/citations, the 90/10 rule, the cohort default rate, fluctuations in title IV volume, high annual dropout rates, discontinuation of programs, closure of programs, and program eligibility. Commenters argued that because there are existing program provisions for those items, the Department may not prescribe regulations establishing reasonable standards of financial responsibility based upon whether institutions meet those program requirements. In a footnote to this comment, the commenters also noted that "a more logical reading" of what the term "specific program provision" means would only affect institutional refunds and return of title IV funds, teach-outs, State actions, accrediting agency actions, and gainful employment.

*Discussion:* As discussed above, we disagree with the commenters' interpretation of the interplay with section 487 and section 498 and have explained how the Department views those two items interacting.

The commenters seem to argue that any matter touched on in the HEA is precluded from use in any other form as a financial responsibility trigger. But this reading is so broad as to be non-sensical, and inconsistent with the statutory text itself. As discussed above, section 487 specifically ensures that the Department does not impose financial responsibility provisions that are inconsistent with or contradict statutory program provisions. Other program provisions that are not inconsistent with the financial responsibility triggers in the Department's regulations are not implicated.

But even under the commenters' line of argumentation, the items they claim are existing program requirements that prevent the use of a mandatory trigger are not in fact program requirements that govern the matter addressed by the trigger. The triggers relate to how the Department can assess the requirements that exist in 20 U.S.C. 1099c(c)(1). That section mentions the need for the Secretary to determine if the institution has the financial responsibility based upon the institution's ability to do three things. First, to provide the services described in its official publications and statements. Second, to provide the administrative resources necessary to comply with the requirements of title IV of the HEA. And third, for the institution to "meet all of its financial obligations, including (but not limited to) refunds of institutional charges and repayments to the Secretary for liabilities and debts incurred in programs administered by the Secretary." The triggers are thus not regulating on those specific program provisions; rather, we are including them as the Department considers the holistic picture of an institution's financial health and compliance with financial responsibility requirements.

Several examples under the commenters' initial interpretation of section 487 show that even what they identify as program requirements is incorrect. For instance, the commenters cite 20 U.S.C. 1094(a)(21) as proof there are program requirements for State citations or actions as well as accrediting agency actions. That paragraph says institutions will meet requirements related to accrediting agencies or associations and that the institution has authority to operate within a State. Those are basic elements of institutional eligibility and participation. However, that does not prohibit the Department from considering the impact of accreditor or State agency actions on the participating institution's financial health. For example, a program that represented a

substantial portion of an institution's enrollment could lose State authorization and the related loss of Federal student aid revenue could imperil the institution's overall financial strength. Similarly, facing actions from accrediting agencies also could threaten an agency's financial health, as they would lose access to eligibility for the title IV, HEA programs and risk having their degrees viewed as illegitimate, making it harder to attract students. The citation provided for teach-outs is 20 U.S.C. 1094(f), which applies to a very specific circumstance where the Secretary must seek a teach-out upon initiation of an emergency action or a limitation, suspension, or termination action. That is a much narrower situation than the reporting trigger for the teach-out provision in this final rule and encompasses teach-outs that could also be sought by States or accreditation agencies. Those matters are not governed by the provision cited by the commenters. The commenters point to 20 U.S.C. 1099c–1 for fluctuations in title IV volume and high annual dropout rates, where the HEA lists indicators the Department should use to prioritize program reviews. Identifying items that may warrant program reviews is distinct from establishing financial protection triggers for those items. It is not the same thing as a program requirement.

Accepting some of the program specific rules cited by the commenter would create paradoxes. For example, commenters point to § 668.172 to say there are already program requirements for equity, primary reserve ratio, and income ratios. But those are regulations established by the Department to determine if an institution has a failing composite score, which is only one part of determining financial responsibility under section 498(c) of the HEA.

The commenters' argument based upon what they identify as "a more logical reading" that limits their critique to institutional refunds and return of title IV funds, teach-outs, State actions, accrediting agency actions, and gainful employment is also flawed. We have already discussed the citation related to teach-out plans, State actions, and accrediting agency actions so we turn to the other triggers mentioned. The commenters cite 20 U.S.C. 1091b and 1094(a)(24) as program provisions that prevent the presence of triggers related to institutional refunds and return of title IV funds. The former establishes requirements for how institutions are to calculate refunds and return of title IV, while the latter is a program participation requirement saying that the institution will abide by the refunds

requirements in 20 U.S.C. 1091b. Neither of those is a program requirement in the manner that the trigger is operating. The Department's concern with the trigger is that failure to pay refunds is a sign that the institution may not meet the standards of 20 U.S.C. 1099c(c)(1)(C), related to meeting all of its obligations, which includes an explicit mention of refunds. The trigger is thus directly connected to the Department's way of assessing if an institution meets that statutory requirement.

The commenters cite 20 U.S.C. 1094(a)(24) as the program requirement related to the 90/10 rule. That is the section that spells out the 90/10 rule's requirements. But this financial responsibility trigger does not address how schools must calculate their Federal and non-Federal revenue. Instead, this rule addresses the potential effects of failing this provision on the financial health of the institution.

The commenters cite § 668.14(b)(26) as the program requirement that prevents a trigger related to gainful employment. Those provisions are related to limiting the maximum length of such a program and establishing the need for the training. As with the statutory requirements discussed above, the regulatory requirements relating to gainful employment set forth conditions of participation. They do not address the potential financial risk—the risk of closure—if the regulatory requirements are not met. The trigger is intended to address the financial risk. Though not cited by commenters, the same would be true of the gainful employment program accountability framework in part 668, subpart S. Those items are concerned with whether programs are able to maintain access to title IV, HEA programs. The purpose of the trigger is to provide a way to for the Department to assess whether the institution is at risk of not being able to meet the requirements of 20 U.S.C. 1099c(c)(1).

*Changes:* None.

*Comments:* Commenters argued that because 20 U.S.C. 1094(c)(1)(B) says the Secretary should establish reasonable standards of financial responsibility that means any financial responsibility requirements must meet the "substantial evidence" standard under the Administrative Procedure Act (APA). The commenter reached this conclusion by pointing to *Dickinson* v. *Zurko,* 527 U.S. 150, 162 (1999) to argue that the best corollary to a reasonableness standard in administrative law is the concept of "substantial evidence" because that is considered to be a degree of evidence that a reasonable person would accept as adequate. The

commenter argued the substantial evidence standard is a higher bar than arbitrary and capricious. Commenters then proceeded to assert that many elements of the financial responsibility requirements are unreasonable, such as the triggers related to lawsuits, changes in ownership, Securities and Exchange Commission (SEC) events, and creditor events. Commenters also used the word unreasonable to describe the reporting requirements associated with the triggers, though this framing appeared to use the word differently as a stand in for excessive in terms of the amount of burden.

*Discussion:* The Department disagrees with the commenters' legal arguments. The "substantial evidence" standard of the APA applies only to record-based factual findings resulting from formal rulemaking under sections 556 and 557. *Dickinson* v. *Zurko,* 527 U.S. 150, 164 (1999). For informal rulemakings, which the Department conducted here, the arbitrary and capricious standard of review applies when determining whether the resulting regulation is lawful. There is no evidentiary threshold with respect to what regulations the Department may propose during the negotiated rulemaking process and publication of the proposed and final regulations. We also disagree with the argument that triggers such as lawsuits, changes in ownership, SEC events, and creditor events are unreasonable either in the manner of the legal standard the commenters argued or as excessive. We therefore disagree with the argument that the triggers are unreasonable based on the comments about there being a legal standard of reasonableness. Nor do we think those triggers are unreasonable in terms of being excessive. The triggers laid out here are all areas that indicate substantial risk to an institution's financial health. They are easily ascertainable and the events that do not require a recalculation of the composite score are not particularly common. We thus believe they are appropriate triggers to adopt.

*Changes:* None.

*Comments:* One commenter argued that the Department's regulatory language around letters of credit amounts resulted in requesting insufficient levels of financial protection. They argued that § 668.175(b) is contrary to the statutory requirements, because it says that an institution must provide financial protection equal to at least 50 percent of title IV, HEA funds received in a year, whereas section 498(c)(3)(A) of the HEA says that the Secretary must receive one-half of the annual financial liabilities

from the institution. The commenter argued that the amount of liability could be much greater than the amount of aid received, meaning that the amount of financial protection received by calculating based on title IV, HEA aid received would be insufficient.

The same commenter similarly argued that the Department has not sufficiently explained why 10 percent is the appropriate minimum amount for financial protection instead of using a higher amount to cover potential losses.

*Discussion:* We disagree with the commenter. The 50 percent and 10 percent figures are minimum amounts. The Department always has the ability to request a higher amount if we believe that is necessary. However, we believe setting minimum amounts based upon annual title IV, HEA volume creates a simple and straightforward way for the Department to determine the amount and the institution to know the minimum amount of financial protection that might be needed. Setting the amount of financial protection based on "annual potential liabilities" is difficult because the Department may not be able to predict future liabilities at the time financial protection is required. The Department believes that using annual title IV, HEA funding, as it has historically done, provides a more straightforward formula for setting the amount of financial protection. With respect to the 10 percent amount, we similarly note that the Department can and does request higher amounts when we believe it is warranted. As we noted in the 2016 final rule that also addressed financial triggers (81 FR 75926), the 10 percent minimum is rooted in the 1994 regulations regarding provisional certification of institutions that did not meet generally applicable financial responsibility standards (34 CFR 668.13(d)(1)(ii) (1994)).

*Changes:* None.

*Comments:* Commenters argued that the language in § 668.171(b) appears to create a new form of financial responsibility standards that are distinct from the statutory framework and are unclear how they would be applied.

*Discussion:* The provisions in § 668.171(b)(3) lay out the situations in which an institution is not able to meet its financial obligations. These lay out additional detail for how the Department implements the statutory requirement in 20 U.S.C. 1099c(c)(1)(C) that says one factor the Secretary uses when determining if an institution is financially responsible is its ability to meet all of its financial obligations. The items in § 668.171(b)(3) are all key indicators of an institution that is not meeting its financial obligations. These

are all critical types of financial obligations where the Department is concerned that past instances of these situations are strongly associated with massive financial challenges.

We also disagree that the standards of these provisions are unclear. All the items in paragraphs (b)(3)(i) through (v) are laid out clearly. The only one that has perhaps the most area of variability is paragraph (b)(3)(i), where the Department would not consider a single incorrect refund as evidence of a lack of financial responsibility but would instead be considering patterns of this behavior. Paragraph (b)(3)(vi), meanwhile, is a reference to the triggers in § 668.171(c) and (d), which we describe in detail throughout this final rule as connecting to concerns about financial responsibility.

*Changes:* None.

*Comments:* Commenters argued that the potential for stacking letters of credit from triggering conditions violates section 498(e) of the HEA, which only requires financial guarantees sufficient to protect against the potential liability.

*Discussion:* We disagree with the commenters. We view each of these triggers as representing risks to an institution through different channels. As we note elsewhere in this final rule, if multiple triggers occur as a result of the same underlying event, we could consider that situation and choose to request a lower level of financial protection. However, an institution that is truly facing multiple independent triggers is going to be in precarious financial shape. For instance, an institution that has entered into a receivership, declared financial exigency, and is being required to make a significant debt payment that results in a failed composite score recalculation is exhibiting multiple warning signs that it could be headed toward a closure. In such situations, the institution could incur liabilities equal to or even more than 30 percent of one year of title IV, HEA volume just from closed school discharges. In other situations, it is possible that the associated liabilities could easily exceed a single year of title IV, HEA funds received. For example, an institution that is now subject to a recoupment action under borrower defense because it engaged in substantial misrepresentations for a decade could be looking at a liability that is equal to what they received for years.

*Changes:* None.

*Compliance Audits and Audited Financial Statements (§ 668.23)*

*Comments:* A few commenters opposed the Department's proposal in

§ 668.23(a)(4) that the submission deadline for compliance audits and audited financial statements be modified to the earlier of six months after the institution's fiscal year end or 30 days after the completion of the audit. These commenters pointed out that this change would increase the burden on schools and auditors.

Some of the commenters believed that the benefit of early identification of financial concerns would be far offset with the administrative burden and possible missed deadlines that many schools would encounter.

A few commenters expressed opposition to the modified deadline, saying it was unfair to proprietary institutions as the modified requirement has no impact on institutions subject to the Single Audit Act.

Some commenters opined that the deadline of 30 days after the completion of the audit was not a clearly defined date. The reason cited by the commenters was that accounting firms differ on how they define completion of the audit. This would result in different deadlines being established depending on what firm calculated the date. The commenters also stated that the review and finalization of a final audit report by the accounting firm occurs after the audit work has been completed thereby using part of the institution's period for submission. The commenters believed that the 30-day deadline had too many variables outside of the audited institution's control to be able to submit a timely audit to the Department.

One commenter expressed the opinion that the issue was more about how quickly the Department processes the audits it receives and suggested that a collaborative relationship between the Department and institutions would be a better way to achieve the desired outcome rather than a more restrictive deadline.

*Discussion:* The Department declines to adopt the changes suggested by the commenters. This provision aligns the treatment of audit submission deadlines for all institutions regardless of whether they are public, private nonprofit, or proprietary. In particular, public and private nonprofit institutions have already been complying with this requirement under deadlines that exist for institutions subject to the Single Audit Act. Under 2 CFR 200.512(a)(1), audits must be submitted at the earlier of 30 calendar days after receipt of the audit report, or nine months after the end of the audit period (plus extension). This provision thus creates equitable treatment across institution types. When there are separate auditor signature dates on the audited financial

statements and the compliance audit, the relevant date is the later of those two dates.

Providing 30 days for the submission of these statements is sufficient time. At this point, the auditor is doing limited further work on the audit. This change gives institutions approximately 30 days to complete the simple task of uploading the finished document. That can easily be completed in this window.

Overall, the Department maintains the importance of this provision. Having up-to-date financial information is critical for properly enforcing financial responsibility requirements needed to conduct proper oversight of institutions participating in the title IV, HEA programs. Allowing institutions to wait months after an audit is completed to submit it would delay the Department learning critical information, particularly if an institution is exhibiting signs of financial distress. This provision does not change the overall deadlines that affect the latest point an audit can be submitted. It simply ensures that audits must be sent to the Department shortly after completion.

*Changes:* None.

*Comments:* Several commenters objected to the proposed requirement in § 668.23(d)(1) that an institution's fiscal year, used for its compliance audit and audited financial statements, match the year used for its U.S. Internal Revenue Service (IRS) tax returns. One of those commenters expressed the concern that the IRS does not permit changes in tax years or will only permit such a change after a long approval process. Another of those commenters stated that it was common for one entity to have a particular fiscal year for tax purposes and a corporate parent may have a different tax fiscal year. Another commenter suggested that this change was an attempt to force all institutions to use a December 31 fiscal year end date.

*Discussion:* Requiring the institution to match its fiscal year to its owner's tax year (the entity at which the institution submits its audited financial statements) allows the Department to conduct consistent oversight. Some of the Department's requirements (for financial protection or following changes of ownership, for example) are based on one or two complete years of audited financial statements. Requiring the institution's fiscal year end to match the owner's tax filing deadline prevents institutions from manipulating the required timelines, and it relieves the Department from having to make case by case determinations. The practice of determining if the use of different fiscal

years for Departmental and IRS purposes is done for manipulative reasons also takes time and resources from the Department's ability to review other institutions. We believe that the occurrence is common enough to warrant this change. This rule is not dictating to institutions which date they must use but is just requiring institutions to be consistent and align the end dates for fiscal and tax years. This rule applies to fiscal years that begin after the effective date of these regulations and we believe that institutions will have sufficient time to comply.

*Changes:* None.

*Comments:* Several commenters objected to the proposal in § 668.23(d)(1) to require the reporting of all related-party transactions. One of those commenters believed that with no limitation on the size of the transactions to be reported, such a provision would be problematic because accounting processes would have to change to capture and report such de minimis expenses as lunches for board members. The commenter went on to suggest that the Department use the publicly available IRS form 990 that nonprofits must already complete annually to address this concern, rather than creating a regulatory requirement. Another commenter inquired as to how a related party disclosure, required in the annual audited financial statements, would be reported if no transactions occurred during the current year. The commenter stated that related parties may exist due to ownership affiliations while no transactions between the companies may be occurring in the current year. The commenter wondered if such a relationship still needed to be disclosed. One of these commenters objected to requiring auditors to disclose related parties since that is not required in generally accepted accounting principles (GAAP) and goes beyond the level of assurance provided by audited financial statements.

*Discussion:* The requirement that an institution must report its related party disclosures is not a new proposal in this regulation. Rather, the NPRM clarified that the items currently listed as possible to include when disclosing related party transactions must be included. That means including identifying information about the related party and the nature and amount of any transactions. The existing reference to related entities in § 668.23(d)(1) requires the institution to submit a detailed description of related entities based on the definition of a related entity set forth in Accounting Standards Codification (ASC) 850.

However, the disclosures under the existing regulations require a broader set of disclosures than those in ASC 850. Those broader disclosure requirements include the identification of all related parties and a level of detail that would enable the Secretary to readily identify the related party, such as the name, location and a description of the related entity, the nature and amount of any transactions between the related party and the institution, financial or otherwise, regardless of when they occurred and regardless of amount. To the commenter concerned with disclosing de minimis transactions, such as meals for a board member, we do not intend to require reporting on such transactions. Routine items such as meals provided to all board members during a working lunch would not be a related party transaction since the meals would be incidental to supporting a board meeting. Transactions with individual board members for other services provided to the institution or a related entity would be reportable. We agree with the commenter that the existing regulatory text was unclear about what an institution should do if they do not have any related party transactions for that year. To clarify this issue, we have added an additional sentence to the end of paragraph (d)(1) noting "If there are no related party transactions during the audited fiscal year or related party outstanding balances reported in the financial statements, then management must add a note to the financial statements to disclose this fact."

We are adding this provision as well as adopting the changes already mentioned in the NPRM because it is critical that the Department receive accurate and identifiable information about related party transactions, including by an affirmative confirmation when no related party transactions exist. These transactions are relevant to whether audited financial statements should be submitted on a consolidated or combined basis. Related party transactions may also require adjustments to the calculation of an institution's composite score. In addition, when a school is participating as a nonprofit institution, or seeks to participate as a nonprofit institution, related party disclosures help the Department identify financial relationships that could be an impediment to nonprofit status for title IV, HEA purposes.

The Department does not believe the information provided on a Form 990 is sufficient for this purpose. In fact, we have seen situations where the

Department uncovered related party transactions existed, but they had not been reported on the entity's 990s.

If no transactions occurred during the year, and no current receivable or liability is included in the financial statements then institutions would not need to include anything related to this relationship in the financial statements for that year.

*Changes:* We have added a requirement in § 668.23(d)(1) for management to add a note to the financial statements if there are no related party transactions for this year.

*Comments:* A few commenters expressed that changes to § 668.23(d)(1) say that financial statements must now be "acceptable" and sought clarification on what the Department means by acceptable.

Two commenters sought assurance that financial statements completed in accordance with GAAP and generally accepted government auditing standards (GAGAS) were acceptable and that there was not some additional requirement.

Another commenter suggested that we remove any requirement beyond GAAP and GAGAS from these final regulations and negotiate it separately.

*Discussion:* To adequately evaluate the financial position of an institution, not only must the financial statements meet the requirements of GAAP and GAGAS, but they must be at the level of the correct entity and show actual operations to be acceptable. As already discussed, the Department strongly believes the triggers and other provisions in these final regulations related to financial responsibility that go beyond GAAP and GAGAS are necessary to carry out the statutory requirement that institutions are financially responsible and do not have to be negotiated separately. These provisions were negotiated, albeit without consensus, in the negotiated rulemaking process leading to the proposal of these regulations.

*Changes:* None.

*Comments:* One commenter stated that the NPRM violates the OMB Memorandum M–17–12 which discourages making personally identifiable information (PII) publicly available. The commenter referred in part to the requirement that institutions disclose related party transactions under § 668.23(d)(1).

*Discussion:* The Department disagrees. The requirement to disclose related party transactions is already in existing regulations. No provision of these final regulations involves releasing PII nor requiring institutions to disclose PII to parties other than the Department.

*Changes:* None.
*Comments:* Many commenters supported the Department's proposed requirement in § 668.23(d)(5) that institutions disclose amounts spent on recruiting, advertising, and pre-enrollment activities. Relatedly, other commenters said the Department should require institutions to disclose in their financial statements the amounts spent on instruction and instructional activities at the program level. One of those commenters further believed that the disclosure should include amounts spent by the institution on academic support and support services.

Many other commenters, however, objected to this proposal. Several commenters said these items are not linked to the institution's actual financial stability. Many of the commenters stated that the Department did not define these terms and sought clarification on exactly what activities would be included in recruiting, advertising, and pre-enrollment activities. Commenters also raised concerns about auditors attesting to these items for the year prior to the one being audited.

*Discussion:* We appreciate the commenters' input. After careful consideration of the comments received, we removed the provision in § 668.23(d)(5) that required a footnote in an institution's audited financial statements that stated the amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures. We also removed the cross-reference to this audited financial statement requirement in the certification requirements in proposed § 668.13(e)(iv). However, we will retain the language in proposed § 668.13(e)(iv), now renumbered as § 668.13(e)(2) in the final rule, stating that the Department may consider these items in its determination whether to certify, or condition the participation of, an institution. We discuss the reason for continuing to include that provision in greater detail in that section of the preamble to this final rule.

The Department is removing the provision in § 668.23 because we are persuaded by the concerns raised by commenters about the lack of clear standards for what auditors would need to attest to as well as the timing of the periods covered by audits versus this requirement. Moreover, the requirement in § 668.23 was added to provide a data source for the supplementary performance measures in § 668.13(e), which are designed to lay out indicators the Department could consider on a case-by-case basis. Since that issue would be considered for individual institutions, the Department believes it would be better to request these data when deemed necessary for a given institution rather than requiring all institutions to disclose them.

The Department declines to adopt the additional disclosures on amounts spent on instruction for similar reasons. We believe this issue is better considered on a case-by-case basis in § 668.13(e) as concerns about excessive spending on marketing or recruitment compared to instruction have in the past been limited to a minority of institutions.

*Changes:* We have omitted proposed § 668.23(d)(5) as well as the reference to that proposed paragraph in proposed § 668.13(e)(iv), now renumbered as § 668.13(e)(2) in the final rule.

*Comments:* One commenter objected to the Department's requirements that financial statements be audited using GAAP and GAGAS. The commenter pointed out that a number of institutions have one or more upper-level foreign owners who may have financial statements prepared in accordance with International Financial Reporting Standards (IFRS) and are audited in accordance with the European Union (EU) Audit Regulations. As an example, the commenter stated that the SEC has accepted from foreign private issuers audited financial statements prepared in accordance with IFRS without reconciliation to U.S. GAAP. The commenter questioned the Department's authority for requiring upper-level owners' financial statements be prepared in accordance with GAAP/GAGAS and requested that we provide in the final rule that we permit IFRS/EU standards with respect to financial statements of upper-level foreign owners.

*Discussion:* The Department's regulations maintain different financial statement requirements for foreign and domestic institutions. For foreign institutions, we spell out when financial statements may be prepared and audited under different standards in § 668.23(h). However, for domestic U.S. institutions we believe GAAP or GAGAS is appropriate for ensuring we are reviewing all domestic institutions consistently. The Department's longstanding policy is not to accept IFRS/EU standards for domestic U.S. institutions, and we think the loss of comparability that would occur from starting to do so would make it hard to apply the financial responsibility requirements consistently.

*Changes:* None.

**Financial Responsibility—General Requirements (§ 668.171(b))**

*Comments:* One commenter opined that the requirements proposed in paragraph (b) appeared to occupy a category of financial responsibility separate from the other requirements proposed in § 668.171. The commenter said there was little explanation of how the general requirements in paragraph (b) would be applied to institutions and what the consequences for noncompliance would be.

*Discussion:* The consequences for non-compliance under § 668.171(b) are the same as any other failure of the financial responsibility standards, including the composite score. That is how this provision has always been applied. Institutions would be given the options as outlined under § 668.175.

*Changes:* None.

*Comments:* One commenter expressed support for the provision in § 668.171(b)(3)(i) that an institution is not financially responsible if it has failed to pay title IV, HEA credit balances to students who are owed those funds. Another commenter, however, requested the Department to confirm that minor infractions of the credit balance rule would not result in an institution being deemed financially irresponsible. The commenter pointed that student credit balance deficiencies has been a top program review and audit finding for some years. The commenter believed that this finding alone did not and should not subject institutions with this finding as automatically not financially responsible. The commenter concluded with supporting language for this provision when it is determined that an institution is withholding title IV, HEA credit balances to utilize those funds for purposes other than paying them to the students owed those funds.

*Discussion:* An institution's failure to pay necessary refunds or credit balances of title IV, HEA funds to students has been a strong sign in the past of institutional financial distress. The Department has seen institutions hold onto these funds to keep themselves in better financial shape, even as it harms students. As it reviews instances that fall under this category the Department will consider if it is an isolated instance or evidence of a larger pattern and consider that in making determinations of financial responsibility.

*Changes:* None.

*Comments:* Several commenters took issue with the provision stating that an institution is not financially responsible if it fails to make debt payments for 90 days. These commenters were concerned that in some instances delayed payments were the result of external factors and did not indicate that the institution was financially irresponsible. The commenters stated that the proposed regulation lacks clarity and does not distinguish between intentional non-payment and instances where the delay is linked to some administrative or logistical challenge. For example, commenters believed that in certain cases, delayed debt payments could arise from factors beyond an institution's control, such as delays in invoice processing or delivery, and this could place an institution in the status of being not financially responsible.

On a similar note, one commenter raised a concern over the provision whereby an institution would be financially irresponsible if it failed to satisfy its payroll obligations in accordance with its published payroll schedule. The commenter suggests that the Department add language to the final regulation establishing a grace period of 10 calendar days so that if an institution resolved its payroll obligations during the grace period, it would remain financially responsible.

*Discussion:* Since participating institutions typically have title IV, HEA funding as their primary revenue source, "external factors" should not negatively impact the institution or owner entity's obligation to make a required debt payment within 90 days. As to the other comment, the failure to satisfy payroll obligations in accordance with a published schedule is an early and very significant indicator of financial instability. To that end, we do not believe a 10-day grace period as suggested by the commenter would be appropriate as that could simply result in the institution moving money across accounts to hide issues.

*Changes:* None.

*Comments:* Many commenters requested clarification on whether there was a materiality threshold for any provision in § 668.171 and what we meant when we used the term "material" in the proposed regulatory text.

*Discussion:* It would be inappropriate to adopt a materiality standard for § 668.171. A materiality threshold commonly depends upon determinations made by auditors, often in response to information provided by management. Adopting a materiality standard would move the discretion away from the Department to the auditor and the institution's management. Doing so would undercut our ability to quickly seek financial protection when needed. However, we agree with the commenters that use of the word material in the NPRM implies a materiality threshold is in place when it is not. Therefore, we will replace "material" with "significant" in describing "adverse effect" or "change in the financial condition" in § 668.171. A significant adverse effect is an event or events impacting the financial stability of an institution that the Department has determined poses a risk to the title IV, HEA programs.

*Changes:* We have replaced "material" with "significant" in §§ 668.171(b), (d), and (f) and 668.175(f), where we refer to adverse effects or changes in financial condition.

**Financial Responsibility—Triggering Events (§ 668.171(c) and (d))**

*Comments:* Several commenters supported the Department's proposed financial triggers, believing that they allow us to swiftly act to protect students when a postsecondary institution's financial stability is called into question. Another commenter expressed that taxpayers would be better protected by the proposed financial triggers in that liabilities arising from school closures would be partially or wholly offset with the financial protection obtained due to the financial trigger regulations.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* Many commenters objected to the proposed financial triggers for a variety of reasons. Several of those comments raised the objection that the financial triggers, as proposed, exceed the Department's statutory authority to ensure an institution participating in the Federal student aid programs is financially responsible.

*Discussion:* We disagree with the commenters and explain our rationale in greater detail in response to summaries of more specific comments. But overall, we believe the financial responsibility regulations are a proper exercise of the Department's authority under the HEA to protect taxpayers from potential losses from closures or other actions that create a liability owed to the Department.

*Changes:* None.

*Comments:* Many commenters objected to the mandatory financial triggers due to their belief that the triggers exceed the authority granted the Department by statute. Some of these commenters cited 20 U.S.C. 1099c(c) (HEA section 498(c)) to support their position that the Department is limited to the prescribed methods in determining an institution's financial responsibility. Commenters also stated that the proposed trigger events are not

related to financial responsibility. Several commenters also argued that mandatory triggers go against Congress's directions that the Secretary determine an institution is not financially responsible.

*Discussion:* As discussed previously, HEA section 498(c)(1) provides the Department with the authority to establish standards for financial responsibility, and that authority goes beyond "ratios" in section 498(c)(2) of the HEA. Our determination that an institution is or is not financially responsible is not solely about composite scores. That is only one component of it. Another important factor in our determination is whether an institution participating in the title IV, HEA programs is financially unstable beyond, and since, what its most recent composite score revealed. HEA section 498(c)(3) authorizes the Secretary to determine an institution to be financially responsible in certain situations if the institution has met standards of financial responsibility, prescribed by the Secretary by regulation, that indicate a level of financial strength not less than those required in paragraph (2) of the same section. It is this provision of the statute that directs the Secretary to ensure through regulation that an institution is financially responsible sufficient to protect the students attending the institution and the taxpayers who have made the funding possible for the title IV, HEA programs. The financial triggers are examples of just such requirements.

Financial instability may be caused by an event that occurs after the most recent composite score, and the purpose of the triggers is to identify those events which might impact the viability of the institution. For example, an event that could lead to closure or serious financial instability may not have occurred during the fiscal year upon which the most recent composite score is based. The inability of the composite score to be predictive in this regard also results from the fact that the due date for audited financial statements is up to 6 or 9 months, depending on the type of institution, after the close of the fiscal year.

Overall, we believe all the mandatory triggers have a clear nexus to financial risk. The financial triggers represent several circumstances of obvious concern. There are some, such as 90/10, cohort default rates (CDR), and gainful employment, where the institution could be at imminent risk of loss of title IV, HEA funds from compliance factors administered by the Department. While that does not guarantee a closure, loss of title IV, HEA funding often does

relate to closure. The declaration of financial exigency and receivership are also signs of significant financial distress and possible closure. Lawsuits and debt payments involve composite score recalculations that could cause an institution to subsequently fail the composite score. The State actions and teach-out requirements are again proof that there are imminent concerns about financial impairment if not outright closure. Finally, there are several triggers that are designed to support the integrity of the Department's financial responsibility composite score methodology, such as triggers related to financial contributions followed by a financial distribution as well as creditor events.

We also note that each of these triggers operate independently of each other. They have their own reporting requirements, and it is possible for an institution to activate a single trigger without activating others. As a result, they each provide a unique and separate value in assessing financial health. This is even the case when the single underlying event activates multiple triggers. In such situations, the event is activating triggers for different reasons.

*Changes:* None.

*Comments:* Many commenters said the Department should adopt a materiality threshold in the triggering conditions. One commenter used an example of a triggering event representing $1 requiring the imposition of a financial protection instrument and felt that result was unreasonable.

Several of the commenters felt the lack of a materiality threshold would result in determinations that an institution was not financially responsible when the causal factor was not one that had a material adverse effect on the institution's ability to meet its financial obligations. The commenters further stated that the Department should be required to use clear criteria to determine that an institution's action or event would, in fact, negatively impact the institution's ability to meet its financial obligations.

Commenters similarly argued that the lack of a materiality requirement was unreasonable. This was incorporated in a larger argument about how a reasonableness standard is akin to the concept of substantial evidence under the APA.

*Discussion:* We disagree with commenters that it would be appropriate to adopt a materiality standard for the triggering events for several reasons. A materiality threshold commonly depends upon determinations made by auditors, often in response to information provided by

management. The goal of the triggers is to identify situations that occur between financial audits that could represent a significant adverse financial effect on an institution. Adopting a materiality standard would move the discretion away from the Department to the auditor and the institution's management. Doing so would undercut our ability to quickly step in and seek financial protection when needed. While commenters have presented hypothetical examples of an unidentified triggering event tied to $1, they have not outlined a concrete example of how that would occur. While it is possible that settlements or judgments could result in $1 payments, those triggers involve a recalculation of the composite score, and it is unlikely that $1 would cause a score to fail. However, as discussed previously, we will replace "material" with "significant" in describing adverse effect and the financial condition of an institution. We crafted the mandatory triggers to identify situations that would represent significant financial threats to an institution's overall health, while the discretionary triggers leave room for us to consider whether the situation poses a significant adverse financial effect. While Departmental consideration is not a materiality threshold, which was suggested by some commenters, it does provide institutions an opportunity in §668.171(f) to explain why they think the discretionary trigger should not result in a request for financial protection. One example of such an explanation might be that the financial impact upon the institution is negligible or nonexistent. We believe that process addresses the commenters' concerns.

Each of the mandatory triggers has a clear connection to significant financial concerns. The triggers related to receivership and financial exigency capture situations where an institution has declared that it is at risk of being unable to afford its financial obligations. The GE, 90/10, and CDR triggers indicate situations where an institution might lose some or all access to title IV, HEA funds in a year.

The triggers for SEC actions and teach-out plans represent situations where there are serious concerns about either an institution's financial health or it is at risk of losing its public listing, which is often a sign of weak finances.

The triggers around distributions followed by a contribution and creditor conditions address a different type of financial risk. In those situations, we are concerned an institution is manipulating its composite score to hide what might otherwise be a failure. We treat the distribution following the

contribution as a failure because we do not have an accurate picture of an institution's finances and this information will allow us to assess the effects of these transactions on an institution's financial health. For the creditor actions, we take the fact that they are worried enough about the institution to insert such a condition as evidence that the Department should also be concerned about institutional financial health.

Finally, the triggers related to legal and administrative actions allow us to recalculate the composite score to determine if the monetary consequences of the actions negatively impacted the institution. This recognizes that there could be gradations within those events that have greater or less financial implications.

As discussed later in the mandatory triggers section, we have also altered some mandatory triggers to make them more clearly connected to financial concerns or shifted them to discretionary triggers if we are concerned that they may not result in a significant adverse financial effect. We believe the result is that the mandatory triggers capture the most concerning financial events, and the discretionary triggers result in a request for protection if they show a negative effect. That will address concerns about institutions being subject to letters of credit for immaterial events.

We also object to the commenters' argument that the lack of a materiality threshold is unreasonable. We have addressed the arguments about reasonableness and substantial evidence in the legal authority section of this preamble related to financial responsibility. In terms of unreasonableness as a general concept, as explained above, we believe the mandatory triggers all represent either common sense areas that can indicate an institution is facing significant financial problems or more complicated ways that an institution is trying to manipulate its results. The greater variability in the discretionary triggers is why they involve a case-by-case determination. But we believe the items identified for discretionary triggers represent obvious and sensible indications that an institution could be seeing negative effects on its finances, which leads to relevant questions about how large the negative effect might be.

*Changes:* As discussed previously, we have changed "material" to "significant" in §§ 668.171(b), (d), and (f) and 668.175(f) where we refer to adverse effects or changes in financial condition.

*Comments:* Many commenters said the Department must provide a process by which institutions would have the opportunity to provide input for the Department to evaluate before making any determination affecting the institution's financial responsibility status. Some of those commenters included said the "automatic" aspect of the financial triggers was inconsistent with the statutory requirements in HEA section 498(c)(3). Several of these commenters elaborated on their concerns by noting that the lack of any interim decision and challenge process means institutions will be required to immediately provide financial protection until the institution continues to pursue dismissal of the cause of the trigger even though the Department may make a final determination that financial protection is not necessary. They contended that some of the mandatory financial triggers were not automatically reflective of an institution's financial stability but if it found itself in violation of one or more of the mandatory triggers would automatically be deemed to be not financially responsible. The commenters asserted that the following triggers did not reflect financial instability: (1) A suit by a Federal or State agency, or a qui tam lawsuit in which the Federal Government has intervened; (2) The institution received at least 50 percent of its title IV, HEA funding in its most recently completed fiscal year from GE programs that are failing the GE program accountability framework: (3) Failing the threshold for non-Federal educational assistance funds; and (4) High CDRs.

*Discussion:* Section 498(c)(1) of the HEA provides the authority for the Secretary to establish standards for financial responsibility, and it is not limited by the reference to "ratios" in section 498(c)(2). Our determination that an institution is or is not financially responsible is not solely about a formula with a composite score. That is only one piece of it. Another important piece factoring into our determination is whether an institution participating in the title IV, HEA programs is financially unstable beyond, and since, what its most recent composite score revealed. Financial instability may be caused by an event that occurs after the most recent composite score, and the purpose of the triggers is to identify those events which might impact the viability of the institution. The Department believes that the provisions in § 668.171(f)(3) strike the balance between giving an institution an opportunity to provide additional information to the

Department without creating a process where risky institutions avoid providing financial protection due to extended discussions. First, § 668.171(f)(3)(i)(A) allows the institution to show that the discretionary trigger related to creditor events need not apply if it has been waived by the creditor. Section 668.171(f)(3)(i)(B) allows the institution to show that when it reports the triggering event, it has been resolved. Coupled with changes discussed later that give institutions 21 days to report triggering events instead of 10 days, we believe this will give institutions a larger window to show that the triggering event is no longer a concern. Finally, § 668.171(f)(3)(i)(C) notes that the institution can provide additional information for the discretionary triggers to determine if they represent a significant negative financial event. As discussed later in this final rule, we changed this language to only reference discretionary triggers.

The result of this language is that institutions will have an opportunity to show that the trigger had been quickly resolved and for discretionary triggers provide more information to show why the situation is not of sufficient concern to merit financial protection. For mandatory triggers, institutions will have the opportunity to share additional information when they provide notification that the trigger occurred in order for the Department to determine if the triggering event has been resolved.

The Department believes this situation gives institutions the ability to swiftly raise concerns about triggers but allow the Department to act quickly if the situation warrants it. This is particularly important as several of the triggering conditions could indicate a fast and significant degradation of a school's financial situation, such as the declaration of receivership. Preserving the Department's ability to act rapidly is, therefore, critical to protecting taxpayers from potential losses.

*Changes:* We changed § 668.171(f)(3)(i)(C) to clarify that the provisions contained therein apply to the discretionary triggers contained in § 668.171(d) and not the mandatory triggers contained in § 668.171(c).

*Comments:* Several commenters said the financial triggers do not appear to result from complete and careful Departmental analysis and expressed concerns about unintended consequences as a result of the financial triggers. Some commenters thought that an unintended consequence would be that some institutions would be thrust into a status of financial instability, including possible closure, due to the burden of complying with these

financial responsibility regulations when they would not have been so categorized under existing rules. Some of those commenters opined that the triggers would especially impact private nonprofit and private for-profit institutions. Another commenter maintained that the Department performed no analysis to identify unintended consequences of these regulations. Another commenter was concerned that the Department did not share its analysis on the necessity of these regulatory changes and additions. Commenters called upon the Department to provide the data used to determine that the existence of these proposed financial triggers would put an institution at a higher risk of closure as stated in the NPRM.

*Discussion:* The Department disagrees with the commenters. Institutions act in a fiduciary capacity on behalf of the Department when they administer the title IV, HEA programs, and they must meet the Department's financial responsibility requirements to perform that role. As discussed in the sections of this document related to the mandatory and discretionary triggers, based on the Department's experience, we have concluded that the mandatory triggering events represent situations of significant financial concern, including the potential for either immediate closure, loss of access to aid after another year of performance results on certain measures, or other sufficient warning signs. Seeking financial protection in these situations represents the Department exercising its proper responsibility for overseeing taxpayer investments in the title IV, HEA programs. Mandatory triggers represent events where there are negative financial effects to an institution's financial health and therefore warrant financial protection while further review of an institution's financial condition can take place. Moreover, discretionary triggers will only result in Department requests for financial protection after a determination by the Department that they represent a significant negative financial effect. As such, we are not persuaded that the triggers will cause the kinds of unintended consequences discussed by commenters. The point of exercising the triggers is to protect taxpayers and ensure that the institutions that students choose to attend are financially responsible. As discussed in the RIA, we recognize that seeking financial protection creates costs for institutions, but we believe those costs are necessary and justified. As further discussed in the RIA, we provided information on

the scope of effect for every trigger where we currently collect the data and addressed which elements related to costs we are and are not able to model. Insofar as commenters suggest that the Department must have perfect data and certainty as to consequences before adopting these protective measures, we disagree. At the same time, having reviewed commenters' predictions regarding unintended consequences, we cannot conclude that those predictions are supported by reasonable judgments and available evidence.

We also disagree with the commenters who argue that the Department should not pursue financial responsibility due to concerns about closure. Section 498(c) of the HEA[6] outlines financial responsibility standards, and the language around the Secretary's determination in section 498(c)(3)(C) requires an institution prove that it has sufficient resources to ensure against the precipitous closure of the institution and to provide the services it has promised its students. Furthermore, the Department has an obligation to safeguard taxpayers' investments including by efforts to minimize costs to taxpayers from student loan discharges and from having to seek repayment from the institutions that generated those costs. Historically, the Department has struggled to secure funds from institutions before they closed, which has left many discharges unreimbursed. For instance, FSA data show that closures of for-profit institutions that occurred between January 2, 2014, to June 30, 2021, resulted in $550 million in closed school discharges. This figure excludes the additional $1.1 billion in closed school discharges related to ITT Technical Institute that was announced in August 2021. Of that $550 million amount, the Department recouped just over $10.4 million from institutions.[7] The Department also included data in the NPRM that are repeated in the RIA of this final rule showing that from 2013 to 2022 the Department assessed $1.6 billion in liabilities against institutions. During that same period, the Department collected just $344 million from institutions. These amounts do not include any unestablished liabilities, such as those from closed school discharges that are not established against an institution. The approach in these rules will generate more financial protection upfront to increase the likelihood that the Department is

reimbursed for liabilities assessed against institutions.

*Changes:* None.

*Comments:* Several commenters raised concerns about the financial triggers generally saying they were broad, unclear, required definitions, and were subjective. The broadness, in the view of the commenters, allowed for an institution violating numerous triggering events simultaneously leading to the imposition of multiple instruments of financial protection, *e.g.,* letters of credit. Another commenter criticized the financial triggers due to a belief that the triggers delegated the role of determining an institution's financial responsibility to third parties, including States.

*Discussion:* We disagree with the commenters. The mandatory triggers all represent clear situations that an institution will be able to know if they have met a triggering condition. The discretionary triggers are intentionally crafted to be broader so that they provide flexibility for consideration with input from the institution to determine whether the situation does in fact represent a significant negative financial situation for the school. For instance, that is why there is not a single standard for withdrawal rates or change in title IV, HEA volume. When these discretionary triggers may apply, the institution will have an opportunity to discuss why they think the triggering event should not merit financial protection.

We also disagree that the triggers are delegating oversight to the States or other third parties. Successful oversight of postsecondary institutions requires coordination among the States and accreditation agencies that make up other components of the regulatory triad. The triggers that relate to their actions ensure that the Department is able to respond swiftly to actions by other regulators, because those actions could either cause, or be predictive of, financial risk.

*Changes:* None.

*Comments:* A few commenters opined that the proposed financial triggers have no bearing on financial responsibility. They stated that the entire concept of a trigger granted the Department the authority to require unreasonable, even impossible, financial restrictions be placed on an institution.

*Discussion:* We disagree with the commenters. All mandatory triggers have explicit linkages to financial concerns. The discretionary triggers are structured so that they could in certain situations have financial implications, which is why we would review them on a case-by-case basis to determine

---

[6] 20 U.S.C. 1099c(c).

[7] The budgetary cost of these discharges is not the same as the amount forgiven.

whether to seek financial protection or not. Below we discuss each trigger in turn and how they connect to financial responsibility.

Legal and administrative actions are intrinsically related to an institution's financial health. These represent situations that can be a sudden financial impairment to an institution or change its financial position significantly. An institution with a low composite score that has to pay an additional debt or liability from a legal or administrative action may not be able to afford those added expenses. Costs from judgments or lawsuits may be significant and may place institutions in an impaired financial condition. As could the act of seeking repayment of borrower defense to repayment discharges, given that most approvals to date have been in the tens of millions of dollars. We are also concerned about how added costs from a final monetary judgment or award, or from a monetary settlement which results from a legal proceeding, including from a lawsuit, arbitration, or mediation, might make a change in ownership financially riskier than it seemed at first.

The withdrawal of owner's equity and the distribution following a contribution both are potentially destabilizing transactions initiated by a school's owner when they pay themselves. The withdrawal of equity causes a score recalculation, whereas the concern with a distribution following a contribution is a school attempting to manipulate its composite score.

The revisions to teach-out plans will capture situations where there are concerns about an institution's finances meriting a teach-out plan for the entire institution. That suggests a risk of closure and the need to plan for it. Just as we want to make sure schools plan for students, we must also plan for the possibility of taxpayer liabilities.

The triggers for publicly listed entities represent situations where they could lose access to public markets by having their stocks being delisted, having their registration being revoked, or being taken to court. All those situations could place the institution at risk of losing the benefits that come from being publicly traded and make it much harder for them to raise the funds necessary to stay in business. This is even the case for failing to provide quarterly or annual reporting, including considering an extended deadline. This is not a common occurrence for large and healthy companies and research shows that shareholders punish this

occurrence significantly.[8] Shareholders react negatively when publicly traded companies miss filing deadlines for quarterly and annual reports. The Department should react negatively in this circumstance too, given that participating institutions act in the nature of a fiduciary in administering the title IV, HEA programs. The provisions related to foreign exchanges are similar.

The triggers related to a school failing 90/10, having high CDRs, or at least 50 percent of an institution's title IV, HEA volume coming from failing GE programs represent situations where an institution will lose access to title IV, HEA assistance the next time we generate those numbers unless they can improve. While institutions can and do survive without access to those funds, many institutions do close when they lose access to such aid. Protecting taxpayers when there is a possibility of aid loss is thus the responsible course of action.

The declaration of financial exigency and receivership are inherently worrisome financial situations. They are strong statements that an institution will not be able to continue in its current state and will need significant changes. These two are reasonable situations to be worried about that directly connect to finances.

Finally, the trigger related to creditor events ensures that institutions cannot leverage their financial agreements to try and dissuade the Department from its financial monitoring. We are concerned about past situations where institutions have conditions in their agreements with creditors that make debts fully payable if the Department were to take steps like require a letter of credit of a certain size or place the institution on heightened cash monitoring 2. We are concerned that the presence of such conditions is designed to place private creditors ahead of the Department and to also dissuade us from engaging in proper oversight and monitoring. The Department is thus treating the presence of those types of conditions as if they will occur and signal from the private market that there are financial concerns. We are thus seeking financial protection when such creditor conditions are present to ensure that we have the funds we need to safeguard taxpayers' investments.

We do not discuss the discretionary triggers in the same level of detail because as we have noted these all have

the requirement that they show a significant financial effect.

*Changes:* None.

*Comments:* A few commenters raised concerns about the language in § 668.171(c) noting that the Department would request separate financial protection for each trigger if an institution ends up with multiple trigger events. Commenters questioned why this was necessary since the Department already has authority under the regulations to require letters of credit for institutions that fail the general standards of financial responsibility or that have a failing composite financial ratio score. These commenters thought that in those circumstances the Department has the ability to set the financial protection amount to be greater than the minimum levels established in the regulations. Some commenters suggested that the proposal to seek multiple financial protection requests would limit the Department's discretion to determine the amount of financial protection needed to deal with one or more triggering events without regard to whether asking for multiple instances of financial protection would overstate the amount of financial protection warranted for many situations. One commenter reviewed prior letters of credit required by the Department and noted that there were very few instances where the Department required institutions to provide letters of credit in amounts greater than 50 percent of an institution's annual Federal student aid funding and expressed concern about the significant financial burdens could be imposed on institutions requiring to provide much larger letters of credit under the proposed regulations.

Commenters also raised concerns about the possibility that multiple triggering events could be the result of one underlying action and that such situations should be viewed as only a single request for financial protection.

*Discussion:* The Department acknowledges that the current regulations do not place limits on the amounts of financial protection that may be required. The revised regulation will provide more notifications to the Department about significant developments relevant to an institution's financial responsibility since the period covered by the last annual audited financial statement submitted to the Department. These notifications will in many instances require the institution to provide financial protections or increase financial protections already in place. With regard to the frequency with which the Department requests financial

---

[8] clsbluesky.law.columbia.edu/2017/11/27/how-missing-sec-filing-deadlines-affects-a-companys-stock-value.

protection in excess of 50 percent of an institution's annual title IV, HEA funding, we note that is an option for institutions that are not financially responsible to continue participating in the Federal student aid programs without becoming provisionally certified. We also remind commenters that part of the impetus for this final rule is the Department is concerned about having insufficient amounts of financial protection to offset liabilities incurred. With regard to the comments about one event causing multiple triggers, the Department's intent is not to make multiple financial protection requests for triggering events that all stem from the same event. We would thus review the triggering events when they occur to determine whether they are all tied to one event.

*Changes:* None.

*Comments:* Many commenters pointed out that in the 2019 Borrower Defense Regulations,[9] the Department stated that financial triggers that are speculative, abstract, and unquantifiable, are not reliable indicators of an institution's financial condition. Some of those commenters called upon the Department to eliminate any proposed financial trigger from the final rule that was speculative, abstract, or unquantifiable.

*Discussion:* The Department addressed these concerns from the commenters in the NPRM.[10] As we noted there, since the elimination of those mandatory triggers we have repeatedly encountered institutions that appear to be at significant risk of closure where we lacked the ability to obtain financial protection due to the more limited nature of triggers that are still in regulation. We also noted that the items that were proposed as mandatory triggers were situations that were clear to identify and represent significant financial risk. We have further refined that standard in this final rule by converting several mandatory triggers into discretionary ones. We also disagree with the implication by the commenters that triggers must be quantifiable so that they fit within the construct of the composite score. The composite score is not designed to be the only way to judge an institution's financial responsibility. It is one measure that captures some issues. But the presence of the triggers, as well as other items in § 668.171(b) that speak to issues like missing payroll obligations or failing to pay refunds, show there are other critical indicators of financial responsibility that the Department

should consider while performing its statutorily mandated function to oversee the Federal student financial aid programs.

*Changes:* None.

*Comments:* Several commenters suggested that all mandatory financial triggers be made discretionary and that a specific determination be made by the Department with an explanation of how the triggering event has a material impact on the financial responsibility of the institution.

*Discussion:* The Department disagrees with the commenters. As discussed, the mandatory triggers are situations that we believe represent the most significant threats to an institution's financial circumstances. As such, we believe it is prudent as part of overseeing the Federal student financial aid programs to seek additional protection when those events occur. As already noted above, we do not think it would be appropriate to adopt a materiality standard for these triggers and believe they represent significant negative financial situations.

*Changes:* None.

*Comments:* Some commenters raised questions around the requirements for financial protection, *e.g.,* letters of credit, remaining in place for two full fiscal years. For example, one commenter requested clarification on whether this would be applicable in a situation where the institution has resolved the action or event that associated with the financial trigger. Another commenter stated that the Department should have the discretion to continue requiring financial protection even if the triggering event has been resolved because the existence of a triggering event that results in the Department requesting financial protection could also highlight other areas of concern.

*Discussion:* Under final § 668.171(c), the Department will consider whether the financial protection can be released after two fiscal years' worth of audited financial statements following the notice of the requirement for financial protection. The Department's goal with the two fiscal year requirement is to give us enough time to have confidence that the institution has demonstrated that the event has ceased or been resolved. We believe two years is more appropriate than only requiring it for a year because that allows us to reduce the likelihood that the events recur. For instance, an institution may have failing 90/10 rates for a year, pass for a year, and then fail again. Or a school could be asked to submit a teach-out agreement, then improve its finances and suddenly see them deteriorate

again. Maintaining financial protection for two years strikes the balance between determining if the triggering event has been truly corrected with not keeping financial protection for unnecessarily long periods.

It is possible that financial protection will need to continue after the two years. That would be the case if the triggering event has still not been resolved.

To the commenter requesting the Department to require financial protection beyond the two-year requirement after a triggering event has been resolved, we do not believe we can do that based on the potential for a triggering event. If the Department identifies another triggering event, we would still be able to require financial protection related to that event.

**Financial Responsibility—Mandatory Triggering Events (§ 668.171(c))**

*General*

*Comments:* Several commenters strongly recommended that some or all of the mandatory financial triggers be eliminated from the final rule and short of that, some or all should be made discretionary. While some commenters addressed this critique to all of the mandatory triggers, some limited their recommendation to the following proposed financial triggers: (1) the trigger concerning lawsuits in proposed § 668.171(c)(2)(i)(B), (2) the trigger addressing change in ownership in proposed § 668.171(c)(2)(i)(D), (3) the trigger applicable to GE programs in proposed § 668.171(c)(2)(iii), (4) the trigger dealing with teach-out plans in proposed § 668.171(c)(2)(iv), (5) the triggering event describing State actions in proposed § 668.171(c)(2)(v), and (6) the trigger concerning publicly listed entities in proposed § 668.171(c)(2)(vi).

*Discussion:* We disagree with the commenters, in part. As discussed in greater detail under the subheading that applies to that trigger, we have elected to make State actions a discretionary trigger and clarify that teach-outs must be related to the whole institution and for financial reasons. We also have determined that an institution that loses eligibility to participate in another Federal educational assistance program will not be subject to a mandatory trigger. Instead, the discretionary trigger addressing a program that loses eligibility to participate in another Federal educational assistance program will be expanded to include when the institution, itself, loses that eligibility. We believe that making this a discretionary trigger will remove the burden of a mandatory trigger when the

[9] 84 FR 49861.
[10] 88 FR 32300.

loss to the institution is minimal and gives the Department the ability to make a determination if the loss of another Federal educational program will have a financial impact on the institution. We elected to move the State action and loss of eligibility provisions due to concerns about the varied effect of events that would cause those triggers. Some of those events were presented by commenters and included examples of a State taking a minor action for collection of a small sum of money or to rectify a minor health related infraction. Regarding the loss of another Federal educational program, examples were provided by commenters where a school may lose eligibility for a program with no enrollees or a very small number of enrollees and the loss of that program had little or no negative impact on the financial condition of the institution. Meanwhile, we think the narrower focus of the revised teach-out trigger will capture the most serious situations. We will also have the change in ownership trigger require a recalculation of the composite score that results in a failure. This aligns § 668.171(c)(2)(i)(D) with the triggers in § 668.171(c)(2)(i)(A) and (C).

We, however, disagree with the other changes recommended by commenters. As also discussed in greater detail throughout this section, we are concerned that institutions that have half their revenue in failing GE programs could face significant financial challenges if they lose half or more of their title IV, HEA revenue. The lawsuit trigger represents serious legal actions taken by government actors, which are not common and can result in very serious judgments against institutions. Similarly, the triggers related to publicly traded entities represent situations where those companies can face the possible loss of access to financial markets or other forms of serious financial consequences that could be a sign of a lack of stability. We believe those items are all serious enough to merit keeping them as mandatory triggers.

*Changes:* We have removed the mandatory triggers that were proposed in § 668.171(c)(2)(v) and (ix) and have moved the provision in proposed § 668.171(c)(2)(v) to the discretionary trigger in § 668.171(d)(9) and have moved the provision in proposed § 668.171(c)(2)(ix) to the discretionary trigger in § 668.171(d)(10). We reserved § 668.171(c)(2)(v) and (ix). We have narrowed the scope of the teach-out trigger in § 668.171(c)(2)(iv) and we will recalculate the composite score for the trigger under § 668.171(c)(2)(i)(D) related to institutions that have

undergone a recent change in ownership and have monetary obligations arising from certain legal and administrative actions.

*Comments:* Many commenters expressed the view that some of the mandatory triggers were duplicative of other areas which the Department monitors for compliance. Some examples put forth by the commenters to justify their view included the financial triggers concerning GE programs, high CDRs, and the 90/10 rule. The commenters believed that the imposition of a potentially debilitating mandatory letter of credit in these situations, without a determination by the Department that the institution is unable to rectify the triggering event, or that the triggering event will have an immediate impact on the institution's financial responsibility, could cause a precipitous financial crisis at the institution when one would have otherwise not been present.

*Discussion:* The Department disagrees with the commenters. The goal of the mandatory triggers is to identify situations where the institution is facing a significant negative threat to its financial health, which puts the institution at an elevated risk of closure or a higher likelihood of generating liabilities such as through approved borrower defense to repayment claims. To that end, the examples highlighted by commenters show that the Department is aligning its financial accountability policies with other oversight and monitoring. For instance, an institution with high CDRs, failing 90/10 results, or at least half of its title IV, HEA funds coming from failing GE programs is a year away from losing access, in whole or in part, to the Federal student aid programs. While institutions can and do stay in business after leaving the Federal student aid programs, losing access to such a large stream of revenue represents an inarguable major financial risk to the institution. Ensuring that taxpayers are protected when the Department knows such a risk could occur is prudent oversight.

The Department also disagrees with the commenters about the effects of seeking financial protection. The Department's job is to safeguard taxpayer funds, minimize losses for discharges such as those tied to closed schools, and protect students. These triggering situations indicate events where the warning signs are significant enough that they immediately impact the institution's financial responsibility, regardless of any mitigating circumstances. In these situations, the Department must immediately exercise

greater oversight to ensure it is carrying out its mission.

*Changes:* None.
*Comments:* One commenter recommended that the Department align financial trigger reporting with accreditors which, in the commenter's opinion, were monitoring the same financial factors for accreditation purposes.

*Discussion:* The Department disagrees with the commenter. Postsecondary oversight is predicated on the idea of the regulatory triad of States, accreditation agencies, and the Federal Government. Having complementary but distinct efforts is useful for ensuring that each party is holding up its part of that accountability relationship. To that end, it is important for the Department to have its own set of financial standards that are particularly concerned with the title IV, HEA programs. Accreditors, by contrast, can and do have varying standards for financial oversight that reflect what each deems important. We do not think ceding that financial oversight work to accreditors would be appropriate, nor would it be allowed under the HEA.

*Changes:* None.
*Comments:* One commenter pointed out that some mandatory triggers are applicable only to institutions with a composite score of less than 1.5 while others are applicable to all institutions. The commenter recommended that all of the mandatory triggers only be applicable to institutions with a composite score of less than 1.5.

*Discussion:* We disagree with the commenter. Composite scores are only one element of financial responsibility analysis. In this situation we are concerned that events occur after the composite scores are calculated and, therefore, they need to be considered immediately so we can obtain financial protection when necessary. Moreover, there are many triggering situations where the threat to the institution is so great that the last completed composite score is not appropriate to consider for the trigger. For instance, if an institution has a composite score of 3.0, the highest available, but still declares financial exigency or is poised to lose access to aid unless it improves its CDRs, the Department should step in and act in response to those warning signs.

*Changes:* None.

## Legal and Administrative Actions (§ 668.171(c)(2)(i))

*Comments:* Section 668.171(c)(2)(i) specifies four mandatory triggers related to legal and administrative actions, designated as paragraphs (c)(2)(i)(A) through (D). For the purpose of this

discussion, we refer to the four separate financial triggers by those letters. A few commenters objected to paragraphs (c)(2)(i)(A) and (B), both of which address possible legal proceedings. The commenters suggested that these two triggers discouraged institutions from reaching settlements with the parties, be they private or governmental, because such a settlement may be a financial trigger, itself. The commenters opined that discouraging parties from resolving legal issues with an agreed upon settlement was bad public policy.

*Discussion:* We disagree with the commenters. The mere presence of a settlement does not result in a trigger. Rather, a settlement that results in a recalculated composite score that is less than 1.0 results in a trigger. Moreover, settlements arise as an alternative to litigating a case, which has the risk of ending in a judgment against the institution, which would also be captured as a trigger if a recalculation produces a composite score of less than 1.0. Settlements are generally designed to benefit both parties and avoid further litigation, which carries its own costs and risks, including the possibility of judgments against the institution that are larger than amounts paid in the settlement. Accordingly, we see no reason to think this trigger discourages institutions working to resolve litigation in the manner that works best for them.

We note that the reference to debts, liabilities, and losses may have contributed to some confusion about what causes the triggers described in this section. Accordingly, we have changed the heading of this paragraph to ''Legal and administrative actions'' which more accurately describes the actions described. We have also modified the regulatory text in paragraphs (c)(2)(i)(A) and (D) to describe more accurately the actions and resulting monetary judgments or awards, or monetary settlements which result from a legal proceeding that will result in a financial trigger. Those changes are explained in detail below.

*Changes:* We have changed the heading of § 668.171(c)(2)(i) to ''Legal and administrative actions.'' We have changed the text in § 668.171(c)(2)(i)(A) to more accurately state the types of monetary actions that are linked to this financial trigger. They are when an institution has entered against it a final monetary judgment or award or enters into a monetary settlement which results from a legal proceeding, including from a lawsuit, arbitration, or mediation, whether or not the judgment, award or settlement has been paid. In addition, we have modified paragraph (c)(2)(i)(D) of this section which

describes a financial trigger applicable to institutions that have recently undergone a change in ownership. The revised language more accurately describes the monetary actions that will lead to the financial trigger and those actions are when the institution has entered against it a final monetary judgment or award or enters into a monetary settlement which results from a legal proceeding, including from a lawsuit, arbitration, or mediation whether or not the obligation has been paid.

*Comments:* A few commenters argued that paragraphs (c)(2)(i)(A), (B), and (D) gave too much leverage to claimants and government agencies in that they could use the threat of a financial trigger being imposed as part of resolving their grievance with the institution.

*Discussion:* We disagree with the commenters. With respect to the provisions in paragraphs (c)(2)(i)(A) and (D), these are elements that result in the composite score being recalculated and which has to result in a failure. The events that are described in paragraphs (c)(2)(i)(A) and (D) result from an actual adjudication of a monetary judgment or award, or the institution's agreement to be bound by a monetary settlement. That means there has been some process in which an institution would have had an opportunity to defend themselves and they are still being asked to pay some kind of amount. With a settlement, that represents a negotiated situation in which an institution has decided it is in its benefit to reach that agreement.

With respect to the government enforcement actions in paragraph (c)(2)(i)(B), the provision does not, as commenters claim, create risks of regulators wielding baseless and frivolous enforcement actions to extort participating institutions. The risks commenters invoke more accurately describe the incentives of lawsuits by private litigants—which are not covered—rather than government enforcement actions. Unlike private litigants, government enforcement actions are tools for enforcing laws and regulations. They lack the incentives associated with lawsuits that can result in private financial gain. Likewise, the government can employ investigative tools of compulsory process to gather evidence and has options outside of civil discovery for obtaining relevant information. Similarly, government regulators' decisions to pursue enforcement are ordinarily informed by considerations in statute, rules, or agency guidance and based on the probability of ultimate success and

efforts at resolution without litigation.[11] Those considerations and the practicalities of allocating limited resources make commenters' fears unlikely. Indeed, neither commenters' submissions nor the Department's experience suggest any examples of frivolous enforcement actions against title IV, HEA participants. And in the unlikely event of one, the provision's triggers may be addressed through filing a motion to dismiss—which provides ample opportunity to filter out actions that are frivolous or facially deficient. Contrary to commenters' speculative fears, the presence of this trigger ensures the Department is acting when there are warning signs about potential negative effects to the financial health of institutions.

*Changes:* None.

*Comments:* A few commenters took issue with the provision in paragraph (c)(2)(i)(B) that includes as a trigger a qui tam lawsuit, in which the Federal Government has intervened, and which has been pending for 120 days, that would constitute a mandatory trigger. They opined that the mere filing of a qui tam lawsuit, regardless of government intervention, should not be a financial trigger. Those commenters went on to object to the 120-day period proposed in the regulation that says that the mandatory trigger applies if there has been no motion to dismiss within 120 days of government intervention or if there was such a motion and it was denied. The commenters stated that 120 days was insufficient in addressing the deprivation of the institution's due process and believed that motions to dismiss at such early stages of a lawsuit are limited to the face of the pleadings without consideration of the factual merits of the claims. They believed the trigger would be activated without due regard to the merits of the claims or the institution's defenses to those claims.

*Discussion:* The commenters misinterpret the standards by which a qui tam lawsuit would become a triggering condition under this paragraph. The mere filing of a qui tam

---

[11] *See, e.g.,* 15 U.S.C. 53(a) (enforcement actions predicated on Federal Trade Commission having a ''reason to believe'' there is an existing or impending violation of relevant law and that the remedy sought ''would be in the interest of the public''); U.S. Dep't of Just., Just. Manual sec. 9–27.220 (2018) (Federal prosecutions informed by a determination that the conduct violates Federal law, that admissible evidence that is probably ''sufficient to obtain and sustain a conviction,'' that action is in the public interest, and that there alternatives remedies are inadequate); E.O. 12988, 61 FR 4729 (Feb. 5, 1996) (civil litigation must be preceded by pre-suit notice, settlement efforts, and attempts at alternative dispute resolution in order to, among other factors, limit suits to ''only meritorious civil claims'').

does not result in a trigger. It is only if the government intervenes that a qui tam could be considered under paragraph (c)(2)(i)(B). According to the U.S. Department of Justice, such interventions only occur in about one-quarter of qui tam cases,[12] and intervention decisions are informed by an express determination of the case's merits.[13] These are not steps that are taken lightly or that occur commonly in the postsecondary education space. Indeed, actions involving institutions of higher education represent only a small fraction of qui tam lawsuits, most of which relate to programs like those administered by the U.S. Department of Health and Human Services (HHS). Statistics from the U.S. Department of Justice show that 61 percent of the 15,246 qui tam lawsuits brought from 1987 to 2022 were related to HHS.[14] Another 12 percent were related to the U.S. Department of Defense.

The Department believes the 120 days are appropriate because it gives sufficient time for a defendant to file a motion to dismiss. At the same time, this captures potential lawsuits early enough in progress that the Department would not be seeking financial protection at the same time an institution has lost a case, which could be the case if we were to instead consider timing related to motions for summary judgment.

The Department does, however, recognize that the phrasing of the trigger related to lawsuits in the NPRM was confusing as it was not fully clear how the 120-day requirements applied to different types of lawsuits. Accordingly, we have clarified in the regulatory text that the trigger applies to lawsuits that have been pending for 120 days or qui tam lawsuits that have been pending for 120 days since U.S. intervention and there has been no motion to dismiss filed or such a motion was filed and denied within 120 days. This update clarifies that this trigger is predicated on the decision by a governmental official with regulatory or law enforcement authority that the school committed the conduct alleged in circumstances warranting an enforcement action and the case having proceeded past the motion-to-dismiss stage. We have also indicated that this would cover motions to dismiss or equivalent motions under State law, such as demurrers.

*Changes:* We have changed the text in § 668.171(c)(2)(i)(B) to more clearly convey how the 120-day requirements work for lawsuits as described above.

*Comments:* One commenter sought clarification regarding the financial trigger in paragraph (c)(2)(i)(B) that states that an institution that is sued by a Federal or State authority to impose an injunction, establish fines or penalties, or to obtain financial relief such as damages would have the mandatory trigger implemented. The commenter inquired if more than one entity is suing the institution for the same act or event, would that generate one requirement for financial protection or multiple requirements due to there being multiple agencies involved in the proceedings. The commenter supported treating such a circumstance as a single event with a single requirement for financial protection.

*Discussion:* As discussed earlier, the Department will review the triggering conditions to determine if what appears to be multiple triggering situations is attributed to a single instance, such as multiple States suing one institution. We will consider whether to treat multiple triggering situations as a single requirement for financial protection on a case-by-case basis as we examine the specific facts.

*Changes:* None.

*Comments:* One commenter recommended that the trigger described in paragraph (c)(2)(i)(B) be modified to be based on summary judgment. The commenter urged the Department to modify the trigger so that it is premised on the agency surviving a motion for summary judgment rather than a motion to dismiss, as proposed. The commenter posited that a motion to dismiss is too low a bar and does not reflect judicial consideration of the merits of the claim. The commenter contends that an agency surviving a summary judgment motion is a better indicator that the agency has a viable claim and that the subject institution is at some financial risk. The commenter acknowledged that premising this trigger on a summary judgment would extend the timeframe somewhat, but nevertheless would occur well before a trial or any appeals.

*Discussion:* The Department disagrees with the commenter. Refraining from any trigger until after the point at which the institution is facing trial makes the Department likely to face circumstances in which much-needed financial protections are not available until it is too late. Similarly, in cases where both parties file cross-motions for summary judgment, and summary judgment on liability is granted to the agency, it may be too late to obtain financial protection.

Instead, the regulations strike the appropriate balance by providing the needed financial protections after a government official with regulatory or law enforcement authority decides, often after an investigation, that the circumstances warrant an enforcement action and, furthermore, after that action has proceeded past the motion-to-dismiss stage.

*Changes:* None.

*Comments:* One commenter suggested that we limit paragraph (c)(2)(i)(B) to Federal and State agencies with specific oversight of postsecondary institutions rather than the proposed language that simply says, "sued by a Federal or State authority." The commenter gave an example of the IRS or a state taxing authority suing the institution, thereby initiating the mandatory trigger, even though these agencies have no particular oversight of the educational operations of the institution.

*Discussion:* The purpose of the mandatory trigger is to identify situations where the financial health of an institution is at risk. For example, any action lawsuit from the Federal or State government based upon that alleges significant liabilities due to unpaid back taxes could represent just as great a risk to an institution's finances as a lawsuit that is specific to Federal financial aid. We, therefore, decline to adopt the commenter's suggestion.

*Changes:* None.

*Comments:* A number of commenters objected to the triggers related to lawsuits. They argued that the requirement that an institution's unfounded lawsuit that fails on the merits might require the institution to post substantial financial protection. One commenter opined that this established a situation where the institution was "guilty until proven innocent." Other commenters believed that the elimination of arbitration agreements and the class action lawsuits in the Borrower Defense regulations creates an environment where frivolous lawsuits against institution will be encouraged with needless financial triggers being activated.

*Discussion:* We disagree with the commenters whose arguments do not accurately capture the nature of the trigger related to lawsuits in § 668.171(c)(2)(i)(A) and (B). For the situations in paragraph (c)(2)(i)(A) of this section, financial protection requirements only occur if the institution is required to pay a debt or incurs a liability from a settlement, arbitration proceeding or a final judgment in a judicial proceeding. Moreover, this trigger is only activated

---

[12] *www.justice.gov/sites/default/files/usao-edpa/ legacy/2012/06/13/ internetWhistleblower%20update.pdf.*

[13] *See* U.S. Dep't of Just., Just. Manual sec. 4– 4.110 (2018).

[14] *www.justice.gov/d9/press-releases/ attachments/2023/02/07/fy2022_statistics_0.pdf.*

if the legal determination results in the impacted institution having a recalculated composite score of less than 1.0, the failing threshold. The focus of this trigger is on the financial consequences to the institution originating from those legal or administrative actions.

The triggering event described in paragraph (c)(2)(i)(B), meanwhile, does not include just any lawsuit filed. It only occurs if the institution is sued by a Federal or State authority to impose an injunction, establish fines or penalties or to obtain financial relief or if the Federal Government decides to intervene in a qui tam lawsuit. Government lawsuits against institutions of higher education are not common events and are not actions undertaken lightly. While qui tam lawsuits are brought by private individuals, they are only a triggering event if joined by the Federal Government, which is also a rare occurrence. None of these are frivolous actions. It is incorrect to claim that the elimination of mandatory arbitration agreements and preventing institutions from forcing students to waive their right to participate in a class action lawsuit create an environment supporting frivolous lawsuits would lead to an increase in the number of mandatory triggering events tied to lawsuits. The mere filing of a class action or other private litigation (other than a qui tam where the government has intervened) are not captured under the mandatory trigger.

The provisions related to borrower defense are also not triggered by the mere presence of claims. They are related to recovery efforts for approved claims as a mandatory trigger or the formation of a group process by the Department for a discretionary trigger. For the discretionary trigger related to borrower defense, the Department must determine that the circumstances create a significant adverse effect on the institution. These are standards that depend upon actions by the Department that are informed by either the approval of claims, which follows a determination based upon a preponderance of the evidence that the institution engaged in conduct that merits a borrower defense approval, or signs that it may have engaged in such conduct for the formation of a group.

*Changes:* None.

*Comments:* One commenter sought clarification on paragraph (c)(2)(i)(C) which describes a trigger that is activated if the Department initiates an action against an institution to recover the costs of adjudicated claims in favor of borrowers under the loan discharge

provisions in 34 CFR part 685. The commenter wanted to ensure that this trigger applied to borrower defense loan discharges and not to other loan discharges like a closed school discharge.

*Discussion:* We agree with the commenter that the trigger described in § 668.171(c)(2)(i)(C) is applicable to borrower defense loan discharges, as we conveyed in the preamble discussion of the NPRM.

*Changes:* We modified the regulatory language in § 668.171(c)(2)(i)(C) to clarify that this trigger is initiated by the Department initiating an action to recover the cost of adjudicated claims in favor of borrowers under the borrower defense to repayment provisions.

*Comments:* A few commenters objected to the provision in paragraph (c)(2)(i)(D) by which institutions undergoing a change in ownership would be subject to a mandatory trigger if the institution is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or an administrative proceeding determination. They also voiced an objection based on the process of a change in ownership being closely monitored and strictly controlled by the Department and therefore the Department can quantify the exact impact of any debt or liability as part of the Department's process. The commenter believed that this ability rendered the financial trigger unnecessary.

*Discussion:* We disagree with the commenters, in part. Each of the actions in paragraphs (c)(2)(i)(A) through (C) of § 668.171 show that an institution is facing a serious legal and administrative action that can result in financial instability of an institution. These events are more concerning after a change in ownership and creates uncertainty around the new owner's ability to operate the institution in a financially responsible way.

Moreover, although the Department reviews the same day balance sheet and financial statements for the new owner and institutions in the course of its review of changes in ownership, those financial statements reflect specific points in time (the day of the transaction and the two fiscal years prior to the transaction). As a result, those financial statements do not capture litigation outcomes that occur subsequently, but which could have a significant negative impact on the institution's finances. Therefore, we do believe that it would be appropriate to also treat this trigger as one that requires a recalculation of the composite score.

This aligns the change in ownership requirements with § 668.171(c)(2)(i)(A), except in paragraph (c)(2)(i)(D) we would perform the recalculation for all situations that are captured in paragraph (c)(2)(i)(D) and not limit it just to those with a composite score of less than 1.5. We think that is appropriate given the concerns about changes in ownership. This means that every action under § 668.171(c)(2)(i) except for paragraph (c)(2)(i)(B) results in a recalculation. We do not recalculate paragraph (c)(2)(i)(B) because the litigation may not indicate a specific dollar amount that would form the basis of a recalculation.

*Changes:* We have indicated in the regulation that institutions subject to paragraph (c)(2)(i)(D) of § 668.171 will have their composite score recalculated.

*Withdrawal of Owner's Equity (§ 668.171(c)(2)(ii))*

*Comments:* One commenter posited that an institution with a score of less than 1.5 that paid a dividend or engaged in a stock buyback which resulted in a recalculated score of less than 1.0 should not be automatically subject to a financial protection requirement. The commenter stated that institutions in this situation should be evaluated to determine if the activity poses financial risk to the institution.

*Discussion:* We disagree with the commenter. In the situation presented as an example, the institution, after engaging in the financial activity, has a failing composite score of less than 1.0. By that measure, the institution is not financially responsible and that results in the need for financial protection, *e.g.,* a letter of credit.

*Changes:* None.

*Comments:* Some commenters objected to the provision in § 668.171(c)(2)(ii) where a proprietary institution with a composite score of less than 1.5 or any proprietary institution through the end of its first full fiscal year following a change in ownership would be subject to the financial trigger. That trigger occurs when an applicable institution has a withdrawal of owner's equity by any means, including a dividend, unless the withdrawal is a transfer to an entity included in the affiliated entity group or is the equivalent of wages in a sole proprietorship or general partnership or a required dividend or return of capital. The requirement for financial protection would only be initiated if the institution, as a result the withdrawal of equity, has a recalculated composite score of less than 1.0, the threshold for failure. The commenters opined that this regulation would create a burden for the Department in that it would be

reviewing many institutions which fall subject to this trigger, but it is then determined that the financial event did not drive the institution's composite score to below 1.0. The commenters further stated that current regulations governing this matter were sufficient and did not require modification.

*Discussion:* We disagree with the commenters. We believe the administrative burden placed on the Department is acceptable because of the significant risk faced by taxpayers when institutions now have a failing composite score as a result of the owner's equity withdrawal. As noted in paragraph (c)(2)(ii)(B) of this section, these institutions would now have a failing composite score and that necessitates obtaining financial protection.

*Changes:* None.

*Significant Share of Federal Aid in Failing GE Programs (§ 668.171(c)(2)(iii))*

*Comments:* Several commenters opposed the financial trigger in § 668.171(c)(2)(iii) for institutions that receive at least 50 percent of their title IV, HEA funds from GE programs that are failing under subpart S of part 668. The commenters stated that this trigger did not correlate to the financial stability of the institution. One of those commenters believed that this trigger would be an extraordinary burden to an institution that offered a limited number of programs. Another stated that the GE calculation has a look back period of several years and that data are not indicative of the institution's current financial status. Some of the commenters believed that the GE provisions in subpart S are sufficient in themselves for Departmental monitoring without adding an additional financial trigger linked to GE.

*Discussion:* We disagree with the commenters. The purpose of the financial triggers is to alert the Department of an institution's financial instability as soon as it is reasonable to know of that situation. An institution with at least half of its title IV, HEA funds coming from failing programs is at risk of a significant loss of revenue if those programs continue to fail and lose title IV eligibility. The projected cessation of these funds creates a situation where the institution's financial health could be negatively impacted. Such a situation is exactly what the financial triggers, as opposed to the GE regulations, are designed to counteract so that financial protection can be obtained to protect current and prospective students at the institution as well as protecting taxpayers' interests.

The issues about the age of the data and the number of programs offered are not relevant for these concerns. The focus of this trigger is about the potential for the effect on the revenue. Whether half of the title IV, HEA revenue comes from one, 10, or 100 programs is not relevant since the overall threat to revenue in percentage terms is the same. Similarly, the Department's concern is about how a program failing the gainful employment requirements could lead to the loss of Federal aid and what that means for the institution's ability to meet its financial obligations. We are worried about the forward-looking implications of that provision, and issues related to the age of the data are addressed by the Department in the separate final rule related to gainful employment.

*Changes:* None.

*Teach-Out Plans (§ 668.171(c)(2)(iv))*

*Comments:* Several commenters expressed concerns around the mandatory trigger in § 668.171(c)(2)(iv) tied to when an institution is required to submit a teach-out plan or agreement required by a State or Federal agency, an accreditor, or any other oversight entity. The commenters expressed the view that institutions are sometimes required to submit a teach-out plan as a normal course of business and not due to any fear of closure, institutional misconduct, or financial instability. A few of the commenters observed that teach-out plans can increase the financial strength of the institution rather than decrease it. A few commenters observed that some institutions may be reluctant to enter a teach-out so that they would not bear the burden of the financial trigger. One of the commenters asserted that the Department could be the Federal agency requiring the teach-out plan, which then in turn would initiate the mandatory trigger associated with submitting a teach-out plan due to changes being made in the certification procedures part of this rule to request a teach-out for a provisionally certified institution deemed at risk of closure. Some commenters argued that mandatory triggers should only be applied to teach-out agreements requested for financial reasons.

Other commenters raised concerns that the trigger as written could require a school to provide financial protection if it voluntarily chose to discontinue a program and was asked by the accreditor to create a teach-out as part of that process.

*Discussion:* The Department agrees with the commenters, in part, that the teach-out trigger as included in the NPRM may capture instances that are not sufficiently concerning enough to merit a mandatory trigger. However, we maintain that circumstances may exist where a teach-out request is a sign of financial instability that merits the Department's action. These required submissions are often associated with institutions facing imminent closure or other financial catastrophe where students are negatively impacted.

Therefore, the Department is clarifying the scope of the mandatory teach-out trigger in paragraph (c) of this section and adding a separate discretionary trigger in paragraph (d) of this section. We are modifying the mandatory trigger to include teach-outs that are requested due to, in whole or in part, to financial concerns and that cover the entire institution. This could include situations where the institution is requested to provide separate teach-outs for all its programs. This will capture the most serious situations in which teach-outs are requested and will exclude situations where the teach-out requirement is part of a routine matter.

Given the narrower scope of this mandatory trigger, we have added a separate discretionary trigger in § 668.171(d)(13) to capture other types of teach-out requests. This trigger is important because there may be other types of teach-outs that still represent significant negative financial consequences. For instance, an institution that is required to submit a teach-out agreement to cover a program that enrolls half its students because of concerns about misrepresentations may merit a financial protection request because of the extent of possible revenue loss. By contrast, a teach-out request for a single small program being phased out by the institution would not merit a financial protection request.

*Changes:* We changed § 668.171(c)(2)(iv) to clarify that the mandatory trigger is initiated when the institution is required to submit a teach-out plan or agreement, for reasons related to, in whole or in part, financial concerns. We have also added new § 668.171(d)(13) that establishes a discretionary trigger which applies to institutions required to submit other teach-out plans or agreements, including programmatic teach-outs, by a State, the Department or another Federal agency, an accrediting agency, or other oversight body that are not covered by the mandatory trigger in paragraph (c) of this section.

*State Actions (§ 668.171(c)(2)(v))*

*Comments:* A few commenters objected to the mandatory trigger in proposed § 668.171(c)(2)(v) tied to when a State licensing or authorizing agency

notifies an institution that it must comply with some requirement, or its licensure or authorization will be terminated. The commenters argued that this trigger was too far reaching and would be unnecessarily activated when an institution had the most minor infraction with a State oversight agency. A few of the commenters pointed out that some State oversight agencies include in all compliance related correspondence pro forma language that authorization can be revoked. Some of the commenters believed that this trigger gave too much leverage to State agencies in that those agencies could use the threat of the Departmental trigger in their interactions with institutions. Two commenters believed that institutions offering instruction in multiple States were particularly burdened by this regulation. One of those commenters believed that any State citation should be a discretionary trigger and not a mandatory one. The other commenter believed that a State action initiated by a State that was not the institution's home State did not present a financial concern to the institution. That commenter suggested that a State action from the institution's home State be a mandatory trigger but a State action by another State be a discretionary trigger.

*Discussion:* We agree with the commenters, in part, and have combined this triggering event with the discretionary trigger in § 668.171(d)(9) that is also related to State citations. We believe that State authorization or licensure for an institution is a fundamental factor of eligibility for institutions seeking to participate or participating in the title IV, HEA programs and that the threat of removal of a State's authorization or licensure poses a financial risk to the institution participating in the title IV, HEA programs. However, we are persuaded by the commenters that States may express these concerns with varying levels of severity and that connecting these actions to a mandatory trigger would risk being over inclusive. Therefore, we made this a discretionary trigger to account for the issues raised by the commenters. Making this a discretionary trigger means that issues raised by commenters about whether the State action is the institution's home State or not can be considered in reviewing the event.

*Changes:* We have removed the mandatory trigger at § 668.171(c)(2)(v) and instead modified the discretionary trigger at § 668.171(d)(9) to include situations where the State licensing or authorizing agency has given notice that it will withdraw or terminate the

institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement. We have reserved § 668.171(c)(2)(v).

*Publicly Listed Entities (§ 668.171(c)(2)(vi))*

*Comments:* Many commenters objected to the mandatory trigger detailed in proposed § 668.171(c)(2)(vi)(D) whereby a late annual or quarterly report required by the SEC activates the mandatory trigger. Some of the commenters opined that there was not meaningful rationale that a late submission of an SEC report indicated any lack of financial stability by the institution or any necessity for financial protection being obtained. One commenter stated that the proposed trigger was speculative, abstract, and unqualifiable and should be eliminated.

*Discussion:* We disagree with the commenters. Submissions of SEC reports are a requirement with a well-known and anticipated deadline so when an entity is late to comply with this requirement, it could be an indicator of the entity's impaired financial stability. We do agree, however, that a minor infraction is not necessarily indicative of financial instability. Such a minor infraction can be easily resolved when the institution reports the late submission of the SEC report to the Department, assuming it has submitted the report in the 21-day period following the SEC due date. Notably, as explained in our discussion of changes to § 668.171(f), we changed the reporting requirements in § 668.171(f) to allow 21 days to report the required events to the Department (rather than 10 as originally proposed) and § 668.171(f)(3)(i)(B) allows the institution to show that the triggering event has been resolved.

*Changes:* None.

*Non-Federal Educational Assistance Funds (§ 668.171(c)(2)(vii))*

*Comments:* Several commenters opined that the mandatory trigger in proposed § 668.171(c)(2)(vii) is unreasonable and unnecessary. This trigger is linked to an institution that did not receive at least 10 percent of its revenue from sources other than Federal educational assistance as provided in § 668.28(c), often referred to as the 90/10 rule. The commenters believed that since this is a regulated event under § 668.28 with sanctions for non-compliance, that there is no need for inclusion in § 668.171(c) as a mandatory trigger. One commenter thought that this trigger was particularly burdensome on distance education providers since

they are prevented from including funds generated through non-eligible distance education programs as part of their non-Federal revenue.

*Discussion:* We disagree with the commenters. Failure of the 90/10 rule is a serious issue of non-compliance with statutory and regulatory requirements. Failing this requirement twice in consecutive years results in an institution losing access to Federal student financial aid for two years. That risk of Federal student aid loss can have an immediate negative impact on the financial stability of the affected institution. This trigger allows us to seek financial protection as far in advance of the potential second failure as we can.

We also disagree with the comment about the burden on distance education providers. The exclusion of non-eligible distance education courses is part of the requirements for 90/10 compliance. Institutions should be able to meet this requirement without counting that revenue, which many distance education providers do. Compliance with the 90/10 rule is important for proprietary institutions to maintain access to title IV student aid. If an institution fails to comply with the rule, there can be serious implications for the institution's financial stability.

*Changes:* None.

*Cohort Default Rates (§ 668.171(c)(2)(viii))*

*Comments:* Many commenters expressed concerns over the mandatory trigger proposed in § 668.171(c)(2)(viii) where an institution is at risk of losing access to Federal aid due to high cohort default rates (CDRs). Many of these commenters believed it is unfair to hold institutions accountable for students' inability to repay their student loans. One commenter posited that the return to normalized student loan repayments, following the COVID–19 national emergency pause in repayments, may not be a smooth transition and that should be factored into any financial trigger linked to CDRs. One commenter stated that this was another example of information that the institution was required to report to the Department when it was already aware of the information.

*Discussion:* We disagree with the commenters. An institution subject to this trigger will lose access to Pell Grants and Direct Loans the next time CDRs are calculated unless they can lower their rates or successfully appeal their results. It is that threat of pending loss of financial aid that merits the inclusion of a mandatory trigger, regardless of the reason why an

institution has a high CDR. While it is true that institutions can and do continue operating without access to Federal student aid, it is also the case that many institutions are heavily dependent on Federal student aid and close when they lose access to it. This trigger is thus a prudent step to protect the taxpayers from potential losses that could occur if the CDR issue is not resolved by the institution.

Regarding the transition to a return to normal repayments following the COVID–19 national emergency, the Department notes that the effects of the pause will continue to keep default rates low for several years. The Department has also implemented multiple policy solutions to help students avoid default during the return to repayment. This includes a temporary 12-month "on ramp" where students who are unable to make payments will not go into default. We have also implemented a new income-driven repayment plan that is more affordable, including the automatic enrollment of delinquent borrowers if we have their approval for the disclosure of the information needed to calculate their payment on income-driven repayment. We agree with the commenter who pointed out that the Department is aware of CDRs as it is the Department that calculates them. We point out that § 668.171(f) does not require institutions to report their CDRs to the Department.

*Changes:* None.

*Loss of Eligibility (§ 668.171(c)(2)(ix))*

*Comments:* We received a few comments objecting to the mandatory trigger proposed in § 668.171(c)(2)(ix) when an institution loses eligibility to participate in a Federal educational assistance program other than those administered by the Department. The commenters believed that the trigger would encourage institutions to not participate in programs that would otherwise assist students. One of the commenters posited that the trigger should be made discretionary and only result in financial protection if the loss or revenue from losing the program's eligibility be determined to be material to the institution.

*Discussion:* We are concerned that an institution's loss of eligibility to participate in another Federal agency's educational assistance program could be a significant indicator that an institution will face financial instability. For instance, an institution that receives significant revenue from serving veterans could be financially destabilized by losing access to a U.S. Department of Veterans Affairs educational assistance program (*e.g.,* the

GI Bill). However, we are persuaded by commenters that some losses of eligibility for other Federal programs could be from programs that represent a small amount of revenue or that only persist for a couple of weeks. Accordingly, we believe making this a discretionary trigger will allow the Department to consider the magnitude of the effect from a loss of eligibility. Therefore, we have modified the discretionary trigger in § 668.171(d)(10) to include loss of institutional eligibility as well as loss of program eligibility related to participation in another Federal educational assistance program.

*Changes:* We removed the mandatory trigger in § 668.171(c)(2)(ix), and we broadened the discretionary trigger in § 668.171(d)(10) to include loss of institutional eligibility to participate in another Federal educational assistance program. Proposed § 668.171(c)(2)(ix) applied only to loss of program eligibility. We reserved § 668.171(c)(2)(ix).

*Contributions and Distributions (§ 668.171(c)(2)(x))*

*Comments:* Some commenters supported making the trigger in § 668.171(c)(2)(x) discretionary instead of mandatory. This trigger occurs when an institution's financial statements reflect a contribution in the last quarter of its fiscal year, and then an entity that is part of the financial statements makes a financial distribution during the first two quarters of the next fiscal year, which would not be captured in the current financial statements.

One commenter believed the trigger should be discretionary because the described action is not always manipulative or results in a lack of financial responsibility. Another commenter stated he or she realizes that the Department's goal is to prevent manipulation of composite scores and to ensure the composite score is demonstrating an accurate level of institutional financial resources available to the institution. The commenter opined that the trigger does not achieve that goal because the Department's recalculation of the composite score would only adjust it downward based on the distribution without consideration of other financial factors that impact the score. The commenter provided an example where an institution has an infusion of capital in the fourth quarter which it used to purchase equipment for a new program. The example continued with the school enjoying a full cohort of students in the new program with the institution achieving an increase in revenues in the first two quarters of the institution's

next fiscal year during which time the institution generated a distribution. According to the proposed trigger, the Department would only consider the contribution in the last quarter of the first fiscal year and the distribution in the first two quarters of the second fiscal year with no consideration of the increase in revenue which may keep their composite score at a passing level. For this reason, the commenter urged that this trigger be discretionary.

*Discussion:* The Department disagrees with the commenters and will keep this as a mandatory trigger. Integrity in the financial responsibility composite score is a key component in ensuring the Department conducts accurate oversight of institutions of higher education. We have seen entities engage in a practice of intentionally increasing their assets at the end of their fiscal year to make an institution's composite score look better and then withdrawing those funds within the first two quarters of the next fiscal year. Doing so presents a misleading picture of financial health and undermines integrity in the composite score process. As such, we believe it is critical to treat such behavior as a form of composite score manipulation that indicates a lack of financial responsibility.

While we understand the hypothetical example provided by commenters, we do not find it persuasive. The recalculated score would have to be a failure. An institution in that situation that made a small distribution would likely not fail the composite score if the school was as financially healthy as the commenter purports. Secondly, two quarters of a fiscal year is just six months. It is reasonable to ask institutions that receive contributions late in the year to simply wait a few months before providing a distribution. Finally, this provision is forward looking. Institutions would not be retroactively subjected to this requirement so they would know going forward that contributions at the end of the year will come with this requirement. Accordingly, we will keep this requirement as a mandatory trigger.

Upon further review, we noted that the second use of the word "institution" in this trigger in the NPRM was not the correct term when it should be "entity" as it relates to the audited financial statements that were submitted to the Department. We have therefore fixed this terminology in the final rule text to adopt the more accurate terminology.

*Changes:* We made a clarifying change to refer to the entity that is part of the financial statements rather than the institution. We also clarified that the associated reporting requirement in

§ 668.171(f)(1)(v) has a deadline of 21 days after the distribution.

*Creditor Events (§ 668.171(c)(2)(xi))*

*Comments:* Some commenters objected to the mandatory trigger dealing with creditor events in § 668.171(c)(2)(xi). One commenter asserted that a creditor may have waived the violation at issue and therefore the creditor event should not initiate the trigger. The commenter asked us to clarify whether the standard articulated at § 668.171(f)(3)(i)(A) would apply to this trigger. Another commenter believed that this trigger would hinder institutions' access to credit. The commenter continued by saying that anytime the Department took an action against a school, it would face both the impact of the action and then a subsequent requirement to post financial protection because creditors would be concerned with the possibility of an institutional default associated with the Departmental action and would be reluctant, or would refuse, to provide credit. One of the commenters opined that the trigger is written in a broad manner that would encompass minor technical violations that have little or no financial impact on the institution. One of these commenters suggested the trigger be made discretionary to give the Department the ability to weigh the impact of the creditor event and then determine the need for financial protection.

*Discussion:* The Department disagrees with the commenters and will keep this as a mandatory trigger. We are concerned that in the past institutions have had conditions inserted by creditors into financing agreements that are designed to dissuade the Department from taking action against an institution because it would make the entire amount come due or otherwise enter default and thus put the institution at risk of sudden closure. If a creditor is so concerned about an institution that it needs to attach significant conditions like automatic default in response to the Department placing conditions like heightened cash monitoring 1 or 2, then the Department believes that is an important sign that an institution is deemed financially risky enough that we should also secure upfront financial protection. It is for these same reasons that we are not persuaded by suggestions from commenters to not apply this trigger if the creditor waives the default. The Department is concerned by the signal sent by these conditions and would not have a way of knowing whether the creditor will or will not waive the default until it is too late.

We disagree with the commenters that this provision would result in the minor technical issues being captured. The regulatory language is clear that we are worried about defaults or adverse conditions. The commenter did not explain how something that is minor or technical could rise to the level of being adverse. Nor did they explain how something that is adverse, such as a default, could only be minor or technical.

This trigger is not covered by the standard articulated in § 668.171(f)(3)(i)(A). That provision is related to loan agreements under § 668.171(d)(2), a discretionary trigger. The concern with this trigger is around financing agreements that specifically implicate Department actions.

The Department's ultimate responsibility is to ensure that institutions are financially responsible, and the Department fulfills its role as a steward of the taxpayer investments in the Federal student financial aid programs. In this instance, we are concerned about efforts to discourage proper and necessary Department oversight actions.

*Changes:* None.

*Declaration of Financial Exigency (§ 668.171(c)(2)(xii))*

*Comments:* One commenter requested clarification on the trigger in § 668.171(c)(2)(xii), which is a mandatory trigger activated when an institution declares a state of financial exigency to a Federal, State, Tribal, or foreign governmental entity or its accrediting agency. The commenter asked the Department to define a "declaration of financial exigency" and clarify that it does not include a routine financial reporting letter.

*Discussion:* We defined "financial exigency" in § 668.2 in the NPRM and maintain that definition here. We confirm that, under the definition, routine financial reporting does not constitute a financial exigency.

*Changes:* None.

**Financial Responsibility—Discretionary Triggering Events (§ 668.171(d))**

*General*

*Comments:* Some commenters expressed support for the discretionary financial triggers. One of those commenters believed that the adoption of the discretionary financial triggers would enhance the financial stability of participating institutions.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Comments:* One commenter expressed support for the discretionary triggers and also proposed adding a discretionary trigger reflecting a financial rating by a third party, such as a credit rating agency, would provide the most updated financial information available to the Department for its determination of the institution's financial responsibility.

Another commenter supporting the discretionary trigger format suggested an additional discretionary trigger linked to the presence of short-term and contingent liabilities. The commenter believes that such debts present greater risks of financial instability to the institution.

*Discussion:* We decline to accept the commenters' suggestion. The presence of short-term financing is not inherently a bad thing, and it cannot be used to help an institution's composite score. Contingent liabilities should be recorded in the financial statements if the amount can be reasonably estimated. If not, it might require a disclosure with a range. We believe other triggers would capture the most common contingent liabilities, such as lawsuits and settlements. If not, the contingent liabilities would be captured in the next audited financial statements.

With regard to the credit rating agency determination, we think that looking at the other actions that could likely affect that credit rating downgrade is a better approach. In other words, we anticipate that looking at specific triggers would allow us to consider the event that leads to the rating downgrade rather than the downgrade itself.

*Changes:* None.

*Comments:* We received a few comments that opposed the discretionary financial triggers in general. One of those commenters opined that the discretionary nature of the financial triggers introduced uncertainty and potential inconsistencies in how these triggers will be applied. This commenter thought it crucial that financial triggers be based on measurable factors and the idea the Department would use its discretion diluted the idea of measurable factors being what caused implementation of any required financial protection. Finally, one commenter stated that discretionary triggers will effectively supplant more reliable indications of an institution's financial status.

*Discussion:* We disagree with the commenters. The concept of the discretionary triggers is for the Department to be alerted to any financial event at a participating institution that may place that

institution in an infringed financial status or indicate the institution is about to close. These triggers, as opposed to the mandatory triggers, allow the Department more flexibility in determining whether the institution is in financial difficulty. That discretion allows the Department to evaluate the institution's situation, often with input by the institution, to decide if the trigger warrants further action, *e.g.,* requiring financial protection. One of the flexibilities of the discretionary financial triggers is the ability to disregard the trigger when the determination is made by the Department that there is no risk to the institution or its students. Conversely, when it is determined that there are reliable indicators of an apparent risk to students the Department can act in the timeliest way possible which is almost always more rapidly than other financial indicators might allow. Additionally, any Federal Government enforcement action that is inconsistent, including how the Department implements these discretionary triggers, is subject to challenge under the Administrative Procedure Act and any other applicable laws.

Contrary to the commenter's argument, we think these triggers do present reasonable conditions where looking at their potential effect is not overly complicated. For instance, the Department could see the type of action taken by the accreditor and look at why it had taken such an action. That could help us understand the possibility of a loss of accreditation for either the institution overall or a program and thus how much revenue from title IV, HEA aid might be lost. We can look at the amounts involved in the defaults, delinquencies, creditor amounts, and judgments as well as any terms of conditions attached to those events to see their effect. The fluctuations of title IV, HEA volume, closure of locations or programs can all be considered in terms of how much title IV aid is attached those programs or locations and what that looks like as a share of institutional revenue. Similarly, for the State citations, loss of program eligibility, teach-outs, and actions by other Federal agencies we can consider the number of students enrolled from that State, how much title IV, HEA aid an institution received from a program which is no longer eligible, and what portion of the institution is being required to put together a teach-out plan. The Department would similarly know the potential size of a group under consideration for a borrower defense discharge. With the high dropout rates

the Department would know how much an institution is undergoing churn on an annual basis, which can be a sign of financial struggles given the high cost of student acquisition and the inability to have a stable and sustained revenue supply from enrollees. Finally, the Department could look at what is being investigated at an institution based upon the exchange disclosure. For all these items, there are reasonable ways for the Department to consider whether a given triggering event at a specific institution is likely to have a significant negative financial effect.

*Changes:* None.

*Comments:* A few commenters believed that the entire set of discretionary triggers were not well defined. Some indicated that the burden placed upon institutions by the discretionary triggers was unacceptable. Commenters also argued that the discretionary triggers did not give rise to issues with significant financial impact and that a process was required to determine if the discretionary trigger impacting an institution is valid and has the requisite financial impact.

*Discussion:* We disagree with the commenters. The goal of the discretionary triggers is to identify situations that could be a sign of financial weakness which merit financial protection. However, the discretionary triggers leave the Department some discretion to determine whether the circumstances are likely to have a significant adverse effect on the financial condition of the institution. This recognizes that the same discretionary triggering event may have different financial effects on an institution. For instance, an institution that closes a number of its locations, such as having a series of satellite locations that are essentially a single classroom for one course, to streamline its operations, while not losing substantial amounts of enrollment, would likely not need financial protection. On the other hand, an institution that closes all but a single location, while suffering massive enrollment losses, likely would. The measures thus do not include specific thresholds that would guarantee the imposition of financial protection, but rather lay out concerning situations that merit more extensive examination.

We also believe the burden placed upon the institution will be reasonable. Several of these triggers, such as fluctuations in title IV, HEA volume and pending borrower defense claims can be determined by the Department and do not require additional institutional reporting. The additional work to report a triggering event and then some back

and forth with the institution if the Department deems the condition potentially worrisome enough to merit a closer look is a reasonable cost compared to the benefits that come to taxpayers in obtaining financial protection prior to sudden closures and the establishment of closed school discharge liabilities. If the institution is financially stable, the case can be easily made, and the trigger will not lead to any required financial protection. If the situation is such that financial protection is determined to be necessary, then we acknowledge that burden but see it as a necessity to protect the interests of students and taxpayers. The institution, in responding to a discretionary triggering event, has the opportunity to explain or provide information to the Department that demonstrates that the triggering event has not had or will not have a significant adverse effect on the institution's financial condition.

*Changes:* None.

*Comments:* A few commenters were concerned with the language that described the discretionary triggers as including those detailed in the regulations but not limited to them. The commenters believed that a list of financial triggers must be finite and not open ended. One of the commenters opined that adding a financial trigger at a later time after the publishing of these final rules would require that it be negotiated.

*Discussion:* We disagree with the commenters. Unlike the mandatory triggers, discretionary events are ones in which the Department will take a case-by-case look at the situation and determine whether it represents a significant negative financial risk. To that end, the list of discretionary triggers identifies the items that we think are most likely to result in such considerations. That is also why we have attached reporting requirements related to them in § 668.171(f). However, with thousands of institutions of higher education there are bound to be unique situations not contemplated in these regulations in which the Department needs to take a closer look at whether they might result in financial instability. As such, the Department believes it is critical to preserve that flexibility as those situations arise. Therefore, the triggers here provide clarity to the field about issues the Department is particularly worried about while ensuring that unanticipated issues can be investigated as needed.

We do not agree that rulemaking is required to consider other factors. In many parts of our existing regulations, we have inexhaustive lists of factors or

requirements that the Department may consider or require. For instance, § 600.31(d) provides a non-exhaustive list of what might be considered a change in control. Similarly, § 668.24(c) has a non-exhaustive list of the records that an institution must maintain, as does the list of items that an institution must provide to enrolled and perspective students in § 668.43(a). For this provision related to triggers, we note that the underlying language in section 498 of the HEA lays out the types of issues the Secretary should consider to determine whether an institution is financially responsible, such as meeting financial obligations as laid out in section 498(c)(C) but does not provide any constraint on how the Secretary should determine whether an institution is meeting that criteria. Given the varied nature in which an institution could fail to show they can meet their obligations, we believe a non-exhaustive list is appropriate.

However, upon reviewing the language further, we do agree that the non-exhaustive list did not provide sufficient clarity for the community of how other situations could end up being a discretionary trigger. To address this issue, we have added new trigger in § 668.171(d)(14), which includes any other event or action that the Department learns about and is determined to likely have a significant adverse effect on the institution. This is the same condition as laid out at the start of § 668.171(d) but clarifies that any other event captured as a trigger would need to rise to this level. As a result of adding the new trigger the Department has deleted the reference to "including, but not limited to" at the start of § 668.171(d). We have also added a corresponding reporting requirement to paragraph (f) of this section.

*Changes:* We have added § 668.171(d)(14) to include any other event or condition that the Department learns about from the institution or other parties, and the Department determines that the event or condition may cause a significant adverse effect on the financial condition or operations of the institution. We have also added § 668.171(f)(1)(xviii) which contains a corresponding reporting requirement for this discretionary trigger.

*Comments:* A few commenters suggested that the final rules allow a process by which institutions can provide input to the Department. The commenters felt that this input was essential to the Department making a correct determination about an institution's financial stability once it encountered a discretionary trigger.

*Discussion:* The Department notes that § 668.171(f)(3) has provisions explaining how institutions subject to financial triggers can provide input demonstrating that the triggering event has been resolved. For discretionary triggers, the provisions in paragraph (f) allow institutions to provide explanations of how the triggering event has not had or will not have a significant adverse effect on the financial condition of the institution.

*Changes:* None.

### *Accrediting Agency, Federal, State, Local, or Tribal Actions (§ 668.171(d)(1))*

*Comments:* One commenter suggested that the final rule be modified to include accreditor findings of financial distress or significant risk of financial distress that would otherwise fall short of "probation" or "show-cause order" be considered as a discretionary trigger.

*Discussion:* We disagree with the commenter. We believe where the regulation discusses placing an institution in a comparable status to show cause or probation would capture something that was truly serious and that raised questions about an institution's financial health. We think this will capture the situations we are most worried about while not capturing every single accreditor or regulator action. Furthermore, in many instances in which an accrediting agency makes a finding of financial distress or there is significant risk of financial distress, the agency places an institution on probation or an equivalent status.

*Changes:* None.

*Comments:* One commenter objected to probation being the cause of a discretionary trigger since, in the commenter's view, institutions on probation routinely have their accreditation continued. Another commenter had a similar view regarding show-cause status as the commenter did not regard that status as a negative action but saw it as an opportunity for institutional improvement.

*Discussion:* We disagree with the commenters. In our experience, these statuses are employed by accreditors and State entities when an institution is in some degree of non-compliance with the entity's rules or standards. The Department's concern here is that an institution being placed in this status may be at risk of losing its accreditation, which could lead to negative financial consequences, such as the inability to award recognized credentials or receive Federal aid. It is also common for accreditors to use one of these statuses when they have concerns about an institution's financial health. As this is a discretionary trigger, the institution

may provide information to the Department demonstrating that the triggering event was not related to an issue that negatively impacted the institution's financial condition.

*Changes:* None.

*Comments:* One commenter sought clarification on whether the discretionary trigger applied to programmatic accreditors and programmatic State licensing entities.

*Discussion:* The language in § 668.171(d)(1) speaks to actions imposed on an institution, not a program, so this applies to an institutional accreditor as we are concerned about an institution losing accreditation, authorization, or eligibility.

*Changes:* None.

### *Other Defaults, Delinquencies, Creditor Events, and Judgments (§ 668.171(d)(2))*

*Comments:* Two commenters sought clarification whether this trigger would be activated if a creditor waived an event that would normally activate this trigger. One commenter was concerned that this trigger might be activated by an inconsequential event. The commenter suggested that this trigger be limited to those events where the institution's independent auditor states that the financial risk is significant in the annual audited financial statement.

*Discussion:* We disagree with the commenters. The purpose of the financial triggers, in most cases, is for the Department to be alerted to possible threats to the institution's financial stability between submissions of the audited financial statement. As this is a discretionary trigger, the Department has to determine that the event has a significant adverse effect on the financial condition of the institution before financial protection is required. The institution has the opportunity to provide information to the Department demonstrating that the event does not have a significant adverse effect on the institution's financial condition, or the event has been waived or resolved.

*Changes:* None.

*Comments:* One commenter was concerned that a financial trigger related to entering into a financing arrangement would introduce further strain on access to credit for postsecondary institutions.

*Discussion:* We disagree with the commenter. The provision in § 668.171(d)(2) is not simply about an institution entering into a financing arrangement. Rather, it is when an institution is subject to a default, the creditor calls due on a balance, or there are other conditions attached to default or other provisions under such arrangement that threaten the

institution's financial condition or the Department's ability to protect itself. Those include when a default, delinquency, or other event occurs that allows the creditor to require or impose an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees; or when the institution can be subject to default or other adverse condition as a result of any action by the Department. We believe this discretionary trigger is important to provide us with the flexibility to protect the Department and monitor an institution with greater financial risk due to such arrangements.

*Changes:* None.

*Comments:* One commenter sought clarification on the word "condition" as it is used in describing this trigger. The commenter's concern was that all institutions are subject to "conditions" in financing arrangements and recommended that the Department clarify that it is only conditions that give rise to potential negative consequences.

*Discussion:* We agree with the commenter that the current language is not clear. To clarify the regulatory text, we have added the word "adverse" before "condition" to align with § 668.171(d)(2)(iv).

*Changes:* We have modified § 668.171(d)(2)(i) to apply when an institution enters into a line of credit, loan agreement, security agreement, or other financing arrangement whereby the institution or entity may be subject to a default or "other adverse condition . . ." to clarify the previous language that only said "condition."

*Fluctuation in Volume (§ 668.171(d)(3))*

*Comments:* One commenter noted that there have been formula changes for the Federal methodology calculation for title IV, HEA programs due to the Free Application for Federal Student Aid (FAFSA) Simplification Act and in case of other future changes due to Federal actions, they suggest adding the language "or changes to the eligibility formula or student eligibility changes" to account for any future legislative changes that could impact student eligibility and therefore impact fluctuation in volume. Another commenter believed that additions or eliminations of title IV, HEA programs would result in fluctuation.

*Discussion:* While we agree with the commenters concern, we believe our existing language is sufficient to address that concern. The rule says fluctuations in the amount of Direct Loan or Pell Grant funds "that cannot be accounted for by changes in those programs." This

would also account for any new programs that could be added under title IV of the HEA.

*Changes:* None.

*Comments:* One commenter suggested the Department include other changes in revenue particularly from online degree or non-degree programs. The commenter stated the Department should be committed to capturing revenue fluctuations outside of title IV, HEA-specific funding, which may provide a risk to an institution's financial stability. The commenter said the proposed change would allow the Department to identify instances when traditional institutions are addressing financial challenges by relying on expanding enrollment through online or non-degree programs. The proposed language should not prevent monitoring revenue changes in other areas.

*Discussion:* The Department disagrees with the commenters. We think it is most appropriate for the Department to focus on the connection to title IV for a trigger related to fluctuations since we are tasked with oversight of the title IV, HEA programs. The institution's overall revenues, expenses, assets, and liabilities are captured on annual audited financial statements and reflected on its composite score, which is where we would observe other fluctuations and identify potential risks.

*Changes:* None.

*Comments:* One commenter requested the Department publish standards for significant fluctuations to avoid inconsistencies in audit report disclosures. Another commenter agreed with the Department's changes but encouraged the Department to provide more explicit thresholds for title IV, HEA volume fluctuations.

*Discussion:* The Department believes that the reporting requirements in § 668.171(f) provide a way for the institution to document when they think significant fluctuations are not sufficiently concerning. We do not think a single standard would be appropriate, as the percentage or dollar amount of a fluctuation would look very different depending on the size of the institution. We think the approach of considering this issue through discussions with the institution is more appropriate.

*Changes:* None.

*Comments:* Some commenters inquired whether a fluctuation in title IV, HEA volume that was linked to an institutional structural change, such as a merger or reorganization, would be treated as a discretionary trigger.

*Discussion:* The commenters' use of the term "merger" needs some clarification. When one institution acquires an institution under different

ownership, and the acquired institution is intended to become an additional location of the acquired institution, the transaction is often referred to as a merger. This type of "merger" is treated as a change in ownership in the first instance, and then the addition of an additional location. Fluctuations in title IV, HEA volume from this type of change would not be a trigger because the Department has other methods (through review of financial statements and potential provisional conditions) to exercise the appropriate oversight. The term merger is also used to refer to the situation where two schools under the same ownership are "merged" so that one institution becomes an additional location of the other institution. This type of "merger" is not treated as a change in ownership because the ownership stays the same. Fluctuations in title IV, HEA volume from this type of merger would not be a trigger so long as the title IV volume on a combined basis does not significantly fluctuate.

*Changes:* None.

*High Annual Dropout Rates (§ 668.171(d)(4))*

*Comments:* One commenter suggests the Department add language stating the high dropout rates should only be considered when they are not caused by external factors. The commenter provides examples of natural disasters and COVID–19 as reasons for high dropout rates that are not indicative of an institution's financial instability.

*Discussion:* The Department believes the reporting process in § 668.171(f) provides a way for the institution to raise these concerns and the Department to consider them without needing to write in specific ways to address these specific issues. However, we note that at a time when enrollment in postsecondary education is declining and the costs of convincing students to enroll is high, the signs of high rates of withdrawal can indicate very significant financial challenges for institutions.

*Changes:* None.

*Comments:* Several commenters called upon the Department to define "high" as it relates to this trigger. One of those commenters asked if the trigger would apply to all schools in the same way. One commenter opined that this trigger would have a disproportionately adverse effect on institutions with an open enrollment policy.

*Discussion:* We believe that the approach used by the Department in assessing discretionary triggers addresses the commenters' concerns. We will look at the dropout rate on a case-by-case basis to see if it indicates signs of financial concern. For instance,

we would look at the cost to the institution of needing to continue recruiting students to replace those who drop out and what that indicates about its financial health given both the cost of student acquisition and the loss of a more stable revenue stream that comes from someone who stays enrolled for longer periods. We would also consider issues, such as the size of the institution, as the number of students who drop out also matters for thinking about revenue in addition to the percentage that drop out.

*Changes:* None.

*Comments:* One commenter pointed out that the Department has long considered a withdrawal (or dropout) rate of less than 33 percent to be a minimum requirement for new institutions seeking participation in title IV, HEA programs for the first time. The commenter recommended that the Department evaluate all private institutions that had a dropout rate of greater than 33 percent and, on an institution-by-institution basis, determine if financial protection was required.

*Discussion:* These discretionary triggers are designed to be flexible and allow the Department to assess on a case-by-case basis whether financial protection is necessary. Thus, we are reluctant to establish a threshold for dropout rates for institutions currently participating in the title IV, HEA programs. The goal of this discretionary trigger is for the Department to evaluate whether the dropout rate of a given institution poses a threat to that institution's financial stability and ability to continue to offer services to its students.

*Changes:* None.

*Pending Borrower Defense Claims (§ 668.171(d)(6))*

*Comments:* Several commenters objected to this discretionary trigger due to an institution having the potential of providing financial protection when the Department forms a group process to consider borrower defense claims that are subject to recoupment. One of the commenters stated that this was essentially an action by the Department to recoup the funds prior to the conclusion of the adjudication of the borrower defense claims and before the institution can contest any of the claims.

*Discussion:* We disagree with the commenters. When there are enough pending borrower defense claims for the Department to form a group process, that could lead to substantial loan discharges from the Department. Therefore, it is appropriate for the Department to consider whether it

needs to seek financial protection. We disagree with the commenters that it is an action to recoup the funds. Seeking financial protection in these instances only provides potential protection for the Department and taxpayers should discharges happen.

*Changes:* None.

*Discontinuation of Programs and Closure of Locations Discretionary Triggers (§ 668.171(d)(7)) and (8))*

*Comments:* Commenters stated the 25 percent threshold determined by the Department is arbitrary and that there is not a strong enough justification to show that a discontinuation of a program or closure of a location under these circumstances is indicative of an institution's financial stability. One commenter summarized the Department's position during negotiated rulemaking on closure of locations that enroll more than 25 percent of students as being that the threshold was determined for the same reason as closure of academic programs and if a location closure strengthens an institution's finances, and the institution was financially stable there would be no escalation. The commenters also stated that the 10 percent LOC provision exceeds the materiality of the closure. Some commenters stated that the trigger will have a large impact on cosmetology schools as they often only offer cosmetology programs, therefore a closure of one program could lead to the discretionary trigger even though it would not be indicative of the institution's financial stability.

*Discussion:* The commenters' concerns speak to some of the reasons why the Department elected to make program discontinuation and location closures discretionary triggers rather than mandatory triggers. Situations such as closures that put an institution in a stronger position could be explained as part of the reporting under § 668.171(f). The Department will thus be able to consider on a case-by-case basis whether to seek financial protection. That case-by-case assessment likewise will allow for consideration of the financial effect compared to the amount of financial protection sought.

With regard to the comments related to cosmetology, if the institution only has a single program and closes it then presumably the school is closed and thus there is no ongoing financial protection requirement. Instead, there would be consideration of whether there are liabilities for closed school discharges. If an institution only offers two programs, with one being very small, then the case-by-case review of

the triggering event would allow the Department to consider whether that closure really does merit financial protection.

The thresholds in these discretionary triggers are not attached to automatic actions the way numerical thresholds are for provisions such as cohort default rates in part 668, subpart N. In those situations, institutions that exceed those thresholds face consequences unless they appeal the results. In this situation, the trigger still results in a case-by-case review and determination. To that end, the threshold keeps reporting for institutions prior to that case-by-case determination more manageable. Absent such a threshold, institutions would have to report every closure to the Department. We thus believe that 25 percent is reasonable to strike a balance between not making institutions report events that are unlikely to have a significant adverse effect on the financial condition of the institution, while not setting the threshold so high that we do miss instances of closure that would cause that result. We note this approach is not dissimilar to other areas, such as reporting requirements in § 600.21 where institutions must report changes in ownership at different percentages of ownership levels on different timeframes based upon our assumption of when a specific review of such reporting might result in a change in control.

In considering the concerns raised by commenters about the portion of this trigger related to enrollment, we also reviewed the part tied to the closure of more than 50 percent of the institution's locations. Upon further review, we think a focus on the number of locations is less useful than the emphasis on enrollment, as locations may vary greatly in size. An institution may close more than 50 percent of its locations and that action may impact only a small percentage of students. We also believe expressing these percentages, as a share of students at the institution who received title IV, HEA funds, is better than the way it was drafted in the NPRM. Focusing on title IV, HEA recipients align this trigger with programs the Department administers, and this will be data more readily apparent to us, which will simplify the burden on institutions for assessing whether this trigger should result in financial protection. We remain convinced that institutional closures of locations or programs that impact more than 25 percent of its enrolled students who received title IV, HEA funds may be an indicator of impaired financial stability. The loss of revenue represented by such a reduction in

enrollment may have an immediate impact on the institution's ability to continue to offer educational services. Additionally, this would capture most, if not all, of the instances where a closure of 50 percent of locations raises concerns for the Department. Therefore, we are modifying the regulation so that this discretionary trigger will be activated only when an institution closes locations that enroll more than 25 percent of its students who received title IV, HEA funds.

*Changes:* We revised § 668.171(d)(8) to reflect that the discretionary trigger described therein will be activated when an institution closes a location or locations that enroll more than 25 percent of the institution's students. We have removed the part of the proposed trigger in § 668.171(d)(8) for situations where an institution closes more than 50 percent of its locations. We have noted that the triggers in both paragraphs (d)(7) and (8) will be assessed as a percentage of students at the institution who received title IV, HEA program funds.

### State Actions and Citations (§ 668.171(d)(9))

*Comments:* Two commenters expressed concern that State agencies can act in areas that have nothing to do with the institution's financial condition and their action will activate this trigger. One commenter recommended that a materiality threshold be established for this trigger. One commenter was concerned that State agencies can incorrectly cite institutions and that this trigger may be activated prior to the institution being able to refute the incorrect citation.

*Discussion:* We disagree with the commenters. This is a discretionary trigger, and the institution will be able to provide information to the Department indicating that the State's action is erroneous or addresses an issue with little or no impact on the institution's financial stability. As we have stated earlier, we do not agree that a materiality threshold should be established for any of the financial triggers. Such a threshold could effectively place the decision about whether an event or action is an indicator of impaired financial stability in the purview of the institution and its auditor. We maintain that this is the Department's purview in order to ascertain if an institution is, in fact, negatively impaired financially due to the actions of a State agency. However, as we noted the discretionary triggers would involve a case-by-case determination to see if the event had a significant adverse financial effect on

the institution. That is not the same as materiality but captures a concept that the mere presence of the discretionary trigger alone is insufficient to lead to a request for financial protection. We note that we did eliminate the mandatory trigger dealing with State actions as explained under the discussion of § 668.171(c)(2)(v) above and moved that provision to be included here as part of the discretionary trigger.

*Changes:* Provisions in § 668.171(d)(9), dealing with State actions and citations has been expanded to include situations where a State licensing agency or authorizing agency provides notice that it will withdraw or terminate the institution's licensure or authorization, making those actions a discretionary trigger rather than a mandatory trigger as was proposed.

### Loss of Program Eligibility (§ 668.171(d)(10))

*Comments:* Two commenters stated that the loss of eligibility for a non-title IV Federal education assistance program may be unrelated to administrative or financial abilities and may be immaterial to an institution's financial well-being. One of the commenters contended that this discretionary trigger would require a detailed financial analysis to determine the impact of losing other Federal education assistance programs and that the Department did not provide any reasoned justification for the trigger.

*Discussion:* We disagree with the commenters. Our concern about the loss of eligibility for another Federal assistance program is twofold. One, it indicates some degree of revenue loss for the institution. For instance, an institution that serves many veterans may face financial challenges if it loses access to the GI Bill. We recognize, however, that the amount of revenue that comes from a given Federal program can vary and thus think a discretionary trigger is best used to assess the extent of the effect.

Second, we are also concerned about what loss of eligibility for a program might indicate in terms of implication for title IV, HEA programs. It is possible that the reason for the ineligibility might indicate problems with Federal aid that need to be examined as well. This may not immediately result in a request for financial protection, but it could, if it indicates a widespread practice of substantial misrepresentations, or some other concern.

We also disagree with the commenter that this would be a challenging trigger to assess. We expect institutions know how many students are served by a given Federal program and how much

money the institution receives from that program. They should be able to report that information to the Department. Where this information indicates that the loss of eligibility for another Federal education assistance program does not affect an institution's financial capability, this discretionary trigger would not lead to a requirement to provide financial protection. We note that we modified this discretionary trigger to also include loss of program eligibility related to participation in another Federal educational assistance program, which was a proposed mandatory trigger in § 668.171(c)(2)(ix) of the NPRM.

*Changes:* As mentioned previously, we removed the mandatory trigger in § 668.171(c)(2)(ix) and included the substance of that proposed mandatory trigger in the discretionary trigger in § 668.171(d)(10) to provide ''The institution or one or more of its programs has lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution or its programs.''

### Exchange Disclosures (§ 668.171(d)(11))

*Comments:* One commenter requested the Department clarify that the discretionary trigger concerning exchange disclosures would activate only if the possible violation negatively impacted the financial condition of the institution.

*Discussion:* This is a discretionary trigger, and institutions would not be required to provide financial protection if they provide information to the Department indicating that the action is not likely to have a significant adverse effect on the financial condition of the institution.

*Changes:* None.

### Directed Question

*Comments:* Several commenters responded to the Department's directed question about whether the Department should include a discretionary or mandatory trigger related to when an institution receives a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity (local, State, Tribal, Federal, or foreign). This would be tied to the reporting requirement in proposed § 668.171(f)(1)(iii).

Some commenters recommended that an investigation by a government entity be included as a discretionary trigger. The commenter believed that simply reporting the occurrence was insufficient and the Department should be empowered to obtain financial

protection if it determines that such protection is warranted.

Some commenters stated that an investigation itself should not be a trigger and there should not be a requirement to report investigations. Another commenter requested the Department clarify whether the trigger covers all third-party requests for information rather than only those from government agencies. Another commenter opined that establishing this factor as a trigger would place too much authority in the hands of a third party.

*Discussion:* The Department agrees with the commenters that it would not be appropriate to make these items a discretionary or mandatory trigger. We believe that the mandatory trigger related to lawsuits in § 668.171(c)(2)(i)(B) captures situations where such requests results in litigation. Other triggers, such as the ones related to SEC actions, State actions, or loss of eligibility for other Federal programs also capture events that may start with such information requests. We think those events are better suited to being triggers because they occur further along in the process whereas information requests are too early to be able to tell the potential effects on financial responsibility.

However, the Department believes that it is still critical to have information on these types of situations for riskier institutions. Knowing about ongoing investigations can help the Department assess whether it should be looking more carefully into an institution and allows us to know sooner if problems might be coming. Accordingly, we are not adopting any trigger language related to this provision in § 668.171(c) or (d). We are also removing the reporting requirement § 668.171(f) because it is not appropriate to ask institutions to report on this information for financial responsibility purposes if it is not being used as a listed discretionary trigger. Instead, we will move a version of this language into § 668.14(e)(10). That is a more appropriate spot for requesting such reporting from riskier institutions, as that section lists conditions that the Secretary may place into the PPA for a provisionally certified institution. In doing so, we also deleted the reference to "informal" information requests because we think that would be too unclear a standard for institutions to understand. This language thus only applies to formal requests, which include subpoenas, civil investigative demands, and requests for documents or information. We have also clarified that institutions would only need to report such requests that are related to areas of

Department oversight, particularly those related to potential borrower defense claims and substantial misrepresentations. These areas are the marketing or recruiting of prospective students, the awarding of Federal financial aid for enrollment at the school, or the provision of educational services for which the Federal aid was provided.

*Changes:* We have removed language in § 668.171(f)(1)(iii) and relocated a modified version of it to § 668.14(e)(10).

## Financial Responsibility—Recalculating the Composite Score (§ 668.171(e))

*Comments:* One commenter agreed with the Department's changes to § 668.171(e).

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* Some commenters suggested that under § 668.171(e)(3)(ii) and (e)(4)(ii), the equity ratio should be adjusted by decreasing both the modified total assets in addition to modified equity. If the Department is decreasing an institution's equity, its total assets should be decreased as well, the commenters argued. Another commenter suggested to make this change only under § 668.171(e)(3)(ii).

*Discussion:* The commenters are correct that both modified equity and modified assets should be reduced for § 668.171(e)(3)(ii), the withdrawal of equity, because for double entry accounting the adjustments would be to decrease the equity and the asset. However, we do not think the change is appropriate for § 668.171(e)(4)(ii), the reclassification of a contribution, because reclassifying a contribution to a short-term loan would be an increase in a liability and a decrease in equity. We have made that change in the regulatory text in the first identified place.

*Changes:* We have adjusted § 668.171(e)(3)(ii) to note that we will also reduce the modified assets.

## Financial Responsibility—Reporting Requirements (§ 668.171(f))

*Comments:* One commenter offered general support for the enhanced reporting requirements and the associated timelines.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* Several commenters stated that the reporting requirements are excessive and burdensome and will lead to institutions not submitting reports timely. One commenter stated that they will likely have to hire additional staff.

*Discussion:* The Department disagrees that the reporting requirements are as complicated as indicated by commenters. The mandatory triggers represent situations that would be easily identifiable by the institution. For instance, they would be well aware if they have been sued, would know if they declared financial exigency, or other similar circumstances. Several mandatory and discretionary triggers also rely upon data that the Department already has in its possession, such as default rates, 90/10 and GE results, and changes in aid volume. Other things are information that institutions have to report anyway, such as accreditor actions or closures of locations. The Department also expects institutions to maintain an adequate number of qualified persons to administer the title IV, HEA programs, as discussed elsewhere in this final rule pertaining to administrative capability. Therefore, we believe the information needed to be reported is manageable and consists of many things that are already covered by other reporting requirements.

*Changes:* None.

*Comments:* Several commenters said 10 days to report triggering events was too short. Some requested 30 days from when the institution had requisite knowledge to report the triggering event. One commenter suggested 21 days would be an appropriate amount of time to report, noting that would fit with the monthly accounting cycle and related financial reporting.

*Discussion:* The Department agrees with the commenters that it is reasonable to provide more than 10 days for reporting. We are particularly persuaded by the suggestion from the commenters to use 21 days as they tied that to existing accounting processes, while other commenters did not provide a specific basis for 30 days. We, however, are establishing that the 21 days be based upon when the event occurred since that is an objective date rather than attempting to ascertain when institutional leadership became aware of the situation. A determination based upon institutional knowledge and awareness would be harder for the Department to verify and could result in institutions intentionally delaying reporting and then claiming they were unaware of the issue. By contrast, the date of the event is going to be more easily known.

*Changes:* We have adjusted the reporting timeframes from 10 to 21 days for any provision in § 668.171(f) that required reporting within 10 days. We have modified the regulation to clarify that the reporting timeframe in

§ 668.171(f)(1)(v) is 21 days after the distribution.

*Comments:* Several commenters raised concerns about the Department's use of the terms "preliminary" and "final" in § 668.171(f)(3)(i) and (ii), respectively. These commenters expressed confusion about how these terms interacted with the triggers, especially the mandatory triggers that are otherwise presented as automatically resulting in a request for financial protection. Commenters stated that without definition, these terms rendered the entire framework of financial responsibility unclear and how the terms will apply to the process of determining if institutions are financially responsible.

*Discussion:* The Department agrees with the commenters that the language used in § 668.171(f)(3) was insufficiently clear with respect to mandatory triggering events. In particular, the concept of a "preliminary" determination is not correct for mandatory triggering events, which represent a determination that an institution is not financially responsible and is subject to a requirement for financial protection. Accordingly, we have deleted the word "preliminary" in the first paragraph under § 668.171(f)(3)(i).

Other paragraphs within § 668.171(f)(3) raise the same issue identified by commenters about how language about a mandatory trigger resulting in a request for financial protection being contradicted by regulatory language implying the submission of additional information to then make a determination about whether financial protection should occur. In particular, proposed § 668.171(f)(3)(i)(C) contained language about the institution providing information that a mandatory or discretionary triggering event has not had or will not have a material adverse effect on the financial condition of the institution. That reference was not correct for either mandatory or discretionary triggers. As we noted in the NPRM and in this final rule, the idea behind the mandatory triggers is that they represent financial situations that are so concerning that they should result in a requirement for financial protection. That would occur following the reporting procedures in § 668.171(f), which includes the opportunity for the institution to show that the issue has been resolved. But it would not involve the demonstration of a material adverse effect. For discretionary triggers, as we have discussed, we do not think the use of the word "material" is appropriate. We have provided several reasons

elsewhere in this final rule why this is the case, including that a materiality standard would defer judgments about the potential risks to taxpayer funds to auditors and representations from institutional management when this should be a function carried out by the Department. However, we do agree that discretionary triggers need more evidence of financial effects than just their occurrence to result in financial protection requests. To make the way the triggers work clearer, we have deleted the reference to the mandatory triggers in this paragraph and also clarified that the standard under consideration is a significant adverse effect on the institution. As stated previously, the Department considers an event to have a significant adverse effect when an event or events impact the financial stability of an institution in such a way that the Department determines it poses a risk to the title IV, HEA programs. This aligns with the policy as described in the NPRM and final rule. It also captures the idea that the institution could provide evidence of the lack of a significant adverse effect for discretionary trigger situations.

The Department does not think similar alterations are necessary for the use of the word "final" in § 668.171(f)(3)(ii). That paragraph includes discretionary triggering events, which would require a determination that an institution lacks financial responsibility as part of the response in paragraph (f)(3)(i)(C). Accordingly, it is appropriate to keep the word "final" in this paragraph.

*Changes:* We removed the word preliminary as it modified the word determination in § 668.171(f)(3)(i). In § 668.171(f)(3)(i)(C), we have also removed the reference to the mandatory triggers under § 668.171(c) and replaced the word "material" (adverse effect) with "significant" (adverse effect).

*Comments:* Several commenters requested that the Department clarify under § 668.171(f) that reporting is only required when a triggering event is reasonably likely to have a material adverse effect on an institution's financial condition. One commenter said that discretionary triggers should not be required to be reported.

*Discussion:* The Department disagrees with the commenters. We believe it is more appropriate for the Department to use its discretion to review whether a given discretionary trigger has a significant adverse effect on the institution rather than relying on the self determination of institutions. Doing so would ensure greater consistency in the process as two institutions may make different judgments about an

otherwise identical event since they would not be aware of what other institutions report. By contrast, the Department will receive reports of discretionary triggers across schools and can consistently treat institutions. Accordingly, we think it is appropriate for institutions to report discretionary triggering events as noted in this section and from that there can be a determination about financial effect. We also note that in reporting the event as laid out in § 668.171(f)(3)(i)(C) the institution may clarify when it reports the triggering event that discretionary triggers do not have a significant adverse financial effect on the institution. Under § 668.171(f)(3)(i)(A) they may also report for the defaults, delinquencies, creditor events, and judgments that are discretionary triggering events as defined in § 668.171(d)(2) that those items have been waived by a creditor. Finally, under § 668.171(f)(3)(i)(B) the institution may report that the triggering event has been resolved or in the case of liabilities or debts owed under the mandatory trigger in § 668.171(c)(2)(i)(A) that the institution has sufficient insurance to cover those liabilities. The extended reporting time of 21 days to report instead of 10 will also further ensure that easily resolvable triggering events can be addressed by the time the institution informs the Department about them.

The effect of these paragraphs is that institutions may show when they first report a mandatory trigger, that is required to be reported in paragraph (f), that the triggering event has been resolved and is no longer a concern or provide additional information clarifying how a discretionary trigger does not present a significant adverse effect on the institution.

*Changes:* As discussed previously, we have changed "material" to "significant" when describing adverse effect. We also clarified in paragraph (f) the point at which an institution can respond to the Department in response to mandatory triggering events before financial protection is required.

*Comments:* Several commenters suggested that the Department remove the requirement § 668.171(f)(1)(iii) that institutions report the receipt of a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity because institutions receive regular questions and inquiries from government entities for various reasons many of which are unrelated to financial stability. One commenter stated that if the Department proceeds

with the language, we should clarify the scope of this reporting requirement.

*Discussion:* The Department agrees with commenters, in part. First, we agree that this provision is best located elsewhere, as we have declined to adopt a trigger related to it. We discuss our reasons for this in the "Directed question" section. However, we do believe that obtaining this information is critical for riskier institutions. Knowing about ongoing investigations and documentation requests helps the Department identify when there are situations that require our attention. It also allows the Department to know if there is the possibility of lawsuits or administrative actions that could impact the institution's financial health or ability to manage the title IV, HEA programs.

Given those considerations, we think this provision is better located within the set of conditions that the Secretary may impose upon provisionally certified institutions in § 668.14(e). Placing this language in that section allows the Department to request it in a more targeted manner when it would be helpful to be particularly aware of those situations.

The Department also recognizes that the language as drafted in the NPRM was broader than needed and raised questions about how institutions were supposed to comply. We have narrowed and clarified the scope of this requirement to remove the reference to informal requests, which was too vague. We have also updated the language to clarify that institutions do not have to report requests that are unrelated to areas of the Department's oversight. Accordingly, we indicate we are only interested in receiving reports related to recruitment and marketing, awarding of Federal financial aid, or the provision of educational services. The Department chose these areas because they are areas that can lead to substantial misrepresentations and potential borrower defense claims.

*Changes:* We have moved § 668.171(f)(1)(iii) to § 668.14(e)(10) and revised the text. First, we have specified that the provision only applies to formal inquiries, which include civil investigative demands, subpoenas, and other document or information requests. We have removed the reference to informal requests. Second, we clarified that these are requests related to marketing or recruitment of prospective students, the awarding of Federal financial aid for enrollment at the school, or the provision of educational services. This thus excludes the types of requests that would not be relevant to Department oversight, such as a health code

violation in the cafeteria, workplace injury investigations, and other similar items.

*Comments:* None.

*Discussion:* As previously discussed in the comments regarding discretionary triggers in paragraph (d) of this section, the Department has added a discretionary trigger at § 668.171(d)(14). As a result of that addition, we also added a corresponding reporting requirement for that trigger in paragraph (f).

*Changes:* We have added § 668.171(f)(1)(xviii) which requires institutions to report no later than 21 days after any event or condition, not already included in paragraph (d), that is likely to cause a significant adverse effect on the financial condition of the institution.

## Financial Responsibility—Public Institutions (§ 668.171(g))

*Comments:* Multiple commenters supported the Department's proposal that a domestic public institution could show that it is financially responsible by providing a letter or other documentation acceptable to the Department and signed by an official of that government entity confirming that the institution is a public institution and is backed by the full faith and credit of the government entity. The commenters believed that our prior approach excused many public institutions from scrutiny of their financial health. Commenters also provided evidence that institutions by proxy of being public are not automatically backed by the full faith and credit of the State and thus the prior regulatory requirement that institutions solely show they are public in insufficient.

Many other commenters opposed this provision. Commenters argued obtaining such a letter would be overly prescriptive and dramatically increase administrative burden and bureaucracy. Commenters also expressed concerns that States may be unwilling to provide such letters or use such a request to extract unrelated concessions from institutions. Commenters also argued that the need for such a provision is unnecessary as there is no documented history of any risk of precipitous closure or financial collapse of a public institution of higher education.

*Discussion:* Section 498 of the HEA establishes that one way an institution that fails to meet requirements of financial responsibility can still be considered financially responsible is if it "has its liabilities backed by the full faith and credit of a State or its equivalent." The Department's

longstanding policy has been to allow institutions that demonstrate they are public to not be otherwise subject to requirements like the financial responsibility composite score. The Department has also looked for full faith and credit backing in considering changes in ownership under current § 668.15. That section is being removed and reserved in this final rule, with some, but not all, of the most relevant provisions moving into § 668.176.

While the commenters are correct that the Department has not seen significant instances of public institutions than seem to be at risk of precipitous closures, we have encountered situations in which public institutions facing the potential for significant liabilities have ended up not, in fact, having full faith and credit backing from a State or its equivalent. When such situations occur, the Department is at risk of having liabilities that cannot be backed by another government entity and insufficient information about the finances of the institution to know if it would be able to reimburse those liabilities.

Accordingly, the Department believes it is critical to have a process in place for reaffirming that public institutions have full faith and credit backing when the Department believes it needs it for oversight purposes. Especially when a new public institution joins the Federal student aid programs, or a private institution converts to a public institution. Since those are brand new public institutions for title IV, HEA purposes, the Department will not have any prior record of their public status. Therefore, we believe it is always appropriate to confirm that these institutions have full faith and credit backing.

For other public institutions, we believe a more flexible approach is preferable as these will be institutions where the Department has a track record of them operating as public institutions for title IV, HEA purposes and the concerns about financial stability that merit double-checking the full faith and credit status are not as universal.

Accordingly, we are proposing to revise § 668.171(g)(1)(ii) to indicate that letters demonstrating public backing will always be required for changes in ownership that result in converting an institution from private to public and upon the first attempt to have an institution recognized as public. We separately reserve the right to make similar requests at other points. For instance, the Department might request such a letter following complaints or concerns about an institution's financial health or evidence of rapid growth that

is not clearly attributable to local population changes. We believe this approach acknowledges the concerns from commenters that applying such requests universally would generate unnecessary work to obtain letters showing what is already known but allows the Department to reaffirm this situation where we believe it to be prudent.

*Changes:* We have revised § 668.171(g)(1)(ii) to require a letter or other documentation acceptable to the Department showing a public institution's full faith and credit backing upon the Department's request, rather than for all public institutions in all instances.

*Comments:* Several commenters expressed confusion about whether the triggering events would apply to public institutions. Others wrote in saying that the financial protection requests attached to mandatory or discretionary triggers should not apply to public institutions because the Department does not seek financial protection from public institutions.

*Discussion:* The commenters are correct that the Department does not seek financial protection from public institutions on the grounds that full faith and credit backing ensures liabilities will be covered. The same would apply to the financial protection requests associated with the triggers. However, a public institution that is subject to a triggering condition could be subject to a finding of past performance, be placed on heightened cash monitoring, or have other conditions besides financial protection placed on them, such as provisional certification or additional reporting requirements.

*Changes:* None.

## Financial Responsibility—Past Performance (§ 668.174)

*Comments:* One commenter requested that the Department clarify if an institution may be delinquent in submitting its audit and if so, what period of delinquency could exist without being cited for a late audit. Another commenter suggested that if a school fails to submit a close out audit in a timely manner, the regulations should address whether such an institution be subject to a late audit citation and whether the institution can be reinstated as an eligible institution.

*Discussion:* The Department currently provides institutions with a 30-day grace period before they are cited for a late submission. Institutions that fail to provide the audit within the grace period are cited for past performance under § 668.174(a).

*Changes:* None.

*Comments:* One commenter opined that the proposed requirement in § 668.174(a)(2) would require an institution to backdate information and create a significant administrative burden.

*Discussion:* We disagree with the commenter. The requirement spells out when issues uncovered in a final audit determination, or a program review determination report would result in a finding of past performance. There is no retroactive reporting of information required. The amendment to § 668.174(a)(2) in this final rule just clarifies the timeframe of the reports in question.

*Changes:* None.

## Financial Responsibility—Alternative Standards and Requirements (§ 668.175)

*Comments:* None.
*Discussion:* In proposed § 668.175(c), we changed a reference to "providing other surety" to "providing financial protection" to better align with our other references to obtaining financial protection from institutions, when necessary. However, we neglected to make a similar change in § 668.175(b) where we referenced "providing other surety." We have changed that reference, in these final rules, to "providing other financial protection" to conform with the change made in paragraph (c) of this section.

*Changes:* We made a conforming change in § 668.175(b) to replace the word "surety" with the phrase "financial protection" to conform with a previous change made in § 668.175(c).

*Comments:* A number of commenters objected to the proposed requirement in § 668.175(c) and (f) that an institution must remedy whatever issues caused a financial responsibility failure. The commenters said that in many instances the event that triggered the failure would have been something that happened that could not be undone even if the consequences stemming from such an event had been mitigated. Commenters noted that even in some cases where a triggering event could be remedied it may take some time and expense for an institution to do so. Some commenters also said that if a situation that caused a triggering event had been remedied or otherwise resolved there would no longer be any reason for the Department to require the financial protection associated with that event.

*Discussion:* The proposed regulations require an institution failing the financial responsibility standards under § 668.171(b)(2) or (3) to remedy those

areas of noncompliance in order to participate in the title IV, HEA programs under a provisional certification. Timely reporting of triggering events may include conditions that cannot be remedied immediately but still require assessments by Department staff of the risks to the institution and its students.

As noted in the discussion related to § 668.171(f), institutions can indicate to the Department that the triggering event has been resolved. If they prove that to the satisfaction of the Department then we would not seek financial protection. However, if that issue has not been resolved, we would continue the financial protection as explained in § 668.171(c) and (d). We do not think releasing the financial protection sooner would be appropriate, as the Department wants to see that issues have been resolved and are not recurring and to give time for the filing of additional financial statements.

*Changes:* None.
*Comments:* Many commenters voiced the concern that the resources needed to provide additional letters of credit would further strain an institution given the requirements by financial institutions to provide 100 percent collateral plus fees for the letters of credit. Commenters also noted that over time letters of credit have become much more expensive for an institution to obtain. The commenters noted that in some cases institutions could be required to post letters of credit that exceeded 100 percent of an institution's annual title IV, HEA funding, an outcome described as being simply unworkable. Other commenters noted that funds used to obtain stackable letters of credit would not be available as working capital for an institution or to assist students. Other commenters acknowledged that the Department has a role to protect students but sees that as an obligation for the Department to protect against an institution's precipitous closure while not unduly impacting an institution's operations to avoid causing the problems the letters of credit are protecting against. Commenters urged the Department to retain its discretion to set the amount of any required financial protection based upon factors including the impact on an institution to meet that requirement.

*Discussion:* The Department recognizes that institutions in weakened financial conditions or at risk of incurring significant liabilities will have harder times providing financial protection. Those same weaknesses and risks warrant providing financial protections for students and taxpayers that are providing Federal student aid funds. Institutions agree to administer

those student aid funds as a fiduciary on behalf of their students, and that reasonably includes obligations to mitigate risks by providing financial protection when an institution does not meet the applicable financial responsibility standards. Students qualify to obtain Federal student aid by enrolling in eligible programs and the risk of any closure can impair or wipe out the value of a student's progress toward completing their educational programs. These risks to the students warrant requiring financial protections from the institutions notwithstanding the additional difficulties institutions may encounter meeting these requirements.

The Department does retain discretion to determine how much financial protection should be so long as that amount is above the 10 percent minimum. We believe that amount provides us a baseline level of protection that would be necessary in all circumstances in which we are seeking financial protection. But we can then make determinations whether greater amounts are needed or not. In doing so, however, the goal is to assess the level of risk to the Department and taxpayers, not simply the institution's ability to meet such requirements. An inability of the institution to provide financial protection equal to the level of risk exhibited by the institution is a concerning sign.

*Changes:* None.

*Comments:* Some commenters pointed out that some reasons the Department requires a letter of credit are not tied to immediate financial risks that an institution may be experiencing. Rather, they deal with an event such as a change in ownership resulting in a change in control where the new owner may have strong financial statements for one year but does not yet have a second year of audited financial statements for the new owner. The commenter viewed this letter of credit requirement as already providing the type of protection that would be covered if a subsequent triggering event happened under the proposed regulations. Consequently, the commenter thought there would be little need for the new owner to provide any additional letter of credit if a triggering event occurred.

*Discussion:* Financial protections required after approving a change in ownership with a new owner or a new approval for an institution to participate in the Federal student aid programs are required. This protection mitigates risks associated with the new owner operating the institution that administers Federal student aid funds as a fiduciary on behalf of its students.

During this period the institution begins to demonstrate that it meets the administrative capability requirements and establishes a track record under its then-current ownership. Reports of triggering events tied to an institution's financial responsibility may represent greater risks to the institution's continued operations than were previously known. In these instances, the increased level of financial protection is warranted while the Department reviews the report about the event and additional information provided by the institution.

*Changes:* None.

*Comments:* One commenter suggested that a larger reworking of the financial responsibility regulations was needed to restructure the consequences of a failed score and offered ongoing support to do so.

*Discussion:* The Department believes that the changes in these regulations provide improvements to its administration of the financial responsibility standards it sets and enforces for institutions. Changes to these regulations in the future will similarly be conducted through the negotiated rulemaking process to benefit from discussions and input with multiple stakeholders.

*Changes:* None.

*Comments:* One commenter said that the minimum letters of credit the Department accepts as an alternative way for an institution to demonstrate financial responsibility or to participate under the provisional certification alternative are too low. The commenter pointed out that the potential liabilities for a closed school can be higher than one year of the Federal student aid funding for that institution since substantial liabilities can arise from refunds and program liabilities. The commenter noted that this larger range of liabilities also shows that the smaller letter of credit provided under the provisional certification alternative can also be much smaller than the liabilities that could arise from a close institution. The commenter said that it is insufficient for the Department to use an institution's prior year funding as a reference for setting the percentage of a letter of credit because the potential liabilities from a closed institution could be larger than that amount.

*Discussion:* The Department recognizes that precipitous closures of institutions can easily establish repayment liabilities that exceed one year of Federal student aid funding for an institution but setting financial protection requirements at the largest potential liabilities would be poorly aligned with the day-to-day operations

of institutions that may fail the financial responsibility standards for reasons that do not present high risks of precipitous closures. We believe that the proposed regulations with the increased financial responsibility triggers and stacked letters of credit will provide a better alignment of required protections with the relative risks present at an institution. We also note that these increased notifications will also provide more information that Department staff can use in oversight to determine what additional steps may be taken to protect students.

*Changes:* None.

*Comments:* A commenter said that the options were not workable for institutions to have funds set-aside under administrative offset or provide cash to be held in escrow instead of providing a letter of credit. The commenter said it was unrealistic to think that an institution would be able to provide cash in the amounts likely to be required under the proposed regulations and noted that having funds held back through administrative offset would impair an institution's revenue stream potentially for months.

*Discussion:* We understand the challenges from choosing either one of these options would prevent many institutions from choosing them. The option for institutions to provide cash to be held in escrow is available because some institutions have asked to do this to minimize banking fees associated with obtaining a letter of credit. Similarly, the option for institutions to fund an escrow account through offset has been made available for institutions that were unable to obtain a letter of credit.

The goal of these financial responsibility provisions is to help the Department receive the financial protection deemed necessary to protect taxpayers from potential liabilities that may be uncompensated, including those stemming from closures. We recognize that providing financial protection in any form, including administrative offset, can create a cost or burden to the institution. However, we believe that burden is justified in order to protect taxpayers and for the Department to carry out its duties. Were we to adopt the posture that we would never request financial protection if it placed burden on the institution then the Department would never end up requesting such protection, would expose taxpayers to continued liabilities, and fail to meet requirements spelled out in the HEA.

*Changes:* None.

*Comments:* Commenters requested that § 668.175 specifically exclude liquidity disclosure requirements under

Financial Accounting Standards Board (FASB) ASC 958–250–50–1. (For-profit and public institutions do not have such a GAAP requirement.) Commenters made this suggestion because all nonprofit entities have a GAAP requirement to disclose in the notes to financial statements relevant information about the liquidity or maturity of assets and liabilities, including restrictions and self-imposed limits on the use of particular items, which goes beyond information provided on the face of the statement of financial position. According to the commenter, without such an exclusion, any nonprofit institution may be seen as having to provide financial protection and, accordingly, the requirements in § 668.175(c) should explain that referenced disclosures would be for institutions under financial stress and are in addition to those required for nonprofit institutions under FASB ASC 958–250–50.

*Discussion:* The Department regularly reviews financial statements for nonprofit institutions when determining whether the institution meets required standards of financial responsibility, including evaluating the extent to which the institution's assets may be encumbered or subject to donor restrictions. We do not believe that any changes to the regulations are needed to change the way that these resources are evaluated. To the extent that a reportable event takes place concerning these assets, the Department will evaluate the report to determine whether a financial risk warrants financial protection or an increase in existing financial protections. The Department reviews the liquidity disclosure; however, that disclosure does not automatically cause an institution to fail the financial responsibility standards. The language in § 668.175 provides the alternatives that an institution can continue participation in the title IV, HEA programs, an institution must have failed at least one of those standards for this section to apply to them. The Department does not exclude any of the accounting standards or disclosures from the required GAAP and GAGAS submission to the Department.

*Changes:* None.

**Financial Responsibility—Change in Ownership Requirements (§ 668.176)**

*Comments:* Several commenters stated that the Department should abandon these regulations because they would have a chilling effect on ownership transactions. Commenters argued that the postsecondary education sector is in a period of contraction and

that allowing for the acquisition of institutions will help avoid closures. They also argued that the Department should encourage (not discourage) financially strong institutions to provide a lifeline to distressed institutions. Commenters also argued that the degree of discretion available to the Department and the burden of these regulations creates too much uncertainty and burden for the parties involved in a transaction. Commenters also pointed to existing accrediting agency policies are sufficient for handling changes in ownership. Finally, commenters raised concerns about requirements that the acquiring institution assume liabilities associated with the institution being purchased as having a chilling effect on transactions.

*Discussion:* The Department believes it is necessary to reevaluate the relevant policies to accommodate the increased complexity of changes in ownership arrangements and to mitigate the greater risk to students and taxpayers when institutions fail to meet Federal requirements. The Department implemented subpart L of part 668 regulations in 1997, and it addresses the financial responsibility of institutions in circumstances other than changes of ownership. Accordingly, the Department has been relying on § 668.15 to evaluate financial health following a change in ownership. The new regulation attempts to harmonize the requirements of § 668.15 with subpart L of part 668 requirements. For example, the Department will now score the audited financial statements that are submitted for the institution and its new owner. In that way, the Department is better able, as one of the commenters suggests, to encourage financially strong acquisitions, and require financial protection in the event the acquiring entity's financial statements do not pass. The Department cannot rely on an accrediting agency to review changes of ownership. Each accrediting agency has its own standards for reviewing such changes, and the rigor and the elements of the review vary among agencies. Although requiring new owners to assume liabilities may limit their interest in some transactions, it ensures that the actual legal entities that own institutions are responsible for any liabilities that an institution fails to satisfy. The Department's interest in requiring owners to assume liability extends to situations where the conduct occurred under prior ownership, or where the liability is established under new ownership. This is also consistent with the Department's longstanding position that liabilities follow the

institution, notwithstanding a change in ownership. The Department is committed to working with institutions that seek to change ownership and we believe that these regulations strike the right balance in appropriate increase in the oversight of transactions but also adding significant regulatory clarity to the process and additional financial analysis of changes of ownership to better protect students and taxpayers.

*Changes:* None.

*Comments:* One commenter expressed concern that there may be "loopholes" that proprietary schools seeking to convert to nonprofit status will use to take advantage of students and taxpayers, while continuing to charge high tuition. However, the commenter did not identify any specific loophole for the Department to close.

*Discussion:* The Department is committed to evaluating changes in ownership so that those significant organizational changes do not put students or taxpayers at risk. One way the Department is doing that is by ensuring the resulting financial ownership is financially strong. We clarified oversight of for-profit to nonprofit conversions by publishing regulations in October 2022, which went into effect on July 1, 2023.[15] In those regulations we particularly clarified the requirements around financial involvement with a former owner to address issues the Department identified when it examined previous transactions where a purported conversion to nonprofit status involved continuing financial relationships with former owners. The Department has found that these ongoing relationships can result in inflated purchase prices with financing provided by the former owner or revenue-based servicing agreements where the former owner continued to benefit from the same stream of revenue. We believe the changes to the regulatory definition of nonprofit, as well as the increased financial oversight of changes in ownership in this final rule, coupled with the continuing rigor of the Department's review of nonprofit conversions, will allow effective Department decision-making when proprietary schools seek to convert to nonprofit status.

*Changes:* None.

*Comments:* One commenter believes that if an institution undergoes a change in ownership and it fails to submit an audited same-day balance sheet as part of an application to continue participation, the Department should address whether such an institution

---

[15] 87 FR 65426.

would be cited for late audit submission and be subject to past performance requirements. The commenter also wanted the Department to address whether the institution may be reapproved after a loss of participation if the past performance violation is still effective.

*Discussion:* The HEA and the Department's regulations provide that an institution that undergoes a change in ownership does not qualify to participate in the title IV, HEA programs.[16] It may continue to participate when the Secretary reviews the change by complying with the requirements of 34 CFR 600.20(g) and (h). Requiring the institution to submit a same day balance sheet under § 600.20(h)(3)(i) is a long-standing requirement for continued participation. The Department's review of the same day balance sheet provides a basis for which to seek financial protection promptly following the change in ownership if the same day balance sheet fails. If an institution fails to submit a same day balance sheet—or any of the other requirements under § 600.20(g) or (h)—it will be subject to a loss of eligibility. The institution may seek reinstatement, but a required element of reinstatement is compliance with those requirements—including submission of an audited same day balance sheet. If the commenter is suggesting that a failure to timely submit a same day balance sheet should bar the institution for 5 years, the Department thinks doing so would be a more significant action than is warranted.

*Changes:* None.

*Comments:* One commenter asked the Department to clarify several provisions under § 668.176(b)(2)(iii). In particular, the commenter asked whether the amount of financial protection would be based upon the title IV, HEA funds associated with one or both institutions involved. The commenter also asked how the Department intends to exempt new owners, while still applying financial protections to other new owners. The commenter said the exception for any new owner that submits two years or one year of acceptable audited financial statements is unclear.

*Discussion:* Because there are not always two institutions involved in the change in ownership, the amount of the financial protection is based on the title IV, HEA funding of the institution that is acquired. The Department has historically required financial protection (typically 25 percent) from new owners that do not have audited

financial statements. We have typically required a lower amount of financial protection (typically 10 percent) if the new owners have one but not two years of audited financial statements. The new rule codifies the practice of allowing a new owner to submit financial protection in lieu of the requirement in 34 CFR 600.20(g) that two years of audited financial statements must be submitted as part of the materially complete application.

*Changes:* None.

*Comments:* One commenter questioned the Department about whether the changes under § 668.176(b)(3) apply to the target school, the acquiring institution, or both. The commenter stated that if the changes are applicable only to the target school, then the regulation could limit a stronger acquiring institution from rescuing a struggling target school.

*Discussion:* The regulation applies to the school that is being acquired and requires that the new owner submit two years of audited financial statements or post financial protection. The commenter's concern about "limiting a stronger acquiring institution" is misplaced. First, not all transactions involve two institutions. Second, when the new owner owns another institution, the Department must confirm that the combined ownership of the two schools is financially stable. If the financial statements of the new owner do not pass the financial responsibility standard, it is prudent to require financial protection.

*Changes:* None.

*Comments:* One commenter stated that the Department should not view a buyer with a composite score below 1.5 to be unqualified (§ 668.176(b)(3)(i)(C)) because many institutions that do not meet the score have demonstrated that they can participate in the title IV, HEA programs without issue.

*Discussion:* The Department has used a composite score of 1.5 as a measure of the financial soundness of an entity for many years. These final regulations do not address the composite score methodology, nor the score required for participation in the title IV, HEA programs. We note, however, that we impose requirements on participating institutions that have a score below 1.5, which may include, among others, financial protection and provisional certification.

*Changes:* None.

*Comments:* A few commenters stated that the Department has not adequately explained in § 668.176(c) how it will determine that an institution is not financially responsible following a change in ownership if the amount of

debt assumed to complete the change in ownership requires payments (either periodic or balloon) that are inconsistent with available cash to service those payments based on enrollments for the period prior to when the payment is or will be due.

Commenters either asked the Department to publish more guidance for how it will assess whether an institution can service debt or argued that the level of cash needed to service debt was unclear and must be clarified in the final rule.

*Discussion:* The Department declines to add specifics about the process for making the acquisition debt determination. The question of how much debt is too burdensome for an institution does not have a one-size fits all answer, and so is best addressed on a transaction-specific basis. The Department will also consider issuing sub regulatory guidance in the future.

*Changes:* None.

*Comments:* One commenter requested clarification on whether the audit requirements apply just to those undergoing a change in ownership in the future or also to existing ownership structures during recertification.

*Discussion:* The provisions in § 668.176 apply to institutions undergoing a change in ownership after the effective date of these regulations.

Changes: None.

**Administrative Capability (§ 668.16)**

*General Support*

*Comments:* We received several comments in support of the amendatory changes to the administrative capability regulations in § 668.16. One commenter commended the Department's changes because they believe when institutions fail to meet administrative capability standards it is an indication that the institution provides a substandard education and jeopardizes the financial investments of the Department, taxpayers, and students.

Another commenter approved of the proposed changes related to career services, geographical accessible clinical or externship opportunities, timely disbursement rules, and improvement of financial aid counseling and communication. In addition, a commenter acknowledged the Department's amendments as a positive step to ensure that institutions that participate in Federal student aid programs are held accountable.

*Discussion:* We appreciate the support of the commenters.

*Changes:* None.

---

[16] 20 U.S.C. 1099c(i); 34 CFR 600.31(a).

*General Opposition*

*Comments:* Some commenters proposed that we remove all the additional administrative capability requirements in the NPRM. The commenters argued that the additional topics are already addressed by other regulations or accreditation standards. The commenters felt that the Department has no evidence to support the need for changes, and the consequence of a finding is significant. According to these commenters, institutions can face fines, penalties, placement on heightened cash monitoring, or even the loss of participation.

*Discussion:* We disagree with the commenters. The Department has identified issues related to administrative capability through program reviews that current regulations do not adequately address. For example, the Department has found that institutions will include externships/clinicals as part of an educational program because the hands-on experience is necessary for the field of study, but then not provide the assistance needed for the students to be placed in the required externships/clinical or the assistance is delayed to the point that the student has to drop out of the program or is dropped by the institution itself. When these required externships are not provided, or if students cannot access them due to geographic constraints, students are unable to complete their programs, or they are unable to obtain licensure or become employed in the field. Ensuring that students are able to complete programs and obtain licensure or a job in their field is an integral part of the administration of a program that provides funds for just that purpose.

Another issue that has been identified during program reviews is that institutions will delay disbursement of title IV, HEA program funds until the end of a payment period so that they can delay the payment of title IV credit balances. This may be done to manipulate an institution's results under the 90/10 rule or to avoid returning funds under return to title IV. In both cases, such actions are a way to evade accountability and oversight of taxpayer funds. Title IV, HEA credit balance funds are needed by students to pay for expenses such as transportation and childcare that are needed for students to attend school. The unnecessary delay in disbursements and payment of credit balances has forced students, who might otherwise complete their programs, to withdraw. The purpose of the title IV, HEA programs is

to provide funds needed for students to obtain educational credentials. Institutional actions that thwart that objective are evidence that the institution cannot properly administer the title IV, HEA programs in the best interests of its students.

The Department has a statutory mandate to ensure that institutions participating in the title IV, HEA programs have the administrative capability to properly implement the programs. The Department has determined that the additional requirements related to administrative capability being added in these regulations are necessary to fulfill its obligations under that statutory mandate.

With respect to the concern that noncompliance with these provisions could result in actions being taken against an institution, the Department points out that it has an obligation to properly oversee the title IV, HEA programs. The Department carries out that role using tools such as HCM, fines, suspensions, limitations, terminations, revocations, and recertification denials. The nature of the action depends on the details and severity of the finding. No matter what action is taken, institutions have the ability to respond. The regulations provide appeal rights within the Department when a suspension, limitation, termination, fine, or revocation action is taken. This final rule provides the Department with greater ability to ensure that institutions are administratively capable of providing the education they promise and of properly managing title IV, HEA programs.

Finally, we note that each of these additions to administrative capability touch on distinct areas that we would assess independently. Each plays a separate role that addresses a critical issue that is not otherwise intertwined with the others.

*Changes:* None.

*Comments:* One commenter requested that the Department delay implementation of the administrative capability requirements until July 1, 2025, to allow institutions time to implement the FAFSA Simplification changes.

*Discussion:* The Department declines to adjust the effective date. The administrative capability provisions here are important for improving our ability to evaluate the capability of institutions to participate in the title IV, HEA programs. The changes will benefit students and a delay would leave them unprotected for too long.

*Changes:* None.

*Comments:* Several commenters objected to the new administrative capability requirements. The commenters stated that the extensive changes and regulatory overload would add to the administrative burden currently facing schools, and are vague, duplicative, and challenging to measure.

*Discussion:* We disagree. As we discuss in the regulatory impact analysis, these indicators of administrative capability provide critical benefits for the Department, students, and institutions. Ensuring that students have accurate financial aid information, get their funds in a timely manner, and receive the career services they are promised is critical for having Federal investments in postsecondary education lead to success. Meanwhile, regulations on past performance, negative State actions, valid high school diplomas, and similar areas provide important protection for Federal investments. The benefits from these steps all outweigh the administrative costs to institutions.

*Changes:* None.

*Legal Authority*

*Comments:* Some commenters challenged that the proposed changes to § 668.16 would create new standards that are outside the scope of the Department's statutory authority. These commenters contended that the administrative capability standards addressed in the HEA do not include Federal student aid requirements that are separate from the actual administration of those funds. The commenters also argued that the proposed rules have no bearing on the administrative capability of an institution to efficiently administer title IV, HEA funds. The commenters indicated that provisions on career services, GE, misrepresentation, and the actions of other regulatory agencies do not belong in the administrative capability regulations.

*Discussion:* We disagree with the commenters. In adopting these rules, the Secretary is exercising authority granted by the HEA. HEA section 487(c)(1)(B) [17] authorizes the Secretary to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV, HEA programs in matters not governed by specific program provisions, and that authorization includes any matter the Secretary deems necessary for the sound administration of the student aid programs. In addition, section 498(d) of

---

[17] 20 U.S.C. 1094(c)(1)(B).

the HEA [18] authorizes the Secretary to establish certain requirements relating to institutions' administrative capacities including their past performance with respect to student aid programs, as well as to establish such reasonable procedures as the Secretary determines will contribute to ensuring that institutions will comply with the requirements of administrative capability required by the statute. These final rules represent standards the Department has deemed necessary to carry out that authority in the HEA. In the sections that follow and elsewhere in the preamble, we explain why each of the added provisions relate to an institution's ability to administer title IV, HEA programs.

*Changes:* None.

*Administrative Capability—Financial Aid Counseling (§ 668.16(h))*

*Comments:* Many commenters supported the Department's proposal requiring that financial aid communications advise students and families to accept the most beneficial types of financial assistance available to them. The commenters commended the Department for devising meaningful and detailed guidelines for disclosures to students related to Federal student aid which require institutions to disclose vital information such as the cost of attendance broken down into components, the net price, the source of aid, and whether aid must be repaid.

Another commenter supported the amendment to § 668.16(h), saying it would increase the transparency of financial aid offers for students, borrowers, and their families. The commenter believed the proposed changes would enable students and their families to make more informed decisions on how to pay for their education, how to compare financial aid offers, and how to choose among schools.

*Discussion:* We agree. We want students to understand the costs of attending their program, including costs charged directly by the institution, and the financial aid offered by an institution.

*Changes:* None.

*Comments:* A few commenters said the term "adequate" financial aid counseling is too vague.

*Discussion:* We believe that the language proposed in § 668.16(h)(1) through (4) provides the necessary clarification for what the Department deems adequate. Those paragraphs lay out the kind of information that would

be adequate for institutions to provide students.

*Changes:* None.

*Comments:* One commenter requested that the Department develop a best practices guideline that can be used by institutions to create financial aid communications specific to their student populations. The guideline, as requested by this commenter, would include all required elements to address the issue of accurate financial information such as the different types of aid, the total cost of attendance, net price, etc. The commenter believes that this approach would provide institutions the ability to further engage with students through their communications, as the comprehensive requirement may not be the most effective solution.

*Discussion:* We appreciate the commenter's suggestion. The Department already offers the College Financing Plan. Participating institutions use this standardized form to notify prospective students about their costs and financial aid. It allows prospective students to easily compare information from institutions and make informed decisions about where to attend school. The "Loan Options" box on the College Financing Plan includes fields for both the interest rate and origination fee of each loan, along with an explanation that, for Federal student loans, origination fees are deducted from loan proceeds. Furthermore, in October 2021, the office of Federal Student Aid issued a Dear Colleague Letter [19] (DCL) outlining what institutions should include and avoid when presenting students with their financial aid offers. This DCL includes guidance to institutions to present grants and scholarship aid separately from loans so that students and families can understand what they are borrowing.

*Changes:* None.

*Comments:* One commenter requested that the Department remove the phrase "for students" from § 668.16 (h)(1) since it seems out of place. The provision requires institutions to provide the cost of attendance and the estimated costs that students will owe directly to the institution based on their enrollment status. The commenter believes that the sentence could be restructured and more clearly stated.

*Discussion:* We decline to accept the commenter's suggestion. In this provision, the language says the Secretary will consider if the financial aid communications and counseling include information regarding the cost

of attendance for students. The clause separating the cost of attendance language from "for students" is important because it outlines what should be included in the cost of attendance and that it needs to present students with the total estimated costs that are owed directly to the institution.

*Changes:* None.

*Comments:* A few commenters said the requirements in § 668.16(h) are too arbitrary, prescriptive, and interfere with their ability to communicate with their students. They stated that accreditors already require them to report and provide financial aid counseling to their students. In addition, the same commenters noted that some institutions assist students with financial aid applications and debt management.

One commenter also noted that financial aid counselors are required to meet with students in need of financial aid annually, and that their students participate in entrance, exit, and financial planning seminars.

*Discussion:* We disagree with the commenters. This provision does not interfere with the ability of an institution to communicate with students about their aid. Institutions that are already communicating this information in paragraph (h) would not be required to change their practices. Rather, we are concerned that there are too many instances in which financial aid information is not clearly communicated. Not all institutions are able to meet one on one with each student, thus clear and accurate financial aid communications is relevant for those institutions. This is the case despite the presence of entrance and exit counseling because information provided, often through financial aid offers, is confusing or misleading. We cannot speak to the content of financial planning seminars offered by institutions, and it is possible that some of those would fulfill these requirements and thus not necessitate any changes by the institution. This requirement thus outlines standards for how to present communications to provide students and families with accurate information about their financial aid options as they make important educational and financial decisions, such as which school provides them with the most beneficial financial aid offer or how much to borrow. Moreover, the Department is the administrator of the Federal aid programs, which represent most financial aid dollars. While accrediting agencies can also play a role in ensuring adequate financial aid counseling, it would be irresponsible to delegate this

---

[18] 20 U.S.C. 1099c(d).

[19] GEN–DCL–21–70.

function solely to a non-governmental entity.

*Changes:* None.

*Comments:* Several commenters noted that providing additional Federal aid information to students can create confusion for potential students. One commenter cautions that disclosures that include the total cost of attendance can be beneficial, however it can also confuse students that attend institutions that do not provide student housing. An unintended consequence would be that students may confuse non-program related costs of attendance as additional institutional charges. Another commenter also noted that there is already a wide range of required consumer information provided to students and the addition of more disclosures could confuse potential students.

*Discussion:* The Department disagrees with the commenters. A student pursuing postsecondary education needs to consider how to pay for non-academic expenses, the largest of which is housing. As an example, the Department's College Financing Plan provides one option for how institutions could provide cost of attendance broken down by on campus and off campus costs. Giving students a full sense of what they will pay will help them make decisions about how to balance work, academics, and borrowing. The Department seeks to provide this clarity.

*Changes:* None.

*Comments:* Several commenters suggested that the Department could further clarify what it means in § 668.16(h) to accept the most beneficial type of financial assistance by describing the order in which students should accept their aid. These commenters suggested that scholarships and grants should be accepted first, followed by subsidized and unsubsidized loans, and then private loan options. This would ensure, according to the commenters, that students and families accept the most beneficial aid options. Another commenter further suggested that we prioritize the types of loans and include PLUS and private loans last.

Many commenters argue that the Department is too vague when we propose that institutions advise students and families to accept the most beneficial types of financial assistance available. The commenters contend that institutions are not privy to a student's overall financial status and have no basis to advise a student to incur loan debt for example. According to the commenters, there is no specific guidance for schools to make this decision.

One commenter criticized the one-size-fits-all approach proposed in the NPRM to notify students about the most beneficial aid. The commenter explained that the most beneficial aid decisions are student specific. The commenter also raised concerns that individual financial aid counseling is unlikely because administrators have less time as they comply with additional burdensome regulations while facing record staffing shortages.

Another commenter asserted that the Department must clearly state that financial aid advisors can only speak to the types of aid offered through their institution, as they are not financial advisors. On the other hand, one commenter warned that dictating which types of aid are the most beneficial could expose institutions to legal action if a student followed the advice of a financial aid offer and later found that another type of aid would have been more beneficial to them.

Several commenters request that the Department remove this new requirement from the final rule.

*Discussion:* The Department's goal with this language is not to dictate what is most beneficial, which may vary by institution or student, but rather to identify patterns and practices when an institution is repeatedly counseling students to accept one kind of aid ahead of another, even when the latter would be the better choice. For instance, an institution that repeatedly counseled students to take out loans before grant aid that does not have to be repaid would clearly not be the most beneficial. So, too, would be encouraging students' parents to take out a Parent PLUS loan ahead of the student maximizing their loans. We also have seen past instances where institutions aggressively pushed their own private loan products, including some that were sometimes presented as grants when they were actually short-term loans. Such practices would not be the most beneficial for students.

The Department already offers the College Financing Plan which provides one example to institutions on how to present financial aid information in a clear way that advises students and families to consider aid that is most beneficial, such as aid that does not have to be repaid, followed by subsidized and unsubsidized loans, and other loan options.

At the same time, we recognize that individual student circumstances vary and that students may have access to specific scholarships or there can be State loan options. We do not expect institutions or financial aid advisors to advise individual students based on

their specific financial status. We believe the emphasis of considering this issue in terms of overall patterns and practices in financial aid communications and clarity on the types of aid, such as grant and scholarship aid and loan options, rather than individual situations addresses the concerns of most of these commenters. We do not believe this would require additional burden on financial aid advisors or open institutions up to legal action.

Regarding the comments about broader financial counseling, this provision is only about financial assistance to pay for postsecondary education and does not create an expectation for institutions to understand and provide counseling to families on broader financial topics such as investments or retirement planning.

*Changes:* None.

*Comments:* One commenter proposed that the Department update the College Financing Plan to include items listed in the proposed regulations. The commenter also believes that if we interact with the financial aid community, the College Financing Plan could be improved further to entice additional institutions to use it.

*Discussion:* The Department has reached out to financial aid administrators to obtain comments on the College Financing Plan during past revisions. We will consider additional opportunities to obtain feedback during future revisions as well. The College Financing Plan is not covered by regulations and does not need regulatory changes to address this issue.

*Changes:* None.

*Comments:* Several commenters suggested that the Department strengthen the proposed rule by better defining financial aid communications. These commenters believe we should clarify that financial aid communication is any communication made to the student detailing his or her financial aid package.

*Discussion:* The Department has included the details in § 668.16(h) of what should be included in financial aid communications provided to students. Financial aid counseling and financial aid communications inform students of the cost of attendance for the program, the costs charged directly by the institution, and the financial aid offered by an institution. Institutions still have the flexibility to determine the best format in which the information is provided to their students.

*Changes:* None.

*Comments:* One commenter proposed that instead of focusing on institutional

capability, the Department should develop financial training and career development modules that students would be required to complete prior to being able to access student loans. They argued that this would take the burden off of institutions.

*Discussion:* Entrance loan counseling is required for students to complete before their student loans are processed. Entrance counseling informs students of the terms and conditions of their loan before borrowing and students are also informed of their rights and responsibilities. Students learn what a loan is, how interest works, repayment options, and tips to avoid delinquency and default. The Department agrees that the financial training provided in the required entrance loan counseling is important information for students to complete before a loan is processed on their behalf. However, institutions are also a trusted source of information for students. It is critical that institutions offer students information that is accurate and complete.

*Changes:* None.

*Comments:* One commenter wanted the Department to require institutions to include information about military education benefits such as the Post 9/11 Bill or GI Bill in the types of aid that they must disclose to students.

*Discussion:* We think it is important for institutions to inform eligible students about their military education benefits, but they are not included in title IV, HEA program funds and so are not appropriate to cover in this provision.

*Changes:* None.

*Administrative Capability—Debarment or Suspension (§ 668.16(k))*

*Comments:* One commenter criticized § 668.16(k)(2) and suggested that we rewrite it to clarify our intent. The same commenter also suggested that we revise § 668.16(k)(2)(ii) to separate the actions of the individual and the impact to an institution. The commenter believes that we should clearly state that it is the misconduct of an individual and the closure of an institution that the Department refers to in the proposed regulation.

*Discussion:* The amendment to § 668.16(k)(2) is to improve institutional oversight of the individuals that are hired to make significant decisions that could have an impact on the institution's financial stability and its administration of title IV, HEA funds. An institution's ability to meet these responsibilities is impaired if a principal, employee, or third-party servicer of the institution committed fraud involving Federal, State, or local

funds, or engaged in prior conduct that caused a loss to the Federal Government.

*Changes:* None.

*Administrative Capability—Negative Action by State or Federal Agency, Accrediting Agency, or Court (§ 668.16(n))*

*Comments:* One commenter supported the addition of § 668.16(n) requiring that an institution has not been subject to a significant negative action. The commenter believes that the regulation strengthens the Department's ability to preserve the integrity of the title IV, HEA programs.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* Several commenters noted that § 668.16(n) fails to provide any basis to determine what action the Department would view as a significant negative action that would prompt administrative capability concerns.

Two commenters requested clarity for the term "significant negative action." These commenters suggested that the Department clearly state that this term applies to instances where the conduct that was the basis for the action or finding directly relates to an institution's handling of title IV, HEA funds. According to the two commenters, the Department should also clarify that the finding must be a "significant negative finding."

*Discussion:* We disagree with the commenters. The Department makes an administrative capability finding when it determines that an institution is not capable of adequately administering the title IV, HEA programs. The new provision regarding significant negative findings provides the Department with another method of determining whether an institution is administratively capable by assessing whether the institution has sufficient numbers of properly trained staff, its systems or controls are properly designed, and its leaders are acting in a fiscally responsible manner and with the best interests of students in mind. The Department declines to provide a definition for "significant negative action" or "significant negative finding." Generally, we view a significant negative finding as something that poses a substantial risk to an institution's ability to effectively administer title IV, HEA programs. We would review the circumstances, the fact and issues at hand, and other relevant information related to the institution and finding in our determination of whether the underlying facts pose a substantial risk.

*Changes:* None.

*Comments:* One commenter requested additional clarity around the terms "finding," including whether it must be significant and negative, "repeated," "unresolved," "prior enforcement order," and "supervisory directive." The same commenter asked for clarity on whether loss of eligibility in another Federal program would lead to an administrative capability issue if that loss of eligibility was limited to a program or quickly cured.

*Discussion:* We do not believe the terms used in the provision are ambiguous or need further clarification. The words "significant" and "negative," both of which have clear meanings, are operating as a modifier to either action or finding. Similarly, the terms used in the regulatory example, repeated and unresolved, are clear terms of art that need no further clarification. It is thus unnecessary to add additional definitions in this provision.

Regarding the loss of eligibility in another Federal education assistance program, we note that it could refer to either institutional or programmatic eligibility loss, but the administrative capability determination is not automatic. The Department would consider the facts and circumstances of the eligibility loss, including whether the issue was resolved, and eligibility quickly restored, when making an administrative capability determination.

*Changes:* None.

*Comments:* Several commenters argued that a non-final action by another agency or court should not deem an institution administratively incapable. These commenters believe the Department would be unjustified if we considered an institution to lack administrative capability because of an accreditor's probation and that we should revise the rule. Ultimately, the Department should state in the preamble that if an accrediting agency continues probationary action after reviewing an institutions response, the Department will consider the institution administratively incapable.

*Discussion:* The Department disagrees with the commenters. It is the Department's experience that a negative action by a State, accreditor, or other Federal agency usually arises from weaknesses in program administration or intentional misconduct, either of which can have a direct impact on the institution's administration of the title IV, HEA programs. Consequently, as part of its oversight responsibilities, the Department must be able to consider these actions when evaluating an institution's ability to properly administer the title IV, HEA programs.

Further, final decisions on these matters may take many years which could put additional students and title IV, HEA funds at risk. Waiting until the various processes are resolved would be insufficient to protect students and taxpayers.

As with actions initiated by a State or another Federal agency, whether a probationary action would be captured here would depend on whether the conduct that resulted in the action is repeated or unresolved and whether it has a significant effect on the institution's ability to serve its students.

We also note that administrative capability findings do not automatically result in ineligibility for title IV, HEA participation. Instead, the Department may consider a range of actions, which can range from heightened cash monitoring to a fine, suspension, limitation, termination action, a revocation of a provisional PPA, or a denial of recertification. No matter what action we take, institutions may respond; institutions may internally appeal fines, suspensions, limitations, terminations, and revocations.

*Changes:* None.

*Administrative Capability—High School Diploma (§ 668.16(p))*

*Comments:* We received many comments in support of the proposed changes to § 668.16(p). Several commenters supported the amendments to strengthen requirements for institutions to devise adequate procedures to evaluate the validity of high school diplomas. One commenter stated that the proposed regulations will prevent institutions from abusing title IV, HEA aid by enrolling students who are not academically prepared to attend postsecondary education. Another commenter noted that the changes will restore greater program integrity.

*Discussion:* We agree and thank the commenters for their support.

*Changes:* None.

*Comments:* Two commenters suggested that the Department publish a list of unaccredited high schools. These commenters believed this would assist institutions in evaluating the validity of a student's high school diploma when needed. Another commenter suggested that the Secretary publish a list of valid high schools.

*Discussion:* K–12 education is not like postsecondary education in which accreditation is a requirement for access to title IV, HEA aid and unaccredited institutions are generally not considered to offer valid degrees and credentials. States have discretion whether to require accreditation and the Department does not review or approve

accreditors of K–12 schools. As such, it would not be appropriate to publish a list of unaccredited high schools. The Department is evaluating the feasibility of creating a list of identified high schools that issue invalid high school diplomas, and the regulatory language is drafted such that, if the Department creates one, the institutions would be expected to consider it when evaluating the validity of high school diplomas.

Regardless of whether the Department publishes such a list, institutions are responsible for enrolling students who have valid high school diplomas, regardless of whether there is a list of them. Any such list would not include all unaccredited high schools, as new ones are created on an ongoing basis. The Department does not need regulatory language to grant the authority to publish such a list, but paragraph (p)(1)(iii) in this section specifies that institutions must consider such a list if it is created. We think a list of high schools that award invalid high school diplomas would be more useful as it would identify high school diplomas that have already been identified as problematic for institutions to monitor.

*Changes:* None.

*Comments:* Several commenters urged the Department to change the language in the proposed regulation in § 668.16(p)(1) to clarify the procedures for institutions. The commenters requested that we explain what constitutes an invalid diploma or when to doubt the secondary school from which the diploma was obtained. Secondly, the same commenters requested that the Department clarify when an institution must use a review process. Finally, the same commenters believe that any business relationships that involve an unaccredited secondary school should require institutions to initiate further validation.

*Discussion:* We believe the language in paragraphs (p)(1)(i) through (iii) of this section lay out what procedures institutions must have for determining the validity of a high school diploma they or the Department believe may not be valid. Under paragraph (p)(1)(i)(A) that means looking at the transcript, the description of course requirements, or obtaining documentation from the secondary school leaders about the rigor. If the school is overseen by a State or other government agency, then paragraph (p)(1)(ii) requires the institution to obtain evidence that the high school is recognized or meets requirements. Paragraph (p)(1)(iii) says institutions should look for the high school on a list of invalid secondary schools if the Secretary chooses to

create one. We believe those paragraphs create clear procedures and that the language in paragraph (p)(1)(ii) gives institutions clarity about when or when not to consider State or other governmental recognition.

Regarding the questions about when to review a high school diploma, the language in § 668.16(p)(2) spells out when an institution should take a closer look at a high school diploma.

We disagree with the suggestion from commenters to require further validation of every instance in which there is a business relationship between the high school and the institution. While we have seen many instances of problematic relationships of this sort, there are also legitimate relationships as well. Requiring validation of every instance of this thus risks being overbroad.

*Changes:* None.

*Comments:* One commenter criticized that the language, ''has reason to believe'' used in the proposed regulation, § 668.16(p)(1) is too broad. According to the commenter, the regulation should be more specific so that the standard is clear. The commenter also believes that the added cost for institutions to perform additional work to evaluate the validity of high school diplomas should not be overlooked.

*Discussion:* We disagree with the commenters. Students who lack a valid high school diploma or its recognized equivalent are only eligible for Federal aid through narrow and specific pathways. Giving aid to students who do not have a valid high school diploma and do not qualify through those pathways represents an illegal expenditure of taxpayer funds. We believe students who lack high school diplomas also tend to have lower success rates in postsecondary education, which can have lasting effects on students if they take out loans that must be repaid. Ensuring students meet these basic eligibility criteria is thus an important protection against fraud, and institutions are the key party to catch these issues. It is thus reasonable for institutions to exercise sound judgment and caution when reviewing high school diplomas to look more closely at ones that seem questionable. We also remind commenters that this provision is about reviewing the institution's procedures and looking at whether there's a pattern or practice of repeatedly failing to identify invalid high school diplomas.

We discuss the relative costs of this provision versus the benefits in the RIA of this final rule. But we reaffirm that the potential costs of disbursing

unallowable funds and the potential for low success for those students are greater than the administrative costs to institutions.

*Changes:* None.

*Comments:* Several commenters objected to the provisions in § 668.16(p)(1)(i) requiring institutions to obtain additional documentation from high schools to confirm the validity of the high school diploma if there is reason to believe that it is not valid. Two commenters raised concern that many non-traditional students would not be able to provide the required documentation because their high schools have closed.

*Discussion:* We disagree. The proposed regulations provide institutions with procedures for determining the validity of a high school diploma. Acceptable documentation includes a transcript, written descriptions of course requirements, or written and signed statements by principals or executive officers of the high school. In general, when high schools close there are record retention policies from States, districts, or other oversight entities that address this issue and provide students access to their diplomas or other records of high school completion. As noted above, the Department would consider an institution's procedures in terms of their pattern or practice. We anticipate the situations described by commenters to be rare. If the required documentation cannot be provided due to high schools closing, we would consider the specific circumstances on a case-by-case basis.

*Changes:* None.

*Comments:* Several commenters objected to the Department's proposal under § 668.16(p)(1)(ii) to add procedures to evaluate the validity of a student's high school diploma. The commenters state that we should allow institutions to continue to follow the procedures that they already have in place, rather than require a new and complicated set of guidelines.

*Discussion:* We disagree with the commenters. Providing aid to ineligible students is a perpetual source of fraud in the student aid programs and represents a misuse of taxpayer dollars. The standards outlined in this section are not requiring institutions to individually verify every student's high school diploma. They are asking institutions to engage in reasonable due diligence when they encounter high school diplomas that appear questionable.

*Changes:* None.

*Comments:* One commenter suggested that the Department develop a process to verify student's high school diplomas

through a national database that the Department maintains. The commenter believes that the Department could collaborate with organizations that provide verification services to quickly validate high school diplomas. The commenter also noted that the database could serve as a repository for verified high school diplomas.

*Discussion:* We do not believe that would be an appropriate role for the Department, as standards for high school diplomas are a State function. However, as previously mentioned, we will consider creating a list of high schools that the Department has deemed to award invalid high school diplomas. The list will in no way be exhaustive, but we believe this would be beneficial.

*Changes:* None.

*Comments:* One commenter raised general concerns that in some areas of the country there are large populations of immigrants. According to the commenter, these individuals may not be able to provide the required documentation about their high school education or may not have been able to complete their high school education due to factors within the country they were born.

*Discussion:* We remind commenters that the intent of the regulations is to add clarity to the process that schools must follow when they or the Department have questions about the validity of a high school diploma. We acknowledge that there are cases where students attended high school in another country but do not have that credential in hand when applying to a postsecondary institution. A student's failure to produce a high school diploma does not obligate the institution to treat the diploma as invalid and the student as ineligible solely because the student does not have the diploma in hand. If, however, other information suggests that the student does not actually have a valid diploma, then § 668.16(p) would require the institution to take additional steps. Institutions may establish policies regarding whether to collect high school diplomas from students and/or what steps to take if a student cannot produce their diploma due to exceptional circumstances. In instances where a student from a foreign country cannot produce his/her high school diploma, the institution should determine what next steps to take based on their process for determining whether a student has completed high school or has met other criteria in § 668.32. When determining compliance with § 668.16(p), the Department will review the institution's procedures, the steps it has taken under those procedures, and the

documentation it maintains, when dealing with situations where facts suggest that a student does not actually have a valid high school diploma. As it does now, the Department will review these situations on a case-by-case basis.

*Changes:* None.

*Comments:* Many commenters criticized as unnecessary the proposed requirement in § 668.16(p)(2)(i) around when a high school diploma is not valid. The commenters particularly objected to the language in paragraph (p)(2)(i) around the Department's proposal that institutions would determine whether the diploma met the requirements established by the appropriate State agency, Tribal agency, or Bureau of Indian Education in the State where the high school is located, and if the student does not attend in person classes, in the State where the student was located at the time the diploma was obtained. The commenters believe that the Department should remove this provision because it burdens institutions, and we should not require an institution to determine whether a high school meets the requirements of the high school's regulatory agency. The commenters suggest that institutions rely on State licenses and approvals and that regulators are better equipped to determine whether a high school should be licensed, approved, or recognized when the high school is physically located within the State.

Many commenters suggested we clarify the language in § 668.16(p)(2)(i) to explain that a high school diploma is not valid if the entity did not have required secondary school licenses or meet requirements from the home State. The commenters suggested that the Department clarify that documentation from a State agency is required to validate a diploma only when the State has a mandatory licensing requirement for private secondary schools in a given State.

*Discussion:* We disagree. Ensuring that students have a valid high school diploma is a critical part of maintaining integrity in the title IV, HEA financial aid programs. Failure to ensure that a student is qualified to train at a postsecondary level often results in students withdrawing from institutions after incurring significant debt and investing time and personal resources. Extra steps taken by institutions on the front end, prevent withdrawals and lost enrollment down the road due to students not prepared to be successful at the postsecondary level. These regulations will provide institutions with additional information when

necessary to determine the validity of a high school diploma.

We believe the added guidance under § 668.16(p)(2)(i) will provide institutions with clarity when determining whether a high school diploma is not valid. This provision would only apply in instances where the State has oversight and has established specific requirements that must be met in order for a student to receive a high school diploma. If private secondary schools are not subject to State agency oversight, then the requirement to receive documentation from a State agency in § 668.16(p)(1)(ii) would not apply.

*Changes:* None.

*Comments:* Many commenters requested that the Department delete the clause from § 668.16(p)(2)(i) regarding a student not attending in-person classes in the State where the student was located when they obtained their credential. The commenters suggested that the standard is not an indicator of an invalid high school diploma because most States regulate high schools located within their borders, but do not regulate online high schools or those located in other States. Furthermore, the commenters thought it would be unfair to students who move from one State to another during their high school years. The commenters further believed this provision would force institutions to reject students even if their high schools were approved in the State in which they started their high school education.

*Discussion:* We agree with the commenters that the provision would be challenging for an institution to enforce as it would have to look at how one State might apply requirements to a high school potentially located in another State.

*Changes:* We have removed the reference to a student's home State for someone not attending in-person classes from paragraph (p)(2)(i).

*Comments:* Several commenters objected to § 668.16(p)(2)(iii), which requires institutions to determine if a diploma was obtained from an entity that requires little or no secondary instruction. The commenters believed that regulatory agencies should determine the validity of the diploma to avoid creating a burden for institutions and suggested that we remove this requirement.

*Discussion:* We disagree with the commenters. The requirements in this paragraph relate to the items included in paragraph (p)(1)(i) of this section in terms of how the institution would make this kind of determination. While the determination of a regulatory agency is important, there are circumstances

when the regulatory agency does not have sufficient information. Institutions should act on any information they obtain from any source which suggests that there is little, or no instruction being provided by the entity or that suggests that the entity is a diploma mill. If after a good faith effort, they are unable to obtain any information indicating that students received coursework and instruction equivalent to that of a high school graduate, then institutions could treat the inability to find that information as proof that the concern in paragraph (p)(2)(iii) is occurring.

This specific provision says that a high school diploma is invalid if it was obtained from an entity that requires little or no secondary instruction or coursework to obtain a diploma, including through a test that does not meet the requirements of § 600.2. The regulations in § 600.2 define a recognized equivalent of a high school diploma. Under that provision, there are two equivalencies that can be obtained by passing a test: a General Education Development certificate (GED) and a State certificate received after passing a State-authorized examination that the State recognizes as the equivalent of a high school diploma. We believe these equivalencies are common and pose little burden on institutions. This provision is an important protection to students and title IV, HEA funds and the requirement is a minimum expectation to protect the integrity of Federal student aid programs.

*Changes:* None.

*Comments:* Commenters asked the Department to expand the provisions in § 668.16(p)(2)(iv) around validating diplomas when there is a business relationship between the institution and the high school. Commenters said the language in paragraph (p)(2)(iv)(B) of this section, which says that a high school diploma is not valid if there is a business relationship and the school is unaccredited, is insufficient. They said that this safe harbor should also include high schools that are licensed or approved by their home State too.

*Discussion:* The Department included this provision because we have seen many instances in the past where there are concerning relationships between high schools and institutions of higher education. However, the high school in question in that relationship has also exhibited issues that would lead to them being identified as invalid under paragraphs (p)(2)(i) through (iii) of § 668.16. As such, we think it is better to remove paragraph (p)(2)(iv) entirely rather than expanding it. This removal reduces what would otherwise end up

duplicating with what is already present in other parts of § 668.16(p)(2). The Department will continue in its own work to look for concerning business relationships when it identifies other evidence of a high school diploma not being valid.

*Changes:* We have removed paragraph § 668.16(p)(2)(iv).

*Administrative Capability—Adequate Career Services (§ 668.16(q))*

*Comments:* Several commenters supported the Department's proposal that institutions provide adequate career services to their students because some institutions leave students on their own to search for jobs or make employer connections. The commenters also noted how unfortunately, it is not until graduation that students learn that the school has no career services staff or no industry connections. The commenters further stated that the requirement to invest in career services creates an expectation at institutions to better prepare students to enter the work force after graduation.

*Discussion:* We appreciate the support of these commenters.

*Changes:* None.

*Comments:* Many commenters supported adding career services to the regulation but believe the Department should not include the criteria regarding the share of students enrolled in programs designed to prepare them for gainful employment. The commenters believe we should remove this from § 668.16(q) because institutions should be required to provide adequate career services for all programs including non-GE programs.

*Discussion:* We disagree with the commenters. The share of students in GE programs is an important factor for the Department consider when evaluating whether institutions have sufficient career services. GE programs are career training programs and having a significant share of enrollment in these programs is a factor to consider whether there are sufficient career services resources. Institutions that do not have significant numbers of students in GE programs would still be considered under paragraphs (q)(2) through (4) of this section.

*Changes:* None.

*Comments:* Many commenters recommended that the Department create career assessment services to assess programs in fields that use a different hiring structure. Career development in the fine and performing arts industry differs from corporate recruiting, according to the commenters, since typical hiring avenues differ. Performing artists typically audition for

work, visual artists, and entrepreneurs, such as cosmetologists who are self-employed and run their own businesses. The same commenters questioned how the Department will apply this career services regulation at institutions with non-traditional programs.

*Discussion:* The Department believes that all students should receive career services that are appropriate for the program they attended that will assist them in securing employment in the relevant occupation. The institution and not the Department determines the type of services that are most appropriate. Institutions decide what programs to offer and construct the curricula used. Therefore, they are best suited to know what career opportunities exist that are tied to a given program and how to help students reach career goals, including what kind of career assessment services are needed. This is the case regardless of whether a program is traditional or non-traditional, since in both cases the institution would know what it is preparing students to do. Our concern is ensuring that institutions made good on the commitments they make to students and have the staff and resources in place to help students reach their career goals.

*Changes:* None.

*Comments:* Many commenters raised general concerns that this provision would give title IV, HEA compliance officers leverage to demand more career services resources than merely those that are necessary.

*Discussion:* This requirement still provides institutions with the discretion to determine how they want to devote their resources between career services and other functions. However, what it does require is that there must be an alignment between the commitments made with regard to career services and what is actually offered. An institution will also have the opportunity to respond and appeal to a finding that it is not administratively capable due to its lack of career services and will have an opportunity to provide additional information to demonstrate that its staffing was appropriate given the institution's circumstances.

*Changes:* None.

*Comments:* Many commenters raised general concerns that title IV, HEA compliance officers be adequately trained in employment services so they can determine whether an institution is providing adequate career services to students, including Departmental review of the number and distribution of staff, the services the institution has promised to its students, and the presence of partnerships with recruiters and employers who regularly hire graduates.

*Discussion:* The Department believes that institutions should have sufficient career services to help students find jobs and honor any commitments made about the type of job assistance they provide. The Department's focus on evaluating institutions will remain on whether the institution can make good on its commitments with appropriate staff and resources in place while institutions are best equipped to determine what is appropriate to offer based on the education it provides.

*Changes:* None.

*Comments:* We received a number of comments opposing the Department's proposal to include adequate career services as a requirement for administrative capability. Many commenters asked the Department to eliminate this provision because accreditors already require that institutions provide career services. The same commenters argued that the standards are too vague and do not clearly state how the Department would determine the adequacy of services. Many commenters also questioned the Department's statutory authority, contending that no link between the administration of title IV, HEA programs and the adequacy of career services was provided. One commenter stated that the issue is more aligned with misrepresentations about the employability of graduates found in § 668.74.

Many commenters recommended that we revise § 668.16(q) to clearly state what is expected of institutions to stay in compliance. For example, one commenter asked whether the Department expected a certain ratio to determine how many career services staff should be employed to accommodate students in GE programs. Another commenter noted that institutions with a limited workforce may need to hire additional staff. One of the commenters also noted that future graduates and alumni rely on the career services that institutions provide. The same commenter stated that the proposed regulation eliminates resources provided by dedicated professionals to fulfil unidentified metrics. To promote consumer awareness, according to the commenter, the Department should clarify the standards so that institutions can inform their students of available career services. One commenter stated that the rule overlooks the fact that programs designed to prepare students for gainful employment are used for career advancement or maintenance, not new employment. The commenter pointed to registered nurses who often intend to stay with their same employer and do not need career services. The commenter said the Department should provide a carve out for these types of programs and students. The same commenter pointed to other examples where the goals of the regulation are already met, such as programmatic accreditation, disclosure requirements and misrepresentation rules.

*Discussion:* The Department disagrees with commenters and affirms the importance of keeping this requirement. With respect to accreditors, the oversight of postsecondary institutions rests on a reinforcing regulatory triad. While there are some elements that one part of the triad will not consider, such as how the Department cannot consider academic quality, some overlap of areas of concern helps ensure there are multiple perspectives looking at an issue. With respect to career services, the Department has seen this as an issue in the past where institutions use promises related to career services as a way to market and recruit students. But then they lack the resources to back up those promises and students report getting no assistance on their job search. The Department is concerned that such behaviors could contribute to the approval of borrower defense to repayment claims if the institution is making promises to students about assistance it knows it cannot provide.

This provision complements, but is not replaced by, the misrepresentation standards for employability of graduates in § 668.74. Many of those items are distinct because they are concerned with things that relate to promises made during recruitment but not the career services offered. This includes areas such as relationships between institutions and employers, promises made about employment, and statistics provided about employment. The overlap involves things such as promised placement services, but the provisions are mutually reinforcing. Having institutions demonstrate they have sufficient career services assists with establishing whether the failure to deliver on those services is a form of misrepresentation.

We also disagree with commenters that there is no link between these provisions and administration of the title IV, HEA programs. Student surveys repeatedly show that obtaining employment is one of the key reasons why they go to college. A national survey of college freshmen at baccalaureate institutions consistently finds students identifying "to get a good job" as the most common reason why

students chose their college.[20] Another survey of a broader set of students found financial concerns dominate in the decision to go to college with the top three reasons identified being "to improve my employment opportunities," "to make more money," and "to get a good job." [21] While postsecondary education is not solely about employment, the continued reliance on loans to finance postsecondary education means students need to have a path to successful careers so they can afford their loan payments. Career services thus intrinsically connect to ensuring that the aid programs generate their intended results. And as noted already, misleading students about the availability of career services support could be grounds for a loan discharge.

The Department declines to adopt a specific ratio for career services staff or create exceptions for career-oriented programs focused on advancement within a given employer. We believe such an approach would not properly capture the significant variation that exists among institutions. For instance, an institution that only offers career-oriented programs might need a lower ratio than one where only one program is career-oriented and the vast majority of students are being prepared to transfer to higher-level programs. Instead, we think the language provides flexibility to consider the range of institutional circumstances when considering whether there are sufficient career services. We disagree that additional clarity is needed for institutions to tell students what services they offer. Institutions will be aware of what they have available for students, and they should provide accurate information about what services they offer. Moreover, the institution can consider whether programs are designed for career advancement within an employer when considering what types of services, they need to provide. For instance, someone seeking a promotion within a given employer may need different help around asking for a pay increase and

how to make their case, as opposed to help with job hunting.

With respect to career services usage by alumni, our focus in this language is on the commitments made to students and what services are provided there. As noted above, there's no requirement that institutions shift resources away from dedicated professionals so long as they have the resources in place to make good on the commitments they provide to students. This language does not dictate what career services promises institutions must make to students. It simply requires that the commitments and resources align.

*Changes:* None.

*Comments:* One commenter believes an alternative solution for institutions to provide adequate career services would be to collaborate and with and get feedback from students, and partner with industries. The commenter opined that if institutions develop a student-centered approach to career services, students should benefit from the personalized support and guidance as they matriculate through college. A student-centered approach can serve the diverse needs of both students and institutions according to this commenter. The commenter continued by explaining that institutions can identify the changing needs and expectations of their students, and students can contribute to the development of the career services offered through conversations and collaboration. Additionally, the commenter suggested that institutions can provide feedback opportunities, via surveys or advisory committees to get input from students regarding their career service experiences. The feedback, the commenter explained, can determine the effectiveness of existing services, identify areas for improvement, and provide ideas for future initiatives.

*Discussion:* The Department supports the idea of a student-centered approach to career services that includes institutions obtaining feedback from students and partnering with private industry. We, however, do not see this suggestion as a substitute for the provision we proposed. We note a high-quality student-centered approach advocated by the commenter likely would comply with the requirement to provide adequate career services, provided the institution is able to fulfil its commitments with respect to career services.

*Changes:* None.

*Comments:* Several commenters questioned how institutions will determine how many career services staff should serve students in GE

programs if the formula to determine "adequate" is not provided. These commenters noted that there is no set ratio for institutions to determine if they are providing adequate career services to eligible students.

One commenter said that all faculty and staff members throughout their campus and not just career services staff prepare students for employment and inform them of opportunities. If the institution is judged only by the number of employees in their career services office, according to this commenter, the collective work of the university would be ignored.

*Discussion:* The Department disagrees. The language in § 668.16(b)(2) requires institutions that participate in the title IV, HEA programs to have an adequate number of financial aid staff. There is no formula to determine adequate. Instead, the Department determines adequacy based on varying factors. Determining the adequacy of career services staff would be similar. The Department will consider the factors set out in § 668.16(q)(1) through (4) in relation to characteristics of the particular institution such as its size, the number and types of programs offered and the requirements for employment in those fields of study. A finding of a lack of administrative capability under this provision would not be automatic. Therefore, institutions that rely on career services support across the faculty could present this information to the Department if they are identified for administrative capability concerns and the Department could take it into consideration.

*Changes:* None.

*Comments:* One commenter disagrees that the Department prioritize GE programs when assessing an institutions' career services. Most institutions offer programs to prepare students for various careers; however, not all programs may be considered GE programs.

*Discussion:* This regulatory language does not prioritize GE programs. Rather it is one factor among four that the Department will consider when judging the adequacy of career services. This helps the Department get a sense of how many programs have a statutory connection to career training or not.

*Changes:* None.

*Comments:* Two commenters suggested that the Department require institutions to provide detailed information on the career services offered and provide the job placement records of all graduates in GE programs. The commenters believe that the change of required data will prevent misleading marketing practices and allow

---

[20] A national survey of college freshmen at baccalaureate institutions consistently finds students identifying "to get a good job" as the most common reason why students chose their college. Another survey of a broader set of students found financial concerns dominate in the decision to go to college with the top three reasons identified being "to improve my employment opportunities," "to make more money," and "to get a good job."

[21] Stolzenberg, E.B., Aragon, M.C., Romo, E., Couch, V., McLennan, D., Eagan, M.K., Kang, N. (2020). "The American Freshman: National Norms Fall 2019," Higher Education Research Institute at UCLA, *www.heri.ucla.edu/monographs/TheAmericanFreshman2019.pdf.*

institutions to deliver on the promises that they make to students during recruitment.

One commenter noted that their institution already takes extra measures to assist students by sponsoring attendance to conferences and trade shows, hosting career fairs, and providing one-on-one career counseling to demonstrate the importance of preparing students to enter the workforce.

Another commenter asserted that the Department should consider verified employment rates to be the number one priority for institutions to demonstrate that they provide adequate career services.

*Discussion:* The Department disagrees. The Department has existing regulations related to job placement rates, including in §§ 668.14, 668.41, and 668.43, and regulations related to misrepresentations, among others. We, therefore, do not need separate requirements related to job placement rates in this section. With respect to the comment regarding an institution providing placement rate records, the Department already has the authority to obtain these records and it does obtain and review these types of records when determining the validity of advertised placement rates. We appreciate the examples highlighted by the commenter and those are the kinds of things that would be considered when looking at paragraph (q)(3) of this section.

*Changes:* None.

*Administrative Capability—Accessible Clinical or Externship Opportunities (§ 668.16(r))*

*Comments:* One commenter expressed full support for the requirement that institutions provide students with a geographically accessible clinical or externship opportunity within 45 days of successful completion of other required coursework.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* Many commenters suggested that institutions be required to provide students with clinical or externship opportunities that previous students participated in. The commenters felt that students should also be reminded that it is ultimately their responsibility to secure placement.

In addition, some commenters agreed with the Department's requirement that private institutions provide students with a clinical site.

*Discussion:* The Department agrees that it is critical institutions provide students with the clinical or externship experiences they need to earn their

credential, including those opportunities that previous students participated in. This requirement applies to institutions of all types where it is relevant. We do not think it is reasonable to put the burden of securing a clinical or externship solely on the student if it is required to complete their program.

*Changes:* None.

*Comments:* Many commenters expressed concern that the providers of clinical and externship opportunities have a say in a students' placement. They want to ensure that the students selected for placement possess the skills and expertise to deliver impeccable care.

Another commenter recommended that institutions be involved and arrange the student placement for their students. The commenter believes that students are more connected and get better care when institutions are involved.

In addition, two other commenters asserted that the responsibility for placement should be a partnership between the institution, the student, and the receiving practice to be a positive training experience.

*Discussion:* We do not see a conflict between the comments and the regulatory language. The Department is adding this requirement because we are concerned that in the past institutions have enrolled students, received significant tuition payments, then failed to find them the clinical opportunities those students needed to complete the program. The absence of those clinical experiences then makes it impossible for the student to work in the field in which they are being prepared. The Department has also seen this occur in some situations where the institution knew as it was recruiting students that it lacked sufficient partnerships to offer clinical spots to all the students it was enrolling.

This regulatory text does not require that a student attend a clinical at a specific spot, just that the institution make sure they have a geographically accessible option. Institutions can and should work with their students around securing placements. If a student chooses to secure a placement on their own, we would not separately demand that the school provide them a placement. This provision is to address situations where an institution fails to provide required clinicals and the students are unable to secure the clinicals on their own.

*Changes:* None.

*Comments:* Many commenters request that this rule not apply to medical schools, allied health, or other health profession programs because it is

confusing to students who are already scheduled to participate in experiences throughout their third and fourth years of schooling, not at the end of their coursework as the regulation suggests. Another commenter suggested that post-graduate training also be excluded from the rule.

*Discussion:* The Department wishes to clarify the coverage of this provision. This language applies to the clinical or externship experiences that are needed for students to complete their programs. Thus, experiences that occur as part of credential completion, such as those in the third or fourth year of a program or at the end of a program, would be included. It does not apply to post-graduation parts of the career ladder, which include things like the national residency program for graduates from medical school. The reference to how the externship or clinical is related to licensure in a recognized occupation is to note that some licensure requirements state that there must be a clinical or externship completed as part of the credential earned. The result is that residencies, clerkships, and other similar post-graduation experiences are not covered by this requirement.

*Changes:* None.

*Comments:* We received a number of comments requesting the Department to define "geographically accessible" clinical or externship opportunities. Several commenters suggest that the definition should specify the mile radius, and which States and regions of the country should be considered.

A few of the commenters expressed concern that if the Department narrowly defines the geographical location required for placement, it may not consider the fact that students in rural areas may be limited and that some students may need to travel outside of their geographic location to complete the requirement.

Another commenter proposed that the Department use commuting zones to provide a reasonable estimation of the geographic areas that a student is likely to look for a clinical placement or externship after graduation. The commenter explained that commuting zones is defined by the Department of Agriculture's Economic Research Service. Commuting zones break the country up into 709 areas based on the geographical distribution of an area's labor market. The commenter believes that it is reasonable to use commuting zones to clarify the definition, geographically accessible. Commuting zones already account for various distances required when it comes to commuting in metropolitan areas compared to rural areas and have

already factored in variations in distance.

One commenter also stated that the term geographically accessible be removed all together.

*Discussion:* The Department declines to provide a specific set of metrics for measuring what is geographically accessible, as there could be programs on the edge of one commuting zone or another and that different program types could have different expectations for what is geographically accessible. For example, a clinical experience tied to a highly specialized field as part of a graduate program may see a geographically accessible option as one that is in another part of the country. By contrast, a commuting zone concept is likely to be a better fit for certificate programs where students are more likely to be staying close to where they live. The Department also declines to remove the geographically accessible requirement. This is a critical concept to maintain because we do not want institutions to otherwise get out of providing the required clinical or externship options by simply offering students an opportunity that is completely infeasible for them to reach. We also remind commenters that this requirement only applies to pre-completion situations, so concerns about how students with medical degrees participate in a national matching program would not be affected.

In terms of assessing geographic accessibility, the Department would consider how accessible distances look very different in rural areas versus urban ones. The level of the credential will also likely affect this consideration. Someone completing a professional degree in a highly specialized field is almost certainly going to have travel longer distances for a clinical and so something quite far away would still be viewed as accessible and in line with their expectations. By contrast, a student completing a 12-month certificate program is not likely expecting to move hundreds of miles away for a clinical experience. Nor would they be completing a credential with a level of specialization such that there may only be a handful of relevant placement options in the country. Preserving the concept of geographic accessibility while recognizing the need for flexibility in how that is considered based upon the credential level, type, and the physical location of the institution is appropriate.

*Changes:* None.

*Comments:* Several commenters opposed the clinical externship opportunities regulation and suggested

that the Department allow the accrediting agencies, credential agencies, and State licensing agencies set the requirements for programs.

*Discussion:* We disagree with the commenters. Accreditation agencies are one part of the regulatory triad and they play an important role in institutional oversight. But the Department must oversee and protect the Federal investment. To that end, we are concerned that students who do not get offered these clinical or externship experiences will not be able to benefit from the educational programs paid for with Federal resources. Having this requirement thus complements whatever work accreditors conduct in this area.

*Changes:* None.

*Comments:* Two commenters warned that to ensure compliance, some institutions may only enroll the number of students that will have clinical opportunities. The same commenters believe that the unintended consequences of this action would cause a decline in enrollment for allied health students. Another commenter agrees that enrollment in high-need areas will be capped, because of the added financial burden placed on the institution to secure placements. The commenter said they anticipate that institutions will need to hire additional staff or contract with private agencies to support out-of-State placements. One commenter warned that an institution may secure a spot in clinical opportunity that is against the students wishes and would result in more than one spot secured for each student. The commenter suggested this could result in a competitive structure that creates added challenges for smaller schools and companies without the same financial resources.

*Discussion:* This provision is not dictating the enrollment size of given programs nor the exact location of where students go for their clinical or externship. But it is critical that institutions have in place the resources to help students secure clinical or externship opportunities if they are required for completing the program. We also note that institutions do not need to provide additional opportunities for students who have already secured a clinical spot on their own. While we recognize this could be an added cost for institutions, we think the benefits for students are significant, as failure to participate in a clinical or externship could make it impossible for the student to graduate or obtain State licensure or certification. Given the downside risk to students, it is an acceptable tradeoff if institutions decide

they have to offer fewer spots in order to ensure that the students they do serve will be able get the additional educational experiences necessary to achieve their goals.

Concerns about a student potentially turning down a spot ignores two key elements. First, a spot turned down by one student may well be accepted by another. Second, the provision is around offering spots that are geographically accessible. Rejections of spots would not be deemed a failure to abide by this provision unless widespread rejections and a lack of spots indicated that the institution was finding some way around this requirement.

*Changes:* None.

*Comments:* Several commenters felt that the Department is exceeding the statutory limits by adding new requirements for clinical or externship opportunities. The commenters do not believe the requirements are related to an institution's administrative ability to process student aid and should be removed from the final regulation.

*Discussion:* Properly administering the financial aid programs means ensuring that the students you enroll and who are funded with Federal aid are able to complete their programs. Institutions that knowingly enroll students in excess of the spots for these required experiences are setting students up for an inability to complete their program either entirely or in a timely manner. It is also a sign that the amount of work going into recruitment and marketing efforts may not be sufficiently matched with the resources needed to make good on those commitments.

*Changes:* None.

*Comments:* We received a number of comments regarding the requirement to provide a geographically accessible clinical or externship within 45-days of successful completion of other required coursework in § 668.16(r). One commenter requested the Department clarify when the 45-day measurement would begin. Another commenter asked that the Department extend the placement timeline from 45 days to 90 days as they have students from every State and many live in rural areas. Two commenters claimed it is unreasonable to expect an externship to begin within 45 days of coursework completion but believe that it is within reason for students to receive their assigned opportunity within that time. One commenter raised a concern that the requirement for students to complete clinical or externship assignments within 45 days of coursework completion would place a hardship on

students. This commenter suggested that we reconsider the rule. One commenter stated that 45-day window does not account for the role of third parties in finding placement spots.

*Discussion:* The requirement is that institutions provide the students with the opportunity within 45 days of successful completion of other required coursework. That does not mean the experiences must start exactly within 45 days. However, the Department will consider whether a pattern where these experiences start well outside reasonable periods, *e.g.,* offering a spot that starts in a year so the student has an extended gap after finishing their coursework is in fact a sign that an institution is not abiding by this requirement and does not have sufficient spots for clinical or externships and thus should result in a finding of a lack of administrative capability. We decline to adopt a longer timeframe. Making a student wait 90 days to receive their spot and then potentially waiting longer to begin that experience risks delaying their ability to complete their program and begin entering the workforce.

We also disagree with the concerns about 45 days being insufficient for third parties. Our anticipation is that institutions will be assessing how many clinical spots they have an ongoing basis for students who will be needing them in terms to come. Students who find their own spots also do not need a second spot offered to them. As such, there is nothing that prevents an institution from planning ahead and working to find spots with third parties.

*Changes:* None.

*Comments:* Two commenters urged the Department to revise § 668.16(r) to state that the institution "make reasonable" efforts to provide students with geographically accessible clinical or externship opportunities.

*Discussion:* We decline to accept the recommendation by commenters. These are opportunities that institutions require as part of the path to completion. Much like we expect institutions to offer students the courses they need to finish their chosen programs, they must provide them with the clinical or externships they need as well. As previously noted, students who find their own spots do not need a spot offered to them.

*Changes:* None.

*Comments:* One commenter proposed that the Department amend § 668.16(r) to require institutions to disclose their placement policies and the services that they promise to provide and require institutions to provide the services promised in the disclosure.

*Discussion:* We decline to adopt the suggestion by the commenter. Our concern here is making sure that if a student must do a clinical or externship to finish their program then they must be given the opportunity to do so. We do not think disclosures would address the situation sufficiently when a needed experience is not offered. We do, however, expect that institutions will deliver the career services they promise to students.

*Changes:* None.

*Administrative Capability—Timely Funds Disbursement (§ 668.16(s))*

*Comments:* One commenter supported § 668.16(s), which requires institutions to disburse funds to students in a timely manner. The commenter also concurred with the Secretary's conditions.

*Discussion:* We thank the commenter for their support.

*Changes:* None.

*Comments:* One commenter suggested that the condition related to high rates of withdrawals attributable to delays in disbursements be eliminated from the regulation because it is very difficult to implement. The commenter stated that the Department would need evidence that student withdrawals were specifically caused by delayed disbursements.

Another commenter questioned how the Department, or an institution would be able to quantify what we consider to be a high rate of withdrawals attributable to disbursements.

*Discussion:* The Department disagrees with the suggestion to remove this requirement. We think it is critical that students receive their Federal aid funds in a timely manner. If students are unable to timely receive the funds for which they are entitled, it can impact their ability to persist in their programs and can cause them to have to withdraw because they are unable to use their funds to pay for books, housing, and more. We are particularly concerned in the past that some institutions have held onto disbursements to manipulate their 90/10 rates. This can be done by holding a disbursement until after the end of the institution's fiscal year. The Department has also seen instances where institutions on a reimbursement payment method hold disbursements to students who have a credit balance. In making a finding on this issue, the Department would need to establish that any of the conditions in paragraph (s)(1) through (4) of this section were occurring, including evidence that a student's withdrawal occurred due at least in part to delayed disbursement.

In terms of quantifying this problem, the Department would look at students who are marked as withdrawn and see if they had a credit balance owed to them, and if so when it was paid. The Department also interviews students as appropriate when conducting oversight matters.

*Changes:* None.

*Comments:* One commenter questioned how the Department would determine or document how an institution has delayed a disbursement to pass the 90/10 ratio. The commenter pondered how the Department would enforce this and whether institutions would have the right to challenge it. The commenter believed we can simplify the rule to require all institutions to disburse funds 10 days before the beginning of the term.

*Discussion:* The Department could assess whether an institution has delayed a disbursement to pass the 90/10 ratio by looking at the timing of disbursements relative to when an institution's fiscal year ends. Disbursements occurring just before or after the end of an institution's fiscal year could be a sign of manipulation, especially when funds that would pay for balances owed prior to the end of the fiscal year are disbursed in the next fiscal year. We decline to accept the commenter's suggestion to require disbursements 10 days before the beginning of the term. This change would apply to cash management regulations, which we did not address in this rule.

*Changes:* None.

*Comments:* One commenter believed that the condition when the Secretary is aware of multiple verified and relevant student complaints as stated in proposed § 668.16(s)(1) could be misinterpreted to suggest that a complaint could cause an administrative capability violation if it is verified to come from a student and relevant because it relates to the timing of disbursements. The commenter further contended if a first-time student complains about the timing of a delayed disbursement under the Department's 30-day delay requirement for disbursing loans to first time students, the institution could be considered in violation of this proposed rule. The commenter recommended that § 668.16(s)(1) be amended.

*Discussion:* The Department agrees with the commenter that "valid" would be a better word than "verified" in this provision to accomplish the Department's goal. Using the word valid would address situations, like the one raised by the commenter with respect to the 30-day loan disbursement delay for

first time students, where a student believes the delay in disbursement is not in their best interest, but the institution was complying with another regulatory requirement. To avoid confusion, the Department will change the wording of that regulatory provision.

*Changes:* The Department has changed ''verified'' to ''valid'' in § 668.16(s)(1).

*Comments:* One commenter agreed that if an institution receives a significant number of student complaints, it is an indication that the institution is not disbursing funds in a timely manner.

On the other hand, another commenter believed the primary issue of multiple student complaints is scale. Multiple can mean two. The commenter points out that two complaints at a school with 10,000 title IV, HEA recipients is on a different scale than 100 hundred complaints at a school with 1,000 recipients, however, the commenter acknowledges that they are equally troublesome.

*Discussion:* Historically, the Department has seen that most institutions do not generate significant numbers of student complaints. This is the case even at institutions with proven instances of widespread misconduct. As such, we do not think simply dismissing complaints due to the overall scale of the institution should be dispositive in an administrative capability analysis. However, the Department will consider the number and nature of these complaints when determining whether there should be an administrative capability finding.

*Changes:* None.

*Comments:* One commenter proposed that the Department remove the condition regarding student complaints from § 668.16(s). The commenter contended that the condition is too vague and hard to prove. The commenter suggested an alternative to eliminating the regulation would be for the Department to state that only complaints that meet all of the following conditions should be considered: (1) complaints that have been made in writing to a Federal or State agency, (2) complaints that remain outstanding for 120 days, following the institution's opportunity to resolve the complaint, and (3) complaints that are material and directly relate to an institution's handling of title IV, HEA funds. When the Department identifies complaints meeting all three conditions, institutions will lack administrative capability only if the number of those complaints exceed 5 percent of the institution's current enrollment.

*Discussion:* We disagree with the commenter. We believe the language in paragraph (s)(1) of this section about valid and relevant student complaints captures this concept without needing to create as much complexity as the commenter suggests. Saying the concepts need to be valid captures the idea that they must be proven to be true, while relevant makes the connection to what we are worried about with timely disbursements. We do not think adopting a threshold for the number of complaints is appropriate because most institutions do not generate significant numbers of student complaints—even at institutions with proven instances of widespread misconduct. We note that the commenter did not provide a rationale for setting the threshold at five percent.

*Changes:* None.

*Comments:* One commenter stated that the language in § 668.16(s) fails to recognize that institutions may have conflicting regulatory restrictions on the timing of disbursements, which could put a school in a position to choose which requirement to comply with. If an institution creates a disbursement schedule to align with title IV, HEA disbursement regulations, the commenter posited that the institution should be considered compliant with administrative capability requirements regardless of student complaints.

*Discussion:* The Department disagrees with the commenter. There is nothing in this administrative capability standard that suggests institutions should not first comply with all required title IV, HEA disbursement rules. Student complaints about an institution's compliance with required disbursement rules would clearly not trigger this provision. What this administrative capability standard addresses are the situations where an institution may comply with specific disbursement rules, such as the 30-day delay for first time loan recipients, but then further delay the disbursement until a time period that is beneficial to the institution but harms the student. Establishing a compliant disbursement schedule would not itself resolve this problem because an institution could still unacceptably delay disbursements.

*Changes:* None.

*Comments:* Two commenters suggested that the Department remove the addition of § 668.16(s) from the final rule since disbursing funds is already regulated. One of the commenters added that we already require funds to be disbursed during the current payment period according to the cash management regulations in § 668.164.

*Discussion:* Although the disbursement regulations in § 668.164 require institutions to disburse during the current payment period, the Department has determined that some institutions wait until the very end of a payment period to delay paying credit balances to students without regard to whether such policies are in students' best interests. In these cases, there is a direct harm to students who need the credit balance funds to pay for educationally related expenses such as books, transportation, or childcare. The delay in making the disbursements and paying the credit balances can cause students to withdraw from their educational programs.

Existing cash management regulations only require institutions to disburse funds intended for a payment period at some point during that payment period (except in unusual circumstances). Regulations for the Pell Grant and campus-based programs require institutions to pay students during payment periods at such times and in such amounts as it determines will best meet the student's needs. The Direct Loan regulations require only that institutions disburse such funds on a payment period basis and, generally, in substantially equal amounts. The current requirements are not consistent across programs, and there is no clear definition in the regulations for what it means to make disbursements at such times and in such amounts that best meet students' needs for the Pell Grant and FSEOG programs. Therefore, the Department believes that the additional regulatory standard is necessary to deter unscrupulous institutional behavior with respect to disbursement timing and to ensure that institutions are required to disburse funds at times that best meet student needs for all the title IV, HEA programs.

*Administrative Capability—Gainful Employment (§ 668.16(t))*

*Comments:* Commenters claimed the Department failed to provide evidence to explain why 50 percent was the proper threshold for title IV, HEA funds from failing GE programs or for the share of full-time-equivalent enrollment in failing GE programs to determine that an institution lacks administrative capability. Other commenters argued that the Department should not use undefined terms like ''full-time equivalent'' as students may shift their enrollment statuses.

*Discussion:* The Department's goal with this provision is to identify the point at which an institution's inability to offer programs that prepare students for gainful employment in a recognized

occupation shifts from being a program-level issue to instead represent a widespread issue that shows there is a more systemic problem with the way the institution operates.

In the NPRM, the Department proposed a threshold based on enrollment and title IV, HEA revenue because we thought both were useful for gauging the impact of failing GE programs. However, we are removing the measurement based upon full-time-equivalent (FTE) students to address concerns raised by commenters. While looking at enrollment using FTE is a common practice within higher education, the way to convert that enrollment may not be clear. Title IV, HEA revenue can also to some degree capture a similar concept as presumably a student who undertakes a larger courseload might receive more Federal aid than one who takes fewer courses. Accordingly, we will only measure this provision in terms of title IV, HEA revenue in the final rule.

Regarding the threshold for revenue, the Department chose 50 percent partly because that is the point where an institution has more title IV, HEA revenue associated with failing GE programs than there are with those that are either not failing or not evaluated for eligibility under the GE metrics. This metric also considers the students who might be enrolling in a failing program but not completing it, and it makes sense to consider how the failing programs may be impacting the larger pool of students while also making the same comparison for students enrolling in the passing programs at the institution. At that point, more of the title IV, HEA funding going to the institution is for students enrolling in failing GE programs than for students enrolling in GE-programs that are consistent with continued participation in title IV. That is an obvious warning sign for the institution, and the 50-percent threshold represents a relatively familiar and easily understood measure that is reasonably related to the Department's regulatory concerns. At lower percentages of title IV, HEA funds at risk it is, in our judgment, relatively more likely the case that the issue is tied to program-specific challenges and a lesser threat to the institution as a whole. We must draw a line for this rule to be fairly clear, and we have concluded that 50 percent reflects a reasonable balance of considerations based on available information. Furthermore, in § 668.16(m) the Department already uses a similar metric related to loan outcomes by considering an institution's cohort default rate.

*Changes:* We have removed the threshold for at least half of an institution's full-time equivalent title IV, HEA recipients that are not enrolled in programs that are ''failing'' under subpart S in proposed § 668.16(t)(2).

*Comments:* We received many comments suggesting that the Department should not connect administrative capability to the number of passing GE programs. Commenters argued that although high numbers of failing GE programs may indicate an institution's financial vulnerability, it should not be assumed the institution is unable to administer title IV, HEA programs. The commenters feel that the Department has failed to explain how these two concepts are related. The commenters further stated that debt-to-earnings rates and earnings premium measures assess financial value, not administrative capability. One of these commenters asserted that the Secretary has no statutory authority to propose the rule since GE standards are based on program eligibility and administrative capability is separate from program eligibility. The commenters requested that we eliminate this proposal.

*Discussion:* Demonstrating administrative capability means that the institution can show that it complies with the HEA. While it is true that GE operates on a programmatic basis, and it is a measure of a program's financial value, the Department believes that an institution's compliance with programmatic eligibility requirements is fully appropriate to review within the consideration of whether an institution is administratively capable of administering title IV, HEA aid, especially when the compliance issue affects the majority of Federal student aid funds received. As explained previously in this section, the Secretary has the authority under HEA section 487(c)(1)(B) to issue necessary regulations to provide reasonable standards of appropriate institutional capability for the administration of title IV, HEA programs within the parameters of requirements set out in specific program provisions, including any matter the Secretary deems necessary for the sound administration of the student aid programs. Institutions that participate in the Federal student aid programs must demonstrate that they meet administrative capability standards that encompass numerous program and institutional requirements. An institution that cannot show at least half of its title IV revenue comes from passing GE programs is failing to meet the requirement in HEA section 102 that its programs prepare students for gainful employment in a recognized

occupations and it is failing to demonstrate administrative capability at the institutional level. The requirement is, therefore, well-connected to the administrative capability requirements and reflects a reasonable choice. If a majority of an institution's title IV, HEA funds go to students enrolling in failing GE programs, then that suggests institution-level deficiencies in administering the title IV programs.

*Changes:* None.

*Comments:* A number of commenters objected to the addition of GE criteria to the administrative capability standard. The commenters believed the added regulations will cause institutions to be penalized twice. Once under the GE rules, and again under the administrative capability rules. Two commenters also criticized the Department's proposal to connect administrative capability to GE, asserting that it stacks unnecessary consequences on institutions. Institutions can face penalties, fines, and loss of program participation, therefore lacking administrative capability caused by a single GE award year failure. The commenters argue that the GE regulations already prohibit failing programs from being offered which leaves no basis for administrative capability concerns.

*Discussion:* The Department disagrees with commenters. While failing GE programs have their own consequences, the Department is particularly concerned that at the point where GE failures are this widespread that the issues at hand represent a more systemic issue. This is a scenario where an institution is at risk of losing at least half of its title IV, HEA revenue, which could result in an inability to meet other requirements and provide students with the education that they have promised to provide. This requirement in administrative capability thus draws a distinction between an institution that may have a few failing GE programs that do not represent a significant effect on the school with a more pervasive set of challenges.

*Changes:* None.

*Comments:* One commenter raised a concern that an institution can be deemed administratively incapable before being given the opportunity to appeal failed GE rates. The proposed administrative capability rule states that an institution can be incapable due to failing GE rates in the most recent award year; however, under the proposed GE regulation an institution can appeal the calculation of rates after the Department starts a program termination action when a program fails GE standards in two out of three award years. The

commenter requests revision of the administrative capability rule to state that the Department would request an institution to provide challenge or appeal information to the Department before initiating action.

*Discussion:* The Department disagrees that the commenter's concern could occur. Institutions have opportunities to review the information used to calculate the GE measures at different points. As a part of the process for calculating the GE measures, an institution may review the accuracy and make corrections to the list of students identified as completers of the program under § 668.405(b)(1)(iii). That step is completed before the calculations of the debt-to-earnings or earnings premium metrics. The program cannot be failing while that process is ongoing. In addition, § 668.603(b) provides for an institution to initiate an appeal if it believes the Secretary erred in the calculation of a GE program's D/E rates or earnings premium measure.

*Changes:* None.

*Comments:* One commenter raised general concern that the addition of GE Programs to the administrative capability standards create a higher compliance standard for GE programs, and it creates needless distinction between GE programs and non-GE programs. The commenter believes that this effort to expand the extent of administrative capability in this way is confusing and provides minimal value to their students.

*Discussion:* The Department disagrees. This provision is a straightforward situation in which an institution has a majority of its title IV, HEA revenue coming from programs that fail to meet the GE requirements. The work to comply with this provision rests in the GE regulations. The Department here is indicating it will take a closer look when an institution shows its typical title IV, HEA dollar flows to a failing GE program.

*Changes:* None.

*Administrative Capability— Misrepresentation or Aggressive Recruitment (§ 668.16(u))*

*Comments:* One commenter supported the proposal to discourage aggressive and deceptive recruitment tactics. The commenter believes that admissions representatives should not pretend to be employees of institutions when they work for third parties.

*Discussion:* We appreciate the commenter's support.

*Changes:* None.

*Comments:* We received a number of comments requesting clarification of the language used in the proposed

regulation. Two commenters questioned what is meant by aggressive recruiting. They felt it is unfair to require an institution to comply with something of which they are uncertain. Another commenter stated that the new language proposed in § 668.16(u) is unnecessary and unwarranted because the Federal definition of misrepresentation was recently expanded and included in the July 1, 2023, Borrower Defense to Repayment regulations located in part 668, subpart F. One other commenter suggested that use of the term unreasonable should be reconsidered. The commenter believes that a clear definition should be provided.

*Discussion:* The Department has explained these terms in part 668, subparts F and R, which would apply here. We believe the term unreasonable, which is used in part 668, subpart R, is important because it indicates a higher standard than just to take advantage of someone, which helps distinguish from common sales tactics versus what crosses the line into aggressive and deceptive recruitment.

*Changes:* None.

*Comments:* One commenter accused several institutions of falsifying information to improve school rankings. The commenter questions if the deceptive actions will be treated the same as aggressive and deceptive recruiting actions. The commenter also asks if the institutions will be sanctioned for its actions.

*Discussion:* The Department cannot comment on the specific conduct of institutions. We would need to consider the facts specific to part 668, subpart F.

*Changes:* None.

*Comments:* Two commenters recommend that the Department edit the proposed version of § 668.16(u) to change misrepresentation to substantial misrepresentation. The HEA prohibits substantial misrepresentation. The statute permits the Department to impose a penalty on an institution that has engaged in substantial misrepresentation. The commenters state that statutory provisions do not allow sanctions based on non-substantial misrepresentation. It is noted that other regulations and guidance distinguish between misrepresentation and actionable substantial misrepresentation.

*Discussion:* The Department agrees with the commenter for the reasons they raised, and we have adjusted the language accordingly.

*Changes:* We have added the word "substantial" before misrepresentation in § 668.16(u).

*Comments:* One commenter argued that the misrepresentation rules are not

a measure of administrative capability, and the Department has no authority to enforce this new standard. The commenter feels the Department fails to provide a valid reason for evaluating an institution's administrative capability so the proposal should be deleted from the final rule, otherwise it should be revised to state that only a final judicial or agency determination which establishes a pattern of misrepresentations can cause an institution to lack administrative capability. Therefore, the commenter contends the new language in § 668.16(u) is considered unnecessary because misrepresentation issues are already addressed in part 668, subparts F and G.

*Discussion:* The authority for the inclusion of this regulation is derived from section 498(d) of the HEA, which provides broad discretion to establish reasonable procedures as the Secretary determines ensure compliance with administrative capability required by the HEA. The inclusion of this in the administrative capability regulations is designed to align with the provisions of part 668, subparts F and R. In addition to being violations of the specific regulatory standards in subparts F and R, the Department believes that institutions engaging in substantial misrepresentations or aggressive recruitment show an impaired capability to properly administer the title IV, HEA programs. These activities not only harm students but also undermine the integrity of the title IV, HEA programs as a whole. As such, these activities must be reviewed, along with other factors, when determining if an institution is administratively capable. The Department does not need a final ruling on substantial misrepresentation or aggressive recruitment in order for it to consider these factors in an administrative capability analysis. Waiting for a final judicial determination could take a substantial amount of time and delay our ability to protect students and taxpayers and minimize potential harm. As with any other determination by the Department, an institution will have the ability to respond to a finding of impaired administrative capability and the factors related to that finding.

*Changes:* None.

**Certification Procedures (§§ 668.13, 668.14, and 668.43)**

*General Support*

*Comments:* Several commenters supported the proposed certification procedure regulations. These commenters believe these requirements

will improve institutional integrity and help to protect students and taxpayers.

A few commenters expressed appreciation that the proposed certification procedures included State consumer protection laws, the withholding of transcripts, and limits to title IV, HEA access.

*Discussion:* We appreciate the commenters' support of these provisions.

*Changes:* None.

*Comments:* Another commenter supported the Department's proposals of adding criteria to enter into a PPA, requiring disclosures related to professional licensure requirements, adding requirements to PPAs that would better protect students directly, including a regulation which would prohibit institutions from withholding transcripts for balances that result from errors or wrongdoing on the part of the institution, and a provision which prohibits institutions from creating additional, unnecessary barriers to students' accessing the title IV, HEA assistance to which they are entitled. The commenter further encouraged the Department to consider requiring entities whose services directly lead to the recruitment and enrollment of over 50 percent of an institution's student enrollment to sign the PPA.

*Discussion:* We appreciate the commenters' support of these provisions. We believe the suggestion related to recruitment is best considered within the issue of third-party servicer guidance and regulations.

*Changes:* None.

*Comments:* A few commenters agreed with the addition of States' attorneys general to the list of entities that can share information with each other, the Department, and other entities such as the Federal Trade Commission and the Consumer Financial Protection Bureau (CFPB). These commenters voiced that any information related to institutions' eligibility to participate in the title IV, HEA programs or any information on fraud and other violations of law would help protect students who are harmed by misconduct.

*Discussion:* We appreciate the commenters' support of this provision.

*Changes:* None.

*Comments:* One commenter agreed that special scrutiny should be applied to institutions that are at risk of closure or those who affiliate with entities that have committed fraud or misconduct using title IV, HEA funds.

*Discussion:* We appreciate the commenter's support of this provision.

*Changes:* None.

*General Opposition*

*Comments:* One commenter argued the Department already has sufficient oversight authority when it comes to certification and that these new regulations will only create unnecessary administrative burden. According to the commenter, it takes a lot of effort to have programmatic accreditation in addition to institutional accreditation. Other commenters stated that the proposed certification procedures introduce statutory concerns, and the Department is operating outside of its authority granted by Congress, as well as infringing on the authority granted to States with the provisions related to State licensure and certification.

*Discussion:* Throughout this final rule, we sought to strike a balance between avoiding imposing unnecessary burden on institutions, and providing greater protections for students who might attend institutions exhibiting signs of financial struggle or that do not serve the students' best interest, as well as protect the taxpayer dollars that follow students. We believe that these final rules will provide that necessary protection, and any burden on institutions is warranted given the risks to students and taxpayers.

We disagree with the commenters that the proposed and final certification procedures exceed the Department's statutory authority. HEA section 498 describes the Secretary's authority around institutional eligibility and certification procedures and includes provisions related to an institution's application for participation in title IV, HEA programs and the standards related to financial responsibility and administrative capability. Section 487(a) of the HEA requires institutions to enter into a PPA with the Secretary, and that agreement conditions an institution's participation in title IV programs on a list of requirements. Furthermore, as discussed elsewhere in the preamble, HEA section 487(c)(1)(B) authorizes the Secretary to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV, HEA programs in matters not governed by specific program provisions, and that authorization includes any matter the Secretary deems necessary for the sound administration of the student aid programs.

Regarding the comment that the Department is infringing on authorities granted to States, we disagree. As explained in the specific provisions related to State licensure and certification, requiring institutions to meet standards established by States in no way infringes on the rights of the states that are setting those standards. These regulations do not impose any additional requirements on States and are related to requirements for institutions. In fact, our regulations are intended to help States use their authority, while protecting students.

*Changes:* None.

*Comments:* Some commenters recommended the Department keep certification procedures as it currently stands and not implement any of these new regulations asserting the existing certification processes are adequate to determine institutional eligibility.

*Discussion:* We disagree with the commenters. We believe that improving upon the existing regulations related to certification procedures is important to protect the integrity of the title IV, HEA programs and to protect students from predatory or abusive behaviors. By amending the certification procedures and adding new requirements, including adding new events that cause an institution to become provisionally certified and new requirements for provisionally certified institutions, these final rules address our concerns about institutions that have exhibited problems, but remained fully certified to participate in the Federal student aid program. The existing regulations inhibit our ability to address these problems until it is potentially too late to improve institutional behavior or prevent closures that harm students and cost taxpayers.

*Changes:* None.

*Removing Automatic Certification (§ 668.13(b)(3))*

*Comments:* A few commenters supported removing the automatic recertification provision. These commenters believe eliminating the automatic timeframe will give the Department greater flexibility in making decisions in the best interests of students and taxpayers rather than being forced to decide quickly.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comments:* Several commenters requested that the Department maintain the current regulation and automatically renew an institution's certification if the Department is unable to make a decision within 12 months. Other commenters asserted that the Department did not provide evidence that it had granted an automatic recertification under the existing regulations. These commenters alleged that removing this provision will remove the incentive for the Department to act on certification

applications within a reasonable timeframe. These commenters also believed that automatic certification at the one-year mark has kept the Department accountable in prioritizing the processing of certification applications. A few commenters noted that the automatic certification provision reached consensus in negotiated rulemaking sessions that took place only a few years ago and that the provision has only been in place for a short period of time. Because of this they argued the Department needed a clearer factual basis for rescinding this provision than it provided.

One commenter recommended that the Department amend language around approving an institution's certification renewal application if a determination has not been made within 12 months to specifically exclude those applications that the Department is actively investigating instead of removing the entire provision.

Many commenters sought a collaborative approach where the Department and institutions work together to establish reasonable timelines and timely responses if the Department moves forward with removing the automatic recertification provision.

*Discussion:* We disagree with the commenters' concern of removing the automatic recertification provision. As explained elsewhere in this preamble, while this provision received consensus approval from negotiators in the prior rulemaking, the Department has realized that imposing a time constraint on recertification negatively impacts our goal of program integrity. As the Department faces the first cohort of institutions subject to this provision, we have seen that this strict timeline can lead to premature decisions of whether to approve applications or not when there are unresolved issues that are still under review, which can have negative consequences on students, institutions, taxpayers, and the Department. In order to avoid an automatic recertification, the Department has had to reprioritize resources, such as expending extensive staff time on a school with only a few hundred students that exhibited significant concerns and should not have been recertified, when it could have been addressed over time. The efforts to resolve these pending applications also delays work for other institutions, as the most complicated cases necessitate the greatest amount of work. The result is that institutions that would have a recertification without issues can see their application delayed as the Department redirects resources to avoid automatically recertifying an

institution that should not be given that treatment. Thus, the Department's primary concern revolves around the resources needed to avoid automatic recertification and not that the prior regulations caused it to grant automatic recertification.

We disagree with the commenter that stated that eliminating this provision will remove the incentive for the Department to act on certification applications within a reasonable timeframe. The Department strives to find a balance between providing timely responses and making informed decisions that protect students and taxpayers from high-risk institutions. As noted previously, the automatic certification provision in the prior regulations forced the Department to prioritize resources in ways that were not best for properly overseeing the Federal aid programs. The removal of this provision allows the Department to act in a reasonable timeframe as it relates to certification applications, while maintaining our goal of program integrity.

We also disagree with the commenters who believed that automatic certification at the one-year mark has kept the Department accountable in prioritizing the processing of certification applications. The prior regulations created situations where the Department had to prioritize reviews of some institutions ahead of others solely to meet this deadline, even if a risk-informed process that considered issues such as the size of the school would have dictated otherwise.

While the presence of this provision has created challenges for the Department's proper oversight of the title IV, HEA programs, its removal does not create harm to institutions. An institution that does not receive a decision on its recertification application before its existing PPA expires maintains access to the Federal aid programs. That participation continues under the same terms as the PPA that expired. The institution's situation thus does not change, and it continues operating as it had been before the PPA expired.

We do not think the suggestion for the Department to only exempt institutions under active investigation from this provision because it would create an unclear standard as to what constitutes an investigation and when it is still ongoing.

We appreciate many commenters offering to work together to establish timelines that help reach this goal, but this is ultimately a question of what is appropriate for the Department in its oversight function. Having the

Department regulate itself by creating such a short timeline for review of applications, unnecessarily binds our oversight authority. These timelines are thus best set by the Department, motivated by a general goal of providing responses back to institutions while also protecting taxpayer interests.

*Changes:* None.

*Events That Lead to Provisional Certification (§ 668.13(c)(1))*

*Comments:* Some commenters asserted that the proposed rule imposed provisional certification in circumstances that exceeded the Department's statutory authority. One commenter argued that the Department cannot provisionally certify institutions except in those situations explicitly defined in the HEA. This commenter argued that the proposed provision contradicts the HEA, which provides that an institution may receive a provisional certification when the Secretary determines that an institution has an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities under a PPA.

Another commenter argued that the new requirements in the certification procedures exceed statutory authority, particularly in conjunction with the financial responsibility triggering events. This commenter argued that we should remove proposed § 668.13(c)(1)(ii)(A), which says an institution becomes provisionally certified if it is subject to one of the financial responsibility triggers under § 668.171(c) or (d), because it is arbitrary and inconsistent with the Department's proposed financial responsibility rules. This commenter stated that while the proposed rule authorizes the Secretary to provisionally certify an institution when a mandatory or discretionary financial responsibility trigger occurs under § 668.171(c) or (d) and the Secretary would require the institution to post financial protection, the commenter pointed out that the mandatory or discretionary financial responsibility events under § 668.171(c) or (d) are not necessarily events that would threaten the administrative or financial condition of the institution so as to jeopardize its ability to perform its financial responsibilities under its PPA. This commenter argued that discretionary triggers encompass circumstances where no such concern would exist, including probationary and show cause actions in their early stages, declines in Federal funding that are not necessarily indicative of any financial concerns, pending borrower defense claims that may have no potential for

material adverse financial effect, and instances of State licensure exceptions regardless of their materiality.

This commenter also argued that the proposed rule's requirement for the Secretary to obligate the institution to post financial protection does not constitute a determination by the Secretary that the institution is unable to perform its financial responsibilities under its PPA. This commenter is concerned that the proposed rule authorizes the Secretary to provisionally certify an institution without first determining if the institution has an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities under a PPA, as required by statute. This commenter is troubled that although the financial responsibility rules on discretionary triggering events provide that the Secretary may determine that an institution is not able to meet its financial or administrative obligations if any of the discretionary triggering events set forth in the regulation is likely to have a significant adverse effect on the financial condition of the institution, the proposed rule in § 668.13(c) states that the institution's certification would become provisional if the institution triggers one of the financial responsibility events under § 668.171(d) and, as a result, the Secretary would require the institution to post financial protection. The commenter is concerned that the financial responsibility rules provide that the occurrence of a discretionary triggering event permits (but does not require) the Secretary to determine that an institution is unable to meet its financial or administrative obligations under that section, and therefore, would allow for provisional certification. However, the proposed certification rule mandates provisional certification of an institution, upon notification from the Secretary, if a discretionary triggering event occurs, provided that the Secretary also requires the institution to post financial protection.

Ultimately, this commenter asserted that in both the certification procedures and financial responsibility rule, provisional certification is inconsistent and at odds with one another. This commenter stated that provisional certification is required when a discretionary triggering event occurs under the certification rules, while in the financial responsibility rule, it is merely permissible when a discretionary triggering event occurs. This commenter is worried this would create an unworkable regulatory scheme, would cause confusion, and

would lead to problems with enforcement.

*Discussion:* We disagree with the commenters. We discuss the statutory authority of the discretionary and mandatory triggers in the financial responsibility sections of this final rule. This includes explaining that discretionary triggers require a determination that the event would or has had a significant adverse effect on an institution, which addresses the concern raised by the commenter about probation and other events. In both cases, we assert that when the triggering condition results in a request for financial protection that means that the institution is no longer financially responsible. One effect of not being financially responsible is that an institution becomes provisionally certified. This is also outlined under § 668.175, which discusses how institutions with a failing composite score may continue participating as a provisionally certified institution depending on the amount of financial protection they provide.

As explained in the financial responsibility section, the events outlined in the financial responsibility triggers are ones that pose a threat to an institution's financial condition. HEA section 498(h)(1)(B)(iii) provides the Department with the authority to provisionally certify an institution if it has been determined that its administrative or financial condition may jeopardize its ability to perform its financial responsibilities under a PPA. We believe those events meet that standard.

*Changes:* None.
*Comments:* One commenter did not agree with institutions being provisionally certified as a result of a change in ownership or merger because they do not believe that indicates a financial or operational concern. This commenter argued that institutions often change ownership or merge because they believe the transaction would materially improve or benefit their financial condition and educational operations. While this commenter understands the Department's desire to monitor institutions that undergo such transactions, they disagreed with the breadth of the conditions the Department would place on provisionally certified schools (including schools provisionally certified solely for having undergone a transaction).

*Discussion:* We disagree with the commenters' assertion that a change in ownership or merger does not create a condition that warrants attention.

Provisional certification provides an opportunity for the Department to oversee and more thoroughly monitor institutions. New owners may have little or no experience administering the title IV, HEA programs. Therefore, the Department must assess the institution's efforts and determine whether technical assistance, further oversight, or both are needed. As another example, provisional certification is particularly important when institutions have undergone a change in ownership and seek to convert to a nonprofit status. As explained in the NPRM and in this preamble, provisional certification provides the Department with greater ability to monitor the risks of some for-profit conversions, such as identifying situations in which improper benefits may inure to private individuals or for-profit entities following a change in ownership or control. Furthermore, HEA section 498(h)(b)(ii) explicitly provides that the Secretary may provisionally certify an institution if there is a complete or partial change in ownership.

*Changes:* None.
*Comments:* Two commenters requested the Department clarify proposed § 668.13(c)(1)(i)(G). One commenter assumed the provision of subpart L applies to institutions that participate via the provisional certification alternative in § 668.175(f), as they believed this would be consistent with the language in the preamble in which the Department describes the provision as allowing the Department to provisionally certify an institution if it is permitted to use the provisional certification alternative under subpart L. If the commenter's understanding is correct, they request the Department clarify in the final rule that institutions may be provisionally certified if an institution is participating under the provisional certification alternative in § 668.175(f). This commenter brought this issue to the Department's attention because they believe every title IV, HEA participating institution is already under the provisions of subpart L, as subpart L contains financial responsibility requirements applicable to all institutions even if select provisions only apply to a subset of institutions.

Another commenter recommended the Department specify that provisional certification may only be applied if an institution is not financially responsible under the provisions of subpart L.

*Discussion:* We agree with the commenters. We want the ability to provisionally certify an institution that has jeopardized its ability to perform its financial responsibilities by not meeting

the factors of financial responsibility under subpart L or the standards of administrative capability under § 668.16. Since an institution is only permitted to use the provisional certification alternative once these standards have been met, we will make this clarification in § 668.13(c)(1)(i)(G).

*Changes:* We have clarified that § 668.13(c)(1)(i)(G) may be used to provisionally certify an institution if it is under the provisional certification alternative of subpart L.

*Provisional Certification Time Limitation for Schools With Major Consumer Protection Issues (§ 668.13(c)(2)(ii))*

*Comments:* In response to the Department's directed question in the NPRM on proposed § 668.13(c)(2) on whether to maintain the proposed two-year limit or limit eligibility to no more than three years for provisionally certified schools with major consumer protection issues, a few commenters recommend that the Department retain the two-year timeline as a maximum. These commenters suggested that the shorter duration would be better than risking an additional year of a low-quality, provisionally certified program continuing to operate largely at students' expense. These commenters stated that the Department has historically failed students and taxpayers in adequately addressing institutions placed on provisional status.

One commenter stated that the recertification process is lengthy and burdensome, and that the Department is likely concerned about the challenges a short recertification period may present to institutions and the Department itself. However, the commenter asked the Department to consider that actions against an institution are also a lengthy process. The commenter further explained that should the Department determine the consumer protection concern warrants new limitations or termination of eligibility it will only have extended that process. According to this commenter, that extension would come at the expense of students who would continue to enroll in the institution, using taxpayer-financed title IV, HEA dollars in the interim. This commenter encouraged the Department to accept the relatively small additional burden of going through another recertification process at two years or shorter, as appropriate, rather than forcing students to bear the expense and wasted time of enrolling in a program with known concerns without the benefit of careful Department oversight.

Another commenter expressed concern for extending the provisional certification timeline to three years for institutions that have consumer protection issues because that would allow institutions to continue operating without the best interest of students and taxpayers in mind.

A few commenters suggested that the Department consider whether an even shorter timeframe of one year might be more appropriate for institutions under provisional certification as a result of claims related to consumer protection laws. Given those consumer protection concerns, the commenters said the Department should pursue the most stringent timeline possible for reassessing provisional certification in the interest of enrolled students.

*Discussion:* Upon consideration of the comments received, the Department believes a three-year limit for provisional certification is more appropriate. Overall, we are concerned that two years may be too short to gain enough information into the major consumer protection concerns. Moreover, this is a maximum period and there is nothing that prevents the Department from selecting a shorter period if it desires.

The Department reached this conclusion after considering the process that goes into recertifications, including the types of information considered and what has been helpful to understand consumer protection concerns in the past. The Department seeks to review all available data to determine the appropriate outcome for certification and actions. As one commenter suggested, the Department is concerned with the challenges that can occur when we recertify for a short duration. For example, a two-year certification might not provide the Department with enough information to understand if a problem or concern has been rectified. Commonly used information sources include the compliance audit and financial statements that institutions submit annually, recent program review findings, cohort default rates, and an institution's policies, among other things. We review the compliance audit, for example, to determine whether the institution has resolved prior findings, particularly repeat findings. If the duration of the certification period is too short, the Department will not have adequate information to make an informed decision. In some instances, if the Department were to adopt a one- or two-year limitation, we could be required to fully certify an institution when there are still problems that have not been addressed, whereas provisional certification gives us greater ability to

monitor risks and impose conditions on an institution.

The Department does not consider a longer provisional certification period to be a way to minimize Department workload as one commenter may believe, nor do we consider it to be an extension for institutions to continue operating when there are issues. Instead, it provides the Department with more time to monitor an institution to determine whether concerns can be resolved. Furthermore, the response to the commenter who raised the issue of limitations or termination that the Department may want to impose is the same. The Department's oversight of institutional eligibility does not exist only when we consider a recertification application. We would have ample opportunities throughout the duration of the certification period to act if we had cause to do so. If the Department received information on a consumer protection issue, as one commenter suggested, the Department would evaluate that information and determine the appropriate course of action.

Gathering adequate evidence to justify an adverse action—such as a limitation, suspension, or termination—takes time. The longer provisional certification duration may provide the time needed to build our case. Conversely, if we tried to terminate or limit eligibility without adequate evidence, our effort could be unsuccessful, which is certainly more problematic for students and taxpayers. Additionally, recently recertifying an institution, even provisionally, could lend credibility to a program that could impede on our ability to impose an adverse action. Finally, the Department sees the best outcome to provisional certification as the institution resolving our concerns. We would not want to limit, suspend, or terminate an institution that has done so.

For the reasons above, we have decided to keep the maximum duration of provisional certification at three years. We note, however, that nothing precludes us from setting a shorter time period where we believe it is useful as some commenters suggested. The Department could impose a provisional certification for a period as short as 6 months.

*Changes:* We are extending the maximum period of recertification from two years to three in (§ 668.13(c)(2)(ii)).

*Comments:* A commenter said that the Department should change its position regarding whether a provisionally certified institution can be given another provisional certification when applying to continue participating in the Federal student aid programs. The commenter noted that section 498(h) of

the HEA does not explicitly provide for consecutive re-approvals when fixing a maximum time limit for provisional certification at three years and contended that this longstanding practice of continuing to issue provisional certifications was unlawful.

*Discussion:* The Department disagrees with the commenter's view that institutions are prohibited from obtaining consecutive approvals to participate in the Federal student aid programs under provisional certification. The Department's longstanding interpretation of section 498(h)(1)(B) of the HEA is that these three-year limits refer to the individual length of provisional certification. In other words, that institutions covered by this provision may not receive a provisional certification that lasts up to six years, the maximum length for fully certified institutions. We believe the purpose of this provision is to ensure that institutions in these situations are revisited on a regular and shorter basis than other institutions, not that it serves as a ticking clock toward ineligibility. We note that the process of requiring institutions to apply for recertification represents a significant safeguard since institutions with demonstrated problems can have the application denied, or corrective actions can be required as a condition of approval. Furthermore, institutions can participate under provisional certification with financial protections while otherwise demonstrating they have administrative capability to provide valuable programs to their students.

*Changes:* None.

*Comments:* One commenter stated that the timeframes for compliance and monitoring settlements between consumer protection agencies and for-profit colleges are illustrative. This commenter pointed out that when agencies such as the Federal Trade Commission (FTC) and State attorneys general reach settlements with institutions for consumer protection violations, they frequently require resolution of consumer protection violations within a short period (generally a few months) and then provide for compliance reporting in one year. This commenter stated that when the FTC entered into an agreement with DeVry University in 2016 regarding the FTC's charges of deceptive advertising, the agreement provided a four-month period for the school to initiate training to address the deceptive practices and imposed a compliance reporting requirement one year from the date of resolution. Similarly, the commenter suggested, the Department should

require resolution of consumer protection violations within a short period (several months) and require recertification after one year.

*Discussion:* While the Department understands the concerns of the commenters, we cannot verify that all problems have been addressed in such a short period of time. A year would not give us enough time to review compliance audits and financial statements that institutions submit annually, recent program review findings, cohort default rates, and an institution's policies, and then monitor an institution's progress. We note, however, that we do not only look at institutions during a recertification. We review each incoming audit and financial statement, for example, and when we do, we also look at many other things as part of a comprehensive compliance review.

*Changes:* None.

*Comments:* One commenter argued that the Department's proposal to end an institution's provisional certification after two years if their provisional status is related to substantial liabilities owed due to borrower defenses to repayment, false certification, or other consumer protection concerns violates fundamental notions of fairness, institutions' due process rights, and contradicts the governing statute. The commenter argued that provisional certification based upon liabilities potentially owed violates fundamental notions of fairness because provisional certification would be based on unproven and unsupported allegations. The commenter also addressed potential liabilities owed in connection with borrower defense by stating that the proposed rule violates institutions' due process rights, which are expressly established in the applicable borrower defense to repayment regulations. The commenter also stated that the borrower defense to repayment regulations provide for multiple layers of fact finding, administrative review, and adjudications in advance of any loan discharge or determination of institutional liabilities associated with borrower defense to repayment claims.

The commenter further stated that the proposed rule is vague and overbroad and failed to define what a substantial liability is, how it is measured, or how tentative or certain a liability must be for it to be considered potentially owed under the regulation. This commenter stated that the proposed rule failed to provide institutions adequate notice for when a provisional certification may be subject to early expiration. According to this commenter, ending an institution's provisional certification with unproven

allegations or premature facts is the same as ending an institution's provisional certification without justification. In addition, the commenter claimed that the proposed rule fails to define what constitutes a claim. This commenter questioned whether a claim would encompass any allegation that is made against an institution, whether formally or informally. This commenter specifically would like to know whether complaints made through an institution's complaint procedures would be considered a claim or if only claims that were filed in a lawsuit or an administrative proceeding would be considered. Further, the commenter pointed out that the phrasing used under consumer protection laws is also overbroad and vague and fails to appropriately narrow the universe of claims that may trigger the application of this proposed subsection of the rule.

In addition, this commenter argued that the proposed two-year period is contrary to the governing statute. This commenter mentioned that the applicable HEA provision provides for provisional certification in only a few specific circumstances, and the only relevant circumstance articulated in the statute is when the Secretary determines that an institution is in an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities under a PPA. This commenter claimed that the proposed provision contemplates that institutions will be placed on a limited term of provisional certification based on subjective and undefined criteria, particularly when the institution faces a substantial potential liability related to borrower defense or arising from claims under consumer protection laws. According to this commenter, the criteria in this provision are ill-defined and unrelated to whether an institution's financial responsibility has been jeopardized.

*Discussion:* We disagree with the commenters but provide additional clarification as to how these provisions work that addresses their concerns. The HEA provides that we can provisionally certify an institution for no more than three years, but it does not say that the Department cannot provisionally certify an institution for a shorter amount of time. Nonetheless, as noted above, upon consideration of the comments received, the Department will require provisionally certified schools that have substantial liabilities owed or potentially owed to the Department for discharges related to borrower defense to repayment or false certification or arising from claims under consumer protection laws to recertify after three

years, and not two. This additional year will give the Department more time to investigate these substantial liabilities owed or potentially owed. We also remind commenters that this provision does not dictate that an institution automatically becomes ineligible by the end of that three-year period. It is instead designed so that the Department looks more frequently at institutions that are provisionally certified. It is thus not a penalty or some kind of adverse action.

We also disagree with the commenter that the maximum timeline for provisional certification due to reasons related to substantial liabilities owed or potentially owed to the Department for discharges related to borrower defense to repayment or false certification, or arising from claims under consumer protection laws violates an institution's due process rights. Substantial liabilities owed or potentially owed related to the aforementioned reasons could pose a serious threat to the continued existence and operation of an institution. That threat bears directly on the statutory requirement that the Secretary determine whether the institution for the present and near future, the period for which the assessment is made, "is able to meet . . . all of its financial obligations." 20 U.S.C. 1098(c)(1)(C). That consideration looks not merely at obligations already incurred but looks as well to the ability of the institution to meet "potential liabilities" and still maintain the resources to "ensure against precipitous closure." We see no basis for the contention that taking into account risk posed by substantial liabilities owed or potentially owed somehow deprives an institution of its due process rights. If the risk posed is within the statutory mandate to assess, as we show above, taking that risk into account in determining whether an institution qualifies to participate in the title IV, HEA programs cannot deprive the institution of any constitutionally protected right. The institution remains free to respond to any claim in any way it chooses. The Department disagrees with the contention that we are barred from considering whether that risk warrants financial protection for the taxpayer as a condition for the continued participation by that institution in this Federal program. And in this instance, we would remind the commenter that a maximum provisional certification period does not mean that an institution would lose certification, rather it is the amount of time the Department would allow for that period of provisional certification. At the end of that time, the Department would

choose to fully certify, provisionally certify, or deny the certification of the institution.

The Department also provides some additional clarity around issues related to the breadth or what constitutes a claim under consumer protection. We do not believe this provision to be overbroad. This provision is designed to capture serious concerns raised by governmental bodies, similar to what we have laid out in the triggers for financial responsibility and the items where we are seeking additional reporting under § 668.14(e)(10). Complaints filed by borrowers or students through an institutions' internal complaint process would not rise to that level since they have not been reviewed by an independent body and a determination made regarding the validity and seriousness of the claim. Although the internal student complaints may ultimately give rise to a governmental action regarding consumer protection violations, the Department believes that governmental action is necessary to trigger this provision. We disagree with commenters that this provision is overly broad.

*Changes:* We amended § 668.13(c)(2) to provide that the maximum time an institution with major consumer protection issues can remain provisionally certified is three years.

*Supplementary Performance Measures (§ 668.13(e))*

Overall

*Comments:* Many commenters wrote in favor of the proposed supplementary performance measures. These commenters stated these measures would be a significant improvement and would collect valuable and helpful data that would improve the process of institutional oversight and certification. These commenters further shared that these measures would better protect students from investing time and money into programs that provide little or no value while also protecting taxpayer dollars. One commenter recommended the Department strengthen the provision further by amending it to provide that the Department shall, rather than may, consider the supplementary performance measures, which will protect students and taxpayers from investing in low-value programs.

*Discussion:* We thank the commenters for their support. We decline the commenter's suggestion to change "may" to "shall" in the regulations. The benefit of the supplementary performance measures provision is that it gives the Department flexibility to consider the varying circumstances at

each institution. We believe this language gives us sufficient ability to meet oversight responsibilities without binding the Department into taking actions that may not be warranted.

*Changes:* None.

*Comments:* A few commenters contended that this regulation is an overreach of government, and that the Department does not have the legal authority to adopt these measures. Several commenters insisted that the supplementary performance measures are not found in or are inconsistent with the HEA. One commenter asked what justification the Department has identified to establish the need to create supplementary performance measures. Commenters stated that HEA section 498 provides the requirements an institution must meet for certification including eligibility, accreditation, financial responsibility, and administrative capability. Commenters opined that the performance measures on the list (withdrawal rates, expenditures on instruction compared to recruitment, and licensure passage rates) do not relate to those requirements. Commenters stated these measures are arbitrary and are not found elsewhere in the HEA or its regulations.

A few commenters stated that there is a statutory provision under 20 U.S.C. 1232a that prohibits the Department from exercising control over expenditures on instruction. They assert that the proposed rule violates the statute by interfering with the normal operations of institutions.

*Discussion:* The Department disagrees. Commenters are correct that HEA section 498 describes the Secretary's authority around institutional eligibility and certification procedures and includes provisions related to the required standards related to financial responsibility and administrative capability. Contrary to the commenters' suggestion, that provision provides the Department broad discretion in determining what factors we deem necessary for an institution to be deemed financially and administratively responsible when being certified or recertified for participation in the title IV, HEA programs. Additionally, HEA section 487(c)(1)(B) provides the Department with the authority to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV, HEA programs in matters not governed by specific program provisions, and that authorization includes any matter the Secretary deems necessary.

The supplementary performance measures in the final rule are within our broad authority to ensure institutions are meeting the standards necessary to administer the title IV, HEA programs in a manner that benefits students and protects taxpayer dollars. The Department has determined that these supplementary performance measures, which we will evaluate during the certification or recertification process, provide factual evidence that is indicative of whether an institution can properly administer the title IV, HEA programs. We disagree with the commenter who stated that such performance measures are arbitrary, not relevant, and are not found elsewhere in HEA or existing regulations. How an institution operates and administers the programs directly impact elements like withdrawal rate and licensure passage rate. In addition, these elements are identified in other places in the regulation. For example, the existing regulations in § 668.171(d)(5) provides a discretionary trigger for institutions with high annual dropout rates.

We also disagree with the commenter who stated that 20 U.S.C. 1232a prohibits the Department from regulating in these areas. Considering an institution's spending on education and pre-enrollment expenditures as a part of a broad range of factors during the certification process does not constitute the Department exercising control over curriculum, program of instruction, administration, or personnel of any educational institution, the spending or exercising any direction, supervision, or control of an institution, curriculum, or its program of any of the provisions listed in 20 U.S.C. 1232a.

*Changes:* None.

*Comments:* One commenter questioned the timeframe for implementation of the supplementary performance measures and requested more time to implement these measures.

*Discussion:* We disagree. Postponing implementation of these supplementary measures would unnecessarily delay the benefits of the rule. We believe the need for the transparency and accountability measures is too urgent to postpone any of these measures; to do so would abdicate our responsibility to provide effective program oversight. However, we note that these provisions will follow the master calendar requirements of the HEA and will be applied with recertifications or initial certifications starting after that point, which means this provision will phase in for institutions.

*Changes:* None.

*Comments:* Several commenters opined that these performance measures

are ambiguous, vague, and subject to interpretations without specific measurements. The commenters stressed that any supplementary performance measures should be clear, specify the thresholds of acceptability, and detail what the ramifications would be if not met. These commenters stated that without this specificity, it would not be possible for an institution to know if it is meeting the standards.

*Discussion:* We disagree with the commenter. As noted in other discussions in this section, these performance measures are among many factors that the Secretary may consider when determining whether to certify, or condition the participation of, an institution. When making this determination, the Secretary may consider the performance of the institution on the measures alongside all other requirements. By listing the measures here, we are providing greater clarity to the field about what indicators we are considering when deciding an institution's certification status.

However, as discussed in greater detail within the relevant subsections in this preamble, we have elected to remove the two supplementary performance measures that are related to GE—debt-to-earnings and earnings premium.[22] We have also removed the audit requirement for instructional spending. Overall, these changes better focus on the measures we are most concerned about that are not captured under other provisions. We believe these remaining measures are clearer and the discussion in the preamble and RIA provides necessary information about how they would be used. The removal of the audit requirement related to spending on instruction versus other areas, meanwhile, reduces burden for institutions.

*Changes:* We have amended § 668.13(e) by removing two supplementary performance measures, listed in the NPRM as paragraphs (e)(ii) and (iii), that are related to GE-debt-to-earnings and earnings premium. We also removed the audit requirement for instructional spending listed in the NPRM as paragraph (e)(iv) and renumbered in the final rule as § 668.13(e)(2).

*Comments:* One commenter expressed concerns about the list of supplementary performance measures that institutions would have to comply with. This commenter worried that these requirements would cause

institutions to close and lead to areas completely lacking certain types of available schools. Another commenter stated that the proposed supplementary measures do not provide more protections for the student than what is currently offered.

*Discussion:* We disagree with the commenter. The supplementary performance measures are a signal to the field about the kind of information the Department will take into account as we review applications from institutions for certification or recertification. The Department will carefully review these applications to determine how concerning the results are of these different measures. We believe these measures are strong indicators of how well an institution is providing educational programs, and how the use of them will protect students. The measures listed in this section identify considerations that are of the utmost importance to both students and taxpayers when evaluating an institution's performance. These are whether students will finish (the withdrawal rate), what kind of investment will the institution make in them for their money (the instructional spending test), and will students be able to get the jobs they prepared for (the licensure pass rate). Institutions that regularly struggle on each or every one of these measures merit a closer look at how they should be certified to participate in the title IV, HEA programs.

We also disagree with the commenters and believe the measures do not create substantial burden for institutions to be in compliance. We note that these performance measures are among many factors that the Secretary may consider when determining whether to certify, or condition the participation of, an institution. They will also go into effect under the requirements of the master calendar and apply to certifications that begin after the effective date of the regulations, which will result in a phase-in for institutions. Finally, two of the five supplemental measures presented in the proposed rules will be removed in the final rule, as well as the auditing requirement in the instructional spending measure, further reducing burden to institutions. These are discussed in greater detail in the subsection of this part of the preamble related to these measures.

*Changes:* None.

*Comments:* One commenter requested that the supplementary performance measures regulation be modified to state that the Department would consider punitive action if two or more of the

---

[22] These measures were listed in the NPRM as proposed § 668.13(e)(ii) and (iii). Since they were removed in this final rule, the remaining supplemental measures have been renumbered as § 668.13(e)(1) through (3).

measures were problematic instead of any one of the five measures.

*Discussion:* The Department does not take punitive actions. We only take administrative action to protect students and taxpayers. As noted in other discussions in this section, these performance measures are among many factors that the Secretary may consider when determining whether to certify, or condition the participation of, an institution. We do not think the suggested modification would be appropriate. For instance, an institution with low withdrawal rates and a high share of spending on education and related expenses that has horrendous job placement rates that cover most of their students merits a closer look.

*Changes:* None.

*Comments:* Other commenters shared that the five proposed measures are not adequately defined in the supplementary performance measures regulatory text. These commenters stressed that these measures must be defined to provide meaningful and valid performance metrics.

*Discussion:* We disagree with the commenters. First, we have removed the debt-to-earnings rates and earnings premium measure from the supplementary performance measures. The remaining measures are common areas with which institutions are familiar. For example, the withdrawal rate measure is of the percentage of students who withdraw from the institution within 100 percent or 150 percent of the published length of the program, aligning with the reporting requirements for the College Navigator as required by section 132(i) of the HEA. Institutions report spending across many categories annually in the Integrated Postsecondary Education Data System (IPEDS) Finance Survey in accordance with the appropriate accounting standards. The Department provides detailed instructions for institutions in the survey materials each year that outline how institutions report various expenses. Lastly, licensure passage rates are a common calculation made for programs that are designed to meet the requirements for a specific professional license or certification required for employment in an occupation.

*Changes:* None.

*Comments:* Several commenters stated that the supplementary performance measures are redundant because all regional accreditors routinely evaluate and set acceptable measures for education spending, graduation rates, and placement rates. These commenters expressed that any

new rules would create unnecessary burden on institutions.

*Discussion:* We disagree with the commenters. As explained in other discussions in this section, these are common measures with which institutions are familiar. Furthermore, accrediting agencies vary in their standards and even in the calculations used when they evaluate an institution for accrediting purposes. We believe it is important for the Department to consider these measures as part of the determination of certifying or conditioning an institution's participation.

*Changes:* None.

*Comments:* Many commenters expressed concern about the other information the Secretary may consider in the supplementary performance measures. These commenters stated that institutions should be clear on what information the Secretary may consider when deciding whether to grant or qualify institutional or program eligibility. Other commenters said that the list of supplementary measures should be finite so institutions have notice of what the Department will consider during recertification.

*Discussion:* The final § 668.13(e) lists three measurable items or aspects useful in recognizing a program or institution's overall effectiveness with regard to title IV, HEA administration. We decline to adopt an exhaustive list of measures for determining whether to certify or condition the participation of an institution under § 668.13(e). Conducting proper oversight requires the Department to carefully review institutions, including if they have unique circumstances that merit a closer look. Listing these three measures is important because it clarifies what institutions can expect the Department to consider. We think an exhaustive list would constrain the Department's ability to engage in sufficient oversight.

*Changes:* None.

*Comments:* One commenter argued that the supplementary performance measures in the proposed rules will have a disproportionate effect on schools with many first-generation college students in which over half are Pell Grant recipients. The commenter stated that the proposed regulation overlooks the reality that certain vital professions offer lower salaries, and many students pursue degrees without expecting immediate financial gains. This commenter noted that they would prefer to see policies and rules that support and commend individuals who chose careers in teaching, both at elementary and secondary levels, as well as other public service-oriented

fields, recognizing that financial rewards may not be as substantial. Therefore, the commenter stressed that labeling programs as failing based on the income of recent graduates compared to those who have been out of high school for over ten years, or because they don't meet the debt-to-earnings ratio, diminishes the true worth of higher education to just immediate earnings. The commenter shared that such perspective poses a significant risk, particularly to first-generation students and that imposing these requirements as part of the PPA could potentially lead to the termination of certain programs due to the GE data requirements.

*Discussion:* As discussed in greater detail in the relevant subsection, we have removed the debt-to-earnings rates and earnings premium measure from the supplementary performance measures. The commenter's concerns are thus no longer relevant for this section.

*Changes:* We have removed the supplementary performance measures related to debt-to-earnings rates and earning premium measures of programs from § 668.13(e).

*Comments:* One commenter argued that the Secretary already has regulatory powers and processes that enable the Department to address concerns in these areas and, therefore, the supplementary performance measures proposed rules are redundant and unnecessary.

*Discussion:* We agree that the Secretary already has this regulatory authority. However, we see value in highlighting that the Department will look at these measures when reviewing an institution's certification. As noted earlier, this is not an exhaustive list of measures, which reflects the Secretary's broader authority.

*Changes:* None.

Withdrawal Rate Measure (Proposed § 668.13(e)(i), Renumbered as § 668.13(e)(1) in the Final Rule)

*Comments:* One commenter noted that the Department is advantaging traditional, highly selective universities in the withdrawal calculation. The commenter writes that risk factors for withdrawal are more present among non-traditional students who attend adult-serving institutions. The commenter recommends removing withdrawal rate from the list of supplementary performance measures.

*Discussion:* We disagree with the commenter. While we recognize that an institution's resources contribute to their ability to support their students, we believe this measure neither advantages nor harms specific types of institutions. Like the high dropout rate

trigger in the financial responsibility regulations in § 668.171(d)(4), we will consider this measure among many factors when reviewing an institution. We decline to remove this provision because we believe that high withdrawal rates can indicate substantial problems at an institution, particularly when there are other concerns that may be related.

*Changes:* None.

Debt-to-Earnings Ratio and Earnings Premium Measure (Proposed § 668.13(e)(ii–iii), Now Removed in the Final Rule)

*Comments:* Two commenters expressed concern that the Department is using inaccurate income data to calculate GE failure. These commenters worry that since earnings data are tied to failing GE programs, certification procedures will be negatively impacted through the set enforcement authority. Another commenter believed that the debt-to-earnings ratio and Earnings Premium measure fail to accurately indicate the quality of a cosmetology institution. The commenter stressed that the current § 668.13 is adequate for institutional eligibility purposes. One commenter emphasized that the Department had stated it had no intention, nor authority, to apply the GE framework to non-GE programs. The commenter shared that this proposed language could be used to determine institutional eligibility on GE metrics for both GE and non-GE programs. The commenter further shared that we did not discuss this approach during negotiations for non-GE programs. The same commenter shared that if debt-to-earnings ratio and an earnings premium measure were calculated for all programs at all institutions and used as a supplementary performance measure, the Department would be applying the GE rules to institutional eligibility by using those GE metrics to approve or recertify an institution's PPA or place them on provisional approval status, even if the institution had no GE programs, or if only its non-GE programs were failing the GE metrics.

*Discussion:* Upon review by the commenters, we have decided to remove the two indicators related to GE, which were in proposed § 668.13(e)(ii) and (iii). While we think these measures do provide important information about schools, we are persuaded that their inclusion here creates confusion about how they interact with the regulations included in a separate final rule related to GE and financial value transparency (88 FR 70004). Similarly, there are already criteria related to administrative capability and financial responsibility

for having 50 percent or more of an institution's title IV, HEA revenue coming from failing GE programs in §§ 668.171(c)(2)(iii) and 668.16(t), respectively. We think it is better to preserve those clearer measures. We refer commenters to the discussion of those metrics and their integrity in the separate final rule related to GE. The removal of the GE measures from this section addresses the concerns for this provision.

*Changes:* We have removed the supplementary performance measures related to debt-to-earnings rates and earning premium measures of programs from § 668.13(e).

Educational and Pre-Enrollment Expenditures (Proposed § 668.13(e)(iv), Renumbered as § 668.13(e)(2) in the Final Rule)

*Comments:* A few commenters opined that the supplementary performance measures rules regarding educational spending place institutions who educate low-income students and have fewer resources at a disadvantage. The commenter stated that education spending, instruction, and academic support are not defined with precision, leaving institutions unsure about applicability and usage.

*Discussion:* We disagree with the commenters but recognize there may be confusion about what this measure considers that we want to clarify. This performance measure does not consider an institution's absolute levels of spending. Rather, the Department wants to look at relative prioritization of spending on instruction and instructional activities, academic support, and support services compared to the amounts spent on recruiting, advertising, and other pre-enrollment expenditures. We recognize that the amount of money available for institutions to spend on educating their students will vary based upon their relative affluence, endowment resources, State investment, and other factors. However, we are concerned about institutions that devote a comparatively small share of their spending to core educational activities and instead devote more to getting students to enroll.

To clarify this issue, we have adjusted the text of proposed § 668.13(e)(iv) (renumbered § 668.13(e)(2)) in the final rule) to include the words ''compared to'' instead of ''and'' when referring to the amounts spent on recruiting, advertising, and other pre-enrollment expenditures.

The Department, however, affirms the importance of this measure. It is a well-known concept that budgetary

prioritization shows overall priorities. To that end, we are worried about institutions that prioritize enrolling students over academic related expenditures.

We also disagree with commenters' assertion that amounts spent on instruction and instructional activities, academic support, and student services are not well defined. As explained elsewhere in this preamble, institutions report educational spending across the categories listed in the measure annually in the IPEDS Finance Survey in accordance with the appropriate accounting standards. The Department provides detailed instructions for institutions in the survey materials each year.

*Changes:* We have clarified that the spending levels in proposed § 668.13(e)(iv), renumbered § 668.13(e)(2) in the final rule, are relative to one another.

*Comments:* One commenter stated that the instructional expense category in the proposed supplementary performance measures is not relevant or well-suited to distance education programs. This commenter opined that the learning and teaching experience in online programs may not solely be composed of activities conducted by the teaching faculty, but may also involve course and curriculum designers, support instructors, faculty mentors, and staff who are otherwise qualified in student engagement and instruction, as well as utilization of online library, tutorial, and interactive learning resources.

*Discussion:* We agree that there are important activities that contribute to students' instruction outside of those provided by teaching faculty, not only for distance education programs but for many programs and institutions. However, we note that this measure considers more than just instruction, including academic support and support services. As explained elsewhere in this preamble, institutions report spending across these categories annually in the IPEDS Finance Survey in accordance with the appropriate accounting standards and the Department provides detailed instructions for institutions in the survey materials each year. In these instructions, the various kinds of activities mentioned by the commenter are captured across the categories of spending.

*Changes:* None.

*Comments:* As discussed in the financial responsibility section related to § 668.23, commenters raised concerns about the reference to disclosures in the audited financial statements of the

amounts spent on academically related and pre-enrollment activities that is included in § 668.13(e)(iv).

*Discussion:* We agree with the commenters that the provision in § 668.23 could be overly confusing, especially considering that the Department can also obtain this information from IPEDS. Accordingly, we have deleted the provision related to the audit disclosure in § 668.23 and have removed it from proposed § 668.13(e)(iv), renumbered § 668.13(e)(2) in the final rule as well.

*Changes:* We have deleted "as provided through a disclosure in the audited financial statements required under § 668.23(d)" from proposed § 668.13(e)(iv), renumbered § 668.13(e)(2) in the final rule.

*Comments:* One commenter stated the proposed supplementary performance measure of resources spent on marketing and recruitment would not show if an institution were financially unstable. The commenter further stated that smaller and non-traditional institutions do not have the ability to rely on name recognition like larger more well-known institutions. The commenter concluded that the Department's proposed supplementary performance measure may disadvantage non-elite and non-traditional institutions that must advertise heavily to survive.

*Discussion:* We disagree with the commenters. As stated above, this performance measure provides important insight into how an institution spends their resources, regardless of institutional size, traditional adherence, or prestige. As explained elsewhere in this rule, we note that this is not a measure of the total dollars spent, but rather a consideration of how an institution allocates its funds in the context of their budget. We feel strongly that this supplemental measure is relevant, applicable, and useful in determining any participating institution's performance.

*Changes:* None.

*Comments:* Another commenter stated that the negotiated rulemaking process did not involve the type of substantive consideration of institutional budgeting, strategic planning, and enrollment management that would be required to consider whether the educational and pre-enrollment spending supplemental performance measure is appropriate and, if so, which ratios or thresholds would be fair to various sectors of postsecondary education. The commenter recommended the Department complete additional research while involving stakeholders,

define expenditure categories sufficiently, and allow for temporary changes in expenditures.

*Discussion:* We disagree with the commenters. We discussed this issue during negotiated rulemaking and although we did not reach consensus, we considered those discussions when writing our NPRM. In response to the NPRM, we received comments from more than 7,500 individuals and entities, including many detailed and lengthy comments. We note that we are not establishing a single bright-line standard. We recognize there will be variation in institutional budgeting priorities that we should consider during the review process. As discussed, with the removal of the audit component from this language, the Department will likely rely upon the IPEDS data in reviewing this issue. The National Center for Education Statistics within the Institute of Education Sciences has responsibility for the IPEDS finance survey where these data are reported. It has its own process for updating that survey as needed.

*Changes:* None.

Licensure Pass Rates (Proposed § 668.13(e)(v), Renumbered § 668.13(e)(3) in the Final Rule)

*Comments:* Several commenters wrote that the definition of licensure pass rates is vague and asked the Department to clarify the scope and implications for institutions.

*Discussion:* As with other supplementary performance measures in proposed § 668.13(e)(v) (renumbered § 668.13(e)(3) in the final rule), we decline to set a specific threshold for this measure. It would be inappropriate to set a threshold in this context because, as we have said previously, these measures are ones we will consider among many factors when determining whether to certify, or condition the participation of, an institution.

However, we believe the concept of licensure pass rates itself is not vague. These would be considered for programs that are designed to lead to licensure in a State and would involve looking at the rate at which the students from that institution obtain their license, including through the passage of necessary licensing tests. This is information readily available to institutions and commonly required by institutional and programmatic accreditors.

*Changes:* None.

*Comments:* Many commenters supported the inclusion of this provision. For example, one commenter thanked the Department for this

addition, saying it would bring added protections for students and taxpayers as the Department currently has little requirements for programs designed to lead to licensure and no ability to hold institutions accountable for low passage rates.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*Signature Requirements for PPAs (§ 668.14(a)(3))*

*Comments:* A few commenters supported adding the PPA signature requirement for entities with ownership or control over a for-profit or private nonprofit institution. One commenter believed it would remind institutions and their principals that the Department has the authority to recover unpaid liabilities from controlling entities and individuals. One commenter suggested that this reminder may deter misconduct and help to prevent unwarranted legal challenges to the Department's efforts to pursue redress for liabilities. Another commenter supported this provision because it expanded on a policy previously outlined in Departmental guidance. This commenter asserted that these signature requirements would offer a common-sense protection to ensure that the Department is able to recoup liabilities from the institution and the company that owns it, as applicable.

One commenter stated that taxpayers should not have to foot the bill due to fraud and mismanagement committed by owners and executives of for-profit colleges. This commenter argued that in the same way the Department has forgiven student debt for borrower defense claims that have indicated widespread fraud, such as the Department's recent loan discharges for former students of institutions like Corinthian Colleges and Marinello Beauty Schools, the Department should also hold companies and executives accountable for their fraud. This commenter claimed that failing to hold highly compensated executives accountable for fraud and mismanagement incentivizes repeat bad behavior. According to this commenter, without a significant change in approach from the Department, executives can act with impunity, knowing they will walk away with millions in compensation and leave taxpayers responsible for the financial harm they have caused. This commenter noted that given the amount of money involved, it is unlikely that the Department would recover more than a fraction of the liabilities, but this proposed provision will hold

individuals accountable and disincentivize the worst types of behavior and preemptively protect students from being harmed.

*Discussion:* We appreciate the commenters' support of this provision.

*Changes:* None.

*Comments:* Many commenters believed we do not have the statutory authority to require financial guarantees from entities in § 668.14(a)(3)(ii). These commenters believed the proposed language is vague, unlawful, and contradicts the purpose of the HEA. These commenters also contended that the Department's authority to require financial guarantees from owners derives from HEA section 498(e), which provides the Secretary the authority to require financial guarantees from an institution, which includes the corporation or partnership itself as well individuals who exercise substantial control over that institution. However, these commenters argued that this authority does not extend to other entities, whether it be a parent or holding company.

*Discussion:* We disagree with the commenters. The HEA speaks to clear limitations for the imposition of personal liabilities on owners. The specific authority for requiring personal signatures from owners, and the specific parameters of such authority, is necessary in the HEA given that general corporate law otherwise places even more restrictive conditions on when it is possible to pierce the corporate veil. By contrast, the HEA does not include any similar limitation on when the Department may obtain additional protection from corporate entities. It does not provide any similar limitations the way it does for individuals. Furthermore, HEA section 498(e)(1)(A) (20 U.S.C. 1099c(e)(1)(A)) outlines the Secretary's authority to require financial guarantees from institutions or individuals who exercise substantial control over an institution. Although HEA section 498(e) specifically addresses individual signatures and does not explicitly address entity signatures, HEA section 498(e)(2)(B) provides that the ''Secretary may determine that an entity exercises substantial control over one or more institutions'' where the entity ''directly or indirectly holds a substantial ownership interest in the institution.'' As institutional ownership has grown exceedingly more complex, the Department has determined that as a matter of prudent stewardship of Federal funds, the entities that directly and indirectly own or control institutions should assume responsibility for the institution's

obligations under the participation agreement. Without the signature of the owner entities, the Department can face significant legal hurdles in attempting to collect unsatisfied liabilities, since corporations and similar entities are used to insulate higher level entities or individual owners from liability.

We also disagree with the commenter that the language of § 668.14(a)(3)(ii) is vague as it describes the institutions, the type of ownership of the authorized representative of an entity and includes four examples of circumstances in which an entity has such power.

*Changes:* None.

*Comments:* One commenter said that the PPA signature requirement will cause mass departures of vital employees from postsecondary institutions. The commenter asserted that individuals in business should not be held personally liable for unintended mistakes or mismanagement any more than government employees should be held responsible for misjudgments and errors that potentially create additional costs for taxpayers.

*Discussion:* The commenter is confusing signatures on behalf of an entity versus one in a personal capacity. This regulation is not addressing when the Department requests signatures in a personal capacity, which is limited under the HEA to certain conditions. This is addressing signatures on behalf of the entities that own institutions, including higher levels of ownership. If an entity can profit from or control an institution while times are good, it is prudent that they also accept liability if it cannot be covered by that same institution. Entity owners of institutions that do not incur liabilities will not face any effects from this provision.

*Changes:* None.

*Comments:* One commenter stated that the language in § 668.14(a)(3) failed to define what is meant by the power to exercise control. According to this commenter, the absence of definitional language and the fact that the proposed language only includes examples indicates that the proposed rule merely provides a non-exhaustive list. This commenter is concerned that the Secretary might consider an entity to have requisite power and require one of its authorized representatives to sign the PPA, which opens the door for other, undefined scenarios. This commenter observed that the proposed rule does not provide any information regarding what constitutes the ability to block a significant action under § 668.14(a)(3)(ii)(B), making the regulation too vague to guess its meaning and application. The commenter concluded that this

proposed rule fails to put institutions on notice for when additional signatures are required for a PPA and fails to provide adequate guidance. This commenter disagrees with the Department's rationale for this provision, specifically that this provision would help maintain integrity and accountability around Federal dollars. The commenter pointed out that several statutory and regulatory financial protections already exist to minimize the risk of financial losses that the Federal Government might incur. This commenter asserted that these protections are specifically designed to ensure that an institution receiving title IV, HEA funds can repay its debts and are more effective than a rule that requires other entities to sign an institution's PPA. For example, the commenter cited 20 U.S.C. 1099c(c) and the financial responsibility standards as examples where the Department has already imposed mechanisms to ensure the financial viability of institutions and, more broadly, entities. The commenter concluded that proposed § 668.14(a)(3) is arbitrary, contradicts the HEA's purpose, and urged the Department to remove it from the final rule.

*Discussion:* We affirm the importance of this provision and decline to remove it. HEA section 498(e)(3) (20 U.S.C. 1099c(e)(3)) provides an expressly non-exhaustive list of what is an ownership interest.

As discussed throughout the NPRM and this final rule, the Department is concerned about the significant unpaid liabilities that have accrued over years as institutions close with little to no warning or engage in misconduct that results in approved borrower defense to repayment discharges. In several of these situations, an additional corporate entity could have helped offset some of these losses, but the Department could not seek repayment from them because they had not signed the PPA. This provision works together with the financial responsibility requirements to ensure that the Department and in turn taxpayers are better protected from uncompensated losses.

Regarding the comments about the lack of a definition of what it means to exercise control, we point commenters to §§ 600.21(a)(6)(ii) and 600.31, which provide definitions and discussions of what it means to exercise control. As to the issue of the power to block a significant action, the Department generally considers those to be the types of actions described in operating agreements, articles of organization or bylaws as needing consent by a

shareholder or group of shareholders to be approved.

*Changes:* None.

*Comments:* A few commenters declared that our proposal to require entities to sign PPAs would likely discourage other entities from investing in or from sustaining existing investments in institutions of higher education. One commenter claimed that while there are certainly smaller mom and pop institutions, owning and operating a higher education institution or group of institutions is a complex and expensive endeavor that requires substantial resources. Some commenters stated that reducing outside investment would harm institutions, deter their operations and growth, and hinder their ability to serve students and provide a variety of programs. Consequently, these commenters alleged that the rule could result in the unanticipated closure of institutions, thereby causing students to have fewer educational options and limiting accessibility, in contravention to the purposes in the HEA.

Several other commenters noted that the proposed signature requirement would be overly burdensome and unnecessary for institutions to comply with.

*Discussion:* The Department is not persuaded by the arguments about the chilling effect on outside investors. If a party wants to take a position of direct or indirect control in a school, it should be willing to assume responsibility for the institution's participation in the title IV, HEA programs. As to the hypothetical investor, if the investor is worried about potential liabilities related to an institution, that may indicate that the institution's ongoing participation poses a risk to the government.

Similarly, we do not believe these requirements would provide undue amounts of burden. In March 2022, the Department published an electronic announcement updating our signature requirements and has been seeking entity signatures under that announcement.[23] We have found that process to be reasonable and manageable. When burden arises under this provision it has largely not been due to the complexity of the act of providing a signature but rather entities arguing about whether they should have to comply.

*Changes:* None.

*Comments:* Several commenters expressed concern with proposed § 668.14(a)(3) and argued that although the HEA allows the Secretary to determine if an entity exercises substantial control over the institution, the HEA does not provide the Department the statutory authority to require a financial guarantee from a legal entity. These commenters reasoned that Congress intentionally excluded language that imposed financial guarantees on entities when they discussed both individuals and entities in HEA section 498(e) and that the final rule should thus remove mention of signatures from entities.

In addition, these commenters also maintained that non-profit and public institutions are not subject to HEA section 498(e) because they do not have owners. These commenters claimed that the leadership structure in these institutions is not the same as the kind of owners Congress contemplated in the 1992 amendments to the HEA. In making this point, these commenters namely pointed a Congressional hearing discussing proprietary school owners who, "when schools close or otherwise fail to meet their financial responsibilities" "escape with large profits while the taxpayer and student are left to pay the bill."[24]

If the Department decides to move forward with a co-signature requirement, these commenters suggest that the final regulation, at minimum, be amended to meet the requirements under HEA section 498(e)(4). According to these commenters, the Department cannot impose financial guarantee obligations on an institution that has met the four criteria outlined under HEA section 498(e)(4), subparagraphs (A)–(D).

One commenter also expressed concern that it would be unclear whether faith-based organizations providing financial support to an institution would represent substantial control as defined by the Department. The commenter was concerned that many faith-based institutions, who were formed by religious denominations, have clergy and other religious leaders in authoritative roles that could be considered liable under the proposed rule. The commenter emphasized that the HEA does not give any indication that these types of religious leaders should be considered owners and be held personally liable. The commenter

also contended that faith-based institutions do not have private shareholders or individuals that escape with large profits as proprietary owners do.

*Discussion:* First, the provisions in this final rule are not related to the imposition of personal liability on individuals. The Department also acknowledges that nonprofit entities, including many faith-based organizations, do not have shareholders that are entitled to profit distributions. However, we disagree that the HEA restricts the Department from requiring an entity or entities that own a nonprofit institution from assuming liability for that institution's obligations by signing the participation agreement. All nonprofit institutions are owned and operated by one or more legal entities. Those legal entities are organized under State law, typically as nonprofit, nonstock (or public benefit) corporations or limited liability companies. The commenter cites the Congressional hearing on HEA 498(e) for the proposition that the entity owner signature requirement cannot apply to nonprofit institutions. First, that statutory provision provides the Department with the authority to seek individual signatures, and the limitations on that authority. The commenter apparently seeks to use the statements of the Department's Inspector General during that hearing to argue that the entity signature requirement should be limited to proprietary schools.

Although the Inspector General explained that the motivation for the proposal was based on an investigation of proprietary schools, the Inspector General nevertheless agreed that the individual signature requirement should not be limited to proprietary schools.[25] The language of section 498(e) contains no such limitation, and instead refers to "an institution participating, or seeking to participate, in a program under this title."

As already discussed in this section, the HEA places specific limitations on requiring individual people from assuming personal liability or personal guarantees out of recognition that it is a significant step for the Department to take. Those limitations are outlined in section 498(e)(4)(A)–(D). However, the HEA does not restrict the Department from requiring signatures on behalf of corporations or other entities that

---

[23] *https://fsapartners.ed.gov/knowledge-center/ library/electronic-announcements/2022-03-23/ updated-program-participation-agreement- signature-requirements-entities-exercising- substantial-control-over-non-public-institutions- higher-education.*

[24] Hearings on the Reauthorization of the Higher Education Act of 1965: Program Integrity, Hearings Before the Subcommittee on Postsecondary Education of the Committee on Education and Labor, House of Representatives, 102nd Congress, First Session (May 21, 29, and 30, 1991).

[25] Hearings on the Reauthorization of the Higher Education Act of 1965: Program Integrity, Hearings Before the Subcommittee on Postsecondary Education of the Committee on Education and Labor, House of Representatives, 102nd Congress, First Session, May 21, 29, and 30, 1991, p.313–314.

exercise substantial control over an institution. Requiring signatures from owner entities allows the Department to ensure that owners are not using multiple layers of corporate entities to shield resources from repayment actions if liabilities are established and the institution does not satisfy them. If Congress had wanted to restrict the Department's ability to require an entity owner to sign the participation agreement, it would have said so, just as it limited the circumstances in which the Department can require an individual to assume personal liability or provide a financial guaranty. In fact, the statutory language governing program participation agreements in section 487 of the HEA references the definitions in section 498(e) of the HEA and refers to individuals and entities separately. Moreover, when Congress added the individual signature provision, the original House version of the bill did not include the limitation on the circumstances where individuals would not be required to assume liability, but it was added in conference. As the conference report states, "The conference substitute incorporates this provision with an amendment providing a set of conditions under which the Secretary cannot require financial guarantees and clarifies that the Secretary may use his authority to the extent necessary to protect the financial interest of the United States." [26] Since Congress did not restrict the Department's ability further and gave the Secretary broad authority, we do not think it would be appropriate to limit entity signatures in the manner that Congress set forth for assumption of personal liability in the HEA.

*Changes:* None.

*Comments:* One commenter expressed frustration that States and accrediting agencies are not being held financially accountable for the costs of their failed consumer protection and negligent oversight of school quality. This commenter explained that Federal taxpayers are incurring billions of dollars in loan discharge costs because States and accrediting agencies have failed to provide meaningful oversight of educational quality and argued that they do not have any incentive to do better. This commenter argued that after incurring billions in loan discharge costs, the Department has a compelling reason to hold States and accrediting agencies accountable as gatekeepers to title IV, HEA funds in the regulatory triad. This commenter reasoned that the Department should hold States and accrediting agencies jointly liable for the

wide range of school misconduct they have enabled and tolerated by requiring these agencies to co-sign a PPA, which would incite States to develop risk pools or decline to co-sign a PPA for a failing or untrustworthy school.

*Discussion:* Accrediting agencies are subject to statutory provisions under the HEA, as well as Department regulations which address issues such as the quality of their oversight. They do not exercise substantial control over the institution; therefore, it is not appropriate for them to sign a PPA. States effectively provide the same financial guarantee as a private owner when they pledge their full faith and credit to a public institution.

*Changes:* None.

*Comments:* One commenter supported the Department's view that to protect taxpayers and students, entities that exert control over institutions should assume responsibility for institutional liabilities and that requiring such entities to assume liability provides protection to the recurring problem of institutions failing to pay its liabilities. However, this commenter argued that the signature requirement in proposed § 668.14(a)(3) is unnecessary. This commenter believed that entities did not have to sign a PPA to be held financially liable. This commenter asserted that the Secretary has broad power to invoke the authorities within HEA section 498(e), and therefore does not need a signature to invoke that authority. This commenter argued that the HEA enumerates specific circumstances in which the Department may not impose the statutory liability requirements and under the doctrine where the expression of one thing implies the exclusion of others. For example, this commenter stated that the list in HEA section 498(e) represents the complete set of circumstances in which the Department is prohibited from exercising its authority in section 498(e)(1)(A) and (B). In this case, circumstances support a sensible inference that PPA signatures being left out must have been meant for them to be excluded.

This commenter determined that the Department's signature requirement is bad policy because it would require the Department to predict, in advance, whether an individual or parent company must sign the PPA. The commenter questioned what would happen if the Department failed to accurately predict the losses, specifically if the Department took the position that a corporate parent (or individual) must sign the PPA before creating those losses to the government. Likewise, the commenter questioned the proposed 50 percent threshold,

particularly whether an institution that caused massive losses to taxpayers and has an entity with a 49 percent ownership would face consequences even though the entity was not required to pre-sign a PPA. The commenter believed the 50 percent threshold would encourage owners to stay under a 49 percent threshold or use corporate structures to avoid signature requirements.

This commenter also argued that the Department's statements in the NPRM and Electronic Announcement (EA) GENERAL–22–16 constituted an unexplained departure from longstanding and current Department regulations regarding substantial control in § 668.174(c)(3). The commenter stated that for decades the Department has considered a person to exercise substantial control over an institution if the person directly or indirectly holds at least a 25 percent ownership interest in the institution or servicer. The commenter pointed out that in 1989 the Department took the position that ownership of more than 50 percent of an institution or its parent corporation confers an ability to affect, and even control, the actions of that institution. The commenter noted, however, that these proposed regulations reflect the fact that the Secretary also considers the ownership of at least 25 percent of the stock of an institution or its parent corporation generally to constitute ability to affect substantially the actions of the institution. The commenter continued that in the 1991 final rule, the Department wrote that there were circumstances under which the Secretary considers a person to have the ability to affect substantially the actions of an institution even when that person does not have a controlling interest in that institution or the institution's parent corporation. The commenter asserted that the Department's statement regarding substantial control remains in the regulations today, with no proposals to change that.

The commenter observed that the proposal in the NPRM, like the guidance outlined in EA GENERAL–22–16, completely disregarded decades of Departmental policy without any explanation. The commenter is not satisfied with the Department's justification that owning more than 50 percent is considered a simple majority and therefore 50 percent would be a suitable percent to use as the threshold. Moreover, the statements in the NPRM regarding substantial control undermine the basis for the Department's definition of substantial control in § 668.174. Finally, the commenter would like to know why the Department has not

---

[26] H. Rep. 102–630.

explained why it is not drawing from the Internal Revenue Code's (IRC) use of a 35 percent threshold for disqualified individuals with respect to private foundations. The commenter described that under the IRC, the term disqualified person is vital to the determination and status of exempt organizations classified as a private foundation, and in addition, the commenter noted that Congress has provided a list of disqualified persons with respect to a private foundation. The commenter then provided the list of disqualified persons, including corporations, partnerships, trusts and estates.

The commenter concluded that signature requirements are not necessary, but if the Department decides to move forward with this provision, they encourage the Department to use a 25 percent threshold. The commenter argued that there are reasoned options to use a different percentage besides 50 and that it provides stronger protections for taxpayers and stronger deterrents for entities. The commenter also asked the Department to not leave out individuals if signatures from holding parent entities and investors will be required. The commenter is troubled that the proposed regulation is tailored only to entity liability but ignores personal liability, given the Department's EA GENERAL–22–16 (Entity Liability) and its subsequent EA GENERAL–23–11 (Personal Liability), they see no reason why both issues would not be considered in this final rule.

*Discussion:* We agree with the commenter that the absence of the mention of entities in the HEA provides us with the authority to seek the signature, but they do not explain why such an absence would allow us to seek liability from a higher-level owner that has not signed the PPA. Traditionally, only the institution of higher education signed a PPA. Absent such a signature from other entities, the Department thus did not have a relationship established with those entities in which there was a clear acknowledgment of acceptance of liability. This is particularly important because many institutions today are structured with multiple levels of ownership, such that it is possible that many entities are being asked to sign. The signature thus clearly establishes that the entity signing will agree to be responsible for any unpaid liabilities from the institution.

We disagree with the commenter that this approach is bad policy. As noted in the March 2022 electronic announcement, as well as in this final rule, seeking signatures will allow the Department to be more proactive about future efforts to ensure taxpayers are compensated for liabilities owed from institutions. We think continuing the status quo argued for by commenters would not result in receiving greater amounts of financial protection and could delay the process of recouping funds as the Department would have to defend against potential challenges from owner entities that they are not liable absent a signature. Seeking additional signatures is thus a prudent policy that improves protection and makes clearer to entities that they will be financially responsible for taxpayer losses caused by the institution.

The Department also disagrees with the commenters regarding the 50 percent threshold in § 668.14(a)(3)(ii)(A). The Department determined that the 50 percent threshold described in (A) was appropriate because that is the level at which the Department typically sees control, most often exercised through the rights described in § 668.14(a)(3)(ii)(A). Blocking rights (as described in paragraph (a)(3)(ii)(B)) are another source of control, which may be held at even lower percentages of ownership. Because the list is non-exhaustive, the Department retains the ability to require signatures from entities that own less than a 50 per cent direct or indirect interest in the institution if the Department determines that the entity has the power to exercise control over the institution.

The Department also disagrees with the use of the 35 percent threshold as suggested by the commenter because based on the transactions that the Department has reviewed, the Department believes that the thresholds identified in the regulation are adequate and provide sufficient flexibility for the Department to address control that might exist below 50 percent.

*Changes:* None.

*Comments:* One commenter asserted that the proposed signature requirements in § 668.14(a)(3) ignores well-established law on corporate veil-piercing. The commenter explained that it is a bedrock principle of corporate law that corporations (and other corporate forms) exist as separate and distinct legal entities with their own responsibilities, including for liabilities. Otherwise, the commenter noted, there would be little purpose to corporations, as one could impute liabilities to all individual owners or ownership entities and would no longer be limited to the assets available to the specific corporation. The commenter stated that if this was the case, entire economies would fail as no business would be able to operate without fear of potentially unlimited liability. For this reason, the commenter claimed, the exception to limited liability for corporate entities, piercing the corporate veil, is very narrow and typically does not apply absent fraud or a similar wrongful purpose. This commenter argued that the Department's proposed regulation would ignore the long-established liability limitations for corporations and instead require ownership entities that meet a certain control threshold to assume liability for the institution's actions in all instances. This commenter believed this approach is tantamount to a declaration by the Department that corporate liability limiting principles will not apply in the title IV, HEA context. This commenter argued that the Department lacks the statutory authority to implement such a seismic change that runs counter to longstanding public policy and the commenter urged the Department to revise the proposed language to instead require ownership entities to sign PPAs only if the Department can establish grounds to pierce the corporate veil under applicable law.

This commenter also suggested that the Department revise the proposed signature requirements to list only the circumstances in which a signature would be required. This commenter believed the proposed language provides the Department flexibility to require additional entities that do not fit the enumerated examples to sign the PPA. The commenter is concerned that giving the Department this much discretion would have an even bigger impact on investment in the space as for-profit and nonprofit purchasers could not even make a minority investment in an institution with certainty that it would not be required to assume liability for the institution. This commenter urged the Department to, at a minimum, revise the language to provide that the enumerated examples are in fact the only circumstances in which the Department would require a PPA signature.

Finally, this commenter requested that the Department clarify what constitutes a significant action. For the reasons mentioned above, this commenter stated it was inappropriate for the Department to abandon corporate law principles by requiring entities to sign the PPA. However, if this requirement remains in the final rule, this commenter requested the Department to clarify which significant actions would constitute control. This commenter presumed the Department is referencing actions that could impact the day-to-day operations of an institution, thus demonstrating exercise over the operations of the institution,

but as written, the regulations are not clear. This commenter emphasized that clarity is paramount as investors and lenders would not commit resources without forewarning of whether they would be required to cosign the PPA.

*Discussion:* The Department disagrees with the commenters. The entity signature requirement has nothing to do with corporate veil-piercing to impose liability on individuals. Moreover, corporate law does not require that an agreement can only be entered into by the lowest level entity or organization. As explained above, the entity signature requirement is protection for taxpayers so that entities cannot shield themselves from liabilities by structuring their ownership in level upon level of different entities. The entities may structure themselves as they deem appropriate for tax or other reasons, but the Department needs to make sure that the entities that want to participate in the title IV, HEA programs are responsible for any liabilities that the institution is unable to satisfy. As stated in § 668.14(a)(3)(ii), the Secretary will only seek an entity signature from entities that exercise control over the institution. An entity that does not meet the requirements of § 668.14(a)(3)(ii)(C) or (D) can affirmatively establish through its corporate governance documents that it does not have the power to exercise any direct or indirect control, by blocking or otherwise. In response to the comment about what the Department means by the ability to block significant actions, the Department's evaluation of that question would depend on the entity's organizational or operational documents. These actions might include the ability to amend the organizational documents, to sell assets, to acquire new institutions or other assets, to set up subsidiaries, to incur debt or provide guarantees.

In further response to one of the commenters, substantial control is not limited to exercising control over day-to-day operations of the institution itself. Most typically, entities exercise indirect control over the institution by their control over major financial and governance decisions.

*Changes:* None.

*Limiting Excessive GE Program Length (§ 668.14(b)(26)(iii))*

*Comments:* A few commenters supported the NPRM's proposal to address maximum program length for eligible GE programs. During negotiations, the Department had proposed to set a maximum length for eligible GE programs, not to exceed the shortest minimum program length required by any States in order to enter a recognized occupation. In the NPRM, the Department revised its proposal to instead stet the maximum length for an eligible GE program at the minimum program length required by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency. The NPRM also proposed an exception whereby an institution may apply another State's minimum required length as its maximum if the institution documents, with substantiation by a certified public accountant, that: a majority of students resided in that other State while enrolled in the program during the most recently completed award year; a majority of students who completed the program in the most recently completed award year were employed in that other State; or the other State is part of the same metropolitan statistical area as the institution's Home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State.

Commenters that supported the NPRM's proposal stated that they understand our concerns with excessive length and the wide variation among States' requirements for the same professions, but that the Department's original proposal during negotiated rulemaking would place undue hardship on institutions and students in States with much longer requirements. The commenters also raised a concern that, if the new rule went into effect immediately, it could place undue hardship on students currently enrolled in a program that could lose title IV, HEA eligibility before they complete their program due to circumstances outside their control.

Another commenter said they are glad the Department is taking the issue of inflated program lengths seriously, especially given reports that program lengths have been deliberately inflated in some States. This commenter supported the proposal to limit program lengths to the minimum hours required for State licensure or, where applicable, the hours required for licensure in a bordering State. This commenter stressed that allowing programs to require up to 150 percent of the hours needed for licensure has created a situation ripe for abuse, with excessively long programs requiring students to spend more time and money than needed to complete their studies. This commenter agreed that these proposed changes will benefit students

and reduce the taxpayer dollars spent on programs requiring licensure that exceed the required length.

Several other commenters supported the proposal to limit the hours that an eligible GE program can require. The commenters noted that the proposed rule would ensure that students only pay for the hours necessary to obtain licensure and do not unnecessarily use up their lifetime eligibility for Pell Grants.

*Discussion:* We appreciate the commenters' support and believe that this provision protects students from being charged for unnecessary training.

While we think it is important to protect students through this provision, we also agree with the commenters who said that it would not be appropriate for this new requirement to affect students who are already enrolled in eligible programs, as we do not want to disrupt those students' educational plans if their program were to lose eligibility for title IV, HEA funds due to being too long. Therefore, when these regulations are implemented, we will permit institutions to continue offering a program after the implementation date of the regulations that exceeds the applicable minimum length for students who were enrolled prior to the regulatory change taking effect. This will mean that some institutions may temporarily offer two versions of the same program concurrently but will not be able to enroll new students in the version of the program that exceeds the minimum length. In these cases, the institution is not required to report both programs to the Department but must internally document the existence of two separate versions of the program and indicate which students are enrolled in each program.

*Changes:* None.

*Comments:* One commenter stated the proposed rule would curtail title IV, HEA eligibility in ways that would sharply reduce nursing graduates, worsening the severe shortage of nurses. The commenter argued that many institutions may no longer be permitted to offer Bachelor of Science in Nursing (BSN) programs with title IV, HEA eligibility because such programs would include more credits than necessary to practice as a nurse, which in many States only requires a diploma or associate degree.

*Discussion:* We agree with the concerns raised by the commenter about how degree programs subject to State hours requirements could be affected and have made a change to address this issue. We are clarifying that this provision does not apply to situations where a State has a requirement for a

student to obtain a degree in order to be licensed in the profession for which the program prepares the student. Minimum length requirements typically operate differently for non-degree and degree programs. For a non-degree program, the hours required by a State typically represent all, or the vast majority of, the curriculum offered in a program. By contrast, State educational requirements for licensure or certification within a degree program may only represent a portion of that credential and likely will not include other components of a degree, such as general education requirements. As such, minimum length requirements for degree programs may understate the potential length of the program and inadvertently exclude programs that are otherwise abiding by the minimum time related to the component of the program that fulfills specific State licensure requirements. For instance, a State may establish requirements for the component of a bachelor's degree in registered nursing related to the nursing instruction, but not speak to the rest of the degree program.

Importantly, this exclusion of State requirements related to completing a degree is based upon the way the requirement is defined, not how the program is offered. In other words, if the State has a requirement for non-degree programs measured in clock hours, an institution could not simply offer a degree program and avoid having this requirement apply.

*Changes:* We have added new § 668.14(b)(26)(iii), which provides several exceptions to the requirement in § 668.14(b)(26)(ii), including that the requirement does not apply in cases where a State's requirements for licensure involve degree programs.

*Comments:* Several commenters argued that the acceptable length of a program is best determined by the institutions and their accrediting agencies and has been refined over time. These commenters noted that accreditors are trusted with ensuring the quality of an educational program. These commenters further claimed that this proposal is an overreach and amounts to prohibited direction, supervision, and control over the curriculum offered by the institution.

*Discussion:* The Department disagrees that § 668.14(b)(26) is an overreach or amounts to control over the institution's curriculum. The general authority of the Department to issue regulations regarding the certification of an institution and an institution's administrative capability is fully outlined in response to multiple comments and is equally applicable

here. Further, these requirements are not dictating the length of a particular program, or its curriculum. Instead, the Department has concluded that programs exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid. As a result, institutions may offer longer programs; the students who attend them, however, cannot receive title IV, HEA funds to pay for them. The Department determined that it did not have the legal authority to partially fund a program, nor did it believe such an approach was appropriate given the potential harms to students who enroll in partially funded programs and are unable to complete their programs due to a lack of title IV, HEA funds.

The Department is concerned that the language in the NPRM sent conflicting signals about how program length requirements set by accrediting agencies could be considered for this provision. While the provision had previously focused on State requirements, the regulatory text in proposed § 668.14(b)(26)(ii) included a mention of the institutional accrediting agency as one of the three parties whose program length requirements would establish the maximum number of hours. We are concerned that continuing to include accrediting agency requirements in this provision would undercut the purpose of focusing on State requirements, as an accreditor could decide to simply set hour requirements higher than what a State deems necessary. Moreover, the inclusion of institutional accrediting agency requirements is problematic in this situation because there are some programmatic accreditors that are sometimes also able to operate as institutional accreditors depending on a school's program mixture. These accreditors may have specific hour requirements, while other institutional accreditors do not. This would create situations where institutions otherwise in the same State would have different requirements based upon their underlying program mix. Removing the provisions pertaining to program length requirements of accrediting agencies will thus ensure greater consistency.

The removal of accrediting agencies' program length requirements also recognizes the different roles of these entities in the regulatory triad compared to the Department and States. Accrediting agencies are responsible for overseeing academic quality while States oversee consumer protections and the Department administers the title IV, HEA programs. While we understand that accrediting agencies may have policies related to program length, they

are involved in setting States' requirements and not required to consider the value of title IV, HEA funds when they make determinations about academic quality, and could therefore approve programs that they may view to be academically valuable without considering the relative costs and benefits to students, including the potential harm to students created by excessive borrowing or loss of Pell Grant lifetime eligibility due to program length that exceeds States' requirements for licensure or certification for the occupation in which a student seeks employment. Therefore, we believe the Department has its own unique interest in this issue that cannot be satisfied merely by relying on accrediting agency determinations about program length.

*Change:* We have removed references to accrediting agency program length requirements from § 668.14(b)(26)(ii).

*Comments:* One commenter suggested the rule should be amended to allow programs to meet title IV, HEA eligibility by allowing for the longer of two measures: The program length can be no longer than the longest number of credit hours required for licensure in a State in which the institution is permitted to enroll students in compliance with § 600.9; or the program length is in compliance with the standards of one of the institution's accreditors. The commenter argued that this approach would allow distance education programs to continue to participate in the title IV, HEA programs while recognizing the licensure variances amongst States.

*Discussion:* The Department recognizes that § 668.14(b)(26)(ii) as written in the NPRM created the potential for confusion for programs offered entirely online or through correspondence. As drafted in the NPRM, the limitation on the number of hours that may be included in an eligible program relied on the minimum in the State where the institution is located. For fully online programs, there may be situations when the length of a program required in the institution's State differs from State requirements for the length of a program in the student's State. To address this issue, we have clarified that this provision does not apply to fully online programs or programs offered completely through correspondence, since these are the only situations where this disparity might occur. Given that the concerns being addressed in this provision are largely focused on in-person or hybrid programs, we believe this change will reduce confusion and better meet the Department's goals. With regard to the commenter's suggested revision to the

language to rely on an institution's accreditors, the Department disagrees. The suggested revision would allow the program length standards of an accrediting agency to set the minimum program length for eligibility and, as mentioned above, the Department is concerned that this inclusion would allow an accrediting agency to set a program length longer than the minimum in a given State and undermine the authority of the State to set requirements. The Department has concluded that following the limits set by States, eliminating the mention of institutional accrediting agencies, and not exposing students to excessive costs for extra hours is the better approach.

*Changes:* We have added new § 668.14(b)(26)(iii) to establish exceptions to the requirement in § 668.14(b)(26)(ii), including that the requirement does not apply to programs that are offered fully through distance education or correspondence courses.

*Comments:* One commenter disagreed with the proposed limitation on excessive hours for GE programs and urged the Department to eliminate that provision of the NPRM. The commenter stated the proposed rule is vague and ambiguous, and that the proposed limitations on program lengths are illogical, contrary to the HEA's purpose, and not supported by any rational basis. The commenter asserted that the proposed rule failed to recognize that for many GE programs, there are no required minimums in that there are no minimum number of clock hours, credit hours, or the equivalent established by a State, or a Federal agency, or the institution's accrediting agency. The commenter concluded that in this scenario, it is unclear how institutions will comply with this proposed rule, and it should be explained in the final rule.

*Discussion:* The Department disagrees with the commenter. The rule is not vague. The requirements for meeting this program participation provision are clearly spelled out in the regulatory text. If a State has established a clock hours, credit hours, or equivalent training requirement for licensure or certification in a specified occupation, then an institution cannot offer a program intended to prepare students for that occupation that is longer than the State-determined length except in the limited circumstance specified.

The regulation set forth in § 668.14(b)(26) has existed in some form, with only slight variation in its effect, since 1994, pursuant to well-established authority under the HEA.[27]

We are only changing the what the maximum is, but we are not changing which programs would be subject to the regulation.

As explained previously, HEA section 498 describes the Secretary's authority relating to institutional eligibility and certification procedures, and HEA section 487(c)(1)(B) gives the Department the authority to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV. Moreover, HEA section 498A(e) authorizes the Secretary to determine an appropriate length for programs that are measured in clock hours. Furthermore, the Department has authority under the HEA sections 101, 102, and 481(b) to implement and enforce statutory eligibility requirements, including those relating to GE programs. Such programs are those that "provide training to prepare students for gainful employment in a recognized occupation." Similarly, as described in the recently-published regulations for Financial Value Transparency and Gainful Employment, various Federal statutes grant the Secretary general rulemaking authority, including section 410 of the General Education Provisions Act (GEPA), which provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department, and section 414 of the Department of Education Organization Act (DEOA), which authorizes the Secretary to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department. These provisions, together with the provisions in the HEA regarding GE programs, authorize the Department to promulgate regulations that establish measures to determine the eligibility of GE programs for title IV, HEA program funds, including establishing reasonable restrictions on the length of those programs.

The Department originally implemented this provision in 1994 in an effort to target areas of past abuse such as course stretching, where institutions had extended the duration of, or number of hours required by, their programs to increase the amount of Federal student aid that the institution could receive as payment for institutional charges. The 1994 NPRM proposing this provision stated, "The Secretary believes that the excessive

length of programs requires a student to incur additional unnecessary debt."[28] Prior to the 1992 reauthorization of the HEA, the Department's Inspector General had told Congress that course stretching can result in students "paying as much as 38 times the tuition charged" for other programs providing the same training."[29]

When the 150 percent limitation was set in 1994, some commenters believed it was too lenient, but the Department had relied on the notion that the 150 percent limitation gave "latitude for institutions to provide quality programs and furnishes a sufficient safeguard against the abuses of course stretching."[30] However, a program that exceeds length requirements by 50 percent is costing students and taxpayers a substantial amount for training that is not necessary to obtain employment.

We believe that revising the limit to 100 percent of the State's requirement for licensure is logical and appropriate. When a student seeks training for a specific occupation, their goal is to meet the requirements for that occupation.

*Changes:* None.

*Comments:* Several commenters stated that requiring program hours to be equivalent to the State minimum would limit educational opportunities for students and destroy critical pathways to employment. These commenters noted that students who would prefer to attend a longer program, up to 150 percent of the State minimum, would be denied the previously allowed student aid if they choose to do so. These commenters further explained that, in order to receive title IV aid, these students would now have to attend programs providing no more than the minimum hours, which may not include the experiences needed for that student to enter their desired employment. Some commenters also raised concern that this would limit the ability of students to relocate to another State and seek employment. Another commenter suggested that border States' graduates with lower hours would be held hostage to the State in which they graduated. According to another commenter, a number of their students may want to work in a neighboring State or even across the country in the future and they argue that limiting a student's education to a State's minimum lowers their chances for reciprocity in the

[27] 59 FR 22431, Apr. 29, 1994.

[28] 59 FR 9548, Feb. 28, 1994.

[29] "Abuses in Federal Student Aid Programs," Report, Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, 1991, *https://files.eric.ed.gov/fulltext/ED332631.pdf.*

[30] 59 FR 22431, Apr. 29, 1994.

future if the student decides they would like to work in a different State.

Another commenter insisted the proposed limitation on program length is unnecessary and potentially counterproductive in terms of helping meet the need for skilled workers to fulfill the urgent demand for individuals to meet our nation's infrastructure rebuilding efforts. A few commenters representing massage therapy institutions also argued that a reduction in program length would put the public at a dangerous risk due to under-qualified practitioners.

*Discussion:* We disagree with the commenters. We believe that it is important to ensure that students and taxpayers are not paying for training programs that exceed the program length required for State licensure. Programs that are unnecessarily long may interfere with a student's ability to persist and complete a course of study. Students in such programs not only pay more in tuition, in order to attend more courses, but also enter the labor market later than they would have if their program were no longer than necessary to satisfy State requirements. Research into the effects of higher hours requirements for the two types of programs most likely to be affected by this provision also finds that there is no connection between more hours and higher wages. A January 2022 study looking at variations of training hours found a lack of any correlation between setting higher hours requirements in massage therapy or cosmetology and increased wages.[31] A 2016 study focused on cosmetology similarly found no correlation between curriculum hours and wages.[32] That same study also found no correlation between training hours and safety incidents or complaints. We also are not persuaded that this provision will deny opportunities for students, as the regulation aligns program length with State licensing or certification requirements. Our goal is to ensure students seeking employment in a specific occupation can do so without incurring excessive debt and spending more time than needed out of the labor market.

We understand the concern of the commenters about students' ability to relocate, but research shows that most students seek or obtain employment close to where they live or attend school.[33] We have addressed such concerns by allowing institutions to prove that a nearby State's hours would be more appropriate to consider. We note that § 668.14(b)(26)(ii)(B) as written in the NPRM and continued in the final rule includes three scenarios in which institutions could use another State's program length in § 668.14(b)(26)(ii)(B). Specifically, that could occur if a majority of students resided in that other State while enrolled in the program during the most recently completed award year; if a majority of students who completed the program in the most recently completed award year were employed in that State; or if the other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State. This flexibility mitigates the commenter's concern about students being unable to seek employment across state lines. States may also adjust their requirements for those with out-of-state training where they deem appropriate, and many do so through participation in licensure compacts and reciprocity agreements.

Finally, none of these commenters explained why the Department should not rely on States' judgments regarding the appropriate amount of training required for particular professions. The Department's proposed revision § 668.14(b)(26)(ii) reflects the concern that any debt incurred or lifetime student aid eligibility used beyond what a State requires is excessive and can hold students back. Programs with lower training requirements in particular tend to result in lower earnings for graduates, which means spending an additional few hundred or thousand dollars to attend an unnecessarily long program may be the difference between a positive and negative return on investment.[34] Such unnecessary expenditures may then lead to further negative financial impacts, such as the need to use an income-driven repayment plan or a higher risk of default from an unaffordable debt load. In order to avoid such unnecessary consequences and safeguard public financial investments, the revised provision ensures that programs funded in part by taxpayer dollars are no longer than necessary to meet the requirements for the occupation for which they prepare students.

*Changes:* None.

*Comments:* One commenter requested the Department reconsider this restriction if programs demonstrate with alternative criteria that they do deliver a specific border State's required educational elements in a shorter amount of time and need every additional clock hour they can get to do so. The commenter shared that Oregon's minimum number of clock hours for their skin care program is 484, while bordering Washington State requires a minimum number of 750 clock hours for the same program. The commenter stated that the two cities where the schools are located are less than 10 miles apart, less than a 30-minute drive in light traffic, but the commenter is concerned that they would not be able to meet the exception criteria provided.

*Discussion:* The Department believes the exceptions in § 668.14(b)(26)(ii)(B) account for the commenter's situation. If many students are indeed living, working, or plan to move to Oregon, the institution will be permitted to extend the program's length to Oregon's minimum number of clock hours. Furthermore, based on the distance mentioned in the comment, it is very likely that the institutions are within a metropolitan statistical area of the other State as provided in § 668.14(b)(26)(ii)(B)(*3*). The Department believes it is appropriate to determine this using the institution's compliance audit report with its most recent completed award year.

*Changes:* None.

*Comments:* One commenter suggested that the Department simplify the proposed language for § 668.14(b)(26)(ii) and lower the threshold from 150 percent to 125 or 115 percent or some carefully considered margin for exceptions, because they assert that not all programs are exploiting students or the intent of the title IV, HEA programs.

*Discussion:* We appreciate the suggestion from the commenter but do

---

[31] *https://www.peerresearchproject.org/peer/research/body/2022.2.17-PEER-Occupationa-Licensing-Final.pdf.*

[32] *https://web.archive.org/web/20210620203106/https://www.ncsl.org/Portals/1/Documents/Labor/Licensing/Reddy_PBAExaminationofCosmetologyLicensingIssues_31961.pdf.*

[33] For example, Conzelmann et al. (2022) find that about two thirds of students live and work in the state in which the institution they attended is located. See Grads on the Go: Measuring College-Specific Labor Markets for Graduates, available at *https://www.nber.org/papers/w30088.* Other research highlights the tight relationship between local communities and postsecondary institutions particularly in the 2-year sector (see for example, Acton (2020). Community College Program Choices in the Wake of Local Job Losses in the *Journal of Labor Economics*), and based on IPEDS data in recent years, over 90 percent of first-time, degree seeking students enrolled at 2-year and less than 2-year institutions did so in the state in which they are a residence.

[34] Cellini, Stephanie R., Blanchard, Kathryn J. "Quick college credentials: Student outcomes and accountability policy for short-term programs," Brookings Institution. Washington, DC. 2021. *https://www.brookings.edu/articles/quick-college-credentials-student-outcomes-and-accountability-policy-for-short-term-programs/.*

not believe we have a reasoned basis for any of those suggested lengths. We believe that 100 percent is the most sensible and defensible program length as it reflects a determination by the State of the minimum program length needed for licensure or certification. As previously discussed, course stretching, where schools deliberately stretch the length of a course or program beyond what is required for employment, imposing increased costs on students and taxpayers, has been a problem that the Department and Congress have worked to address for decades.

Aside from the circumstances addressed in § 668.14(b)(26)(ii)(B), discussed above, commenters have not demonstrated that allowing institutions to offer programs with hours exceeding State minimum requirements for licensure confers sufficient value to offset the potential harm to students resulting from additional borrowing, or reduced Pell Grant lifetime eligibility to pay for the additional hours.

*Changes:* None.

*Comments:* Several commenters noted that institutions know best when deciding how many hours within the 100 to 150 range are needed to help students obtain jobs. Several commenters specified that their programs are more than 100 percent but less than 150 percent of the threshold, which is in line with the requirements of most employers and therefore allows more flexibility for job placement. Commenters did not provide great detail of occupations that are affected by such additional requirements, but mentioned them in reference to some pipeline programs.

*Discussion:* States establishing licensure or certification requirements for specific professions carefully consider their hour requirements, which are often set through a body convened for this purpose. We believe it is appropriate to rely on States' determinations regarding the proper length of the program, rather than on institutions' preferences. As noted above, the research on earnings for cosmetology and massage therapy professionals has not found a connection between higher numbers of hours and increased earnings. We cannot speak to the preferences of individual employers, but overall, the studies the Department has seen show that requiring more hours of training, beyond what a State requires, does not translate into better economic results for borrowers. We believe it is appropriate to follow State requirements. If employers are requiring additional training beyond what is required for licensure in an occupation in order for

a student to obtain employment in that occupation, employers and institutions should work with their States to update the minimum requirements.

*Changes:* None.

*Comments:* One commenter expressed concern that the proposed rule would disqualify financial aid for programs equal to the level of the State's requirement for licensure. The commenter noted that massage therapists in some States may only require 500 hours to get licensed and the minimum hour requirement for title IV, HEA program eligibility is 600 hours. For example, several commenters noted that the State of Florida has the lowest minimum clock-hour requirements for cosmetology, skin, barbering, and massage programs in the United States. Florida's State minimum for Massage Therapy is 500 hours; for Full Specialist it is 400 hours; and for Electrolysis, Laser Hair Removal and Skincare the State minimum is 540 hours. Since a program must include at least 600 hours to qualify for Federal funds, this would make programs in Florida ineligible. These commenters warned that this proposed rule would lead to school closures.

Several other commenters similarly stipulated that institutions rely on the 150 percent rule to qualify their programs for title IV, HEA participation and that if the rule is amended from 150 percent of a State's minimum to 100 percent, they would lose eligibility for title IV financial aid. One commenter suggested that if the Department retains this provision, it should also reduce the minimum number of hours required for title IV, HEA eligibility. The commenter stressed that only 21 States require 500 hours to become licensed in massage therapy. The commenter recommended that the Department conclude that the States' requirements adequately determine the minimum program requirements for purposes of title IV, HEA eligibility.

*Discussion:* We agree with the commenters' premise that a State's requirements for program length are adequate for a student seeking employment in a licensed or certified occupation in that State. That is why we are limiting the maximum program length for GE programs to 100 percent of the respective State's minimum for licensure or certification in a given occupation for which the program trains students. The Department defers to State authorities regarding the appropriate number of instructional hours required to qualify to practice in a given profession. If a State has set a minimum requirement that is lower than the minimum number of hours required to

qualify for title IV, HEA eligibility, it would be inappropriate to allow such a program to qualify for aid that Congress intended to support students enrolled in longer programs. Institutions offering programs longer than the State minimum licensing requirements may have engaged in course stretching and designed the programs to obtain title IV, HEA aid, resulting in increased costs to taxpayers and students. To the extent commenters seek to criticize State licensing requirements, such concerns should be directed to the States and respective licensing bodies.

Furthermore, we cannot change program eligibility thresholds for title IV programs as those are minimum statutory requirements provided in HEA section 481(b), which require programs to provide 600 clock hours of instruction to be eligible. However, the 600-hour threshold referenced by the commenters is applicable only to program eligibility for Pell Grant assistance, not Direct Loans. Programs comprising between 300 and 600 clock hours, such as those referenced by the commenters, can access Direct Loans if they meet the other requirements in HEA section 481(b)(2) (20 U.S.C. 1088(b)(2)) and in the Department's regulations under § 668.8(d)(2).

*Changes:* None.

*Comments:* Several commenters pointed out that the proposal to limit excessive length of GE programs does not result in a uniform application across all States, given that the States set the minimums. For example, one commenter opined that it is unfair that a massage therapy student in a State where the State minimum is 750 hours qualifies for title IV, HEA funds, but a similarly situated student in a State with a minimum of 500 hours does not.

*Discussion:* This issue is an unavoidable effect of the decentralized higher education system that exists. For instance, differing program lengths across States also result in students receiving different amounts of total aid depending on the duration of a program. Aid amounts received for students at public institutions vary depending on the amount of investment the State makes in its public institution and the corresponding tuition then charged to students. The Department is not dictating the number of required hours to States. We are committed to not overpaying for programs beyond what the State requires for licensure or certification. This is particularly important for programs that prepare students for occupations that only require a short amount of training, as the financial returns for these programs are often quite low and the additional

cost of hours beyond what a State requires may further reduce the return-on-investment, or even make them negative.

*Changes:* None.

*Comments:* Another commenter argued that the proposed rule confers too much control over program length on the Department by virtue of its authority over title IV, HEA administration.

*Discussion:* The Department is not dictating how long programs must be. The Department is deferring to the judgment of States regarding the minimum time someone should be in a program to obtain licensure or certification. As discussed above, the revised maximum program length adopted here reflects our conclusion that it is inappropriate to expend taxpayer resources to fund coursework beyond what the State deems necessary. Institutions are always free to offer programs outside of title IV, HEA.

*Changes:* None.

*Comments:* A few commenters questioned why the Department would mandate all GE programs to be the same length. The commenters opined that many programs go beyond core skill curriculum and teach service writing, technical writing, or business math skills. These commenters argued that additional classes are related, desirable, and beneficial to the graduate. Many of these commenters also argued that reducing these classes would result in disadvantaged or harmed students, deteriorated programs, ceasing participation in the title IV, HEA programs, and widespread school closures.

*Discussion:* The Department is not mandating uniform program length. The regulatory change will specify that if a State dictates the number of hours needed for licensure or certification, we will not provide taxpayer funding for programs that exceed that number. If commenters believe these additional hours are critical for success, we suggest they approach their State about revising the program length requirements or offer the coursework outside of the title IV, HEA programs.

*Changes:* None.

*Comments:* Several commenters shared their concern about accrediting agencies and State agencies approving changes in program length and the time needed for these actions. These commenters suggested that the Department accommodate all current GE programs and develop a gradual transition period to bring all GE programs into compliance.

*Discussion:* The Department does not think an extended legacy eligibility

period is appropriate given our concern about the effects of excessive debt on students. As already noted, we will apply this provision to new program enrollees following the effective date of these regulations, so that no currently enrolled student would be negatively affected.

*Changes:* None.

*Comments:* Several commenters argued that reducing program length to the minimum required by the State would result in a lower pass rate for State licensing examinations. These commenters predicted that there would be a close correlation between the reduced passing or licensure rate and the reduced program length.

*Discussion:* If the commenters believe that graduates cannot pass the State licensing exam following completion of a program that complies with State training requirements, we suggest they discuss with the State whether the hours required are appropriate. We note, in any case, that the commenters did not establish any correlation or causal relationship between longer programs and passage rates.

*Changes:* None.

*Comments:* A few commenters argued that reducing the allowable program length would not reduce the institution's overhead expenses but would reduce the amount of title IV, HEA aid received by students. These commenters insisted that many students, especially female, low-income, and minority students, could not afford such a reduction in aid and would withdraw.

*Discussion:* The Department disagrees with commenters that this provision would result in an unfunded gap for students. Institutions would not be able to offer a program eligible for title IV, HEA funds if it is longer than the State minimum, so the program would either have Federal aid for the full program length, assuming it otherwise remained eligible, or not at all. Institutions that stay within the minimum course length would likely have reduced costs from providing less instruction. We note again that this provision will apply to new program enrollees on or after the effective date of these regulations.

*Changes:* None.

*Comments:* One commenter stressed that many State regulators are slow to update licensure requirements and this may hurt students. The commenter explained that obtaining support from various State legislators or regulators to promptly update existing, obsolete requirements is a process that can span several years, thus inhibiting students from obtaining the most up to date education in the occupation. The

commenter recommended that the Department continue the existing GE program length limit at no more than 150 percent of an existing State requirement.

*Discussion:* The Department cannot speculate on how quickly or slowly licensing bodies may update licensure requirements. However, States are the ones tasked with determining whether certain occupations require licenses or certifications and what standards apply to such licenses or certifications. The Department has no way to verify the commenters' claims. However, we note that by statute, regulations regarding title IV, HEA funds are subject to the master calendar deadline, which includes at least seven months between a regulation's finalization and effective date.

*Changes:* None.

*Comments:* One commenter cited section 101(b)(1) of the Higher Education Act which defines an institution of higher education, in part, as any program that provides not less than a one-year program of training that prepares students for gainful employment in a recognized occupation, and urged the Department to not adopt any rule that would require eligible training programs to be at least one year. The commenter insisted that a one-year minimum would have an adverse impact on many massage therapy training programs.

*Discussion:* The Department is not requiring that programs be at least one year in length. We refer the commenter to section 103(c) of the HEA, which includes a definition for a "postsecondary vocational institution," which does not contain a requirement related to program length. As noted in section 102(a)(1)(B), these institutions are eligible to participate in the title IV, HEA programs, if they meet other eligibility requirements. The minimum length for a program is found in section 481(b) and it is at least 300 hours offered over a minimum period of 10 weeks, along with some added criteria.

*Changes:* None.

*Comments:* One commenter noted that eliminating the 150 percent rule would be problematic because 21 States regulate the massage therapy profession with a 500-hour requirement for entry-level education, yet the average school operates at just over 625 hours. Additionally, the commenter said eliminating the 150 percent would severely undermine the massage therapy interstate compact, which set the requirement to mirror the industry average at 625 hours. Separately, a few commenters referred to other efforts of the Federation of State Massage Therapy

Boards (FSMTB) regarding the "minimum clock hour pact." The commenters stated that institutions participating in this pact will be required to provide a minimum of 650 hours so that the graduates can seamlessly transfer their license among participating States. The commenters recommended that the Department consult with the FSMTB and set a minimum program requirement that best aligns with the massage therapy industry. The commenters insisted this approach would enable the graduates to be able to apply their education to other States and appropriately transfer their license to practice.

*Discussion:* As noted above, an institution in a State that increases or decreases its minimum hours for certain professions can adjust the lengths of corresponding training programs accordingly. Thus, if the States in this compact adjust the minimum hours for certain licenses, then the programs can adjust too. If a State chooses not to join the compact for whatever reason, we do not see why we should not respect their choice to keep hours shorter.

*Changes:* None.

*Comments:* Several commenters argued the proposed alternate State rule is too restrictive and impossible to meet. These commenters further stated the current adjacent State rule should remain in effect.

*Discussion:* The Department is concerned that the current rule, which simply allows a program to meet the adjacent State's requirement without justification, could be used simply to increase program length and take in more Federal aid even if no student from that institution works in that State after graduation. Given our concerns about the affordability of programs, we believe institutions should demonstrate there is an actual need to apply an adjacent State's higher hours due to the majority of the program's students residing, or the majority of graduates being employed, in the adjacent State. As stated in § 668.14(b)(26)(ii)(B), an institution will have to provide documentation that is substantiated by the certified public accountant who prepares the institution's compliance audit report to use an adjacent State's program length.

*Changes:* None.

*Comments:* A few commenters from Florida stated that the Florida State legislature relied on the 150 percent rule when deciding to reduce the State minimum program length. The commenter shared that the reduction in minimum clock hours would not have been adopted by the Florida State legislature if Florida students' Federal

funding for these programs was going to be jeopardized.

*Discussion:* This rule does not prohibit any State from amending its own State laws. States can and do regularly amend their laws, on an ongoing basis, and this final rule would not interfere with their ability to do so. We cannot speculate on the reasons for a given State's decision to enact a specific requirement nor second guess a State's licensing determination when setting a Federal requirement.

*Changes:* None.

*Programmatic Accreditation, State Licensure/Certification, and State Consumer Protection Law Requirements (§ 668.14(b)(32))*

Overall

*Comments:* Commenters shared that although the proposed language was taken from the negotiated rulemaking process in 2022, the provisions related to State authorization reciprocity agreements, State consumer protection laws, and State licensure requirements are not suitable for this final rule. Commenters stated stakeholders interested in State reciprocity, consumer protection laws, and licensure were excluded from the original conversations and must be included for any proposed regulation. One commenter said that the Department did not follow established procedural mechanisms for rulemaking and stressed that the proposed rules were flawed due to a lack of adequate representation and feedback of stakeholders and said these topics should not be included in this final rule.

Many commenters argued that the section on consumer protection laws was particularly rushed during negotiated rulemaking and advised the Department to delay any changes pertaining to this issue and negotiate it when we discuss distance education and State authorization and include more qualified negotiators in the discussion.

One commenter added that because this issue was not properly addressed during the last negotiated rulemaking, the NPRM noticeably lacks the root problem that is trying to be solved, research on the scope of that problem, and economic impact on institutions and States of the proposed language. Another commenter stated that due to the broad implications of the proposed regulatory change, the subject of State authorization reciprocity agreements should have been an issue addressed by the Committee.

*Discussion:* We disagree with the commenters' concerns. Section 492(b)(1)

of the HEA (20 U.S.C. 1098a(b)(1)) provides that the Secretary shall select individuals with demonstrated expertise or experience in the relevant subjects under negotiation, reflecting the diversity in the industry, representing both large and small participants, as well as individuals serving local areas and national markets. The Department identified the relevant subjects to be negotiated and invited the public to nominate negotiators and advisors. After reviewing the qualifications of the nominees, the Department made selections for Committee members. The Committee included negotiators representing accrediting agencies, institutions of higher education from multiple sectors, State attorneys general, other State agency representatives, among others. These negotiators had the proper qualifications to negotiate issues related to consumer protection and State authorization reciprocity agreements, particularly institutional and State representatives. We also disagree that these issues were not discussed during negotiated rulemaking. Versions of the language we are finalizing in § 668.14(b)(32) were included in issue papers submitted to negotiators. Non-Federal negotiators also submitted additional materials expressing thoughts on the issue. These items did not reach consensus and the Department is exercising its authority under the HEA to issue rules as we see fit, taking into account public comment as we move from the proposed to final rule.

Furthermore, the Department provided many opportunities for public comment throughout the negotiated rulemaking process. In response to the proposed rule alone, the Department received more than 7,500 comments.

We also disagree that the scope of the problem we want to solve isn't clear. As articulated throughout the NPRM and again in this final rule, the Department is concerned about the significant liabilities Federal taxpayers keep incurring due to discharges from closed schools or approved borrower defense to repayment claims. Closures also have very significant and concerning effects on students, as has been well documented by Government Accountability Office (GAO) and State Higher Education Executives Officers Association (SHEEO). To that end, the changes in this section are designed to strengthen the regulatory triad by allowing States to be stronger partners in addressing these problems if they choose to do so.

*Changes:* None.

*Comments:* Many commenters predicted that implementing proposed § 668.14(b)(32), the provision with

licensure and certification requirements and State consumer protection laws, would increase burden and cost to institutions. These commenters assert that institutions would pass these costs on to students or in some cases simply reduce their educational offerings, which would also be detrimental to students.

*Discussion:* The Department is concerned that a program tied to licensure or certification where a student cannot then work in that field will leave them with unaffordable debt burdens that they will struggle to repay. That also creates the risk for significant taxpayer losses if it results in approved borrower defense to repayment claims. As to the commenters' concern that institutions will pass these costs onto students, institutions will still need to consider pricing their programs so the return on investment is reasonable for students and competitive with institutions located in the student's home State.

*Changes:* None.

*Comments:* A few commenters raised a concern about the change of using the word "ensure" in the proposed regulatory text considered during negotiated rulemaking to "determine" in § 668.14(b)(32) in the proposed rule, which requires all programs that prepare students for occupations requiring programmatic accreditation or State licensure to meet those requirements and comply with all State consumer protection laws. One commenter opined that the word "determine" is no less a legal burden than "ensure."

*Discussion:* We changed "ensure" to "determine" in the NPRM to align with the relevant language in existing regulations in § 668.43 related to licensure and an institution's obligation to make a determination regarding the State in which a student resides. As discussed in greater detail in response to other comments on this provision, we believe the increased standard is appropriate and necessary so that students are not using Federal aid to pay for credits and programs that cannot help them reach their educational goals.

*Changes:* None.

*Comments:* One commenter questioned whether the Department evaluated the potential impact of the amendment to § 668.14(b)(32) to students and online programs.

*Discussion:* The Department recognizes that the implications of these changes will most likely affect institutions that offer online programs to students who live in States different from where the institution is located. But these are the exact situations we are

concerned about addressing with these changes. The Department is worried that an institution enrolling students from another State may not be doing the work to ensure their programs have the necessary approvals for licensure or certification the way a school with a physical location would. Similarly, we are concerned that these institutions may not be doing as much to help provide transition opportunities for students. As discussed in the RIA, we recognize that this will create additional costs to these institutions, but we believe the benefits exceed those costs. In particular, we cite the benefits to the Department from shrinking the number of sudden closures that then result in closed school discharges and reducing taxpayer transfers to programs that cannot help students achieve their educational goals. Furthermore, institutions that participate in a reciprocity agreement could rely on that process to understand the different requirements of States and what provisions may require adaptations.

*Comments:* A few commenters shared concerns about a lack of clarity with the term "at the time of initial enrollment" and asked for clarification before any proposed regulation goes into effect. The commenters requested the Department share additional guidance on "at the time of initial enrollment" and a list of licensing bodies by profession and State.

Several commenters wondered whether the proposed requirement applied only to the State the student was in at the time of enrollment or if it also applied to any State the student might move to later. Some commenters wanted to know if program eligibility is specified at the time of initial enrollment, and whether the program remain eligible if the student moves to a State where the program does not meet prerequisites. Several commenters would also like to know if the proposed requirements only addressed incoming students, or would it also apply retroactively to students admitted to the program before the regulation became effective.

*Discussion:* The Department intends for institutions to use the provision in § 600.9(c)(2)(iii) to determine initial enrollment. This is a term that is already used in existing State authorization regulations and was cited in § 668.14(b)(32) in the proposed and now final rule. That establishes consistency across the regulations when this concept is applied.

The existing regulation, § 600.9(c)(2)(iii), provides that an institution must make a determination regarding the State in which a student

is located at the time of the student's initial enrollment in an educational program and, if applicable, upon formal receipt of information from the student, in accordance with the institution's procedures, that the student's location has changed to another State. Institutions thus have flexibility to determine how to structure such a policy. This could allow them to make determinations around students who plan to move to a different State during the enrollment process, for example. Institutions collect a substantial amount of information in a student's application and when students enroll, and we hope that the information collected there will assist them in their determinations.

We recognize that institutions cannot predict if a student moves and do not think it would be reasonable to apply this criterion in a way that covers students even after they moved. We also recognize that this provision could affect the eligibility of some programs. Our goal is not to have it apply retroactively. As such, it would cover new program entrants on or after the effective date of these final regulations.

Finally, we are persuaded by arguments from commenters that it is possible a student may be currently living in one State but have concrete plans to move to another one. At the same time, the cost to the student and taxpayers of paying for a program that does not lead to licensure is so great that we think there needs to be sufficient proof from the student themselves of their plans. To that end, we are adding a provision that also allows an institution to offer a program to a student who currently lives in a State where the program does not meet requirements for licensure or certification if they can provide an attestation from the student about the specific State they intend to move to, and the program does satisfy the educational requirements for licensure in that State. If borrowers in this situation do end up filing borrower defense to repayment applications, the mere presence of such an attestation alone would not necessarily be proof the claim is not approvable. The Department would be looking for information about how the information about eligibility was conveyed to the borrower, such that they did understand their attestation.

*Changes:* We have modified § 668.14(b)(32) to include the phrase "or for the purposes of paragraphs (b)(32)(i) and (ii) of this section, each student who enrolls in a program on or after July 1, 2024, and attests that they intend to seek employment . . . ."

*Comments:* Other commenters noted that the proposed language said that the determination of an initial enrollment would be in accordance with existing regulations in § 600.9(c)(2)(iii). However, some expressed concerns that the time of initial enrollment seems to be inconsistent with § 600.9(c)(2)(iii). Other commenters pointed out that this could include prospective face-to-face students who will ultimately be located at the institution where the program meets State requirements at time of initial enrollment.

*Discussion:* We remind the commenters that § 600.9(c)(2)(iii) is in reference to students enrolled in distance education or correspondence courses. For face-to-face students, they would fall under the requirement that the institution's programs meet the requirements of the State in which the institution is located. However, to provide further clarification, we will add the words ''in distance education or correspondence courses'' after ''or in which students enrolled by the institution.

*Changes:* We have modified § 668.14(b)(32) to say, ''In each State in which the institution is located or in which students enrolled by the institution in distance education or correspondence courses are located . . .'' to clarify that the initial enrollment determination is regarding those students who will not be engaged in face-to-face instruction.

*Comments:* Many commenters asked how the Department would train on and enforce compliance for State licensure and certification requirements and State consumer protection laws. These commenters further asked what we would require as evidence of compliance for both provisions.

*Discussion:* With respect to closure, the Department would ask institutions to indicate which States have laws they are complying with, and we would look at how those reports vary across institutions. With respect to licensure and certification we would look for institutions to report what States a given program is not able to enroll students in. Institutions are already disclosing a lot of this information under § 668.43, which we are adjusting to harmonize it with this change in the certification procedures regulations, and we would look at how the disclosures align with the States where students are enrolling. We would also look at student complaints and borrower defense applications alleging that they are unable to work in the field tied to their program.

*Changes:* None.

*Comments:* A few commenters affirmed that the proposed regulation for State consumer protection does not account for the unique nature of medical education, which requires residencies and clinical rotations away from the school. These commenters were concerned that the changes might negatively impact students enrolled in graduate clinical degree programs by resurrecting pre-reciprocity barriers to participate in internships and clinical rotations at health care institutions in other States. These commenters stated that under the reciprocity agreement such barriers have been taken down, and this would be a reversal of that progress. Some commenters suggested that the Department exempt medical colleges from the new requirements or recommended that revised regulations state that students enrolled in out-of-State clinical education rotations are considered enrolled at the main campus of their medical institution rather than in distance education or correspondence courses. One commenter stated that if an exemption from the proposed State consumer protection law requirements is not provided to U.S. medical schools, the Department should clarify in the final regulation that medical schools should not face undue administrative burdens and fees that further complicate distance education requirements.

*Discussion:* The Department does not believe this language affects the concerns raised by commenters. The NPRM language did not cover issues related to education rotations, and the final rule's language narrows the scope of this provision even further. To the extent the commenters meant to discuss the provisions in administrative capability related to clinicals or externships, we note that those are experiences prior to completion of the credential.

*Changes:* None.

Programmatic Accreditation or State Licensure, and Disclosures (§§ 668.14(b)(32)(i) and (ii) and 668.43(a)(5)(v))

*Comments:* Several commenters opposed the regulation that requires all programs that prepare students for specific occupations requiring programmatic accreditation or State licensure to meet those requirements. The commenters stated that to comply with the proposed regulation, a distance education program that prepares students for an occupation that requires licensure would be required to confirm that the program satisfies licensure requirements for each State where they have students enrolled.

A few commenters requested that the Department add language that acknowledged institutions that may be unable to obtain the information necessary to comply with the provision. Several commenters wondered what the Department recommended to do when an institution cannot obtain affirmation or there is no available process to determine State educational prerequisites in a State. The commenters insisted the current State licensure environment does not have a process to allow distance programs to provide such confirmations. The commenters warned that the Department cannot compel State licensure agencies to create processes and procedures to provide the necessary determinations. A few commenters stressed that licensure requirements are subject to change and licensing bodies are under no obligation to communicate those changes to out-of-State institutions. A few commenters suggested the Department add language that provides an opportunity for exceptions concerning the State licensing boards because they argue that State professional licensing boards vary widely and that some have no mechanism or process for providing documented approval for an out-of-State institution's program.

*Discussion:* The Department is concerned that students who use title IV funds to pay for programs that lack the necessary approvals for licensure or certification in the States where the student wishes to work will end up incurring debt and using up lifetime eligibility for loans and grants that cannot be put toward the occupations for which they are being prepared. Given that licensure or certification outside of cosmetology is generally associated with higher wages, that also means that students may not receive the economic returns necessary to afford their loan payments.[35]

This provision is not dictating what requirements States do or do not set for licensure or certification. Nor is it dictating what States must provide in terms of information to institutions. It is simply saying that if such requirements exist, an institution must follow them with respect to the students attending from those States. That also means that if an institution cannot determine that its program meets the education requirements for licensure or certification, then it cannot offer the program to future students in that State.

---

[35] Kleiner, M.M. and A.B. Krueger (2013), ''Analyzing the Extent and Influence of Occupational Licensing on the Labor Market,'' Journal of Labor Economics, 31(2): S173–S202.

Furthermore, as noted elsewhere in this section, institutions using a reciprocity agreement for distance education can use that to streamline how they are able to understand the different requirements of States.

With respect to changes in State licensure requirements, we would not expect institutions to immediately discontinue programs for existing students when requirements change. However, we would expect the institution to come into compliance with the new requirements in short order or cease enrolling new students in that program. Institutions should reach out to the Department when such situations arise.

*Changes:* None.

*Comments:* A few commenters opposed this provision saying that it would unfairly limit the student's choices and mobility options, the student has a right to enroll in any program when they are fully informed, the missing requirements for licensure are usually minimal, information regarding requirements across States is inconsistent and the increased burden upon institutions would harm enrollment and outreach efforts.

*Discussion:* The Department disagrees with the commenters. Postsecondary education programs are significant investments for students, which can easily cost into the thousands or tens of thousands of dollars. When a student attends a program that is tied to a profession that requires licensure or certification, they should have a reasonable expectation that the Federal Government will only allow them access to a program that will allow them to meet their professional goals. Any burden to institutions here is outweighed by the benefit this final regulation will have on students and taxpayer investments. If the commenters believe the differences in requirements are minimal, then we suggest they take steps to make their programs compliant with the necessary requirements.

*Changes:* None.

*Comments:* A few commenters shared concern about the lack of clarity with the term "satisfies." The commenter asked for clarification before any proposed regulation goes into effect.

*Discussion:* Under § 668.14(b)(32)(ii), the term "satisfies" means that were someone to graduate from that program they would have met whatever educational requirements the State sets for obtaining licensure and certification. That does not cover post-completion assessments that institutions do not administer. The Department is concerned that in the past institutions have told prospective students that

programs would obtain necessary approvals for licensure by the time students graduated, but then they never did. Those students were then left with what were essentially worthless credentials.

*Changes:* None.

*Comments:* A few commenters suggested the Department add language that provides an opportunity for exceptions concerning the State licensing boards because they argue that State professional licensing boards vary widely and that some have no mechanism or process for providing documented approval for an out-of-State institution's program.

*Discussion:* The Department notes that institutions are the ones making the certification to the Department. If they cannot determine it based upon the State licensing board, they could also look at the experiences of their graduates and document confirmation that those graduates all met the educational requirements for licensure or certification. We do not, however, believe an exemption is appropriate. The cost in terms of dollars and time in postsecondary programs is too great for the Department to presume that a program that an institution is unsure meets the licensing requirements will qualify. Moreover, sorting through licensing requirements can be a challenging and time-consuming task. We believe the burden of that task should be placed on the institution that will be making determinations again and again for students across multiple States instead of placing it onto the individual student.

*Changes:* None.

*Comments:* Several commenters observed that the proposed regulation for institutions to satisfy the educational prerequisites for State licensure or certification requirements would impose an infeasible burden for both schools and State licensing boards.

Many commenters reported that in previous determinations of licensure compliance, such investigations were time-consuming and costly and often yielded no definitive answer. According to these commenters, inquiries to State bodies frequently resulted in no reply. The commenters further explained that State rules vary widely and are subject to frequent changes. For institutions offering distance education to have legal certainty that a program provides such prerequisites, the commenters stated that they would need to confirm that information with each State or territory where they offer the program and vary in operation. For example, some licensing boards do not have a procedure for validating out-of-State

programs, or they may lack the legal authority or sufficient personnel to make such evaluations. The commenters asked how the Department could impose this requirement given that we cannot guarantee the necessary State cooperation.

*Discussion:* When a student enters a program that prepares them for an occupation that requires licensure or certification, they should have the expectation that finishing that program will allow them to fulfill the educational requirements necessary for getting the necessary approval to work in that field. We are concerned that students attending programs that do not have those necessary approvals will not only fail to achieve their educational goals but may also end up with earnings far below what they expected. Such programs also represent a waste of taxpayer money, as the Federal Government is supporting credits that cannot be redeemed for their stated purpose. The Department agrees that complying with this requirement will create costs for institutions, but we also believe those costs are worthwhile to protect student and taxpayer investments. Institutions are not required to participate in the title IV programs, both overall and on a programmatic basis. If they do not want to take the necessary steps to protect against wasted investments, then they can choose to make these programs not eligible for Federal aid.

The Department cannot speak to how States vary in terms of commitments made to institutions. It is reasonable to presume however, that they all explain the rules around what it takes to obtain a license or certification and we believe it is far more appropriate to place this burden on the institution rather than the student. The institution can use the information determined again and again as it enrolls additional students and employ people with experience understanding licensing rules. It is unreasonable to expect the student to be as knowledgeable about licensing and certification requirements as institutional employees.

Regarding changes in State licensure, we do not expect a program to suddenly cease its offerings to currently enrolled students. However, we expect the institution to take swift action to come into compliance for new enrollees.

*Changes:* None.

*Comments:* One commenter remarked that there is burden associated with contacting out-of-State entities, and that they particularly did not like that regulations require institutions to treat territories and freely associated states in the same way that they treat States.

While the commenter agreed with this in principle, they stated that applying this proposal would be challenging because not all territories have boards for evaluating disciplines. In addition, the commenter mentioned that some boards do not have internet presence, which would make the proposal to treat territories the same as States improbable. According to this commenter, institutional size causes burden because these regulations do not fall evenly on all institutions. The commenter mentioned that their institution does not have the luxury of State and large private institutions, who have multiple staff members to work on these issues. The commenter stated that their faculty spend countless hours completing tasks for States and territories in which they have no student inquiries or enrollment. The commenter argued that these policies are anti-competitive, in the sense that they favor institutions with the footprint to be able to manage massive compliance operations, and anti-student because they limit student choices needlessly.

*Discussion:* This requirement only applies to the States where institutions are enrolling students and where they are either living at the time of initial enrollment or where they attest that they wish to live. If an institution is not enrolling students from a given State, it is not obligated to determine anything regarding that State; it just cannot offer the program to anyone in that State.

We disagree with the framing of anti-competitiveness. A student who has a credential from a program that does not allow them to be licensed or certified in their State is not just at a competitive disadvantage in the workplace, they are disqualified from competing. Allowing institutions to put the burden and risk on the student that a multi-thousand-dollar credential may put them on the road to nowhere is an unacceptable outcome. The purpose of the title IV aid programs is to provide opportunity for students. Institutions should have the resources to operate the programs they wish to offer.

*Changes:* None.

*Comments:* Many commenters noted that it is not reasonable to presume that students will necessarily pursue their career in the State in which they initially enroll in their program. For example, several commenters offered that the students might be members of the military or family thereof and only be temporarily located in that State, or they might live near a State border and intend to find employment in a neighboring State or move to a State where jobs are more available.

Several other commenters added that students might want to enroll in a specific program based on the strength of its reputation, or because their desired program may simply lack certain State-specific courses, such as State history, that the State that they intend to move to may require. These commenters also noted that students may simply want to enroll in a program that requires licensure but have no intention of pursuing that license. Several commenters argued that it should be sufficient for institutions to inform student prior to enrollment about possible licensure or certification issues they may need to consider.

*Discussion:* We disagree with the suggestion that students may simply not be interested in the license. Overall, it is reasonable to assume that a student who enters a program that prepares students for an occupation that requires licensure or certification wants to work in that program. We also believe it is too easy for institutions to tell students information verbally about whether they could be licensed or certified that will then result in the potential for the filing of a borrower defense to repayment claim that will be challenging to adjudicate.

However, we do agree that there are instances in which a student, such as a military-connected student, might plan to leave the State they reside in and intend to seek employment in another State. Therefore, we have added language to § 668.14(b)(32) to say that an institution can consider the State a student is in at their time of initial enrollment, or the State identified in an attestation from a student where they intend to seek employment in another State. We would note that the student must identify a specific State and the institution's program must meet the requirements of that State.

Programs must meet the requirements for licensure in the relevant State. We are worried that a program that leaves a student just shy of that finish line still represents potentially added costs for students and a roadblock that could prevent them from earning their license or certification.

*Changes:* We have modified § 668.14(b)(32) to cover States in which students enrolled by the institution in distance education or correspondence courses are located, as determined at the time of initial enrollment in accordance with 34 CFR 600.9(c)(2); or, for the purposes of paragraphs (b)(32)(i) and (ii), each student who enrolls in a program on or after July 1, 2024, and attests that they intend to seek employment.

*Comments:* Several commenters encouraged the Department to add language in proposed § 668.14(b)(32)(ii) that acknowledged institutions that may be unable to obtain the information necessary to comply with the proposed provision of satisfying the applicable educational prerequisites for professional licensure or certification requirements in the State. One commenter pointed out that during the negotiated rulemaking, suggested language that accounted for institutions in this situation was proposed.

Several commenters also encouraged the Department to allow case-by-case waivers of the licensure and certification requirements for students who knowingly enroll in programs that fail licensure requirements in their current State because they know students who plan on moving to different States, States in which their licensure and certification would be accepted. These commenters claimed that such waivers would allow for students to acknowledge, as has previously been the case, that they are aware of limitations of the program they are about to enroll in.

*Discussion:* The Department declines to adopt the commenters' suggestion. We are concerned that such waivers could be exploited by institutions that do not want to engage in the necessary work to determine if their programs have the necessary approvals. We are not convinced that students would be fully informed as to what they are or are not agreeing to and this could instead be used by institutions to attempt to avoid other potential consequences, such as approved borrower defense to repayment claims. However, we would note that, as discussed previously, we will allow students to attest that they intend to seek employment in another State, but the institution would still be required to determine that their program meets the requirements of that State.

*Changes:* None.

*Comments:* One commenter predicted that because students can complete educational prerequisites for licensure or certification at the undergraduate level, the proposed change would require an institution offering a graduate level program preparing students for licensure or certification to offer the same course. According to this commenter, this provision could require students to take the same course twice if they did not complete the educational prerequisites from the same institution offering the licensure preparation program. Finally, one commenter pointed out that § 668.43(a)(5)(v) refers to "educational requirements" whereas § 668.14(b)(32)(ii) refers to "educational

prerequisites.'' The commenter asked for clarification and consistency on these terms.

*Discussion:* The regulatory requirement relates to institutions ensuring their programs have the necessary approvals for licensure or certification. We do not believe that our regulation is written in a way that would require what the commenter described, but we have changed ''prerequisites'' to ''requirements'' for clarity and to align with the regulations related to disclosure requirements. This provision concerns whether the program meets the requirements for licensure or certification. If the program does overall but there is a difference in the student's educational trajectory that means they might have to do some additional coursework we would not consider that individual circumstance to be a violation. However, we do note that institutions separately must be aware of rules around false certification discharges, which capture situations such as when an institution enrolls someone in a program that prepares students for an occupation that requires licensure when they know that person has a criminal conviction that would make them ineligible for licensure.

*Changes:* We have modified § 668.14(b)(32)(ii) to replace ''prerequisites'' with ''requirements.''

*Comments:* A few commenters objected to the public disclosure requirement in proposed § 668.43(a)(5)(v) if an institution is also subject to § 668.14(b)(32)(ii). The commenters argued that these rules are redundant and impose unnecessary, costly, and overly burdensome requirements on institutions. Some of these commenters pointed out the wording change in § 668.43(a)(5)(v) in that an institution's obligation is limited to those States where the institution is ''aware'' that a program does or does not meet a State's educational requirements. The commenters suggested that this change lessens an institution's obligations. The commenters stated if this is not the Department's intended result, then they oppose the language as it removes the current option to indicate that an institution has not made a determination. A few commenters were concerned that the institution may not address each State as is currently required in proposed § 668.43(a)(5)(v).

Several commenters suggested that instead of pursuing the proposed regulation in § 668.14(b)(32), the Department should simply continue enforcement of the current regulations directing institutions to offer public notifications addressing all States regardless of student location and

individualized notifications to prospective and enrolled students as provided in § 668.43(a)(5)(v) and (c). A few commenters remarked on how the proposed regulation seems to be at odds with the current regulations pertaining to individual notifications and recommended that these discrepancies be fixed.

Another commenter urged the Department to withdraw proposed § 668.14(b)(32)(ii) in favor of continued institutional implementation and the Department enforcement of the current regulations. According to the commenter, the current rules requiring institutions to offer public notifications addressing all States and individualized notifications to prospective and enrolled students is adequate.

*Discussion:* We believe this requirement in certification procedures complements the disclosure requirements described by commenters but are making some alterations to § 668.43(a)(5)(v) to address areas of confusion. The requirement in § 668.14(b)(32)(ii) protects students from enrolling in programs that cannot meet their educational goals and stops the expenditure of taxpayer resources for such programs as well. The disclosure requirements are also important because they send information to students prior to enrollment about where they will or will not be able to have a program meet educational requirements for licensure or certification. Without such disclosure requirements, a student could enroll and be told by an institution that they are not able to study in their preferred program because they would not be eligible for title IV funds to do so. This could result in students wasting time and money on programs they do not desire when they could have enrolled at another institution that has a program that meets the necessary requirements for them to obtain employment in their home State.

We agree with the commenter that the change from ''determine'' to ''aware'' is confusing and conflicts with the language in § 668.14(b)(32) and other language in § 668.43. We will change ''is aware'' to ''has determined'' and add a cross reference to § 668.14(b)(32). Additionally, we will make other conforming changes in § 668.43(c).

*Changes:* We have modified § 668.43(a)(5)(v) to say, ''. . . where the institution has determined, including as part of the institution's obligation under § 668.14(b)(32) . . .'' Additionally, we have modified § 668.43(c)(1) to say, ''. . . provide notice to that effect to the student prior to the student's enrollment in the institution in accordance with § 668.14(b)(32).'' We have modified

§ 668.43(c)(2) to remove the reference to paragraph (a)(5)(v)(B) since that paragraph no longer exists. It now only references paragraph (a)(5)(v).

*Comments:* A few commenters predicted that the proposed changes in § 668.14(b)(32) would have an inordinate effect on the people-helping professions, such as behavioral and mental health services. One commenter was concerned that the proposed changes in § 668.14(b)(32) did not appear to consider multi-jurisdictional institutions and programs, programs which are largely offered through distance education.

*Discussion:* The Department is concerned that someone who wants to work in a people-helping profession will not be able to do so if they attend a program that lacks the approvals necessary for licensure or certification in the student's State. As noted, the institution has discretion to decide which programs they offer, and from which States they recruit students.

*Changes:* None.

*Comments:* Many commenters pondered how the Department reconciled the limitation on institutions and students from meeting State educational prerequisites for Teacher Preparation Programs that often include only a course or two in the program addressing State specific history or culture even though, there is a pathway to licensure through State reciprocal agreements and the new Teacher Education Compact for license mobility.

*Discussion:* The Department's concern is that a student who completes a program be able to meet the educational requirements for licensure or certification in their State. We are persuaded by commenters that the way to meet this requirement can take a few forms. While the most straightforward would be to simply get licensed in the State they are living in, there are options for some occupations like teaching to obtain a license in their home State through reciprocity. In such situations the student obtains a license in a different State, but there is an agreement that allows them to use that license elsewhere. We believe that such situations would address the Department's policy concern, provided that the student obtain a license that through reciprocity allows them to work in the State covered by the requirements in § 668.14(b)(32)(ii). This could include both a full license as well as a provisional one. Because these are all forms of licensure we do not think a regulatory change to capture this concept is necessary.

*Changes:* None.

*Comments:* Several commenters pointed out that the changes to § 668.14(b)(32) will be done to regulations that reached consensus during negotiations a few years ago. Commenters emphasized that consensus is hard to achieve, and that it should not lightly be set aside, especially in favor of changes that are strenuously disputed.

*Discussion:* Since that consensus language was reached, the Department has approved multiple claims related to borrower defense to repayment for programs that made promises or claims about State approval that were not true. The review of those claims has taken extensive amounts of resources to verify and even then, not every borrower who was harmed from those false statements has applied for relief and even when the loans are discharged the Department cannot make up for the borrower's lost time. This is particularly worrisome since many of these individuals likely cannot find the time to go back and enter a program that would let them work in their desired profession. As such, the Department is concerned from its practice administering the aid programs that disclosure alone is insufficient. It creates too many opportunities for institutions to disclose one thing on paper but then try to convince the student of something else verbally. We also believe that putting the burden on an individual student is the incorrect policy when the institution is receiving significant sums of Federal resources to administer the Federal aid programs.

*Changes:* None.

*Comments:* A few commenters suggested that the Department meet with members of State licensing boards and educators to become more informed about what is required for the licensure process. Another commenter suggested that the Department maintain a website that would allow students to easily find the State requirements for licensure for each profession.

*Discussion:* The Department believes that a website-based approach would still have the limitations that come from disclosures that we think are insufficient. As noted earlier in this section, the Department has determined that the institutions should be the ones to work with States to determine if their programs have the necessary requirements for licensure or certification since they know their content and curricula. In making this regulatory change, the Department sought comment from all interested public stakeholders, and received and considered over 7,500 comments on these final regulations.

*Changes:* None.

*Comments:* One commenter opined that occupational licensing requirements limit employment opportunities with little benefit and that the proposed regulation would further entrench State licensing requirements when Federal policymaking should be encouraging States to reverse the proliferation. The commenter continued that similar to actions by the Trump administration, the Executive Order on Promoting Competition in the American Economy from the Biden administration, called for banning or limiting cumbersome occupational licensing requirements that impede economic mobility. The commenter asserted that there are better proxies for program quality than a program meeting State licensing standard, and the Department should not impede States as they reconsider current licensing standards.

*Discussion:* This rule, among other things, requires institutions to determine that each program eligible for title IV, HEA program funds meet the requirements for professional licensure or certification in the State it is located or where students in distance education or correspondence courses are located, as determined at the time of initial enrollment in accordance with 34 CFR 600.9(c)(2). This rule is not requiring States to set up licensing or certification requirements. Whether they have such requirements or what they put them in is up to the State. Instead, § 668.14(b)(32) is focused on not using government resources to support programs where the graduates will not be able to work in the field for which they are prepared.

*Changes:* None.

*Comments:* One commenter encouraged the Department to maintain current consumer protection requirements at the institutional level and not extend them to the program level because that has the potential to create a mix of compliant and noncompliant programs within an institution.

*Discussion:* Issues applicable to licensure or certification occur at the programmatic level because they are occupation specific. The advantage of such an approach is that institutions can continue to offer compliant programs while they work to correct deficiencies with non-compliant programs. This situation already commonly exists today. Institutions may have some programs eligible for Federal aid while others are not. They may seek approvals for some programs but not others.

*Changes:* None.

State Consumer Protection Laws (§ 668.14(b)(32)(iii))

*Comments:* Several commenters supported proposed § 668.14(b)(32)(iii) and agreed that the current regulations were not sufficient to protect students. For example, attorneys general from 20 States and the District of Columbia stated that students are entitled to the protection of consumer protection laws in their State, no matter if they attend a school located in their State or if they attended an online program offered by an out-of-State institution.

However, many of these commenters also thought that the proposed regulations in § 668.14(b)(32)(iii) did not go far enough; particularly that limiting the discussion to closure, recruitment, and misrepresentation leaves out other consumer protection laws, which generally need to be affirmed. One commenter suggested a list containing, for example, disclosure requirements, laws creating criminal liability for violations of education-specific or sector-specific State laws, and laws related to school ownership and record retention. Another commenter asked that the list include, among other things, enrollment cancellations and agreements, incentive compensation, and private causes of action.

*Discussion:* We appreciate the commenters' support but decline to broaden this provision. Many of the issues raised by the commenter get at broader questions of State authorization and reciprocity, which we think are better addressed in a future regulatory package. We do, however, remind the public that this language in no way eliminates the requirement that institutions abide by laws not related to postsecondary education from a given State, as provided in § 600.9(c)(1)(ii). This includes unfair and deceptive acts and practices (UDAP) laws.

*Changes:* None.

*Comments:* In addition to the broader concerns some commenters shared about the inclusion of the requirement for compliance with States' consumer protection laws related to misrepresentations, some commenters said that the definition of misrepresentation was unclear. Some suggested aligning the definition with the misrepresentation definition in § 668.74. Other commenters said that misrepresentations are covered under other laws because they are considered UDAP laws. Commenters also said that State attorneys general are already authorized to act upon misrepresentation claims that institutions have against them. Other commenters said that the inclusion of

misrepresentation specifically could unintentionally imply that the Department was narrowing the scope of the existing requirement that institutions are not obligated to comply with other general-purpose laws of other States beyond misrepresentation.

*Discussion:* We are persuaded by the commenters that the language related to misrepresentations is capturing many situations that institutions are still subject to even if they are part of a reciprocity agreement. As noted by commenters, most State laws related to misrepresentations fall under UDAP laws. Those are generally applicable laws and thus apply to institutions of higher education in all circumstances because they are not specific to postsecondary education. Given that many of the borrower defense to repayment regulations are informed by State UDAP laws, we think that continuing to rely on them here rather than a separate call out for misrepresentation is sufficient.

*Changes:* We have removed the reference to misrepresentation in § 668.14(b)(32)(iii).

*Comments:* Many commenters said the language in this section is vague. These commenters pointed out that the terms closure, recruitment, and misrepresentation have different meanings from State to State and are used in different contexts. For example, commenters wanted to understand what was meant by closure, specifically if it refers to programs, schools, or locations. These commenters would also like to know who will determine what are consumer protection laws, will it be the Department or each State. If it would be determined by the Department, commenters asked for guidance, and if determined by the State, commenters warned that the result could be an uneven patchwork of protection. One commenter provided examples of ways in which States differ with their handling of closure (*e.g.,* how prescriptive teach-out requirements are), recruitment (*e.g.,* whether it includes advertising) and misrepresentation (*e.g.,* vast differences in how fraud is dealt with).

*Discussion:* The Department agrees with the commenters and is both removing some provisions that are unclear and providing a more precise definition of the remaining term. As discussed above, we are removing misrepresentation because it is already going to be covered by State UDAP laws. We are also persuaded that the coverage of recruitment is hard to separate from marketing. We also think that from a State perspective many of the issues related to recruitment would fall under

UDAP so believe it is an acceptable tradeoff to rely on UDAP laws for this purpose as well. In terms of closure, we added clarification that this includes requirements related to record retention policies, teach-out plans or agreements, and tuition recovery funds or surety bonds. This includes both programmatic and institutional requirements. These items are the four key types of tools that States have to address closures and we think giving a concrete and limited list will remove any ambiguity as to what does or does not apply.

The Department notes that these concepts are also supported by August 2023 research from SHEEO that talks about common policies related to closure.[36] That research notes a short-term benefit for re-enrollment from teach-out and record retention policies. The findings for tuition recovery and surety bonds are more complicated because those policies tend to be about making students whole for losses instead of encouraging continuation.

Tuition recovery funds were discussed by the Department during the NPRM as falling under this requirement. Relatedly, we would also consider surety bonds required by States. We did not call out teach-outs or record retention policies by name but are persuaded that those are related to this issue. As noted in the discussions for financial responsibility and provisional certification, teach-outs are an important tool to helping students complete their degree when an institution closes.

*Changes:* We have revised § 668.14(b)(32)(iii) to read "Complies with all State laws related to closure, including record retention, teach-out plans or agreements, and tuition recovery funds or surety bonds."

*Comments:* Another commenter believed that the proposed rules would lead to decreased access for out-of-State students due to uneven protection rules. To avoid this, the commenter stressed that the terms closure, recruitment, and misrepresentations must be defined precisely so that they will be interpreted consistently across State lines and as desired by the Department. The commenter recommended the Department engage with organizations who best understand State reciprocity agreements to address this topic.

*Discussion:* We disagree with the commenter. Students enrolling in distance education programs have many options and requiring institutions to comply with State consumer protection laws when a State seeks to enforce them

only helps students have better protections from bad practices by institutions. The Department believes that the greater specificity around policies related to closure and the removal of misrepresentation and recruitment will address the commenter's concerns. These are all clear policies, the terms of which will vary across States but the nature of what these terms capture will not.

*Comments:* Several commenters pointed out that National Council for State Authorization Reciprocity Agreements (NC–SARA) has a new Policy Modification Process that launched in January 2023 and would conclude by the end of October 2023. According to the commenters, this process covers multiple topics, including student consumer protection, and commenters argued that this Policy Modification Process should serve as some justification for the adequacy of NC–SARA as well as justification to delay consideration of this issue until the next round of rulemaking.

*Discussion:* The Department disagrees with the suggestions from the commenters. There are specific and limited windows for the Department to issue regulations that abide by the master calendar dates. Given ongoing issues with closures and approval of borrower defense to repayment claims, we do not think it would be appropriate to wait for a non-governmental entity to instead play a role we can address through regulations now. Further, we have no ability to know what the outcome of that process will be.

*Changes:* None.

*Comments:* Another commenter shared their concern in that the proposed language could be interpreted to say that institutions authorized to operate in multiple States pursuant to a reciprocity agreement are not required to comply with all generally applicable State laws. The commenter recommended the provision be revised to clarify that institutions that are authorized to operate in multiple States pursuant to a reciprocity agreement must follow all generally applicable State laws and those education-specific State laws that relate to closure, recruitment, and misrepresentations. The commenter also recommended broadening the provision to require institutions authorized pursuant to a reciprocity agreement to comply with all consumer protection laws in States where programs are offered.

*Discussion:* The Department agrees with the commenter that this language does not affect the applicability of generally applicable State laws. This provision concerns the certifications the

---

[36] https://sheeo.org/college-closure-protection-policies/.

institution will make to the Department and confirming to us that they are complying with all State laws related to closure of postsecondary institutions. Institutions can and should be subject to laws beyond the specific types that institutions are certifying to us. That includes generally applicable State laws and what other laws specific to postsecondary education that apply for institutions that do or do not participate in a reciprocity agreement.

*Changes:* None.

*Comments:* Many commenters asserted that the requirement to observe individual States' consumer protection laws pertaining to closure, recruitment, and misrepresentations, including both generally applicable State laws and those specific to educational institutions, will eliminate most or all of the advantage that derives from subscribing to NC–SARA. These commenters remarked that NC–SARA was created to streamline compliance with the patchwork of State laws, and that these proposed regulations on State consumer laws would move us in the opposite direction, and problems that have been addressed in the past would return. Commenters argued that State authorization is a State prerogative and outside the purview of the Department, which risks assuming State authority in what it proposes. States have the right to authorize the operation of institutions of higher education and to enter into reciprocity agreements that are not rendered ineffective by the Department.

Commenters also stated that NC–SARA adequately addresses problems that students might encounter as well as concerns the Department wants to address. These commenters also asserted that this requirement would impose a costly, time-consuming burden on institutions offering distance education to track and adhere to the various State consumer protection laws. These commenters concluded that this regulatory burden would mostly negatively target the smaller, less affluent institutions that do not have the same staffing and resources of larger schools. Similarly, other commenters said the provisions in the proposed rule were vague and redundant to work carried out by NC–SARA.

Other commenters remarked that there are other consumer protections available to students outside of NC–SARA, for example, that can be found in State laws that are enforceable, in the governing boards of higher education institutions, and in the requirements of accreditors. As one commenter put it, safeguards for distance education students are currently in place not only through NC–SARA but also through the regulatory triad of accreditors, State agencies, and the Department.

*Discussion:* The three provisions in § 668.14(b)(32)(iii)—consumer protection laws related to closure, recruitment, and misrepresentation—that the Department outlined in the NPRM are the biggest sources of taxpayer liabilities generated by institutional actions. We have removed the issues related to misrepresentation and recruitment because we are persuaded those can be largely addressed by generally applicable State laws. We are unpersuaded, however, that reciprocity agreements would be undermined by asking institutions to take steps requested by a State to protect students in case of a closure. As 21 State attorneys general also noted, complying with State consumer protection laws does not impede the purpose of reciprocity agreements.[37] The attorneys general explained that institutions would still be exempt from State authorization requirements, like submitting an application or paying a fee to a State authorization agency.

We disagree that our proposal renders reciprocity agreements ineffective. Institutions will still have the many benefits that such agreements offer, including reduced burden and fees. States are a key part of the regulatory triad of postsecondary education. We believe that if States wish to create laws to protect their students from closure, they should be able to do so. This language preserves State flexibility on how they wish to write their laws.

Research demonstrates how closures can be incredibly disruptive to students' educational journeys, many of them never re-enroll, and those with student loan debt have very high default rates.

In response to the rule creating burden on institutions that offer distance education, we believe it is reasonable for an institution that chooses to offer distance education adhere to State laws where the student they enrolled is located. The burden on the institution is far outweighed by the benefits for students of not taking on debt or using up lifetime Federal aid eligibility for programs that cannot help them meet their educational goals.

The Department also rejects the zero-sum framing that suggests this change is not necessary because of the presence of other parts of the regulatory triad. The existing regulatory triad work has not prevented numerous closures, particularly sudden ones. The Department is improving its work in

this space and believes other parties should do the same. We believe the aforementioned changes to § 668.14(b)(32)(ii) of the final rule to focus explicitly on closure addresses the concerns of vagueness and redundancy.

*Changes:* None.

*Comments:* One commenter mentioned how States could be inundated with burdensome compliance actions if the proposed language under § 668.14(b)(32) moves forward. For example, this commenter mentioned that Colorado is the home State to 42 Colorado-based institutions that participate in NC–SARA, and that 1,166 institutions from other States, through NC–SARA, also serve students in Colorado. These 1,166 institutions are annually approved to participate in NC–SARA by each of their home States. The commenter is concerned that under the proposed regulation, Colorado may need to manage the NC–SARA compliance of not only their 42 in-State institutions, but also the additional 1,166 institutions that serve students in Colorado based on Colorado's unique requirements for recruiting, closure, and misrepresentations.

*Discussion:* The Department believes limiting this provision to only closure and spelling out specific areas underneath it addresses the concerns of commenters. Moreover, the extent to which these closure provisions apply to out-of-State schools will depend on underlying State law. For example, some tuition recovery funds specifically exclude out-of-State institutions.

*Changes:* None.

*Comments:* A few commenters believed the success of State-led reciprocity agreements are clear from the extraordinary speed with which the legislatures of nearly every State and territory adopted new legislation for the purpose of joining the State authorization reciprocity agreement administered by the NC–SARA. According to these commenters, NC–SARA's success demonstrates the overwhelming approval of the existing reciprocity framework by the directly elected representatives of those States. These commenters concluded that the State legislatures, controlled by both Democrats and Republicans, signaled their strong belief in a system of reciprocity that would eliminate the very bureaucracy and administrative burden that the Department, with no mandate from Congress, now proposes to reinstate.

A few additional commenters also added that although the Department would be reintroducing a problem previously deemed so serious that every State, but one acted with unprecedented

---

[37] ED–2023–OPE–0089–2975; *https://www.regulations.gov/comment/ED-2023-OPE-0089-2975.*

speed to address it, the agency does not seem to be solving any particular problem in return. These commenters stated that if there were no tools available to manage issues relating to closure, recruitment, and misrepresentations, they would understand the argument for taking such an extraordinary step, but they do not believe this to be the case. These commenters pointed out that every State has general consumer protection laws that may be invoked to address such concerns involving students, and every State has created new laws outside their State authorization framework if they feel additional tools are required. These commenters believe the Department has an extraordinary array of statutes, regulations, and guidance at its disposal for assisting students with matters involving closure, recruitment, and misrepresentations. Moreover, commenters recognized that this administration has dedicated the better part of its regulatory agenda to expanding and strengthening such provisions. Accordingly, these commenters concluded that there is no reasonable justification for requiring students, employers, and institutions to pay the extreme cost that would be associated with this proposed rule.

*Discussion:* The Department is clear about the problems we are concerned with—the disruptive nature of closures and how they affect students' ability to complete and generate costs for taxpayers in the form of loan discharges. Joining a reciprocity agreement should not absolve institutions from doing a better job at managing closures. The removal of misrepresentation and recruitment addresses the confusion about generally applicable State laws.

*Changes:* None.

*Comments:* A few commenters asserted that the Department knows who the bad actors are and who are causing harm to students as they pursue their higher education. These commenters stated that rather than implementing changes that would affect many schools in costly, burdensome ways, the Department should instead target the bad actors with more tailored rules or otherwise deal with them appropriately.

*Discussion:* The Department identifies institutions it is concerned about through its various oversight authorities. But not all institutions that suddenly close were easily identifiable as a problem right before the moment of closure. Instead, we think normalizing steps to prepare for closures would leave students, taxpayers, and institutions in a stronger position.

*Changes:* None.

*Comments:* One commenter predicted that implementing proposed § 668.14(b)(32)(iii) would subject institutions to inconsistent, costly, and unnecessary State-by-State laws, such as required contributions to numerous and varying State tuition recovery funds, numerous and varying bonding requirements, requirements to register recruiters, and restrictions on recruiting practices and methods.

*Discussion:* We disagree with the commenters. The removal of recruitment and misrepresentation address the concerns raised about registering recruiters. If institutions seek to benefit from enrolling out-of-State students, we think it is reasonable they contribute to the costs of protecting them in case of a closure. We note that many States exempt closure requirements for institutions of certain sectors, students attending out-of-State institutions through distance education, institutions under a reciprocity agreement, or a combination of those factors. And while institutions could make changes to their policies related to closure, that is also true regarding their participation in reciprocity agreements.

*Changes:* None.

*Comments:* One commenter agreed that the Department should pay close attention to the issue of State consumer protection because States have concerns about out-of-State schools taking advantage of students. The commenter cited an August 2021 letter by State attorneys general and several higher education consumer protection groups. However, the commenter pointed out that State attorneys general are only one entity. The commenter further noted that all States except California have chosen to enter NC–SARA, which in most cases involved a bill passed by State legislature and signed by the governor voluntarily. On this same point, another commenter affirmed that if any State has sufficient concerns, it could affect remedies under NC–SARA policies or simply depart NC–SARA and enforce any laws it wishes.

*Discussion:* The Department is not telling States how to structure their laws related to closure. We are requiring institutions to certify to us that they are complying with all laws related to closure in the States where they operate. This is critical because we are concerned about the disruptions and costs associated with closure.

*Changes:* None.

*Comments:* One commenter reported that there seems to be three possible interpretations of the Department's suggested language in § 668.14(b)(32)(iii), one being that institutions are currently non-compliant, the second being that the Department's proposal supersedes NC–SARA policy, and the third interpretation being that the Department's proposed rule does not affect NC–SARA policy. The commenter offered extensive reasons why each of the three interpretations were problematic, namely that the Department did not offer any research backing that if its policies are implemented, it would provide relief. The commenter cited research of a large student tuition recovery fund that, though students paid into it for years, made payouts to only a tiny fraction of students who were harmed by closing institutions. The commenter also reported that they commissioned a law firm to examine State legal enforcement actions against high-profile institutions that often led to closure. The commenter stated that that assessment showed that State attorneys general have almost exclusively used general purpose fraud and misrepresentation consumer protection statutes when filing claims against institutions they believe are serving students poorly. The commenter then mentioned that as the Department is likely aware, NC–SARA policy does not prevent States from enforcing these statutes. The commenter concluded that this analysis, at the very least, raises substantial questions about whether the concerns noted by the Department could be addressed through other means.

*Discussion:* The Department is persuaded by the commenter, in part. As already noted, we have removed the language related to misrepresentation and recruitment as we believe those issues would be largely covered by State UDAP laws, which generally apply. However, in addition to tuition recovery funds, we are concerned about requests for teach-outs and provisions for record retention. The Department agrees that tuition recovery funds or surety bond requirements in many States may not be as effective as possible, which recent SHEEO research confirms.[38] However, given the continued presence of closures and their disruption, every part of the regulatory triad must do all it can to help minimize the negative effects from closures.

*Changes:* None.

*Comments:* Many commenters advised the Department to work with NC–SARA as well as consumer protection groups and relevant higher education associations to create a process that would protect students more uniformly. These commenters are concerned that the proposed regulations on State consumer protection laws

---

[38] *sheeo.org/college-closure-protection-policies.*

would leave protection up to each State and likely cause it to have uneven protection. However, if the Department is determined to implement the regulations, one commenter proposed that the Department limit the language to two issues of concern, tuition recovery funds and aggressive student recruiting, which would align with how it is addressed elsewhere in the NPRM.

*Discussion:* As discussed above, the Department has limited this language to include tuition recovery funds as well as three other areas specifically related to closure. We will continue to identify opportunities to improve joint oversight of institutions of higher education.

*Changes:* None.

*Comments:* Several commenters suggested the Department reconcile the proposed language in § 668.14(b)(32)(iii) with the existing definition of State authorization reciprocity agreement in § 600.2.

*Discussion:* We disagree. This regulation concerns what institutions will certify to the Department. It requires that they certify compliance with all requirements related to closure in any State in which they operate. It does not adjust the definition of a reciprocity agreement, but institutions will have to ensure they are being accurate in their certifications to the Department.

*Changes:* None.

*Comments:* One commenter opined that the proposed regulation for State consumer protection contradicts the Department's stated goals of promoting innovation and flexibility in distance education because it imposes rigid, prescriptive requirements that stifle creativity and diversity in instructional design and delivery.

*Discussion:* The Department does not think creativity in avoiding the costs of closures is a good avenue for innovation. This provision does not affect modes of instructional design and delivery. Instead, it seeks sensible protections for students to try to minimize the costs and disruption from closures.

*Changes:* None.

*Comments:* One commenter requested that the Department clarify what it means that institutions are only required to comply with State laws to which they are subject. For example, the commenter wants to know if the Department means to say that if a State's consumer protection laws explicitly state that they apply only to institutions operating with a physical presence in the State, an institution operating under a reciprocity agreement without a physical presence should not be

required to comply with a law from which it is exempt.

*Discussion:* This certification requires institutions to affirm that they are complying with applicable State laws related to record retention, teach-out plans or agreements, and tuition recovery funds or surety bonds. Institutions would have to affirm they are complying with those applicable and relevant State laws. For instance, if a State's tuition recovery fund law exempts out-of-State institutions, those institution would not have to abide by it. This provision does not speak to generally applicable State laws, which apply to institutions.

*Changes:* None.

*Comments:* One commenter worried that the proposed regulation for State consumer protection would create conflicts with NC–SARA protocols to the point that there would be confusion and consumer protection would be weakened rather than improved oversight. The commenter added that potential conflict with the rules of accrediting agencies could also increase. In addition, the commenter pointed out that many States have difficulty maintaining and implementing their own policies and that adding new, complicated Federal requirements for them to comply with will result in those regulations being implemented ineffectively or not at all.

*Discussion:* We disagree with the commenters. The situation of decreased oversight suggested by the commenter would have been most likely to arise when there is ambiguity or a lack of clarity as to what is or is not covered by this requirement. The changes to this provision in the final rule remove that ambiguity and will make it easier for all parties to understand what is covered. We also do not think this provision will create conflicts with accreditation agencies, as they cannot dictate State laws. This provision also does not tell States how they can or should structure their laws related to closure of postsecondary institutions and the four areas underneath that. They can continue to structure such laws, if they have them, as they see fit.

*Changes:* None.

*Comments:* One commenter asserted that the current definition of State authorization reciprocity agreement allows agreements that prohibit States from enforcing their education specific consumer protection laws against member schools. As a result, the commenter states that the NC–SARA agreements prohibit member States from applying or enforcing their education-specific consumer protections to member out-of-State schools, which has

created an unfair two-tier system that leaves millions of online students unprotected by State law and vulnerable to fraud and financial ruin.

*Discussion:* The Department believes that we need to protect students from the most concerning outcomes in postsecondary education. We added § 668.14(b)(32)(iii) to remind institutions of the requirement to comply with State laws related to four key elements that relate to closure.

*Changes:* None.

*Comments:* Several commenters were concerned that the proposed language in § 668.14(b)(32)(iii) could be mistaken to imply that institutions that do not participate in a reciprocity agreement and that offer programs in multiple States, do not have to comply with State laws in each State where they operate, except for in the three specified areas. These commenters stated that in fact, institutions that operate in multiple States without participating in a reciprocity agreement must comply with all applicable State and Federal laws. The commenters urged the Department to revise the proposed regulations to make clear that institutions that do not participate in a reciprocity agreement, must comply with all applicable State laws in the States where they offer programs.

One commenter recommended that the Department revise the proposed language in § 668.14(b)(32)(iii) because as it is, it runs the risk of inadvertently suggesting that title IV schools are not required to comply with generally applicable State consumer protection laws. This commenter emphasized that no such exemption exists and, notably, that State authorization reciprocity agreements do not exempt institutions offering distance education from compliance with such generally applicable laws. This commenter suggested that the Department clarify this language to prevent any possible misinterpretation. This commenter also observed that requiring schools that offer programs in multiple States to comply with all State consumer protection laws in each State where the school enrolls students would not impede the purpose of reciprocity agreements, which seek to reduce the cost and burden of compliance with multiple States-authorization requirements. This commenter argued that schools can be required to comply with all applicable consumer protection laws, while still being exempt from compliance with State-authorization requirements, including, for example, requirements to submit an application or pay a fee to a State-authorizing agency.

*Discussion:* This language does not change the existing requirement that institutions must comply with generally applicable State laws. In fact, that is one of the reasons why we have removed misrepresentation and recruitment, as State UDAP laws would likely address those issues. Instead, this language specifically requires that institutions certify that they comply with relevant State laws related to the closure of institutions of higher education. We address our concerns by rewriting this language to address the types of closure-related requirements. Institutions would have to provide this certification regardless of whether they participate in a reciprocity agreement.

*Changes:* None.

*Comments:* One commenter recognized that the suggested language in the State consumer laws section is an attempt to give States back some of the authority they have lost, but the commenter believed that the changes might create unintended consequences by only focusing on the specific areas listed in the proposed language. To address the problem, the commenter suggested some language changes to alleviate some likely unintended consequences of the text as currently proposed. Namely, this commenter suggested to simplify that this provision would apply to all applicable State laws. In addition, this commenter suggested that this provision include that for institutions covered by a State authorization reciprocity agreement as defined in § 600.2, notwithstanding any limitations in that agreement, the institution comply with all State higher education requirements, standards, or laws related to risk of institutional closure, or to recruitment and marketing practices, and with all State general-purpose laws, including, but not limited to those related to misrepresentations, fraud, or other illegal activity.

*Discussion:* The Department appreciates the suggestion from the commenter, but we think making this language clearly about four key items related to closure clarifies that it applies to all institutions regardless of whether they participate in a reciprocity agreement.

*Changes:* None.

*Transcript Withholding (§ 668.14(b)(33))*

General Support

*Comments:* Several commenters appreciated and supported the Department's proposal to prohibit transcript withholding or take any other negative action against a student related to a balance owed by the student that resulted from an error in the institution's administration of the title IV, HEA programs, returns of funds under the R2T4 funds process, or any fraud or misconduct by the institution or its personnel.

Commenters cited a range of reasons for the support. Several commenters noted that transcript withholding is most likely to affect low-income and first-generation students, students most at risk of not finishing their programs, as well as students of color, and thus limiting the practice is particularly important for students seeking educational opportunity. For instance, one commenter cited a study that found that low-income students, as measured by their eligibility for a Federal Pell Grant, only make up 30 percent of enrollment at Virginia's two-year public colleges but comprise 63 percent of those students who owe debts to those schools. That same commenter provided similar statistics showing that although Black students comprise only 17 percent of enrollment in Virginia's two-year public institutions, they account for 40 percent of the students who owe debts to those schools.

Several commenters provided detailed stories about how transcript withholding had stymied students' educational paths, including one student who was on a payment plan with a private university that would take 15 years to pay off.

A few commenters also noted that transcript withholding can be an enormous obstacle preventing them from securing employment and beginning their career. In fact, one commenter emphasized, in some States, graduates cannot sit for professional licensure exams without their transcript.

A few commenters also pointed to actions taken by States, such as New York, Washington, Louisiana, and California, in recent years to ban transcript withholding more broadly as further recognition that this is a problem that must be addressed. A few other commenters argued that transcript withholding frustrates the policy goals of Federal aid programs by preventing students from pursuing higher education at other venues.

Several commenters also cited findings by CFPB examiners that found transcript withholding under certain circumstances to be abusive and in violation of Federal consumer protection law. One commenter emphasized a phrase from CFPB's report which stated that institutions took unreasonable advantage of the critical importance of official transcripts and institutions' relationship with consumers. Several other commenters cited research by the Student Borrower Protection Center, which found that schools typically receive only cents on the dollar when they collect on institutional debts using transcript withholding. These commenters said they do not believe the benefits to the schools from the small amounts collected justifies the stress and delays transcript withholding places on students.

A different commenter raised concerns about how schools routinely charge the withdrawn student for amounts of returned title IV aid, creating an account balance for expenses that were previously covered by financial aid. The commenter believes this is a windfall for schools, which can collect for educational services that were never fully rendered to students.

Overall, several commenters argued that this provision has significant benefits that could help millions of students, including allowing students to continue pursuing their educational goals.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

General Opposition

*Comments:* Several commenters stated that this provision exceeds the Department's authority in the HEA by interfering with the normal operation business of the institution. They also said the Department has routinely stated that it is not within its authority to ban transcript withholding without due cause. The commenters pointed to discussions during negotiated rulemaking where the Department talked about difficulty in identifying any legal standing to engage on this topic. The commenters also noted that the Department acknowledged that the student has an agreement with the institution, which shifts the conversation from institutional error to a scenario of process, procedure, and institutional business, where the Department lacks the authority to intervene.

*Discussion:* We disagree with the commenters. While we agree that a student establishes an agreement with an institution when the student enrolls, we disagree with the commenters' characterization of the discussion of the rulemaking. The existence of an agreement does not mean that an institution is exempt from oversight. The Department has authority under HEA section 487 to establish its own agreement with an institution, setting the conditions for its participation in the title IV, HEA programs.

Additionally, HEA section 498 requires the Secretary oversee an institution's administration of title IV, HEA funds on behalf of students, ensuring that the institution is administratively capable and financially responsible. When an institution withholds transcripts from students that include credits that have been paid for or should have been paid for, even in part, using title IV, HEA funds, withholding of such transcripts due to a balance owed falls squarely under the Department's authority to oversee the administration of those funds. In such cases, the institution denies a student a substantial portion of the value of the service that the institution tacitly or explicitly agrees to provide when it enrolls a student, *i.e.*, authoritative confirmation of a student's academic progress. Such an action also undermines the express purpose of the title IV, HEA programs to support students' completion of postsecondary credential.

*Changes:* None.

*Comments:* Several commenters supported the Department's position that institutions should not prevent students from enrolling or re-enrolling in school because of small balances due. However, in the case of larger balances, many commenters stated that institutions have limited alternatives to collect past due debts.

Several commenters stated that they work with students that owe a balance by offering payment options that meet the individual's needs and asserted that one of their only means of leverage in many cases is withholding a transcript. Many commenters said transcript withholding is typically the only thing that would make a student want to pay their debt. One commenter said many students in their school do not respond to requests to repay debts because they simply stop attending classes and never officially drop out from the classes. These commenters indicated that in many cases, they would be unable to recoup the amounts owed from the students who intend to quit school entirely or attend another institution.

One commenter stated that they work diligently with students to keep their account balances in house to avoid collection fees and credit bureau reporting. This commenter also asserted that they charge no interest or plan fees on students who enroll in a plan, which is to the student's advantage since returned funds may reduce what the student owes in Federal loans. The same commenter questioned what an institution's incentive would be to continue working with students with outstanding balances when it could easily turn the accounts over to

collections for more aggressive collection options.

Many commenters argued that arguments made by consumer advocates are anecdotal, limited in scope, and appear to neglect the greater consumer impact. These commenters said the CFPB's findings in its Fall 2022 Supervisory Highlights that institutions rarely, if at all, release transcripts to prospective employers were untrue. They said interviews with college officials would find that almost all of them disclose transcripts to potential employers. A few other commenters stated that for students that are in line for a job, trying to enter the military or need their transcripts to pass their boards, the school releases transcripts. These commenters reasoned that when the student becomes gainfully employed, they will be able pay the debt.

Another commenter argued that institutions would need to build infrastructure to manage the added costs of this provision, which would detract from funding for other core services. A separate commenter noted that transcript withholding is particularly important for private institutions that cannot rely upon collecting State tax refunds to pay institutional debts the way a public institution could.

A few commenters supported the Association of Collegiate Registrars and Admissions Officers' (AACRAO) and National Association of College and University Business Officers' (NACUBO) recommendations that were provided to the Department in April 2022, which allow the use of administrative process holds and student success holds while eliminating holds tied to trivial or minor debts.

Many of these commenters explained that without the option to withhold transcripts, institutions might resort to using collection agencies with more negative impacts on students than transcript withholding. One commenter warned that outside collection agencies could ultimately increase the amount a student owes to an institution.

*Discussion:* We appreciate the commenters' efforts to provide favorable repayment options to students and hope that institutions will continue to do so. We also appreciate that some institutions choose to provide transcripts to employers upon request, but the commenters do not provide conclusive evidence that this is true of all or even most institutions, whereas the CFPB provided a clear account of this problematic practice.

We disagree that withholding transcripts is the most appropriate way to get students to repay a balance owed.

In fact, doing so can make it more difficult for students to repay if it affects their ability to obtain gainful employment, even for those students who have not yet completed a degree. Although we acknowledge that preventing institutions from withholding transcripts removes a key form of leverage that an institution has over a student to demand that the student repay a debt to the institution and could result in additional burden on the institution to collect that debt, we believe that trade-off is justified given the significant harm to students when they are unable to access their transcripts.

Finally, we note that the regulatory language prevents the institution from taking any other negative action against a student related to a balance owed by the student that resulted from the institution's own error. Because selectively referring a student to a collection agency would be a negative action, an institution would not be permitted to use a collection agency to have the student repay an amount owed specifically because of the error. In these cases, institutions will either need to find other methods of encouraging students to repay amounts owed or write off the balances entirely.

*Changes:* None.

*Comments:* Several commenters stated that before taking extreme measures such as employing outside collection agencies, their institutions use transcript holds as a means of encouraging communication with the student. One commenter noted that many students are unaware of how they finance their college education and even less are aware of general economic concepts, such as how to save, create a budget, and simple or compounding interest. Several commenters stated that through financial literacy discussions, they teach students and borrowers much needed skills related to financial literacy and work with them to find a debt solution that fits within their present financial capabilities. By taking away these tools, the commenters indicated, the institution loses the power to have discussions about financial literacy, which the commenter asserted ultimately hurts the students. Other commenters also pointed to financial literacy as a reason why students may end up owing balances.

*Discussion:* We appreciate the commenters' point that financial literacy efforts can help students repay debts. However, we disagree with the commenters that transcript withholding should be a tool to initiate such counseling. Institutions have many opportunities to work with students to

provide instruction and support regarding financial literacy prior to withdrawal, and we do not believe that the value of such education outweighs the significant negative impacts on students when they are unable to obtain transcripts and cannot demonstrate their other educational achievements to another institution or an employer. We also do not see how financial literacy would address some of the situations in which we are preventing transcript withholding, particularly as a result of an institution's actions. Financial literacy training can be useful if done well, but it is preventative process that does not obviate the problems that are caused when students already owe a balance to the institution and the institution withholds their transcripts.

*Changes:* None.

*Comments:* One commenter questioned why the Department would want students to continuously accrue more debt. The commenter is concerned that in the proposed requirement there is no verbiage regarding the Fair Credit Reporting Act and the student's responsibility to repay debt in a timely manner. They assert that this challenges the legality and liability for the university to report outstanding debt to credit bureaus for other creditors to be informed. The commenter argued that the proposed requirement regarding release of transcripts deserves more conversation because they believe, as written, it will cause more harm than good. The commenter pointed out that increasing a person's debt beyond their means creates a scenario where their debt-to-income ratio is unmanageable. The commenter asserted that it is unfair to students who have the right to know the damage that accruing more debt may cause and it is damaging to their credit and future capabilities when attempting to make purchases.

*Discussion:* We disagree with the commenters. The Department does not believe that students should continuously take on more debt, but we also are not persuaded by commenters that a regulation that prevents an institution from withholding transcripts will cause students to take on substantially more debt. This regulation does not relate to students taking on more or less debt. It only relates to the ability of an institution to withhold a transcript for credits already earned and paid for by the student. Although we acknowledge that some institutions may find it more difficult to recoup debts from students without withholding their transcripts, institutions have other methods of contacting students and persuading them to repay their debts.

As we describe below, although we have still broadly limited an institution's ability to withhold transcripts for payment periods that are fully paid for, we have limited the applicability of the regulation that prevents institutions from taking "any negative action" to only occasions where the balance owed is the result of institutional error, fraud, or misconduct. We believe that this is an appropriately narrow scope for the strict prohibition on taking negative action. Specifically, with respect to the Fair Credit Reporting Act, any institution that is reporting to the credit bureaus have an obligation to report accurate information. Where the derogatory reporting is on a debt that is due to institutional error, fraud, or misconduct, the derogatory reporting would not be accurate information that would be of value to other potential creditors.

*Changes:* None.

*Comments:* One commenter shared that their university currently places a hold on the student's account that prevents all services, including additional registrations, and places the student's account with third party collection agents if a student owes a balance, which they are concerned would be seen as a negative action if this provision is included in the final rule. This commenter worried that the proposed regulatory language would not allow the university to pursue debt collection or prevent the students with balances from future registrations.

*Discussion:* The commenter is correct that the actions described, including placing a student's account with third party debt collectors and preventing the student from registering for future courses, would be considered "negative actions" that are not permitted under these final regulations if the student's balance owed is due to school error. In these situations, we acknowledge that institutions may need to write off balances owed if the students do not agree to repay the funds to the institution. However, we do note that we have removed the provision that would also have prevented these actions for a balance owed due to an R2T4 process.

*Changes:* None.

## Transcripts for All Paid for Credits (§ 668.14(b)(34))

*Comments:* Several commenters expressed support for the changes in transcript withholding but said the Department should go further. One commenter stated that colleges should be required to transcript every credit that title IV funds have paid for. This commenter argued that when

institutions fail to do so they deprive students of the credits they've earned and diminish the value of the title IV programs. Several other commenters argued against this idea. They noted that students have a multitude of funds from various sources, for example, that Federal funds are intermixed with State, institutional, scholarship, and individual funds. These funds are combined to address all institutional charges and though Federal funds are usually the first dollar in, commenters stated that it is a stretch to argue that Federal dollars paid for the entire credits earned by the student. These commenters continued to say that it would be nearly impossible for an institution to deconstruct the credits paid entirely by Federal dollars and as a practical matter it would be impossible to parse out the amount on a transcript.

Another commenter urged the Department to categorically ban transcript withholding in title IV schools related to any debt, not just debt that accrues due to R2T4 and prohibit title IV schools from withholding any academic records as a form of debt collection, including diplomas, certificates, and any other document that a student or graduate may need to complete their education elsewhere or to enter the workforce.

*Discussion:* We are convinced by the arguments made by commenters who said that transcript withholding in general diminishes the returns to students and taxpayers from title IV funds by depriving students of the credits they have already paid for and earned and effectively preventing them from transferring to another institution without substantial loss of time and resources. While we disagree with the commenters who argued against this, we agree with their argument that determining which credits have been paid for with title IV, HEA funds is difficult because that money is fungible. For those reasons, we have added an additional paragraph requiring institutions to transcript all credit or clock hours for payment periods in which (1) The student received title IV, HEA funds; and (2) all institutional charges incurred for the payment period were paid for or included in an agreement to pay, such as a loan or a payment plan, when the request for the official transcript is made.

For purposes of these new provisions, we consider an institutional charge to be "for a payment period" if they are allowable charges for the payment period, as defined under § 668.164(c)(1). We consider all charges incurred for a payment period to be paid for when the

institution has credited the student's account for an amount sufficient to cover those charges Additionally, we consider charges to be paid sequentially as a student's account is credited, where the oldest charges are the first to be paid.

Regarding the commenter who asked the Department to categorically ban all transcript withholding at institutions eligible for title IV aid, we continue to believe that we do not have the authority to prevent an institution from withholding transcripts in circumstances where the student does not receive title IV, HEA funds, or in cases where the student has not paid for all the institutional charges associated with the credits they have earned. In those cases, the Department does not impose restrictions on an institution's ability to withhold transcripts or transcript credits from payment periods in which the student has not received title IV, HEA funds or has not paid for all institutional charges.

*Changes:* We have redesignated proposed § 668.14(b)(34) to (b)(35) and added an additional paragraph (b)(34) to establish a requirement for institutions participating in the title IV, HEA programs to transcript all credit or clock hours for payment periods in which (1) The student received title IV, HEA funds; and (2) all institutional charges were paid, or included in an agreement to pay, at the time the request is made.

Objections Tied to R2T4

*Comments:* Several commenters supported the Department's original language around transcript withholding for school error but were concerned with the Department's current proposal to expand the prohibition to R2T4. Other commenters specifically criticized the new R2T4 provisions.

Several commenters noted that when they return funds to the Department through R2T4, this creates a balance due to the institution. In these cases, the Department gets its money back, but the institution does not. The commenters asserted that this could affect as much as one-quarter of its students and that being unable to collect that much revenue due to a ban on transcript withholding would be a significant loss.

A few commenters raised concerns about the limit on transcript withholding due to R2T4 because of differential treatment between students who do and do not receive Federal aid. They said because schools are barred from having a separate policy for title IV and non-title IV students this requirement is attempting to dictate school policy for all students.

One commenter argued that attempts to have tuition refund policies closely mimic R2T4 requirements often resulted in balances owed. This commenter stressed that R2T4 is not a simple proration, but a complex three-page worksheet, and asserted that even the best aligned policy does not guarantee offsetting a student's credits and debits. Other commenters pointed out that page 32383 of the NPRM indicated uncertainty about the legal authority of these regulations by saying that institutional policies and R2T4 rules may not coincide and discrepancies between the two could result in a balance owed by the student after the student's withdrawal.

Several commenters argued that not allowing institutions to recoup these costs would have a range of negative consequences. One commenter said that universities could end up having to view Federal aid as "bad money" because they will no longer plan on receiving a substantial portion of the Federal funds promised ahead of a semester. A few other commenters warned that institutions would pass these costs on to future students in the form of higher tuition to offset the cost of more generous refund policies. One commenter argued that these unpaid balances would be paid for with institutional aid, which limits the availability of those funds for other students. A few other commenters, meanwhile, said institutions would reduce access, including through more stringent admissions practices focused on identifying students who would be better able to pay their university expenses without adequate Federal aid.

A few commenters raised concerns about withholding transcripts due to R2T4 calculations by pointing to Department rules on overpayments. One commenter stated that the HEA denies Federal student aid to students who owe overpayments on grants, including balances of more than $50 resulting from the R2T4 calculation, until the student repays those funds. According to this commenter, institutions frequently repay the Department for student balances owed because of the R2T4 calculation instead of reporting an overpayment to the Department. The commenter further explained that this keeps the liability with the school instead of the Department. This commenter argued that it is inconsistent for the Department to maintain such a strict policy for overpayments while holding schools to a different standard when students owe balances of title IV funds because of the R2T4 calculation. The commenter concluded that if this provision remains in the regulations,

institutions will likely alter their practices and begin reporting overpayments to the Department instead of repaying them on the student's behalf, potentially leaving students worse off if they owed small balances.

Several commenters asserted that preventing transcript withholding related to R2T4 creates operational issues for institutions since they are unable to determine the exact amount of any debt that might come from the R2T4 money because funds are often comingled. The commenters stated that when title IV, HEA funds are returned, a student's balance owed increases, which is a challenge for institutional systems that can't tell the difference. Additionally, they said when the institution tries to only collect a percentage of the entire debt owed, this causes additional difficulty for the students.

Another commenter raised similar operational concerns, indicating that financial holds are often initiated via the bursar's office or office of student accounts. The commenter noted that leaders representing these offices have indicated that it would be challenging to pinpoint a debt—and its resulting hold—to a R2T4 calculation. The commenter mentioned that student's ledger account is a snapshot in time and that charges are continually added and removed from the account while payments are processed, and refunds are distributed.

One commenter stated that the transcript withholding provision would negate the terms of enrollment agreements or institutional tuition refund policies across all sectors of education, since it would essentially not permit an institution to obtain payment for tuition that is not refunded to a student under the institution's tuition refund policies.

Additionally, the commenter stated that many student account systems may not be able to automatically identify these holds/debts as R2T4-related. According to the commenter, staff would have to manually analyze the accounts of students with holds to determine if they were caused by return, and then release the hold. The commenter is unclear how staff would be required to handle a balance on a student's account that came from both an R2T4 calculation and some other source and may result in the elimination of a non-R2T4 hold.

Several commenters argued that the Department should not prohibit transcript withholding due to R2T4 because the institution is not solely at fault when a student owes a balance, such as students who withdraw due to

work, childcare, family, addiction, housing insecurity, or food insecurity. Commenters also cited students who failed all their classes or withdrew after receiving a refund check.

Along similar lines, one commenter argued that prohibiting institutions from withholding transcripts or taking any other negative action except in cases of student fraud would result in a "free-for-all" education system. This commenter asserted that students would be able to obtain educational credits, withdraw from the institution, and simply transfer those credits to another institution because the first institution was prohibited from withholding an academic transcript due to an unpaid balance.

Many of these commenters suggested either removing the ban on transcript withholding or taking other negative action due to R2T4 while a few others suggested removing this proposed provision until the next round of rulemaking, when discussions on R2T4 will take place.

*Discussion:* We are persuaded by many of the commenters who wrote in opposition to preventing institutions from taking negative actions against students who owed balances due to the R2T4 process. We continue to believe that balances owed due to the R2T4 process present impediments to a withdrawn student's eventual completion of a postsecondary credential, and as described in the NPRM, our data suggests that there is a relationship between returns under the R2T4 process and negative student outcomes. We were not convinced by arguments that the prohibition on transcript withholding due to R2T4 would cause institutions to lose substantial amounts of revenue, particularly when that revenue would have been owed in many cases for periods for which the student did not receive instruction. Nor were we persuaded by the argument that enrollment agreements would be violated, since such agreements could be renegotiated in light of new requirements, potentially to include more generous tuition refund policies. However, in light of the arguments presented by commenters regarding the administrative challenges to implementing the provision, concerns about students at open access institutions who enroll solely for the purpose of receiving a credit balance, and the fact that the broader prohibition on transcript withholding we are establishing will largely result in most withdrawn students receiving transcripts including credits for payment periods that are fully paid for,

we believe it is reasonable to remove the provision regarding R2T4 from proposed § 668.14(b)(33).

We disagree with the commenters that the Department's policy preventing institutions from withholding a transcript or taking another negative action is analogous to its requirements regarding overpayments, particularly when the provision related to R2T4 is removed. Institutions are still permitted to withhold transcripts and take other negative actions against students when students owe a balance for payment periods in which they have not received title IV, HEA funds or have not fully paid charges, except in cases where an institution's error caused the account balance. The prohibition applies only in limited circumstances and is tailored to ensure that students do not lose the value of the educational experience that title IV, HEA funds supported.

*Changes:* We have struck the phrase "or returns of title IV, HEA funds required under § 668.22 unless the balance owed was the result of fraud or misconduct on the part of the student" from the end of § 668.14(b)(33).

Alternative Ideas

*Comments:* One commenter encouraged the Department to look for all opportunities to minimize or prohibit transcript withholding, including for institutions under provisional status, given the well-documented harm this practice inflicts upon students.

*Discussion:* The Department agrees with the commenter and has taken the strongest possible action within its purview to prevent such withholding by requiring institutions to transcript all credits that were paid for in periods where students received title IV, HEA funds.

*Changes:* None.
*Comments:* One commenter recommended limiting the prohibited actions for R2T4 debts to the withholding of transcripts because other actions, such as holding diplomas or holding future enrollment, do not impede a student from enrolling elsewhere if they can transfer their completed coursework and secure transcripts.

*Discussion:* The Department acknowledges this commenter's concern, and the elimination of the R2T4 provision resolves it. The intent of the remaining provisions in § 668.14(b)(33) is to prevent an institution from taking any negative action against a student for a balance resulting from its own error, fraud, or other misconduct, and we continue to believe this is appropriate.

*Changes:* None.
*Comments:* One commenter disagrees with the Department requiring schools sending funds back to the Department as part of R2T4, and instead recommended that the Department collect the debt from the student themselves.

*Discussion:* Although we have eliminated the R2T4 provision related to transcript withholding, the Department does not agree with shifting the substantial burden of returning title IV, HEA funds to the Department, from institutions to students. In addition, we do not have statutory authority to do so even if the Department agreed with the commenter.

*Changes:* None.
*Comments:* One commenter requested the Department allow campuses to retain Federal funds for students who withdraw if their R2T4 portfolio falls below a designated threshold (*e.g.,* average of 5 percent return over last three years) of their total Federal aid disbursements in a year. This commenter pointed out that campuses could continue to report the R2T4 calculations for the Department to assess this measure in future years to determine if they are exempt from returning these funds and thus prohibited from billing for the portion of the account paid by these Federal funds.

*Discussion:* Although we have eliminated the R2T4 limitation from the transcript withholding provisions, the Department disagrees with limiting the applicability of the other provisions to institutions that have a limited number of students who withdraw or a limited proportion of title IV, HEA funds that is returned through the R2T4 process. The Department intends for these provisions to apply to all institutions equally.

*Changes:* None.

*Conditioning Financial Aid (§ 668.14(b)(35))*

*Comments:* Several commenters stated that the proposed rules to prohibit any policy, procedure, or condition that induces a student to limit the amount of Federal aid they receive is vague and harmful. The commenters opined that the proposed rule would bar institutions from providing counseling services and forbids any policy or procedure that persuades students not to over borrow. The commenters stated the proposed rule would deprive students of valuable information that they need to avoid overborrowing. The commenters further stated that the proposed rule should be replaced with language that expressly authorizes institutions to engage in counseling practices aimed at discouraging over-borrowing, including consultations

aimed at discouraging students from borrowing more than amounts needed to cover school charges, except to the extent that the student has a demonstrable need for additional funds to pay for living expenses.

*Discussion:* We disagree with the commenters' concern that policies and procedures limiting the amount of Federal aid is harmful to students. As explained elsewhere in the rule, we believe it is critical that students have access to the Federal aid to which they are entitled, especially to cover necessities like food and housing. The final rule would allow institutions to provide counseling to students, but it would prevent institutions from establishing obstacles or inducements against borrowing as a matter of practice and policy.

*Changes:* None.

*Conditions for Provisionally Certified Institutions (§ 668.14(e))*

*Comments:* One commenter supported the Department's inclusion of a non-exhaustive list of conditions that the Department may apply to provisionally certified institutions. This commenter agreed that the list provides several tools that the Department can use in appropriate circumstances to protect students and safeguard the integrity of the title IV system. This commenter argued that it was important that the list be explicitly non exhaustive to preserve the Department's flexibility to impose additional conditions where appropriate to respond to the highly varied, situationally specific compliance issues faced by institutions seeking certification or recertification.

*Discussion:* We appreciate the commenter's support.

*Changes:* None.

*Comments:* One commenter cited recent research from the State Higher Education Executives Officers Association (SHEEO) to show the significant harm students suffer when their college closes suddenly. The commenter explained that the SHEEO report found that less than half of students impacted by a school closure ended up enrolling elsewhere and that less than half of those who did enroll completed their program of study. Given the significant threat that schools at risk of closure pose to students and taxpayers, the commenter supports the Department's proposal to set additional conditions on institutions deemed at risk of closure. However, the commenter is concerned that because closures can happen very rapidly, requiring schools at risk of closure to have just a teach-out plan is not enough. The commenter noted that teach-out plans require time,

staff, and significant effort to convert into actual teach-out agreements, which are all things institutions at risk of closure often do not have at their disposal. Therefore, the commenter urged the Department to require institutions at risk of closure to submit teach-out agreements, and not only teach-out plans.

*Discussion:* The Department appreciates the commenter's support. As noted in the language, the Department has the discretion to request either a teach-out plan or agreement when we think that a provisionally certified institution is at risk of closure. This provides the flexibility to require either a plan or agreement depending on the level of concern.

*Changes:* None.

*Comments:* Many commenters asserted § 668.14(e) exceeds the Department's authority under section 498 of the HEA. These commenters claimed that although section 498(h) of the HEA provides the Department with limited authority to provisionally certify certain types of institutions, they argue that there is no corresponding authority for the Department to assert additional conditions on those institutions. These commenters argued that if Congress had intended to give the Department the authority to impose restrictive conditions on provisionally certified institutions, they would have made that clear in section 498(h) or in another provision of the HEA.

In conclusion, these commenters suggested that the Department clearly define its authority to apply conditions to provisionally certified institutions, specifically how the Department would determine what is necessary or appropriate for an institution, including the addition of criteria and a materiality standard. These commenters also would like the opportunity to converse with the Department about the imposition of such conditions, including appropriate appeal rights in the event of an adverse decision ensure this authority is used properly. These commenters claimed such checks on the Department's authority is particularly important if the Department's list of conditions remains non exhaustive.

*Discussion:* We disagree with the commenters. HEA section 498(h) provides that the Secretary may provisionally certify an institution's eligibility to participate in the Federal student aid programs. This provides for an alternative certification method compared to full certification. While the HEA does not provide for imposing conditions explicitly, it inherently provides the Secretary with flexibility in how the Department certifies those

institutions where financial risks or administrative capability concerns are present. Furthermore, HEA section 498(h)(3) provides the Secretary with the authority to terminate an institution's participation at any time during a period of provisional certification if the Secretary determines the institution is unable to meet its responsibilities.

*Changes:* None.

*Comments:* While expressing disapproval of § 668.14(e), some commenters listed a few conditions they would like to see revised if the Department moves forward with this rule. Namely, the revision of limitations on the additions of new programs and locations and on the rate of growth of new enrollment by students, pointing out that these conditions may inhibit an institution's ability to provide high-quality educational programming or to secure funds sought by the Department to show financial responsibility, thereby making such conditions counterproductive for institutions and the Department. These commenters also claimed that the proposed conditions would impede the Department's goal of providing students with the best educational programs at the best possible prices by inhibiting an institution's ability to revise or introduce programs consistent with new trends and employer demands. These commenters highlighted that for career schools in particular, the ability to adjust and to adapt to new technologies is essential to prepare students for current job markets. These commenters are concerned that an institution could be prevented from making a necessary change to its programs due to Department imposed conditions, and students taking outdated programs may, unnecessarily, be at a competitive disadvantage when applying for jobs. These commenters emphasized that these concerns could lead to lower starting salaries or poorer career outcomes for students, both of which would be harmful to students, employers, and the taxpayers supporting title IV programs.

*Discussion:* The Department affirms the need for the ability to put conditions on a provisionally certified institution. A school in this position is exhibiting some concerning signs that merits additional oversight and work to protect taxpayer investments and students. We are concerned that allowing a risky institution to continue growing or adding new programs could increase the total amount of exposure to closed school discharges and result in greater disruptions for students. We believe addressing those concerns are more

important than the hypothetical benefits identified by commenters. The conditions laid out in this section would not prevent an institution from improving its existing programs, especially since the Department does not consider issues like curricula. The Department will consider which of these conditions are most appropriate for each provisionally certified institution it reviews.

*Changes:* None.

*Comments:* One commenter expressed concerns with the list of conditions for provisionally certified schools being prefaced with ''including, but not limited to'' as it would give the Department the discretion to impose virtually any condition it wants. The commenter stated this notion is further confirmed in the NPRM's preamble when it says the Department will add to this list of conditions at a later date. The commenter asserted that the potential conditions on provisionally certified schools will make it more difficult for institutions to enter transactions. This commenter emphasized that transactions often provide significant benefits to students as transaction partners can provide additional resources to improve or expand an institution's educational offerings. This commenter warned that if the proposed rules take effect, potential buyers or merger partners would be less likely to undergo transactions due to the risk that the institution, which would participate provisionally, would be subject to conditions that prohibit the very purpose of the transaction (*e.g.,* to invest in and expand educational offerings). Also, this commenter stated that the risk is exacerbated by the Department's non-exclusive list of conditions, as transaction partners would have to weigh the benefits of the transaction against unknown regulatory conditions. This commenter concluded that such uncertainty would make it very difficult for a rational business actor to enter a transaction.

This commenter is also concerned that the Department would, as a routine matter, impose all available conditions on all provisionally certified schools. This commenter believes the Department has recently started imposing growth restrictions as a consequence of all transactions when they were previously reserved for transactions involving buyers without one or two complete years of audited financial statements. This commenter agreed the Department should be required by regulation to identify a specific concern the Department has about a provisionally certified institution when imposing conditions

on that institution. This commenter is concerned with the ease in which the Department could place an institution on provisional certification, coupled with the breadth of potential conditions and the risk that would be universally applied because the Department is essentially promulgating conditions that would be applicable to virtually the entire private postsecondary sector. This commenter urged the Department to revise the list of conditions that would be placed on provisionally certified schools by making the list exhaustive rather than non-exhaustive, requiring the Department to tailor conditions imposed on individual institutions and explain each condition and create a process for institutions to appeal the imposition of one or more conditions.

*Discussion:* The Department affirms the importance of a non-exhaustive list. Proper oversight of institutions of higher education necessitates flexibility to apply conditions that the Department deems critical to address specific issues identified at institutions. With thousands of institutions to oversee, it would not be possible to anticipate every single situation the Department might uncover that requires addressing. Providing the non-exhaustive list of conditions provides some important clarity to the field about the general types of conditions the Department would consider. This helps them know the most common types of conditions that might be employed.

With respect to growth conditions, the Department includes this condition currently when we are worried about the condition of the institution following a change in ownership. This growth condition is not applied universally. It is possible that the commenter is simply more aware of riskier changes in ownership.

*Changes:* None.

*Comments:* Two commenters raised concerns about proposed § 668.14(e)(9). One commenter raised concerns that the provision lacks sufficient definition, violates First Amendment protections, and grants the Secretary sweeping authority to impose burdensome restrictions on an institution that may interfere with the institution's ability to timely deliver necessary information to the student.

Two commenters raised concerns that this proposal would allow the Secretary to rely on mere allegations, which may include speculative and unreliable information without providing those institutions access to due process or testing before a judge or regulatory authority.

One of the commenters objected to basing this provision on

misrepresentations instead of substantial misrepresentations. The commenter said this distinction is particularly important because only substantial misrepresentations are a ground for borrower defense, while a misrepresentation may be an inadvertent or immaterial statement.

Third, one of the commenters said it would be unreasonable for the Department to review all the marketing and other recruitment materials. They noted that any delay caused by reviewing these materials would harm the ability of students to make informed enrollment decisions and achieve academic success. Further, this commenter is concerned with the proposal being silent on what the Secretary would be reviewing in the materials submitted to them, which would open the door to the Department interfering with aspects of the materials that have no connection to delivering accurate, non-deceptive information to students.

The same commenter also said the provision runs afoul of well-established First Amendment jurisprudence designed to prevent unjustified government interference in commercial speech. The commenter noted that before commercial speech can be subject to prior restraint, the Supreme Court requires a determination that the speech is false or misleading. The commenter argued that the proposal ignores this requirement and instead mandates review of any alleged misrepresentation, failing to provide any determination that the speech is false or misleading. The commenter claimed this unfettered discretion is impermissible because virtually any amount of discretion beyond the merely ministerial is suspect and standards must be precise and objective. Moreover, the commenter stated that regulation of commercial speech must not be more extensive than is necessary to serve governmental interest. The commenter stated that this requires narrow, objective, and definite standards which are necessary to cure the problem of unbridled discretion characterizing prior restraints. The commenter noted that the absence of a final deadline constitutes a prior restraint of unlimited duration that would not pass constitutional muster.

*Discussion:* The Department agrees with the commenter in part. First, we agree that it would be prudent to align the standards for misrepresentation to what is under part 668, subpart F, as that provides the basis for why the Department would be concerned about the misleading nature of statements. That means clarifying this provision is

related to substantial misrepresentations.

Second, we agree that allegations are not a sufficient bar for applying this condition as it would not be consistent with how the Department has constructed the other parts of this rule, such as the financial responsibility triggers. To address this, we have removed allegations and instead focused it on when an institution is found to have engaged in substantial misrepresentations.

We believe these two changes address the other concerns raised by the commenter. In this situation the Department would be responding directly to a finding that the institution engaged in substantial misrepresentations, aggressive and deceptive recruitment as defined under part 668, subpart R, or the incentive compensation rules, which are in § 668.14(b)(22). As the Department's review would be directly related to the issues identified we believe the nexus sought is clear.

With regard to the burden of submitting materials for review, the Department believes reviewing marketing and recruitment materials is a reasonable step for institutions in this situation. The schools affected by this provision will have been found to have engaged in violations directly related to their recruitment processes. Two of the three provisions also potentially have a direct connection to borrower defense to repayment, which means those actions may have resulted in approved discharges for borrowers that have to be reimbursed. When such situations occur, the Department must have confidence that the concerning behavior has been remedied. Receiving these materials allows the Department to ensure that the institution has corrected its issues. Absent such abilities, the Department may otherwise have to consider terminating the institutions if we are not confident it can recruit students without resorting to activity that runs afoul of the HEA and its regulations.

*Changes:* We have revised § 668.14(e)(9) to say, "For an institution found to have engaged in substantial misrepresentations."

*Comments:* See earlier comments related to the directed question for financial responsibility triggers in § 668.171.

*Discussion:* In the NPRM, the Department included a directed question asking about whether there should be a financial responsibility trigger in § 668.171 related to when an institution receives a civil investigative demand, subpoena, request for

documents or information, or other formal or informal inquiry from any government entity (local, State, Tribal, Federal, or foreign). While the Department did not include a trigger for this issue in the regulatory text, it did include a reporting requirement for it in proposed § 668.171(f)(1)(iii).

In response to comments provided in the financial responsibility component of the regulations, the Department is persuaded that it would not be appropriate to include a trigger related to just the receipt of such requests as they may not ultimately result in actions by government authorities. Absent a trigger, it is thus not appropriate to have a reporting requirement for those items in the financial responsibility section. However, the Department does think having institutions report this information to us is important, as it can help identify issues that might need further monitoring. Accordingly, we have relocated the provision that was in § 668.171(f)(1)(iii) to a new § 668.14(e)(10). We believe that applying this to institutions that are at risk of closure is appropriate as the Department has in the past seen institutions suddenly close following years of government investigations at the State and Federal level.

In moving this provision, the Department also considered comments received on this language when it was a financial responsibility reporting requirement. In particular, we were persuaded by concerns that the language was too broad or confusing. For those reasons, we have removed informal requests from this language, since the standard for what is an informal request is not clear. We have also further clarified that the types of requests that would be reported should be related to marketing or recruitment of prospective students, the awarding of Federal financial aid for enrollment at the school, or the provision of educational services for which Federal aid is provided. We chose these areas because they are ones that relate to the possibility of borrower defense to repayment claims, which can be a source of liability, as well as the Department's rules on misrepresentation and aggressive and deceptive recruitment in part 668, subparts F and R. We think these are appropriate to request of institutions that are at risk of closing because we are concerned about potential liabilities from such institutions and whether they would be repaid.

*Changes:* We have added new § 668.14(e)(10) as described.

*Change in Ownership From For-Profit to Nonprofit Status (§ 668.14(f))*

*Comments:* Several commenters agreed with the Department's proposed § 668.14(f) and the rationale that the changes would allow for more rigorous oversight of institutions that as a group have had problematic conversions and that have been at heightened risk of harming students and taxpayers.

One commenter supported the change in ownership provisions included within certification procedures. This commenter cited a recent GAO report that suggested a former owner or other senior institutional official played an inappropriate insider role in the transaction in a third of the conversions it reviewed. The commenter asserted that given these findings, the requirements that any institution attempting a conversion must continue to comply with the 90/10 rule, comply with restrictions on advertising itself as a non-profit, and provide reporting on any relationship between a former owner and the new entity are vital protections.

*Discussion:* We thank commenters for their support.

*Changes:* None.

*Comments:* One commenter suggested that as the Department oversees schools changing from a for-profit to nonprofit status, that it also considers that such schools typically maintain high tuition when compared to State and community colleges that offer similar programs. This commenter believed that if the new regulations allow this, that loophole should be closed, or the new rules would be worthless.

*Discussion:* We are expressly prohibited from regulating postsecondary institutions' tuition. Currently the HEA regulates the amount of money an individual can receive, not how much an institution can charge.

*Changes:* None.

*Comments:* One commenter said they submitted extensive material and recommendations for the proposed GE regulations in subpart S and advised that institutions undergoing the conversion to a nonprofit status not be required to adhere to subpart S as proposed in § 668.14(f) until the Department revises its framework in accord with the commenter's GE recommendations.

*Discussion:* The Department addressed the comments related to GE in the separate final rule related to this topic. Conversions are an ongoing concern for the Department. We do not think it would be appropriate to delay our review of that issue, because it encompasses issues that go above and beyond items related to GE.

*Changes:* None.

*Comments:* One commenter argued against the proposed changes for schools undergoing a conversion to nonprofit status because they believed the rules the Department has already implemented with the final regulations of October 2022 ensure that nonprofit buyers are legitimate, and that requiring monitoring or prohibiting relationships with the institution's prior owner is sufficient. This commenter also asserted that the proposal to require the submission of two complete fiscal years of compliance audits and financial statements imposes an unnecessary waiting period on schools. The commenter is concerned that given that the Department has taken a long time, more than a year in some cases, to complete its review of audits and statements, that could mean that a school seeking approval would have to continue to comply with GE and 90/10 rules for several years after the purchase and conversion took place. Instead of allowing for such delays, the commenter suggested that once the Department has approved the transaction and related conversion, it should regulate the school as a legitimate nonprofit entity.

*Discussion:* We disagree with the commenters. The regulations here give the Department the ability to monitor risks associated with conversions from proprietary to nonprofit status, including but not limited to improper benefit to former owners of the institution or other affiliated individuals or entities. The requirement for continued 90/10 and GE reporting is included so that conversions cannot be used to circumvent those rules.

*Changes:* None.

*Comments:* Several commenters approved of the Department's rigorous review of changes in institutional ownership to convert to non-nonprofit status in § 668.14(f) and (g). One commenter agreed that an enhanced review of conversion attempts, including, as noted in the NPRM, monitoring IRS-institution communications, would alert the Department to covert conversion attempts.

Another commenter supported the Department's proposal to set out PPA conditions for institutions converting from for-profit to nonprofit status, stating that this proposal will protect consumers and will strengthen the Department's ability to monitor converted for-profit institutions. This commenter agreed that the proposed rule would add important safeguards to the conversion process by requiring institutions seeking to convert from for-profit to nonprofit status to continue to

meet all the of regulatory requirements applicable to for-profit colleges for a period of the later of years under the new ownership, or until the Department approves the institution's request to convert to nonprofit status. This commenter argued that in recent years, several for-profit colleges have purported to convert from a for-profit to a nonprofit, sometimes while maintaining financial arrangements that continue to benefit the previous for-profit owner, calling into doubt whether the nonprofit label really fits. This commenter also supported this provision requiring converting institutions to submit regular reports on agreements entered with a former owner of the institution or a related person or entity. This commenter asserted this would help the Department monitor and assess whether the converted nonprofit's arrangements with the former owner are appropriate and whether the institution is in fact operating as a nonprofit. This commenter also strongly supported the provision that would prohibit an institution from advertising that it operates a nonprofit until the Department approves the institution's request to convert to a nonprofit institution.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comments:* One commenter argued that requiring extended compliance in § 668.14(f) and (g) will limit buyers who are legitimate nonprofit entities. This commenter noted that the Department's soon to be effective change in ownership regulations already address the Department's underlying concerns by ensuring nonprofit buyers are legitimate and monitoring or prohibiting (in some cases) relationships with the institution's prior owner. The commenter therefore believes there is no need for the Department to require a converting institution to comply with regulations applicable to for-profit schools after the Department has approved the conversion. As written, the commenter stated, converting institutions would have to continue to comply with the gainful employment and 90/10 rules for the later of the Department's approval of the conversion to nonprofit status and the Department's acceptance, review, and approval of financial statement and compliance audits covering two full fiscal years under the new nonprofit ownership. They mentioned that this second prong related to acceptance of financials could greatly extend the post-transaction compliance period. The commenter explained that for example an

institution with a calendar year fiscal end undergoing a change in ownership and nonprofit conversion in March 2025 would not submit the second full fiscal year of financials to the Department until mid to late 2028. According to the commenter, the Department has recently taken an increasingly long time (including well over a year) to review and approve financial statement submissions, so it is very possible the institution would have to comply with the gainful employment and 90/10 rules until well into 2029 which would be over four years after the transaction occurred. The commenter stressed that the Department has already promulgated regulatory changes to ensure that converting institutions involve legitimate nonprofit entities so they are unclear why the Department feels such institutions should also comply with for-profit regulations for such an extended period of time. The commenter emphasized that this timeframe would make legitimate nonprofit entities reluctant to acquire for-profit institutions and ensure they operate on a nonprofit basis. The commenter recommends the Department revise the proposed regulatory language to require converting institutions comply with the gainful employment and 90/10 rules only until the Department has had a chance to approve the transaction and related conversion. The commenter argued that once the Department has made a determination that the institution and/or its new owner is a legitimate nonprofit entity, it should be regulated as such.

*Discussion:* The Department disagrees with the commenters. It is true that the regulations related to change in ownership that went into effect on July 1, 2023, addressed the process for reviewing attempts to convert from a for-profit to a nonprofit status in ways that will identify unacceptable continuing relationships with former owners. However, we also do not want institutions engaging in conversions solely as a means of evading accountability provisions that are specific to either for-profit institutions or certain programs they offer, such as the GE requirements. Accordingly, continuing to have an institution abide by GE and 90/10 requirements will reduce the likelihood that an institution converts solely to avoid accountability consequences. We note this approach is similar in concept to how the Department monitors an institution's finances more carefully for multiple years after a change in ownership occurs.

The Department disagrees with concerns about the timelines and their effect on nonprofits purchasing for-profit institutions. Keeping institutions subject to these provisions for a few more years serves as an added protection that institutions will be operating legitimately as nonprofits. Absent this condition the Department is concerned that institutions would simply convert to nonprofit status solely as a means of avoiding accountability and not because of a determination that that is the best way to serve students. We anticipate that institutions purchase institutions for long-term operation. Another few years of oversight is thus eminently reasonable.

*Changes:* None.

*Comments:* One commenter stated that the proposed changes for financial responsibility, the PPAs, and administrative capability are good steps forward because such proposals will prohibit known bad actors from simply setting up shop under a new name and continuing to access Federal funds. The commenter stated this final rule will allow more oversight of programs at risk of closing for failure to meet GE metrics. However, the commenter urged the Department to further mitigate the risk of institutions failing to meet Federal requirements and creating risky financial situations for students and taxpayers. The commenter suggested setting preemptive conditions for initially certified nonprofit institutions as well as for institutions that have undergone a change in ownership and seek to convert to nonprofit status. The commenter noted that these preemptive conditions would help the department monitor risks associated with some for-profit institution conversions, such as the risk of improper benefit to the school owners and affiliated people and entities.

*Discussion:* The Department appreciates the commenter's support. We will continue to review changes of ownership, including changes from for-profit to nonprofit status, and add conditions to institutions that we deem appropriate.

*Changes:* None.

**Ability To Benefit (ATB) (§§ 668.2, 668.32, 668.156, and 668.157)**

*General Support*

*Comments:* Many commenters supported the consensus language and noted that the regulations will add much needed clarity to the ATB and eligible career pathway program (ECPP) processes.

*Discussion:* We thank the commenters for their support.

*Changes:* None.

*General Opposition*

*Comments:* One commenter believed that ATB alternatives are flawed and do more harm than good for students. The commenter suggested that we eliminate ATB completely.

*Discussion:* ATB and ECPPs are authorized by the HEA. Furthermore, giving ATB students access to high-quality programs can help put them on a path to long-term success.

*Changes:* None.

*General Comments*

*Comments:* One commenter stated that the Department only indicated that it was going to regulate on § 668.156 the Approved State Process in the request for negotiator nominations yet went beyond that during rulemaking and regulated on eligible career pathway programs.[39]

*Discussion:* The Department announced topics for the rulemaking, that as the commenter mentions, included ATB. One of the three ATB alternatives is the Approved State Process ("State process" or "process") which falls under § 668.156. Under that process, a non-high school graduate could receive title IV, HEA, Federal student aid for enrollment in an institution that is participating in the State process. In both the NPRM and these final regulations, we are establishing that those institutions that participate in the State process must meet the definition of an ECPP. For these reasons, we believe that ECPPs are tied to the ATB alternatives and are a logical outgrowth of the regulatory process to discuss how ECPPs are implemented and affect the State process.

*Changes:* None.

*Comments:* A few commenters noted that the data that the Department distributed during rulemaking showed that student enrollment through the ATB alternatives and ECPPs has decreased by over 50 percent since 2016. The commenters believed that increasing regulation on the State process could have a chilling effect on States and postsecondary institutions choosing to use the alternative.

*Discussion:* We disagree this regulation will have a chilling effect on States and postsecondary institutions choosing to use this ATB alternative. While the Department acknowledges that the State process has been used little to date, we also know there could be many reasons it has been underutilized. For instance, the data

shows that overall undergraduate enrollment has fallen significantly over the last several years.[40] It also shows a greater share of high school students graduating with a high school diploma or equivalency, and fewer people enrolling in postsecondary education, due at least in part to, demographic trends that show there are fewer high-school age individuals in the country.[41]

Nonetheless, we believe the changes to the ATB and ECPP processes will encourage their responsible usage by providing much-needed clarity. For instance, the current success rate requirement meant States had to admit students through a State process without the use of title IV aid to obtain the data necessary for the application (using prior- or prior-prior-year data). If the combined success rate for all the participating institutions in a State process is not 95 percent of what high school graduates achieved, no postsecondary institution in the State can admit students through the State process. With these final regulations, we created an initial application that does not require a success rate calculation. That will allow States and participating institutions time to collect the data for the success rate calculation and still allow access to title IV aid. We have also separated the success rate calculation in the subsequent application to account for individual participating institutions as opposed to a combined success rate for all participating institutions in the State. Finally, we have lowered the success rate calculation to 85 percent of what high school graduates achieved, giving states a better chance of success in the State process, while simultaneously ensuring positive outcomes for students.

We have also added clarity to ECPPs with these final regulations. Since 2014 the Department has provided guidance on ECPPs through a series of Dear Colleague Letters (DCL GEN 16–09 and 15–09). The DCLs help postsecondary institutions to implement ECPPs, but there are currently no regulations or clear documentation standards for ECPPs. We believe this has led to inconsistency in ECPPs, labeling of programs as ECPPs that do not meet the statutory threshold and a lack of authority for the Department to intervene. With these final regulations, we are defining ECPPs and clarifying the documentation requirements for them as well. We believe this will also serve to increase States' participation in the State process.

---

[39] 86 FR 69607.

[40] The case for college: Promising solutions to reverse college enrollment declines | Brookings.
[41] *https://knocking.wiche.edu/report/.*

*Changes:* None.

*Definitions (§ 668.2)*

*Comments:* Several commenters stated the Department should use the exact definition of "eligible career pathway programs" from section 484 of the HEA because it is consistent across three statues: the HEA, the Workforce Innovation and Opportunity Act of 1998, as amended (WIOA) and the Perkins Career and Technical Education Act of 2006, as amended Perkins IV. The commenters believe that the regulations should mirror the exact language in statute to avoid unintended consequences, loopholes, conflicts, confusion, or misinterpretations.

*Discussion:* As discussed in the preamble to the proposed rule, the definition of an ECPP is in large part a duplication of the statutory definition found in HEA section 484(d)(2) and has the same effect. The Department has only excluded the statutory language that reads "(referred to individually in this chapter as an 'apprenticeship,' except in section 171)." [42] That

exclusion has no impact on the definition's meaning and does not affect its alignment and consistency with the statutory definition.

*Changes:* None.

*Student Eligibility—General (§ 668.32)*

*Comments:* One commenter recommended that the Department communicate that technical changes made to § 668.32 were not done as a benefit to those enrolled prior to 2012, but rather as an unfortunate fact that those enrolled two decades ago were not required to experience program design and delivery innovations that focus intentionally on supporting their access and success. The commenter believed that since 2015 the Department has communicated the idea that pre-2012 ATB requirements were easier and better than new ATB and that these legacy students had the better option. The commenter also requested that the Department reveal the numbers of potential participants who could utilize the legacy provision.

*Discussion:* The changes made to § 668.32 are technical, required by

statute and were explained in 2012 through DCL GEN 12–09.[43] The Department does not view the legacy requirements in statute as fortunate or unfortunate, but rather a fact of the law. The Department is unable to know the potential number of participants that could use the legacy provision.

*Changes:* None.

*Approved State Process (§ 668.156)*

*Comments:* One commenter requested that the Department add the six services that participating institutions were required to offer each ATB student back to the final regulations.

*Discussion:* The six services were introduced in 1994—20 years prior to the introduction of ECPPs. Most ATB students who enroll and receive title IV aid will be required to enroll in an ECPP. The services required under the previous regulation are somewhat redundant to the requirements of an ECPP and they meet the same goals. Please see the chart below for a comparison.

| Previous services required under the State process | Requirements of ECPPs |
|---|---|
| * Orientation regarding the institution's academic standards and requirements, and student rights.<br>* Assessment of each student's existing capabilities through means other than a single standardized test.<br>* Tutoring in basic verbal and quantitative skills, if appropriate.<br>* Assistance in developing educational goals.<br>* Counseling, including counseling regarding the appropriate class level for that student given the student's individual's capabilities.<br>* Follow-up by teachers and counselors regarding the student's classroom performance and satisfactory progress toward program completion. | * Aligns with the skill needs of industries in the economy of the State or regional economy involved.<br>* Prepares an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937.<br>* Includes counseling to support an individual in achieving the individual's education and career goals.<br>* Includes, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational Cluster.<br>* Organizes education, training, and other services to meet the needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable.<br>* Enables an individual to attain a secondary school diploma or its recognized equivalent, and at least 1 recognized postsecondary credential.<br>* Helps an individual enter or advance within a specific occupation or occupational cluster. |

*Changes:* None.

*Comments:* One commenter requested that the Department increase the initial period under § 668.156(b) from two to three years.

*Discussion:* We believe that two years is adequate time for the State to gather the data necessary to determine a success rate (outcome metric for the ECPPs) to reapply to the Department. If a participating institution does not enroll any ATB students through its State process under § 668.156(g)(2), we

will grant the State a one-year extension to its initial approval.

A State begins its initial period after its first application has been approved by the Department. During the initial two-year period, the participating institutions will not be subject to outcomes metrics about their ECPPs. Instead, a participating institution will be required to demonstrate that it does not have a withdrawal rate of over 33 percent and there will be a cap on enrollment of ATB students in ECPPs. In the subsequent application (the

application to be submitted two years after the initial application was submitted), the participating institution will be required to calculate a success rate. The success rate is a metric directly related to the ECPPs the participating institution offers.

As mentioned in the NPRM, we believe, that the two-year initial period is a necessary guardrail against the rapid expansion of ECPPs through the State process. These protections are particularly important because as mentioned above the required success

---

[42] As we observed in the NPRM, the statute's reference to "section 171" may have been intended as a reference to section 171 of the Workforce Innovation and Opportunity Act, Public Law 113–

128, which is in section 3226 of title 29, Labor. Neither the National Apprenticeship Act nor the HEA contains a section 171.

[43] *https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2012-06-28/gen-12-09-subjecttitle-iv-eligibility-students-without-valid-high-school-diploma.*

metric is no longer included at the initial application of a State process.

*Changes:* None.

*Comments:* One commenter said that we should exempt States with processes approved prior to the effective date of this final regulation from the initial two-year period under proposed § 668.156(b).

*Discussion:* We believe it is clear that § 668.156(b) relates solely to a State applying for its first approval. States that had an approved process before the effective date of these regulations are not subject to the initial 2-year period. Those States will be subject to the new requirements under § 668.156(e) for the subsequent application.

*Changes:* None.

*Comments:* Many commenters requested that the Department remove the enrollment cap in the State process of no more than 25 ATB students or one percent of enrollment in an ECPP at each participating institution during the initial two-year period. These commenters believe that the cap will hamper innovation, restrict funding, is arbitrary, is too small to get an accurate data for the success rate calculation, and will disincentivize the use of the State process option.

*Discussion:* We disagree with the commenters' assertions about the enrollment cap. First, the enrollment cap is not arbitrary. As we stated in the NPRM, the enrollment cap is intended to serve as a guardrail against the rapid expansion of ECPPs during a period when there is no required success metric at the initial application of a State process. Additionally, although the Department started with an enrollment cap of 1 percent, it was a committee member, concerned about its impact on smaller institutions, who suggested that the cap be established as the greater of one percent of enrollment or 25 students at each participating institution. The Committee adopted that committee member's suggestion, and the Department incorporated it into these regulations.

This enrollment cap will not disincentivize the use of the State process option. As noted in this section, the clarifying amendments to these regulations, including a lower success rate of 85 percent, is likely to increase participation in the State process. Further the enrollment cap is only for a two-year period, that will be lifted upon successful reapplication to the Department.

*Changes:* None.

*Comments:* One commenter asked multiple questions about the definition of the enrollment cap in § 668.156(b)(2). They asked whether the Department

could enforce this requirement and whether the cap will only apply to the initial two-year period. They also asked whether the "cap" is a limitation on enrollment for postsecondary institutions that offer ECPPs or a cap on the number of ATB students who are eligible to receive title IV aid through the State process in the initial two-year period. Finally, they asked about the Department's statutory authority to institute a cap on the number of students who are eligible to receive aid under the ATB State process and whether the Department has the authority to limit access to title IV aid to eligible students.

*Discussion:* In terms of enforcement, the cap is a part of the State process, so enforcement of the cap is the State's responsibility. If the State is unable to enforce requirements in the regulation, the State may wish to take more time before applying to the Department to resolve internal control issues and may wish to apply later for an approved State process.

The cap is the limit on the number of ATB students at each participating institution who are eligible to receive title IV aid through the State process. It applies solely for the initial two-year period. It no longer applies once the subsequent application is approved.

The Department's authority for the enrollment cap stems from section 484(d)(1)(A)(ii) of the HEA, which gives the Secretary authority to determine the grounds for approval or disapproval of a State process.

*Changes:* None.

*Comments:* Several commenters requested lowering the success rate under § 668.156(e)(1) from 85 to 75 percent. These commenters believed that 75 percent would be a more reasonable target and help to encourage States to submit an application to the Department for the State process ATB alternative.

*Discussion:* Like the commenters, the Department seeks to encourage participation in the State process, provided there are appropriate protections in place for students. The negotiated rulemaking committee reached consensus on the 85 percent threshold after careful discussion, and we are not persuaded that the Department should deviate from the consensus language.

We believe that changing the requirement from a success rate of 95 percent to 75 percent would unduly compromise student protections built into this alternative. We believe a reduction to 85 percent best supports the Department's interests in increasing State participation in the State process,

while simultaneously ensuring positive outcomes for students.

In arriving at the 85 percent success rate, the Department considered relevant data on the use of the State process under the current regulations. Many States have not availed themselves of this alternative, despite it providing a pathway for non-high school graduates to gain access to title IV aid. Although the State process was authorized under section 484 of the HEA in 1994, the Department did not receive its first application until 2019. As of August 2023, only six States have applied to the Department to have a State process approved. In the approved States, student enrollment through the State process has been slow and relatively low. Several States reported single digit enrollment after years of Department approval.

We understand that States may be hesitant to apply, in part, due to the 95 percent success rate requirement. Given the modest enrollment figures, the bar may be set too high for a State to risk investing resources in the process only to have its application denied. For example, under the 95 percent success rate requirement, if the high school graduate success rate was 80 percent based on 10,000 students, but the success rate for non-high school graduates was 70 percent based on 10 graduates in the State process, the overall success rate would be 87.5 percent and that State would fail, meaning that every participating institution would be prohibited from awarding title IV aid to ATB students admitted through the State process. However, that State would meet an 85 percent success rate. Additionally, under these final regulations, the success rate of those participating institutions would now be calculated individually, and not collectively as a State. This would mean individual participating institutions could pass the 85 percent success rate calculation, even if other participating institutions in their State did not.

As the Department seeks to increase participation in the State process, it must also ensure that the State process results in positive outcomes for non-high school graduate students. The Department believes that lowering the success rate to 85 percent and applying it to participating schools individually, will best balance these interests, while encouraging States to apply for the State process and expand postsecondary options for students. We believe that a success rate below 85 percent would compromise quality and program integrity.

Despite these changes to the success rate, we believe it is important to note the 95 percent success rate served the Department's interest in ensuring that the State process offers a postsecondary pathway to students who are, non-high school graduates. Although we have determined to reduce the required success rate from 95 percent to 85 percent to help encourage States to establish these pathways, and determined that, even with such a reduction, there are adequate protections for students, ultimately, we believe that ensuring these programs create positive student outcomes is more important than simply increasing the number of participating States and, for that reason, favor a more rigorous success rate requirement.

*Changes:* None.

*Comments:* One commenter said that the 85 percent success rate is not an appropriate outcome indicator for the State process because they believed that quality should not be measured by the financial outcomes of program completers.

*Discussion:* The success rate calculation does not take financial outcomes into account. The success rate calculation is a persistence metric. Section 484(d)(1)(A)(ii) of the HEA requires the Department to consider the effectiveness of the State process in enabling students without a high school diploma to benefit from the ECPP. Since 1994, the Department has implemented this requirement by assessing the effectiveness of a State process through a success rate, which is a persistence metric and not an earnings metric.

*Changes:* None.

*Comments:* One commenter noted the Department proposed two new reporting requirements for the State process ATB alternative, yet there is no such reporting required under the ATB test, six credit-hour, or 225 clock-hour alternatives. The commenter contended that this could discourage participation in the State process alternative.

*Discussion:* These reporting requirements related to the State process are necessary for the Department to discharge its statutory obligations under section 484 of the HEA.[44] Section 484(d)(1)(A)(ii) requires the Secretary to consider the effectiveness of the State process in enabling students without secondary school diplomas or the equivalent thereof to benefit from the instruction offered by institutions utilizing such process, and also take into account the cultural diversity, economic circumstances, and educational preparation of the

populations served by the institutions. Through the additional reporting requirements in § 668.156(e)(3), States will provide the Secretary the information necessary to meet this statutory obligation. Specifically, § 668.156(e)(3) requires States to report information on the enrollment and success of participating students by eligible career pathway program and by race, gender, age, economic circumstances, and educational attainment, to the extent available. We have also added under § 668.156(h) that a State must submit reports on its process, according to deadlines and procedures that we publish in the **Federal Register**.

*Changes:* None.

*Comments:* Several commenters asked the Department to add linguistic status to the proposed reporting under § 668.156(e)(3). One commenter stated that knowing whether ATB supports new Americans is imperative for the future of not only many new Americans, but also the future labor market. The commenter recommended that we require reporting on other languages that are spoken at home and the self-reported English proficiency of students.

*Discussion:* We appreciate the commenters' suggestion. We will specify the data elements that must be reported in a notice published in the **Federal Register**. We will consider including linguistic status.

*Changes:* None.

*Comments:* One commenter asked the Department to broaden the Department's discretion under § 668.156(j)(1)(iii), which provides that the Department may lower the success rate to 75 percent (from the standard 85 percent) for two years if more than 50 percent of the participating institutions in the State fail to reach 85 percent. The commenter suggested that the Department should have the discretion to determine an appropriate success rate in circumstances that may extend beyond two years.

*Discussion:* Under § 668.156(j)(1)(iii), the Department may lower the success rate required under § 668.156(e)(1) from 85 to 75 percent if 50 percent or more participating institutions across all States do not meet the success rate in a given year. As discussed elsewhere in this document, through these regulations, the Department is lowering the otherwise applicable success rate from 95 to 85 percent. Given this easing of the requirement, we believe that two years will provide participating institutions sufficient time to comply with the regulations.

We also believe that having a standardized rate (75 percent) will help program integrity, data efficacy, and ensures consistency. We choose two years because that is the length of the initial approval period under § 668.156(b). We choose 75 percent, because we believe that is a reasonable exception and reduction from the 85 percent success rate requirement.

Under § 668.156(e)(1), each participating institution will calculate its own success rate. Previously, there was one collective success rate calculated for all participating institutions in the State. If flexibilities under § 668.156(j)(1)(iii) are invoked and a participating institution, or group of institutions, continues to have a success rate of less than 75 percent for more than two years, the State will need to remove the specific institution(s) from their State process, or risk revocation of its approval by the Department.

*Changes:* None.

*Eligible Career Pathway Program (§ 668.157)*

*Comments:* The Department received many comments requesting that we reconsider requiring the Department to approve nearly all ECPPs for ATB use. Commenters were concerned that this is a dramatic departure from the Department's current practice, and this could further discourage use of ATB and ECPPs.

*Discussion:* Currently, we do not approve individual career pathway programs for ATB use and have provided minimal guidance on documentation requirements. The Department is aware of compliance and program integrity concerns with programs that claim to offer an ECPP but do not offer all required components. While the Department believes that many institutions have made a good-faith effort to comply with the statutory definition, we believe it is necessary to establish an approval process in regulation to ensure program quality. Approving ECPPs would address these issues and allow ATB students served by ECPPs to receive better educational opportunities.

The Department, however, understands the concerns voiced through public comment and is persuaded based on the data released during negotiated rulemaking[45] that approving almost every ECPP for ATB use could add too much regulatory and

---

[44] 20 U.S.C. 1091.

[45] *www2.ed.gov/policy/highered/reg/hearulemaking/2021/analysisofatbusage.pdf. www2.ed.gov/policy/highered/reg/hearulemaking/2021/atbusagedata.xlsx.*

operational burden for postsecondary institutions.

In the final rule, the Department balances the consumer protection and burden concerns by instead limiting the Department approval to the first ECPP offered by an institution for ATB students. The Department will also maintain the authority to review ECPPs beyond the first one if the Secretary deems it necessary. This approach is similar to the Department's approval of prison education programs in part 668, subpart P, and direct assessment programs in § 668.10. If an institution already offers an ECPP, the Department will require the institution to apply for and obtain affirmative verification that the ECPP meets the standards as outlined in these new regulations in order to enroll students in the ECPP through ATB. The postsecondary institution will also need to affirm that any other ECPPs that the school offers for ATB use also comply with the new regulatory standards and documentation requirements. If the ECPP fails to meet the new standards as outlined in regulation on or after the effective date, then the ECPP will lose eligibility for ATB students who wish to use title IV aid to enroll, and the Department reserves the authority to evaluate other eligible ECPPs that enroll ATB students (if any) at the postsecondary institution. Please note that if an ECPP loses ATB title IV eligibility that does not mean that it loses overall title IV program eligibility, it just means that an ATB student could not receive title IV aid to enroll in the program. Only students with a high school diploma or its recognized equivalent could receive title IV aid to enroll in an eligible program that has lost its ECPP designation.

If the institution does not offer an ECPP, then the institution will be required to apply to the Department and have its first ECPP approved by the Department prior to offering title IV aid to enrolled students in the ECPP through ATB. The postsecondary institution will also need to affirm that any and all other ECPPs that the school offers to ATB students also comply with the new regulatory standards and documentation requirements.

Through this approach the Department will know who is offering an ECPP through ATB and that at least the first offering meets requirements.

*Changes:* The Department has amended § 668.157(b) and (c) to require the approval of one ECPP at each participating institution. If an institution already offers an ECPP for ATB use, it must apply for and obtain affirmative verification that the ECPP meets the regulatory standards in order

to continue enrolling ATB students in the ECPP and affirm that any other ECPPs that it offers to ATB students also comply with the standards and documentation requirements.

The Department has also omitted § 668.156(a)(3), which would have required the Department to verify a sample of ECPPs that enroll ATB students through the State process alternative, as noted above, one ECPP will be approved per postsecondary institution, including those that enroll students through the State process.

*Comments:* Several commenters requested that the Department detail the ECPP approval process in regulation. One commenter further suggested that the Department should delay final ATB regulations until it has done so.

*Discussion:* The Department declines to regulate on the approval process. Regulating the process reduces the Department's ability to quickly adapt the process to better meet the needs of ATB. However, we will release sub-regulatory guidance on ATB and ECPPs as needed.

The Department will release an ATB ECPP application form prior to the effective date of the regulations. All information collections are required to go through an approval process that includes two separate timeframes for the public to comment. Therefore, there will be additional public feedback received through that process.

*Changes:* None.

*Comments:* Several commenters asked whether institutions could continue offering eligible ECPPs while the approval process is ongoing. The commenters also asked if the Department would work with institutions if an ECPP is not approved for ATB use and expressed concern about whether institutions would have sufficient funding and staff to complete the approval process.

*Discussion:* Postsecondary institutions can continue to offer eligible ECPPs to ATB students while a Department review is pending. The Department will release information about the approval process through sub-regulatory guidance. The Department will not hold a postsecondary institution liable if its ECPP does not meet the documentation standards in these new regulations prior to July 1, 2024. The Department will however continue to hold a postsecondary institution liable if we determine that the postsecondary institution did not make a good-faith effort (as outlined in the seventh question in DCL GEN 16–09) to comply with the statutory definition of an ECPP which has been in law since 2014. The Department will

work with postsecondary institutions when issues arise regarding the continued title IV eligibility of their ECPP(s); however, ECPPs that fail to meet the regulatory definition on or after the effective date of these regulations may lose title IV eligibility for ATB students for failure to comply. We do not believe that the approval requirements are unduly burdensome and note, regarding the commenters' concerns about funding and staff, that the Department is amending the regulations to require the approval of one ECPP as opposed to almost all ECPPs offered for ATB, so the burden to complete the approval process will be limited.

*Changes:* None.

*Comments:* One commenter stated that the Department should publish on its website the basis for its conclusions that an ECPP submitted by a postsecondary institution does or does not comply with the HEA and Department ATB regulations for all programs it reviews to show that the Department is not using its review process to target and eliminate proprietary institution programs.

A few commenters believed that the Department's reference to curtailing bad actors in the NPRM was a veiled reference to ECPPs at proprietary institutions.

*Discussion:* The standards in the ATB and ECPP regulations apply to all postsecondary institutions and the Department will continue to review all ECPPs pre-July 1, 2024, based on the statute and post July 1, 2024, based on the statute and regulations. When an ECPP is denied, that institution will be informed of the reason for the denial. If we observe trends or common reasons for denials, the Department will consider issuing additional information, but we do not plan to publish individual denials. Inquirers may be able to file a Freedom of Information Act requested for that information.

*Changes:* None.

*Comments:* One commenter noted that the Department's documentation requirement under § 668.157(a)(1)(iii) is redundant to the requirement under § 668.157(a)(1)(ii) and that the Department should change § 668.157(a)(1)(iii) to reference integrated education and training as defined in 34 CFR 463.35.

*Discussion:* The Department does not believe the documentation requirements are redundant. Documentation requirements under § 668.157(a)(1)(ii) required an institution to demonstrate that a student enrolled in an ECPP receives adult education and literacy services under § 463.30. The adult

education and literacy services under §463.30 include eight different programs activities, and services, and the regulatory text uses an ''or'' and not ''and'', meaning that the services do not necessarily have to include ''workforce preparation activities'' in §463.30(g) as long as one other service under §463.30(a) through (f) or (h) is incorporated. We believe that the reference to workforce preparation activities under §668.157(a)(1)(iii) is important to maintain in the case that workforce preparation activities are not included in the ECPP under §668.157(a)(1)(ii). Furthermore, our regulations specify the definition of ''workforce preparation activities'' as defined in §463.34.

We do not believe that it is necessary to reference §463.35 because the requirements under §668.157(a)(5) essentially uses the definition of integrated education and training.

*Changes:* None.

*Comments:* A few commenters recommended that the Department change the reference to secondary education in §668.157(a)(5) to adult education.

*Discussion:* The Department declines to make this change because the commenter did not provide sufficient rationale. However, we are going to delete the word ''secondary'' to align with the language of the statute, which references ''education'' broadly. Section 484(d)(2)(D) of the HEA states that the ECPP must include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster.

*Changes:* We have removed the word ''secondary'' from §668.157(a)(5).

*Comments:* One commenter asked the Department to provide more detail on academic and career services in §668.157(a)(4) and workforce preparation activities and training in §668.157(a)(5). The commenter contended that the Department has not established baseline requirements and that it is unclear where, how, or when the Department will create them.

*Discussion:* The Department declines to further change §668.157. We established baseline requirements by requiring that postsecondary institutions maintain specific documentation that will validate their ECPPs for ATB use upon request of the Department. As stated throughout this final rule, previously the Department did not have ECPP approval requirements for ATB. The Department does not seek to regulate in a way that will curtail flexibility in a

postsecondary institution's ECPP. However, the Department expects the institution to be able to document its position that the ECPP meets the HEA and regulation definition of an ECPP.

The Department intends to release sub-regulatory guidance on this topic.

*Changes:* None.

**Executive Orders 12866 and 13563**

**Regulatory Impact Analysis**

Under Executive Order 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is ''significant'' and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866, as amended by Executive Order 14094, defines a ''significant regulatory action'' as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $200 million or more (as of 2023 but adjusted every 3 years by that Administrator of the Office of Information and Regulatory Affairs (OIRA) for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities;

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive Order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

This final regulatory action is not anticipated to have an annual effect on the economy of more than $200 million. The Department has not historically estimated that there is a significant budget impact on changes to Financial Responsibility, Administrative Capability, Certification Procedures, and ATB, and anticipates that this will continue in the final rule. The Financial Responsibility regulations would be the most likely to result in transfers if the Department collects on a letter of credit or funds in an escrow account to offset the costs of unpaid liabilities or discharges related to closed schools or borrower defense to repayment. However, the Department has not consistently had significant financial

protection to cover those types of liabilities, so we have taken a more conservative approach to not assume any savings from these provisions. Potential effects of collecting on greater amounts of financial protection are instead captured as a sensitivity analysis.

However, the issues in this final regulation are significant because they raise legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order. Therefore, this regulation is subject to review by OMB under section 3(f)(1) of Executive Order 12866 (as amended by Executive Order 14094). We therefore have assessed the potential costs and benefits, both quantitative and qualitative, of this regulatory action and have determined that the benefits will justify the costs.

We have also reviewed these regulations under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866 (as amended by Executive Order 14094). To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency ''to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible.'' The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include ''identifying

changing future compliance costs that might result from technological innovation or anticipated behavioral changes.''

We are issuing these regulations only on a reasoned determination that their benefits will justify their costs. In choosing among alternative regulatory approaches, we selected those approaches that maximize net benefits. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in Executive Order 13563.

We also have determined that this regulatory action will not unduly interfere with State, local, territorial, or Tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, summarize the key changes from the NPRM to the final rule, respond to comments related to the RIA in the NPRM, discuss the potential costs and benefits, estimate the net budget impacts and paperwork burden as required by the Paperwork Reduction Act, and discuss regulatory alternatives we considered.

The regulatory actions related to Financial Responsibility, Administrative Capability, and Certification Procedures provide benefits to the Department by strengthening our ability to conduct more proactive and real-time oversight of institutions of higher education. Specifically, under the Financial Responsibility regulations, the Department can more easily obtain financial protection to offset the cost of discharges when an institution closes or engages in behavior that results in approved defense to repayment claims. The changes to the Certification Procedures rules allow the Department more flexibility to increase its scrutiny of institutions that exhibit concerning signs, including by placing them on provisional status or adding conditions to their PPA. For Administrative Capability, we are expanding the requirements to address additional areas of concern that could indicate severe or systemic administrative issues in properly managing the title IV, HEA programs, such as failing to provide adequate financial aid counseling including clear and accurate communications or adequate career services. Enhanced oversight ability better protects taxpayers and helps students by dissuading institutions from engaging in overly risky behavior and encouraging institutions to make improvements. These benefits come at the expense of some added costs for institutions to acquire additional

financial protection or potentially shift their behavior. The Department believes these benefits of improved accountability outweigh those costs. There could also be limited circumstances in which an institution that was determined to lack financial responsibility and required to provide financial protection could choose to cease participating in the Federal aid programs instead of providing the required financial protection. The Department believes this would be most likely to occur in a situation in which the institution was already facing severe financial instability and on the verge of abrupt closure. In such a situation, there could be transfers from the Department to borrowers that occur in the form of a closed school loan discharge, though it is possible that the amount of such transfers is smaller than what it would otherwise be as the institution would not be operating for as long a period as it would have without the request for additional financial protection. However, the added triggers are intended to catch instances of potential financial instability far enough in advance to avoid an abrupt closure.

Finally, the ATB regulations provide much-needed clarity on the process for reviewing and approving State applications to offer a pathway into title IV, HEA aid for individuals who do not have a high school diploma or its recognized equivalent. Although States will likely incur costs in pursuing the required application, for this population of students, the regulations provide students with more opportunities for success by facilitating States' creation and expansion of options.

## 1. Congressional Review Act Designation

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated that this rule is covered under 5 U.S.C. 804(2) and (3).

## 2. Need for Regulatory Action

Institutions of higher education receive tens of billions of dollars in Federal assistance for postsecondary education each year. In most cases, these grants and loans provided to students help them achieve their educational dreams, unlocking opportunities they would not otherwise be able to afford. Unfortunately, however, there are also far too many situations in which institutions take advantage of borrowers instead of serving them well. Over the past several years, the Department has approved around $13.6 billion in student loan discharges for borrowers who attended

institutions that engaged in a range of misrepresentations, including lying about job placement rates, the employment opportunities available to graduates, whether programs had certain necessary approvals for graduates to be licensed or certified to work in occupations related to the training, and the ability to transfer credits. Almost all these discharges were related to conduct by institutions that are no longer operating and who closed prior to the Department obtaining sufficient financial protection to offset the losses to taxpayers from granting these discharges.

Relatedly, the Department also regularly encounters situations when institutions close with minimal to no warning for students. A study of college closures from July 2004 to June 2020 by the State Higher Education Executive Officers (SHEEO) Association found that 70 percent of students affected by a closure experienced a sudden closure.[46] A larger share of students affected by closures received Pell Grants than those who attended open institutions. Sudden closures leave behind numerous problems. For students, they often have no approved teach-out options, giving them minimal direction on where they could finish their education. They also often have trouble accessing necessary records, and in many cases, do not continue their postsecondary education anywhere. The SHEEO report confirms this outcome, noting significantly negative correlations between sudden closures and either re-enrollment or completion compared to students who experienced an orderly closure. SHEEO found the re-enrollment rate for those in an orderly closure was nearly 30 percentage points higher than those affected by a sudden closure (70 percent versus 42 percent). Sudden closures are also costly for the government, as the Department rarely has sufficient financial protection on hand to offset the losses to the taxpayer from the closed school loan discharges that are a critical benefit for giving students a fresh start on their debt.

By contrast, the individuals and entities that managed, administered, or owned the institutions prior to their closure often faced minimal consequences for their actions beyond the loss of ongoing revenue from the title IV programs. To date, these entities have rarely paid liabilities from the costs of discharges that are not covered by any financial protection on hand. Companies and individuals have been able to own or operate other institutions

[46] sheeo.org/wp-content/uploads/2022/11/SHEEO_NSCRC_CollegeClosures_Report1.pdf.

even after sudden closures or significant evidence of misconduct.

The final regulations improve the Department's ability to take proactive steps to mitigate the harm from sudden closures and institutional misconduct. Changes to the financial responsibility regulations, for instance, allow the Department to seek financial protection as soon as certain warning signs occur. Doing so allows the Department to have more funds on hand to offset taxpayer losses if misconduct or closures occur. It will also discourage institutions from engaging in certain behaviors that are likely to result in a demand for financial protection. These rules recognize that while the exact timing of a closure may be sudden and unexpected, the months and years leading up to that point often involve several signs that indicate a weakening financial situation. Taking swifter and more proactive action when those indicators occur will ultimately leave students and taxpayers in a stronger position.

The changes to certification procedures provide similar benefits with respect to the conditions placed on institutions as they operate in the title IV programs. Historically, many problematic institutions have maintained full certification status up to the date they closed suddenly. The final rule strengthens the ability of the Department to place additional conditions on institutions, including more situations where an institution can become provisionally certified. The rules also make it easier for the Department to demand a teach-out plan or agreement. This is a critical tool for ensuring that borrowers have clear options for how they could continue their education in the event of a closure.

The certification procedures rules include several protections for students that will limit situations in which credits paid for with title IV funds cannot be used to deliver the benefits sought from an educational program. Requiring institutions to certify that they have the necessary approvals for program graduates to obtain licensure or certification ensures students are not taking on loan debt or using up their financial aid eligibility for programs where they legally will not be able to work in their desired field. Similarly, restrictions on when institutions can withhold transcripts due to unpaid balances will ensure students can make use of credits paid for in whole or in part by taxpayer money.

The administrative capability provisions in this final rule accomplish three goals. First, they identify additional areas where the Department has seen concerning activity by institutions, often through program reviews, that leads to loan discharges tied to misconduct, false certification discharges, or the establishment of other liabilities. This is addressed through areas like clearer expectations for career services and verifying high school diplomas. Second, the rules strengthen the Department's ability to hold institutions accountable when they employ someone who has a history of concerning past conduct in the aid programs. Third, the rules address areas where the Department has seen institutional conduct undercut the ability of students to successfully use their financial aid dollars. For instance, student aid offers that have confusing or misleading terminology or fail to clearly differentiate between what is a grant or a loan may lead students into taking on debt they did not intend to incur or not be able to fully understand the relative costs of different educational options.

Finally, the ATB provisions bring much-needed clarity to help States stand up educational opportunities for students who do not have a recognized high school diploma or its equivalent. That will help States looking to create more of these programs and lead to the expansion of ways for students to seek postsecondary education.

## 3. Summary of Comments and Changes From the NPRM

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS

| Provision | Regulatory section | Description of final provision |
|---|---|---|
| **Financial Responsibility** | | |
| Disclosures of related party transactions | § 668.23(d)(1) ........................................... | Require management to add a note to the financial statements disclosing if there are no related party transactions for the year. |
| Disclosures on amounts spent on re-cruiting activities, advertising, and other pre-enrollment expenditures. | § 668.23(d)(5) ........................................... | Delete a proposal in the NPRM to require an institution to disclose in a footnote to its financial statement audit the dollar amounts it has spent in the pre-ceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures. |
| Effect of discretionary triggers on an in-stitution's finances. | § 668.171(b)(3)(vi), (d)(5), and (f)(3)(i)(C) and 668.175(f)(1)(i). | Replace the word "material" with "significant" as it describes both an adverse effect on an institution or the financial condition of an institution from a discre-tionary trigger. And removing the reference to a mandatory trigger in § 668.171(f)(3)(i)(C). |
| Mandatory Triggers—Legal and adminis-trative actions. | § 668.171(c)(2)(i)(D) ............................... | State that for institutions subject to conditions as described, the trigger will be activated only when the conditions result in a recalculated composite score of less than 1.0 as recalculated by the Department according to § 668.171(e). The timeframe for this trigger is through the end of the second full fiscal year after the change in ownership has occurred. |
| Mandatory Triggers—Teach-out plans or agreements. | § 668.171(c)(2)(iv) ................................... | State that the mandatory trigger is activated if the institution is required to sub-mit a teach-out plan or agreement for reasons related to financial conditions. |
| Discretionary Triggers—Teach-out plans or agreements. | § 668.171(d)(13) ...................................... | Add a discretionary trigger for when an institution is required to submit any teach-out plan or agreement by a State, the Department or another Federal agency, an accrediting agency or other oversight body and which is not cov-ered by § 668.171(c)(2)(iv). |
| Mandatory Triggers—State actions ........ | § 668.171(c)(2)(v) .................................... | Remove the mandatory trigger dealing with State actions from § 668.171(c)(2)(v) and § 668.171(c)(2)(v) is reserved. |
| Discretionary Triggers—State actions .... | § 668.171(d)(9) ........................................ | Amend the discretionary trigger at § 668.171(d)(9) to include when an institution is cited by a State licensing or authorizing agency and the State or agency for not meeting requirements and is provided notice that the State or agency will withdraw or terminate the institution's licensure or authorization if the institu-tion does not come into compliance with that requirement. |
| Mandatory Triggers—Loss of eligibility ... | § 668.171(c)(2)(ix) ................................... | Remove the mandatory trigger dealing an institution's loss of eligibility for an-other Federal educational assistance program from § 668.171(c)(2)(ix) and § 668.171(c)(2)(ix) is reserved. |

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS—Continued

| Provision | Regulatory section | Description of final provision |
|---|---|---|
| Discretionary Triggers—Loss of program eligibility. | § 668.171(d)(10) | Amend the discretionary trigger at § 668.171(d)(10) to include when an institution or one of its educational programs loses eligibility to participate in another Federal educational assistance program due to an administrative action against the institution or its programs. |
| Mandatory Triggers—Legal and administrative actions. | § 668.171(c)(2)(i) | Change the heading of § 668.171(c)(2)(i) from "Debts, liabilities, and losses" to "Legal and administrative actions" to better reflect what actions are related to this mandatory trigger. Amend § 668.171(c)(2)(i)(A) to more accurately state what financial actions will activate this trigger. They are when institution has entered against it a final monetary award or enters into a monetary settlement which results from a legal proceeding, whether or not the judgment, award or settlement has been paid. |
| Mandatory Triggers—Legal and administrative actions. | § 668.171(c)(2)(i)(B) | Amend § 668.171(c)(2)(i)(B) to state that when a qui tam lawsuit, in which the Federal Government has intervened is a mandatory trigger but only if the qui tam action has been pending for 120 days after the intervention and there has been no motion to dismiss or its equivalent, filed within the applicable 120-day period or if a motion to dismiss was filed and denied within the applicable 120 day period. |
| Mandatory Triggers—Legal and administrative actions. | § 668.171(c)(2)(i)(C) | Amend § 668.171(c)(2)(i)(C) to state that the trigger is activated when the Department has initiated action to recover from an institution the cost of adjudicated claims. |
| Discretionary Triggers—Discontinuation of programs and closure of locations. | § 668.171(d)(8) | Revise § 668.171(d)(8) to reflect that the discretionary trigger described therein will be activated when an institution closes a location or locations that enroll more than 25 percent of the institution's students. We removed the similar proposed trigger in § 668.171(d)(8) for situations where an institution closes more than 50 percent of its locations. |
| Reporting Requirements | § 668.171(f)(1)(iii) | Remove the reporting requirement at § 668.171(f)(1)(iii) and reserving § 668.171(f)(1)(iii). We have moved the requirement that was proposed at § 668.171(f)(1)(iii) to § 668.14(e)(10). |
| Reporting Requirements | § 668.171(f)(3)(i) | Remove the word "preliminary" as it describes the determination made by the Department. |
| Recalculating the Composite Score | § 668.171(e)(3)(ii) and (e)(4)(ii) | Adjust the equity ratio by decreasing the modified equity and modified assets. |
| Reporting Requirements | § 668.171(f) | Provide institutions 21 days to report triggering events, up from 10 days in the NPRM. |
| Public Institutions | § 668.171(g) | Clarify that the financial responsibility provisions for public institutions with full faith and credit backing from the State would relate to conditions such as past performance and heightened cash management, but not letters of credit. |
| Public Institutions | § 668.171(g) | State that the Department will ask for proof of full faith and credit backing when a public institution first seeks to participate in the aid programs, if it converts to public status, or otherwise upon request. |
| Alternative Standards and Requirements | § 668.175 | Clarify that if the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger, unless the Department determines that individual triggers should be treated as a single triggering event. |

**Administrative Capability**

| | | |
|---|---|---|
| Procedures for determining validity of high school diplomas for distance education students. | § 668.16(p) | Require institutions to look at the State where the high school is located to determine its validity, not the student's State if they are attending courses on-line. |
| Failing gainful employment programs | § 668.16(t) | Remove § 668.16(t)(2), which said institutions had to have more than half of their full-time-equivalent students who received title IV not be enrolled in programs failing gainful employment. |

**Certification Procedures**

| | | |
|---|---|---|
| Provisional certification stemming from a lack of financial responsibility. | § 668.13(c)(1)(i)(G) | Clarify that the Secretary may provisionally certify an institution if it is under the provisional certification alternative within subpart L. |
| Maximum certification length for institutions with consumer protection concerns. | § 668.13(c)(2)(ii) | Require institutions exhibiting consumer protection concerns to recertify within no more than three years. |
| Supplementary performance measures | § 668.13(e) | Remove debt-to-earnings rates and earnings premium from the supplementary performance measures the Secretary may consider in determining whether to certify or condition the participation of an institution. Also removed the requirement for all institutions to include an audit disclosure related to the amount of money spent on recruitment and marketing and clarified that provision would be based on comparing amounts spent on recruiting, marketing, and pre-enrollment activities to amounts spent on instruction and instructional activities, academic support, and student support services. |
| Limiting excessive hours of GE programs. | § 668.14(b)(26)(ii) and (iii) | Limit the number of hours in a GE program for new entrants starting on the effective date of the regulations. Limit this provision to non-degree programs not offered entirely through distance education and remove program lengths as set by an institution's accrediting agency from the maximum length determination. |
| Licensure or certification requirements | § 668.14(b)(32)(i) and (ii) | Require all programs that prepare students for occupations requiring programmatic accreditation or State licensure to meet those requirements for all new entrants upon the effective date of the regulations for each State in which the student is located if they are not enrolled in face-to-face instruction or a State that a student attests they intend to seek employment in. |
| State laws related to closure | § 668.14(b)(32)(iii) | Require institutions to comply with all applicable State laws related to closure, including teach-out plans and agreements, tuition recovery funds, surety bonds, and record retention policies. |

TABLE 3.1—SUMMARY OF KEY CHANGES IN THE FINAL REGULATIONS—Continued

| Provision | Regulatory section | Description of final provision |
|---|---|---|
| Prohibition on transcript withholding ....... | § 668.14(b)(33) ......................................... | Prevent institutions from taking negative action against a student for balances owed due to school error. Remove a similar proposed requirement for balances owed due to R2T4 requirements. Prevent institutions from withholding transcripts for any credits funded in whole or in part with title IV funds. |
| Requirements for provisionally certified institutions at risk of closure. | § 668.14(e)(10) ......................................... | Add a reporting requirement to inform the Department of government investigations. |
| Disclosure requirements related to whether a program meets the educational requirements for licensure or certification in a State. | § 668.43(c) ............................................... | Changes to harmonize this disclosure requirement with the provisions in § 668.14(b)(32). |
| **Ability to Benefit** | | |
| Department approval of eligible career pathways programs. | § 668.157 ................................................. | Require the Department to approve at least one career pathway program offered by an institution for ATB use to verify compliance with the regulatory definition. |

*Comments:* Some commenters raised concerns that the proposed changes in certification procedures related to institutions agreeing to comply with State laws related to misrepresentation, recruitment, and closure did not include a federalism analysis in the NPRM and did not include an assessment of the burden on States or institutions.

*Discussion:* The proposed changes in certification procedures do not require a federalism analysis because they are not regulating States. Instead, we are requiring institutions to certify that they are meeting certain requirements within a State in which they are located or a State from which they choose to enroll students in distance education programs. Whether a State chooses to have education-specific laws in these areas is and remains an area of State discretion. Moreover, many States already exercise discretion around when and whether provisions related to closure, such as tuition recovery funds, apply to institutions that do not have a physical presence in their State. For institutions, any burden would come from whether States do or do not enforce additional laws against them. Accordingly, the burden will vary by the institution's specific situation, and there is not a direct burden from the Federal Government related to this provision.

*Changes:* None.

*Comments:* A few commenters argued that they could not support the NPRM due to the regulatory, financial, and logistical burden reporting would place on small institutions. They worried that they would have to shift resources away from students and toward reporting to meet the standards of the NPRM.

*Discussion:* The Department feels that any additional burden on institutions will help protect students. That said, we believe the reporting provisions in this rule are largely about requiring institutions to tell us about critical

events in a reasonable timeframe, which will not be particularly burdensome to address. We have made changes in other areas, such as ATB, to reduce the burden on institutions by requiring approval for only one program.

*Changes:* None.

*Comments:* Some commenters said the NPRM's RIA lacked an analysis of the financial consequences or unintended outcomes of the Department determining that the same event led to multiple mandatory or discretionary triggering events. They also argued that the RIA did not consider the financial cost from seeking a letter of credit when a triggering event is immaterial.

*Discussion:* The Department disagrees that the commenters' concerns would occur and, therefore, does not think there are additional analyses that could have been conducted. We clarify in this final rule that our intent is not to stack multiple requests for financial protection from the same event. Instead, we will consider whether those triggers connect to one event. We will also consider these events when determining the amount of the financial protection required.

We also disagree that the triggering conditions would lead to the Department asking for financial protection due to immaterial events. As we discuss in response to commenter suggestions to add a materiality threshold for these triggers, we believe that all the mandatory triggering situations represent significant and worrisome events that present a risk to an institution's financial health. The few items within that category in which the size of the effect might vary substantially based upon the individual facts calls for a recalculation of the composite score. We will evaluate the discretionary triggers on a case-by-case basis, which allows us to determine if the triggering event represents a lack of financial responsibility. We do not need

to analyze hypothetical events that we do not believe will occur.

*Changes:* None.

*Comments:* Some commenters argued that the Department did not consider how the costs of obtaining a letter of credit could financially harm an institution due to the fees charged to obtain the financial protection or by tying up funds that must be held as collateral.

*Discussion:* The Department discussed both issues in the NPRM. With respect to the fees charged, institutions may provide cash in escrow instead of a letter of credit. That would not entail any fees being charged.

The Department believes the benefits from seeking financial protection are worth the costs to institutions in terms of either fees paid for a letter of credit or the opportunity cost of funds being held in escrow. The mandatory and discretionary trigger situations allow the Department to obtain financial protection when there are situations that indicate a serious risk that the institution may be facing financial challenges. These actions correct an imbalance that exists in regulations, where institutions can operate while exhibiting significant signs of risk and either close suddenly or engage in misconduct, resulting in unreimbursed discharges and costs to taxpayers. The Department believes it is appropriate to better reflect taxpayer equities, even at the expense of some capital for institutions. Moreover, there is no guarantee that institutions would put the funds that go toward financial protection toward ways that would strengthen an institution. Institutions can and have issued executive compensation or bonuses to senior leaders even while exhibiting signs of significant financial risk.

*Changes:* None.

*Comments:* One commenter noted that the Department's estimate for

compliance costs are incredibly high, with an estimate of $240 million and 5.1 million hours of reporting burden on institutions in the first year alone. This commenter and others stated that the costs were far too high for institutions to bear.

*Discussion:* The Department feels that any compliance costs will help protect students in the long run. The shift of any resources toward reporting would help students know if the program they are entering will yield a sustainable income. We note that the compliance costs discussed in the comment are largely related to the GE program accountability framework and the financial value transparency framework. That issue is discussed in the separate final rule that covers those topics. We anticipate the compliance costs for this regulation to be $4 million, which includes ATB as well as the accountability focused items.

*Changes:* None.

*Comments:* One commenter noted that there has not been a proper estimate of the impact this NPRM will have on States and institutions, and that previous estimates have been far below the actual time and cost it has taken for institutions to comply. They argued that more research is necessary before any new requirements are implemented.

*Discussion:* The Department feels that these new requirements will help protect students. An increase in time and cost to institutions will be worth it in the long run.

*Changes:* None.

## 4. Discussion of Benefits, Costs, and Transfers

### Financial Responsibility

Assessing whether institutions are financially responsible is a critical way the Department ensures integrity in the title IV, HEA programs. Institutions facing financial struggles are more likely to go out of business. Particularly at private for-profit colleges, closures are more likely to be abrupt, meaning students are given minimal to no notice and there are no agreements in place to help students continue their educations elsewhere without delays and disruptions. Institutions in poor financial health may also pursue any possible means to bring in additional revenue, even if doing so results in taking advantage of students. In the past, the Department has seen institutions engage in high-pressure sales tactics to try to attract as many students as possible to continue meeting revenue goals. Such situations engender cultures where recruiters are better off making misleading comments to

students about credit transferability, job placement rates, and graduate earnings so they can keep their jobs and keep enrollment up. But such behavior also leads to the later approval of loan discharges related to borrower defense to repayment.

Hundreds of thousands of students have been affected by these sudden closures and institutional misconduct over the last decade-plus. For instance, a study by SHEEO found that 70 percent of students who experienced a closure from July 2004 to June 2020 went through an abrupt closure.[47] Similarly, FSA data show that closures of for-profit colleges that occurred between January 2, 2014, to June 30, 2021, resulted in $550 million in closed school discharges. (This excludes the additional $1.1 billion in closed school discharges related to ITT Technical Institute that was announced in August 2021.) Of that amount, the Department recouped just over $10.4 million from institutions.[48]

Separately, as of September 2023 the Department had approved $13.6 billion in discharges related to borrower defense findings for almost 1 million borrowers. Among approvals since 2021, there has only been a single instance in which the Department recovered funds to offset the costs of borrower defense discharges from the institution, which was in the Minnesota School of Business and Globe University's bankruptcy proceeding. In that situation, the Department received $7 million from a bankruptcy settlement. While the Department will continue to pursue recoupment efforts of approved borrower defense claims, it will be challenging to obtain any funds from institutions that have already closed.

The financial responsibility regulations will increase the situations in which the Department seeks financial protection in response to warning signs instead of waiting until it is too late, and the institution is out of money. These situations fall into two categories. The first are mandatory triggering events. These are uncommon but serious situations that indicate an impairment to the institution's financial situation that is worrisome enough that the Department needs to step in and obtain protection. The second category are

discretionary triggering events. These may be more common occurrences that may, but do not always, indicate concerning financial situations. These items would be reviewed on a case-by-case basis to determine whether they merit obtaining financial protection.

The table below shows the Department's estimation of the possible effect of the mandatory and discretionary triggering events based upon past observed events. In some cases, the table may overstate the potential effect of the triggers, assuming there is not an overall change in institutional behavior that leads to a baseline increase in triggering events. For example, some of the mandatory triggering events would involve a recalculation of the composite score. That could mean those events result in a request for financial protection at a lower rate than is reported. Similarly, one event may cause multiple simultaneous triggering events. As noted in the preamble to this rule, the Department would consider in those situations whether a single or multiple letters of credit are appropriate. The table below does not account for this overlap or the possibility that the same institution could show up under multiple of the triggering events for different reasons. The numbers for discretionary triggers are particularly likely to overstate the effect because they do not account for how many would be determined to warrant financial protection. Finally, even though the Department's goal in establishing these triggers is to obtain financial protection in advance of a closure, there is a possibility that some of the trigger events could occur so close to the closure that there is not an opportunity to obtain that relief in time.

There are some triggers where the Department cannot currently identify the number of institutions potentially affected. Each of these is a situation with obvious connections to financial concerns but where data systems have not been set up to track them on a comprehensive basis. For example, the Department has not historically asked institutions to report when they declare financial exigency, so we do not have a complete tally of how many institutions have done so. However, the declaration of financial exigency is supposed to occur when there is a significant and immediate threat to the financial health of the entity that might necessitate drastic measures. Other mandatory triggers are constructed with the hope that they will not be triggered but will rather discourage certain actions that could be used to undercut the financial oversight structure. For instance, the

---

[47] Burns, R., Brown, L., Heckert, K., Weeden, D. (2022). A Dream Derailed? Investigating the Impacts of College Closures on Student Outcomes, State Higher Education Executive Officers Association. *https://sheeo.org/project/college-closures/*; *https://sheeo.org/wp-content/uploads/2023/08/SHEEO_CollegeClosures_Report11.pdf*.

[48] The budgetary cost of these discharges is not the same as the amount forgiven.

withdrawal of equity after making a contribution is a sign of attempting to manipulate composite scores. Treating that as a mandatory trigger will dissuade that activity and ensure there is greater integrity in the composite scores. Similarly, the presence of creditor conditions has been used in the past to try and discourage the Department from taking actions against an institution. We are concerned that such approaches try to put private creditors ahead of the Department and a trigger in this situation corrects for that problem.

### TABLE 4.1—MANDATORY TRIGGERING EVENTS

| Trigger | Description | Impact |
|---|---|---|
| Debts or liability payments § 668.171(c)(2)(i)(A). | An institution with a composite score of less than 1.5 with some exceptions is required to pay a debt or incurs a liability from a settlement, final judgment, or similar proceeding that results in a recalculated composite score of less than 1.0. | For institutional fiscal years that ended between July 1, 2019, and June 30, 2020, there were 225 private non-profit or proprietary schools with a composite score of less than 1.5. Of these, 7 owe a liability to the Department, though not all of these liabilities are significant enough to result in a recalculated score of 1.0. We do not have data on non-Department liabilities that might meet this trigger. |
| Lawsuits § 668.171(c)(2)(i)(B) ...... | Lawsuits against an institution after July 1, 2024, by Federal or State authorities or a qui tam in which the Federal Government has intervened. | The Department is aware of approximately 50 institutions or ownership groups that have been subject to Federal or State investigations, lawsuits, or settlements since 2012. This includes criminal prosecutions of owners. Many of these institutions, however, are no longer operating. Some of these would not have resulted in a trigger under the requirements related to the filing of a motion to dismiss within 120 days. |
| Borrower defense recoupment § 668.171(c)(2)(i)(C). | The Department has initiated a proceeding to recoup the cost of approved borrower defense claims against an institution. | The Department has initiated one proceeding against an institution to recoup the proceeds of approved claims. Separately, the Department has approved borrower defense claims at more than nine other institutions or groups of institutions where it has not sought recoupment. |
| Change in ownership debts and liabilities § 668.171(c)(2)(i)(D). | An institution in the process of a change in ownership must pay a debt or liability related to settlement, judgment, or similar matter at any point through the second full fiscal year after the change in ownership. | Over the last 5 years there have been 188 institutions that underwent a change in ownership. This number separately counts campuses that may be part of the same chain or ownership group that are part of a single transaction. The Department does not currently have data on how many of those had a debt or liability that would meet this trigger. Moreover, we cannot estimate how many of these situations would have resulted in a recalculated composite score that failed. |
| Withdrawal of owner's equity § 668.171(c)(2)(ii)(A). | A proprietary institution with a score less than 1.5 has a withdrawal of owner's equity that results in a composite score of less than 1.0. | In the most recent available data, 161 proprietary institutions had a composite score that is less than 1.5. The Department has not determined how many of those may have had a withdrawal of owner's equity that would result in a composite score that meets this trigger. |
| Significant share of Federal aid in failing GE programs § 668.171(c)(2)(iii). | An institution has at least 50 percent of its title IV, HEA aid received for programs that fail GE thresholds. | There are approximately 740 institutions that would meet this trigger based upon current data. These are almost entirely private for-profit institutions that offer only a small number of programs total. These data only include institutions operating in March 2022 that had completions reported in 2015–16 and 2016–2017. Data are based upon 2018 and 2019 calendar year earnings. |
| Teach-out plans or agreements § 668.171(c)(2)(iv). | The institution is required to submit a teach-out plan or agreement, by a State, the Department or another Federal agency, an accrediting agency, or other oversight body for reasons related in whole or in part to financial concerns. | Not identified because the Department is not currently always informed when an institution is required to submit a teach-out plan or agreement. |
| Actions related to publicly listed entities § 668.171(c)(2)(vi). | These apply to any entity where at least 50 percent of an institution's direct or indirect ownership is listed on a domestic or foreign exchange. Actions include the SEC taking steps to suspend or revoke the entity's registration or taking any other action. It also includes actions from exchanges, including foreign ones, that say the entity is not in compliance with the listing requirements or may be delisted. Finally, the entity failed to submit a required annual or quarterly report by the required due date. | Department data systems currently identify 38 schools that are owned by 13 publicly traded corporations. One of these may be affected by this trigger. |
| 90/10 failure § 668.171(c)(2)(vii) ...... | A proprietary institution did not meet the requirement to derive at least 10 percent of its revenue from sources other than Federal educational assistance. | Over the last 5 years an average of 12 schools failed the 90/10 test. Most recently, the Department reported that 21 proprietary institutions had received 90 percent or more of their revenue from title IV, HEA programs based upon financial statements for fiscal years ending between July 1, 2020, and June 30, 2021. |
| Cohort default rate (CDR) failure § 668.171(c)(2)(viii). | An institution's two most recent official CDRs are 30 percent or greater. | Twenty institutions with at least 30 borrowers in their cohorts had a CDR at or above 30 percent for the fiscal year (FY)2017 and FY2016 cohorts (the last rates not impacted by the pause on repayment during the national emergency). |

TABLE 4.1—MANDATORY TRIGGERING EVENTS—Continued

| Trigger | Description | Impact |
|---|---|---|
| Contributions followed by a distribution §668.171(c)(2)(x). | The institution's financial statements reflect a contribution in the last quarter of its fiscal year followed by a distribution within first two quarters of the next fiscal year and that results in a recalculated composite score of <1.0. | Not currently identified because this information is not currently centrally recorded in Department databases. |
| Creditor events §668.171(c)(2)(xi) ................ | An institution has a condition in its agreements with a creditor that could result in a default or adverse condition due to an action by the Department or a creditor terminates, withdraws, or limits a loan agreement or other financing arrangement. | Not currently identified because institutions do not currently report the information needed to assess this trigger to the Department. Several major private for-profit colleges that failed had creditor arrangements that would have met this trigger. |
| Financial exigency §668.171(c)(2)(xii) .......... | The institution makes a formal declaration of financial exigency. | Not identified because institutions do not currently always report this information to the Department. |
| Receivership §668.171(c)(2)(xiii) ................... | The institution is either required to or chooses to enter a receivership. | The Department is aware of 3 instances of institutions entering receiverships in the last few years. Each of these institutions ultimately closed. |

TABLE 4.2—DISCRETIONARY TRIGGERING EVENTS

| Trigger | Description | Impact |
|---|---|---|
| Accreditor actions §668.171(d)(1). | The institution is placed on show cause, probation, or an equivalent status. | Since 2018, we identified just under 190 private institutions that were deemed as being significantly out of compliance and placed on probation or show cause by their accrediting agency, with the bulk of these stemming from one agency that accredits cosmetology schools. |
| Other creditor events and judgments §668.171(d)(2). | The institution is subject to other creditor actions or conditions that can result in a creditor requesting grated collateral, an increase in interest rates or payments, or other sanctions, penalties, and fees, and such event is not captured as a mandatory trigger. This trigger also captures judgments that resulted in the awarding of monetary relief that is subject to appeal or under appeal. | Not identified because institutions do not currently report this information to the Department. |
| Fluctuations in title IV, HEA volume §668.171(d)(3). | There is a significant change upward or downward in the title IV, HEA volume at an institution between consecutive award years or over a period of award years. | From the 2016–2017 through the 2021–2022 award years, approximately 155 institutions enrolled 1,000 or more title IV, HEA students and saw their title IV, HEA volume change by more than 25 percent from one year to the next. Of those, 33 saw a change of more than 50 percent. The Department would need to determine which circumstances indicated enough risk to need additional financial protection. |
| High dropout rates §668.171(d)(4). | An institution has high annual dropout rates, as calculated by the Department. | According to College Scorecard data for the award year (AY) 2014–15 cohort, there were approximately 66 private institutions that had more than half their students withdraw within two years of initial enrollment. Another 132 had withdrawal rates between 40 and 50 percent. The Department would need to determine which circumstances indicated enough risk to need additional financial protection. |
| Interim reporting §668.171(d)(5) | An institution that is required to provide additional reporting due to a lack of financial responsibility shows negative cash flows, failure of other financial ratios, or other indicators of a significant adverse change of the financial condition of a school. | Not currently identified because Department staff currently do not look for this practice in their reviews. |
| Pending borrower defense claims §668.171(d)(6). | The institution has pending borrower defense claims and the Department has formed a group process to consider at least some of them. | To date there are 53 institutional names that have had more than 2,000 borrower defense claims filed against them. This number may include multiple institutions associated with a same ownership group. There is no guarantee that a larger number of claims will result in a group claim, but they indicate a higher likelihood that there may be practices that result in a group claim. |
| Program discontinuation §668.171(d)(7). | The institution discontinues a program or programs that affect more than 25 percent of its enrolled students that receive title IV, HEA program funds. | Not currently identified due to data limitations. |
| Location closures §668.171(d)(8). | The institution closes locations that enroll more than 25 percent of its students who receive title IV, HEA program funds. | Not currently identified due to data limitations. |
| State actions and citations §668.171(d)(9). | The institution is cited by a State licensing or authorizing agency for failing to meet State or agency requirements, including notice that it will withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement. | Not identified because institutions do not currently report this information consistently to the Department. |

TABLE 4.2—DISCRETIONARY TRIGGERING EVENTS—Continued

| Trigger | Description | Impact |
|---|---|---|
| Loss of institutional or program eligibility § 668.171(d)(10). | The institution or one or more of its programs loses eligibility to participate in another Federal education assistance program due to an administrative action. | The Department does not currently have comprehensive data on program eligibility loss for all other Federal assistance programs. The Department is aware of 5 institutions participating in title IV, HEA programs that have lost access to the Department of Defense's Tuition Assistance (TA) program since 2017. Three of those also lost accreditation or access to title IV, HEA funds. Since 2018 the Veterans Administration (VA) has reported over 900 instances of an institution of higher education having its access to VA benefits withdrawn. However, this number includes extensive duplication that counts multiple locations of the same school, withdrawals due to issues captured elsewhere like loss of accreditation or closure, and withdrawals that may not have lasted an extended period. The result is that the actual number of affected institutions would likely be significantly lower. |
| Exchange disclosures § 668.171(d)(11). | An institution that is at least 50 percent owned by an entity that is listed on a domestic or foreign stock exchange notes in a filing that it is under investigation for possible violations of State, Federal, or foreign law. | Department data systems currently identify 38 schools that are owned by 13 publicly traded corporations. There is one school that could potentially be affected by either this trigger or the similar mandatory one. |
| Actions by another Federal agency § 668.171(d)(12). | The institution is cited and faces loss of education assistance funds from another Federal agency if it does not comply with that agency's requirements. | Not identified because current reporting by institutions do not always capture these events. |
| Other teach-out plans or agreements § 668.171(d)(13). | The institution is required to submit a teach-out plan or agreement, including programmatic teach-outs and it is not captured in § 668.171(c)(2)(iv). | Not identified because the Department is not currently always informed when an institution is required to submit a teach-out plan or agreement. |
| Other events or conditions § 668.171(d)(14). | Any other event or condition the Department determines is likely to have a significant adverse effect on the financial condition of the institution. | Not identified because this is designed to capture events not present in other triggers that have a similar effect on the institution. |

Benefits

The changes to the financial responsibility regulations provide significant benefits to the Federal Government as well as to students. There are some additional benefits to institutions that are not subject to these triggering conditions due to the deterrent effects of these regulations.

Federal benefits come in several forms. First, the Department will obtain greater amounts of financial protection from institutions. That increases the likelihood of offsetting costs to taxpayers that arise from discharges in the case of a school closing or engaging in misconduct that results in the approval of borrower defense to repayment claims. As already discussed in this section, the Department historically has had minimal funds in place to offset these discharges. That means the cost of giving borrowers the relief they are entitled to has fallen on the taxpayers more heavily than on the institutions whose behavior created those circumstances.

The Department also benefits from the deterrent effects of many of these provisions. For instance, the trigger related to the withdrawal of owner equity after making a contribution discourages institutions from engaging in behavior that could disguise their true financial condition. That gives the Department a more accurate picture of an institution's financial health. Similarly, the trigger related to creditor conditions dissuades institutions from attempting to leverage the threat of

creditor actions as a reason why the Department should not take an action that it deems necessary to protect taxpayers' investments and students. The triggers also discourage the use of receiverships by institutions, which the Department has seen in the past still lead to chaotic closures and problems for students.

Other triggers achieve deterrence in different manners. For instance, the clearer linkages between triggers and lawsuits or conduct that results in recoupment efforts from approved borrower defense claims creates a further disincentive for institutions to behave in such a manner that could lead to misconduct, approved borrower defense claims, and recoupment. Similarly, facing financial protection tied to high cohort default rates, achieving insufficient revenue from non-Federal sources, and having too much title IV revenue come from programs that do not meet gainful employment requirements is an added incentive to not fail to meet those requirements.

The regulations also provide benefits to students. The rules encourage institutions to put themselves in the strongest financial situation possible. In some cases, that might mean additional investment in the institution to improve its results on certain metrics, such as student loan default rates or performance on gainful employment measures or to keep funds invested in an institution instead of removing them. The triggers that have a deterrence effect

also benefit students since the institution would have further reason to not engage in the kind of aggressive or predatory behavior that has been the source of many approved borrower defense claims to date or destabilized institutions and contributed to their closure.

Protecting students from sudden closures will provide them significant benefits. For example, research by GAO found that 43 percent of borrowers never completed their program or transferred to another school after a closure.[49] While 44 percent transferred to another school, 5 percent of all borrowers transferred to a college that later closed. GAO then looked at the subset of borrowers who transferred long enough ago that they could have been at the new school for six years, the amount of time typically used to calculate graduation rates. GAO found that nearly 49 percent of these students who transferred did not graduate in that time. These findings are similar to those from SHEEO, which found that just 47 percent of students reenrolled after a closure, and of those who reenrolled, only 37 percent earned a postsecondary credential.[50]

The deterrence effect of these final rules also benefits students by encouraging institutions to improve the financial value of their educational offerings. For example, the trigger for

---

[49] www.gao.gov/products/gao-21-105373.
[50] sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020.

institutions with high dropout rates will incentivize institutions to improve their graduation rates. Along with the trigger for institutions failing the cohort default rate, this can reduce the number of students who default on their loans, as students who do not complete a degree are more likely to default on their loans.[51] Improved completion rates also have broader societal benefits, such as increased tax revenue because college graduates, on average, have lower unemployment rates, are less likely to rely on public benefit programs, and contribute more in tax revenue through higher earnings.[52]

Many institutions will also benefit from the financial responsibility triggers. In the past, institutions that were unwilling to engage in aggressive and deceptive tactics may have been at a disadvantage in trying to attract potential students. These triggers will discourage the use of such tactics, providing benefits to institutions that will not have to adjust their recruitment or marketing approaches to avoid conduct that risks causing a triggering event to occur.

Costs

Some institutions will face costs from these regulatory changes. The largest are the costs associated with providing financial protection. Some of these are administrative costs in the form of fees paid to banks or other financial institutions to obtain a letter of credit. These are costs that an institution bears regardless of whether a letter of credit is collected upon. The exact amount of this fee will vary by institution and at least partly reflect the assessment of the institution's riskiness by that financial institution. Institutions do not report the costs of obtaining a letter of credit to the Department. Anecdotally, institutions have reported that, over time, financial institutions have increasingly charged higher fees for letters of credit or asked for a larger percentage of the funds to be held at the financial institution in order to issue the letter of credit. That is why many institutions are instead opting to provide funds in escrow to the Department, an option that does not carry additional fees.

Institutions also have opportunity costs associated with the funds that must be set aside to obtain a letter of credit or placed into escrow as they cannot use those resources for other purposes. The nature of the opportunity cost will vary by institution as well as

the counterfactual use of the funds otherwise identified for that purpose. For example, an institution that would have otherwise distributed the funds set aside as profits or dividends to owners faces a different set of opportunity costs than one that was going to make additional investments in the educational enterprise, such as upgrading facilities or adding staff. There is no way to clearly assess what these opportunity costs are because money is fungible, and each institution's circumstances are unique. Moreover, there will be some institutions that provide letters of credit when they could have instead made investments in the institution to have avoided the triggering event. For instance, additional spending on instruction and student supports might have raised completion rates and helped lower default rates and therefore would have avoided a trigger. Another example of a way to avoid a trigger is not taking a distribution after making a contribution. As such, it would not be reasonable to determine that every instance of financial protection provided incurs an opportunity cost that would have benefited the institution and its students.

Institutions will also face costs in the form of transfers to the Department that occur when it collects on a letter of credit or keeps the funds from a cash escrow account, title IV, HEA offset, or other forms of financial protection. In those situations, the Department would use those funds to offset liabilities owed to it. The collection of the escrow does not affect the total amount of liabilities originally owed by the institution, as those are determined through separate processes. However, this would be a transfer because the Department would be collecting against a liability in situations where it traditionally has not done so at high rates. Successfully offsetting the cost of more liabilities is a benefit to the Department and taxpayers.

On net, the increase in the number of triggering conditions means it is likely that the Department will be seeking financial protection more often than it does under current practice. It is also likely that the amount collected upon will also increase as there will be some institutions that would close regardless of any deterrence effect of the trigger. In other cases, whether increases in requests for financial protection translate into greater collection of this protection will depend on how institutions change their behavior.

Variations in institutional response to the triggers could affect the amounts collected. If there is no change in

institutional behavior, then the amount collected will increase, as institutions face triggering events and then take no steps to avoid closures or misconduct. However, if institutions do respond to the triggers, then both the frequency at which the Department asks for financial protection and the rate at which it collects upon it may not significantly change. Examples highlight how these dynamics could affect outcomes. If the number of institutions that enter into receivership does not change as a result of the mandatory trigger, then the Department would seek more financial protection than it currently does. The past instances of receivership that the Department is aware of ended in closures. If that too is unchanged, then the presence of the trigger would result in the collection of greater amounts of financial protection. However, if the trigger fully discourages the use of receiverships, then there would not be financial protection demanded as a result of this trigger and there would not be funds from that trigger to collect. Similarly, if institutions change their conduct to avoid the types of lawsuits that result in a trigger, then neither the frequency with which the Department seeks financial protection, nor the amount collected would change.

Regardless of the institutional response, the general effect of these provisions is that increases in financial protection provide greater opportunities for benefits that help the Department and students with a related increase in the potential costs faced by institutions that are subject to additional requests for financial protection.

*Administrative Capability*

Benefits

The Administrative Capability portion of the final rule provides benefits for students and the Department.

Students

For students, the changes help them make more informed choices about where to enroll and how much they might borrow and helps ensure that students who are seeking a job get the assistance they need to launch or continue their careers. The changes in § 668.16(h) expand an existing requirement related to sufficient financial aid counseling to also include written information, such as what is contained when institutions inform students about their financial aid packages. Having a clear sense of how much an institution will cost is critical for students to properly judge the financial transaction they are entering into when they enroll. For many

---

[51] *libertystreeteconomics.newyorkfed.org/2017/ 11/who-is-more-likely-to-default-on-student-loans/.*

[52] *www.luminafoundation.org/resource/its-not-just-the-money/; www.thirdway.org/report/ripple-effect-the-cost-of-the-college-dropout-rate.*

students and families, a postsecondary education is the second-most expensive financial decision they make after buying a home. However, the current process of understanding the costs of a college education is far less straightforward than that of a buying a home. When home buyers take out a mortgage, for example, there are required standard disclosures that present critical information like the total price, interest rate, and the amount of interest that will ultimately be paid. Having such common disclosures helps to compare different mortgage offers.

By contrast, financial aid offers are extremely varied. A 2018 study by New America that examined more than 11,000 financial aid offers from 515 schools found 455 different terms used to describe an unsubsidized loan, including 24 that did not use the word "loan."[53] More than a third of the financial aid offers New America reviewed did not include any cost information. Additionally, many colleges included Parent PLUS loans as "awards" with 67 unique terms, 12 of which did not use the word "loan" in the description. Similarly, a 2022 report by the GAO estimated that, based on their nationally representative sample of colleges, 22 percent of colleges do not provide any information about college costs in their financial aid offers, and of those that include cost information, 41 percent do not include a net price and 50 percent understate the net price.[54] GAO estimated that 21 percent of colleges do not include key details about how Parent PLUS loans differ from student loans. This kind of inconsistency creates significant risk that students and families may be presented with information that is both not directly comparable across institutions and may be outright misleading. That hinders the ability to make an informed financial choice and can result in students and families paying more out-of-pocket or going into greater debt than they had planned.

The new requirements establish key information that must be provided to students. Some of these details align with the existing College Financing Plan, which is used by half of the institutions in at least some form. Students will thus be more likely to receive consistent information, including, in some cases, through the expanded adoption of the College Financing Plan. Clear and reliable information further helps students choose institutions and programs that

might have lower net prices, regardless of sticker price, which may result in students enrolling in institutions and programs where they and their families are able to pay less out of pocket or take on lower amounts of debt.

Students also benefit from the procedures in §668.16(p) related to evaluating high school diplomas. It is critical that students can benefit from the postsecondary training they pursue. If they do not, then they risk wasting time and money, as well as ending up with loan debt they would struggle to repay because they are unable to secure employment in the field they are studying. Students who have not obtained a valid high school diploma may be at a particular risk of ending up in programs where they are unlikely to succeed. The Department has seen in the past that institutions that had significant numbers of students who enrolled from diploma mills or other schools that did not provide a proper secondary education have had high rates of withdrawal, non-completion, or student loan default. The requirements in §668.16(p) better ensure that students pursuing postsecondary education have received the secondary school education needed to benefit from the programs they are pursuing.

In the past, the Department has had problems with several institutions related to promises of getting jobs or making sure students are prepared to enter certain occupations. These issues are addressed by the changes in §668.16(q) and (r). The first deals with ensuring that institutions have the career services resources necessary to make good on what they are telling students in terms of the degree of assistance they can provide for finding a job. This responds to issues the Department has seen where recruiters tell students that they will receive extensive job search and placement help only for those individuals to find that such assistance is not actually available. The second addresses issues where institutions have recruited students for programs that involve time in a clinical or externship setting in order to complete the program, only the institution does not actually have sufficient spots available for all its students to be offered a necessary spot. When that occurs, the student is unable to finish their program and thus cannot work in the field for which they are being prepared. Students will thus benefit from knowing that they will receive the promised career services and be able to engage in the non-classroom experiences necessary to complete their programs. That in turn will help them find employment after graduation and

give them an improved financial return on their program.

Changes on the awarding of financial aid funds in §668.16(s) will help students by ensuring they receive their refunds when most needed. Refunds of financial aid funds remaining after paying for tuition and fees gives students critical resources to cover important costs like food, housing, books, and transportation. Students that are unable to pay for these costs struggle to stay enrolled and may instead need to either leave a program or increase the number of hours they are working, which can hurt their odds of academic success. Timely aid receipt will thus help with retention and completion for students.

Finally, the provisions in §668.16(k)(2) and (t) through (u) also benefit students by protecting them from institutions that are engaging in poor behavior, institutions that are at risk of losing access to title IV, HEA aid for a significant share of their students because they do not deliver sufficient financial value, and institutions that are employing individuals who have a problematic history with the financial aid programs. All three of these elements can be a sign of an elevated risk of closure or an institution's engagement in concerning behaviors that could result in misrepresentations to borrowers.

Federal Government

The Department and the Federal Government also benefit from the Administrative Capability regulations set out in this rule. False institutional promises about the availability of career services or failure to get students into the externships or clinical experiences they need can result in the Department granting a borrower defense discharge. For instance, the Department has approved borrower defense claims at American Career Institute for false statements about career services and at Corinthian Colleges and ITT Technical Institute related to false promises about students' job prospects. The Department has also encountered numerous applications that contain allegations that institutions promised extensive help for career searches that never materialized. But the Department has largely not been able to recoup the costs of those transfers to borrowers from the Department. The added Administrative Capability regulations increase the ability of the Department to identify circumstances earlier that might otherwise lead to borrower defense discharges later. That should reduce the number of future claims as institutions would know ahead of time that failing

[53] www.newamerica.org/education-policy/policy-papers/decoding-cost-college/.

[54] www.gao.gov/products/gao-23-104708.

to offer these services is not acceptable and therefore would comply. It also could mean terminating the participation in the title IV, HEA programs sooner for institutions that do not meet these standards, reducing the exposure to future possible liabilities through borrower defense.

The Department also benefits from improved rules around verifying high school diplomas. Borrowers who received student loans when they did not in fact have a valid high school diploma may be eligible for a false certification discharge. If that occurs, the Department has no guarantee that it would be able to recover the cost of such a discharge from the institution, resulting in a transfer from the government to the borrower. Similarly, grant aid that goes to students who lack a valid high school diploma is a transfer of funds that should not otherwise be allowed and is unlikely to be recovered. Finally, if students who lack a valid high school diploma or its equivalent are not correctly identified, then the Department may end up transferring Federal funds to students who are less likely to succeed in their program and could end up in default or without a credential. Such transfers would represent a reduction in the effectiveness of the Federal financial aid programs.

Provisions around hiring individuals with past problems related to the title IV, HEA programs also benefit the Department. Someone with an existing track record of misconduct, including the possibility that they have pled guilty to or been convicted of a crime, represents a significant risk to taxpayers that those individuals might engage in the same behavior again. Keeping these individuals away from the Federal aid programs would decrease the likelihood that concerning behavior will repeat. These regulations will reduce the risk that executives who run one institution poorly can simply jump to another or end up working at a third-party servicer.

The Department gains similar benefits from the provisions related to institutions subject to a significant negative action or findings by a State or Federal agency, court, or accrediting agency; and institutions found to have engaged in substantial misrepresentations or similar behavior. These are situations where a school may be at risk of closure or facing significant borrower defense liabilities. Allowing these institutions to continue to participate in title IV, HEA programs could result in transfers to borrowers in the form of closed school or borrower defense discharges that are not reimbursed. These provisions will allow

for more proactive action to address these concerning situations and behaviors.

The provision regarding institutions with significant title IV revenue from failing GE programs recognizes that having most aid associated with programs that could imminently lose access to Federal student aid represents a sign of broader institutional problems than a program-by-program assessment may indicate. These situations raise broader concerns about the amount of debt institutions are leaving students to pay and the return that students are receiving. Making that an administrative capability finding will allow the Department to conduct a more systemic review of the institutions in question.

Finally, the Department benefits from students receiving accurate financial aid information. Students whose program costs end up being far different from what the institution initially presented may end up not completing a program because the price tag ends up being unaffordable. That can make them less likely to pay their student loans back and potentially leave them struggling in default. This could also include situations where the cost is presented accurately but the institution fails to properly distinguish grants from loans, resulting in a student taking on more debt than they intended to and being unable to repay their debt as a result.

Costs

The regulations create costs for institutions, as well as some administrative costs for the Department, and the possibility of some smaller costs for students in more limited circumstances. Institutions could see increased costs to improve their financial aid information, strengthen their career services department, improve their procedures for verifying high school diplomas, and improve partnerships to provide clinical opportunities and externships. The extent of these costs will vary across institutions. Institutions that do not have to change any practices will see no added costs. Beyond that, costs could range from small one-time charges to tweak financial aid communications to ongoing expenses to have the staff necessary for career services or findings spots for clinical and externship opportunities. The costs associated with a strengthened review of high school diplomas will also vary based upon what institutions currently do to review questionable credentials and institutions' tendency to enroll students with the kinds of indicators that merit further review. Based upon past experience, the Department has seen

issues with valid high school diplomas being most common in open access certificate and associate degree programs.

The provisions related to issues such as State, accreditor, or other Federal agency sanctions or conducting misrepresentations also have varied cost effects on institutions. Those not facing any of these issues would see no added costs. Institutions subject to these provisions would see costs to rectify these problems and, if they go unaddressed, could see costs in the form of reduced transfers from the Department if those actions result in loss of access to title IV, HEA financial assistance.

These changes also impose some administrative costs on the Department. The Department needs to incorporate procedures into its reviews of institutions to identify the added criteria. That could result in costs for retraining staff or added time to review certain institutions where these issues manifest.

Several commenters asserted that the provisions related to valid high school diplomas would create costs for students. They claimed this would happen from institutions rejecting otherwise valid high school diplomas or delays associated with reviewing diplomas. The Department disagrees that such situations are likely to occur because the provisions do not require the review of every diploma, but only those for which there is a question about its validity. By providing the guidance and clarity in these regulations, we believe that this provision will help institutions develop processes to evaluate diplomas so that they do not arbitrarily reject diplomas, therefore helping students. The commenters raising these concerns also largely represented four-year private nonprofit institutions and well-regarded private high schools, none of which have been the source of these issues in the past. Instead, the possible cost to students would be borne by individuals who do not in fact have valid high school diplomas who would have been able to obtain financial aid under the prior regulations but are unable to do so in this situation. While this restricts the choices available to those individuals, they should not have been eligible for aid under the old regulations. Additionally, this restriction may itself not always be a cost, as individuals in those situations would be less likely to complete their courses, and more likely to be able to have difficulty repaying loans or end up in default.

*Certification Procedures*

Certification procedures represent the Department's process for ensuring that institutions agree to abide by the requirements of the title IV, HEA programs, which provides critical integrity and accountability around Federal dollars. Decisions about whether to certify an institution's participation, how long to certify it for, and what types of conditions should be placed on that certification are critical elements of managing oversight of institutions, particularly the institutions that pose risks to students and taxpayers. Shorter certification periods or provisional certification allow the Department greater flexibility to respond to an institution exhibiting some signs of concern. Similarly, institutions that do not raise concerns can be certified for longer and with no additional conditions, allowing the Department to focus its resources where greater attention is most needed.

Benefits

The Certification Procedures regulations provide benefits for the Federal Government, students, and States.

Federal Government

The regulations provide several important benefits for the Department and the Federal Government more generally. These particularly relate to improved program integrity, improved resource management, greater protection from closures, greater assurances that taxpayers will not fund credits that cannot result in long-term student benefits, and improved resource management. The elimination of § 668.13(b)(3) addresses the first two benefits. The provision being removed required the Department to issue a decision on a certification within 12 months of the date its participation expires. While it is important for the Department to move with deliberate speed in its oversight work, the institutions that have extended periods

with a pending certification application are commonly in this situation due to unresolved issues that must be dealt with first. For instance, an institution may have a pending certification application because it may have an open program review or a Federal or State investigation that could result in significant actions. Forcing decisions on those application before the review process or an investigation is completed results in suboptimal outcomes for the Department, the school, and students. For the institution, the Department may end up placing it on a short certification that would result in an institution facing the burden of redoing paperwork after only a few months. That would carry otherwise unnecessary administrative costs and increase uncertainty for the institution and its students.

The provisions in § 668.13(c)(1) that provides additional circumstances in which an institution would become provisionally certified also provides benefits for program integrity and improved program administration. For instance, the ability to request a teach-out plan or agreement when a provisionally certified institution is at risk of closure ensures the Department is not solely dependent upon a State or accreditation agency to help find options for students when a closure appears possible. The inability to ask for a teach-out plan or agreement to date has limited the Department's ability to ensure students are given options for continuing their education. This can result in an increase in closed school loan discharges, as well as significant costs to students who cannot recoup the time spent in a program they cannot continue elsewhere. Creating situations that automatically result in provisional certification also helps with program integrity and management. An institution may face a sudden shock that puts them out of business or the gradual accumulation of a series of smaller problems that culminates in a sudden closure. The pace at which these events occur requires the Department to be

nimble in responding to issues and better able to add additional requirements for an institution's participation outside of the normal renewal process. Under current regulations, the Department has too often been in a position where an obviously struggling institution faces no additional conditions on participation even if doing so might have resulted in a more orderly closure.

Such benefits are also related to the provisions in § 668.14(e) that lay out additional conditions that could be placed on an institution if it is in a provisional status. This non-exhaustive list of requirements specifies ways the Department can more easily protect students and taxpayers when concerns arise. Some of these conditions make it easier to manage the size of a risky institution and would ensure that it does not keep growing when it may be in dire straits. This would be done through conditions like restricting the growth of an institution, preventing the addition of new programs or locations, or limiting the ability of the institution to serve as a teach-out partner for other schools or to enter into agreements with other institutions to provide portions of an educational program.

Other conditions in § 668.14(e) give the Department better ability to ensure that it is receiving the information it needs to properly monitor schools and that there are plans for adequately helping students. The reporting requirements in § 668.14(e)(7) and (10) help the Department more quickly receive information about issues so it could react in real-time as concerns arise.

To get a sense of the potential effect of these changes, Table 4.3 below breaks down the certification status of all institutions participating in title IV, HEA programs. This provides some sense of which institutions might currently be subject to additional conditions.

TABLE 4.3—CERTIFICATION STATUS OF INSTITUTIONS PARTICIPATING IN THE TITLE IV, HEA FEDERAL STUDENT AID PROGRAMS

| | Fully certified | Provisionally certified | Month-to-month certification |
|---|---|---|---|
| Public | 1,748 | 86 | 23 |
| Private Nonprofit | 1,464 | 191 | 35 |
| Private For-Profit | 1,115 | 489 | 43 |
| Foreign | 297 | 73 | 42 |
| Total | 4,624 | 839 | 143 |

Source: Postsecondary Education Participants Systems as of August 2023.
**Note:** The month-to-month column is a subset of schools that could be in either the fully certified or the provisionally certified column.

As the table shows, there is a very significant difference in the amounts of liabilities assessed versus the amounts collected. This shows the importance of greater accountability to avoid the liabilities in the first place. It also demonstrates the critical need for tools like the financial responsibility triggers to obtain protection that can offset these liabilities.

The Department also benefits from changes in § 668.14 that increase the number of entities that could be financially liable for the cost of monies owed to the Department that are unpaid by institution. EA GENERAL–22–16 updated PPA signature requirements for entities exercising substantial control over non-public institutions of higher education.[55] While EA GENERAL–22–16 used a rebuttable presumption, language in § 668.14(a)(3) would not only require a representative of the

institution to sign a PPA, but also an authorized representative of an entity with direct or indirect ownership of a private institution. For private nonprofit institutions, this additional signature would generally be by an authorized representative of the nonprofit entity or entities that own the institution. Historically, the Department has often seen colleges decide to close when faced with significant liabilities instead of paying them. The result is both that the existing liability is not paid and the cost to taxpayers further due to closed school discharges due to students.

To get a sense of how often the Department successfully collects on assessed liabilities, we looked at the amount of institutional liabilities established as an account receivable and processed for repayment, collections, or referral to Treasury following the

exhaustion of any applicable appeals over the prior 10 years. This does not include liabilities that were settled or not established as an account receivable and referred to the Department's Finance Office. Items in the latter category could include liabilities related to closed school loan discharges that the Department did not assess because there were no assets remaining at the institution to collect from.

We then compared estimated liabilities to the amount of money collected from institutions for liabilities owed over the same period. The amount collected in a year is not necessarily from a liability established in that year, as institutions may make payments on payment plans, have liabilities held while they are under appeal, or be in other similar circumstances.

TABLE 4.4—LIABILITIES VERSUS COLLECTIONS FROM INSTITUTIONS

[$ in millions]

| Federal fiscal year | Established liabilities | Amounts collected from institutions |
|---|---|---|
| 2013 | 19.6 | 26.9 |
| 2014 | 86.1 | 37.5 |
| 2015 | 108.1 | 13.1 |
| 2016 | 64.5 | 30.8 |
| 2017 | 149.7 | 34.5 |
| 2018 | 126.2 | 51.1 |
| 2019 | 142.9 | 52.3 |
| 2020 | 246.2 | 31.7 |
| 2021 | 465.7 | 29.1 |
| 2022 | 203.0 | 37.0 |
| 2013–2022 | 1,611.9 | 344.2 |

Source: Department analysis of data from the Office of Finance and Operations including reports from the Financial Management Support System.

The added signature requirements are important because there may be many situations where the entities that own the closed institution still have resources that could be used to pay liabilities owed to the Department. The provisions in § 668.14(a)(3) make it clearer that the Department will seek signatures on PPAs from those types of entities, making them financially liable for the costs to the Department. In addition to the financial benefits in the form of the greater possibility of transfers from the school or other entities to the Department, this provision also provides deterrence benefits. Entities considering whether to invest in or otherwise purchase an institution would want to conduct

greater levels of due diligence to ensure that they are not supporting a place that might be riskier and, therefore, more likely to generate liabilities the investors would have to repay. The effect should mean that riskier institutions receive less outside investment and are unable to grow unsustainably. In turn, outside investors may then be more willing to consider institutions that generate lower returns due to more sustainable business practices. This could include institutions that do not grow as quickly because they want to ensure they are capable of serving all their students well or make other choices that place a greater priority on student success.

The provisions in § 668.14(b)(32)(iii) will benefit the Department in its work to minimize the costs of institutional

closures in two ways. The first is to help students better navigate their options if they wish to complete their education while the second is to minimize the financial costs associated with loan discharges for students who do not continue their education elsewhere. The part of the provision related to requiring institutions to abide by a State's laws related to closure around teach-out plans or agreements and the retention of student records relate to that first goal. Teach-outs are designed to give students the most seamless path to finishing a program and typically address complex issues like what credits will or will not transfer, whether the cost will be the same, and other key matters. Similarly, successful transfer requires that

---

[55] Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions of

Higher Education. https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-

participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education.

students have ways to access their records, especially transcripts. An August 2023 study by SHEEO found that students whose colleges closed and were in States that had both teach-out and record retention policies in place were more likely to re-enroll within four months than those who did not have those policies in place.[56] Though there were not long-term completion benefits from these policies, it does suggest that at least giving students the chance to continue has benefit.

Providing students with a smoother path to continuing their education when their college closes provide financial benefits for the Department too. The regulations around closed school discharges that were finalized on November 1, 2022 (87 FR 65904) state that borrowers who did not graduate from a program and were enrolled within 180 days of closure only lose eligibility for a closed school loan discharge if they accept and complete either a teach-out or a continuation of the program at another location of the same school.[57] That provision is designed to encourage orderly closures and the provision of teach-out agreements. Reinforcing the emphasis on teach-outs by requiring institutions to abide by State specific laws related to that area will thus further encourage the offering of orderly plans for students to continue their education and potentially reduce the number of closed school discharges that are granted because more borrowers will re-enroll, complete, and thus not be eligible for a closed school discharge.

Requiring institutions to abide by State-specific laws related to tuition recovery funds and surety bonds also benefits the Department by providing another source of funds to cover potential costs from closures. As SHEEO notes in its August 2023 paper, these policies as currently constructed are generally less about encouraging re-enrollment or program completion and more about giving students a path to having some of their costs reimbursed. To the extent these funds can help students pay off Federal loans, that would cover costs that are otherwise

borne by the Department. Moreover, making institutions subject to these requirements would also help deter behavior that could lead to a closure since it would result in increased expenses for an institution.

Overall, having institutions abide by State laws specific to closure of postsecondary education institutions will benefit the Department by allowing the State part of the regulatory triad to be more involved. That means the Department would get greater support in ensuring struggling colleges have teach-out plans and agreements in place, as well as lessening the costs from discharges that are not reimbursed.

Several other provisions in the certification procedures regulations address the benefits related to ensuring that Federal student aid is paying for fewer credits that cannot be used for long-term student success. This shows up in several ways. For one, the Department is concerned about students who receive Federal loans and grants to pay for credits in programs that lack the necessary licensure or certification for the students to actually work in those fields. When that occurs, the credits are essentially worthless as they cannot be put toward the occupations connected to the program.

In other cases, students may be accumulating credits far in excess of what they need to obtain a job in a given State. Section 668.14(b)(26) provides that the Department will not pay for GE programs that are longer than what is needed in the State where they are located (or a bordering State if certain exceptions are met), subject to certain exclusions. States establish the educational requirements they deem necessary and paying for credits beyond that point increases costs to the Department and also creates the risk that the return on investment for the program will be worse due to higher costs that may not be matched by an increase in wages in the relevant field.

The Department also receives benefits from ensuring that students are able to use the credits paid for with Federal funds. The changes in § 668.14(b)(34) establish that institutions must provide official transcripts that include all credits from a period in which the student received title IV, HEA program funds and the student had satisfied all institutional charges for that period at the time when the request was made. This provision bolsters other requirements that ban transcript withholding related to institutional errors § 668.14(b)(33). As a result, students will be more easily able to transfer their credits, which can bolster rates of completion and the associated

benefits that come with earning a postsecondary credential.

The changes in § 668.14(b)(35) also benefit the Department by bolstering the ability of students to complete their education. Research shows that additional financial aid can provide important supports to help increase the likelihood that students graduate. For example, one study showed that increasing the amount some students were allowed to borrow improved degree completion, later-life earnings, and their ability to repay their loans.[58] The language in § 668.14(b)(35) addresses situations in which an institution may prevent a student from receiving all the title IV aid they are entitled to without replacing it with other grant aid. The changes diminish the risk that students are left with gaps that could otherwise have been covered by title IV aid, which would help them finish their programs.

Students

Many of the same benefits for the Department will also accrue to students. This is particularly true for the provisions designed to make college closures more orderly and better protect students throughout that process. In most cases, college closures are extremely disruptive for students. As found by GAO and SHEEO, only 44 to 47 percent of students enroll elsewhere after a closure, and even fewer complete college.[59] SHEEO also found that over 100,000 students were affected by sudden closures from July 2004 to June 2020.[60] Allowing the Secretary to provisionally certify an institution deemed at risk of closure as well as request a teach-out plan or agreement from a provisionally certified institution at risk of closure will provide students with more structured pathways to continue their education if their institution shuts down. Requiring institutions to abide by State-specific laws related to the closure of postsecondary institutions will also give States a stronger role to ensure closures are orderly. As noted above, SHEEO has found that the presence of teach-out and record retention requirements are positively correlated with short-term enrollment, though long-term benefits fade out.[61] Ensuring States can enforce

---

[56] Burns, R., Weeden, D., Bryer, E., Heckert, K., Brown, L. (2023). A Dream Derailed? Investigating the Causal Effects of Student Protection Authorization Policies on Student Outcomes After College Closures, State Higher Education Executive Officers Association. *https://sheeo.org/wp-content/uploads/2023/08/SHEEO_CollegeClosures_Report3.pdf* page 35.

[57] The closed school discharge regulation is currently stayed pending appeal from a court's denial of a preliminary injunction. *See Career Colleges & Schs. of Tex.* v. *United States Dep't of Educ.*, No. 23–50491, Doc 42–1 (5th Cir. Aug. 7, 2023).

[58] *www.nber.org/papers/w27658.*

[59] *www.gao.gov/products/gao-21-105373; sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.*

[60] *https://sheeo.org/more-than-100000-students-experienced-an-abrupt-campus-closure-between-july-2004-and-june-2020/.*

[61] *https://sheeo.org/wp-content/uploads/2023/08/SHEEO_CollegeClosures_Report3.pdf.*

their laws related to tuition recovery funds and surety bonds also provides financial benefits to students by giving them another avenue to receive money back besides a closed school loan discharge.

Other changes within § 668.14(b)(26) provide benefits to students by reducing the number of postsecondary credits paid for with Federal aid that are either not needed for success or cannot be used to help students achieve their educational goals. In the former area, limitations on the length of programs will reduce situations where borrowers may be paying for credits beyond what is needed to get licensed for a GE program. Given that many of these are certificate programs that result in low-to-moderate incomes, the cost of added credits may well undercut a program's positive financial return on investment. It also represents more time a student must spend enrolled as opposed to making money in the workforce. Provisions around requiring programs to have necessary approvals for licensure or certification reduce the likelihood that students may end up expending significant amounts of time and money, including Federal aid, in programs where they will be unable to work in their chosen field upon completion. It would be very challenging for students in these situations to receive the financial benefits they sought from a program and protections will ensure that time and money are well spent.

The limitations on how institutions can withhold transcripts in § 668.14(b)(33) and (34) similarly benefit students by increasing the situations in which they will be able to make use of the credits they earn. In particular, the requirement added from the NPRM that institutions must provide a transcript that includes credits earned during a period in which the student received title IV, HEA program funds and no longer has a balance for that period will protect more credits entirely from withholding. Withheld transcripts are a significant issue. A 2020 study by Ithaka S+R estimated that 6.6 million students have credits they are unable to access because their transcript is being withheld by an institution.[62] That study and a 2021 study published by the same organization estimate that the students most affected are likely adult learners, low-income students, and racial and ethnic minority students.[63] This issue inhibits students with some college, but no degree, from completing their

educational programs, as well as prevents some students with degrees from pursuing further education or finding employment if potential employers are unable to verify that they completed a degree or if they are unable to obtain licensure for the occupation for which they trained.

Finally, the requirement in § 668.14(b)(35) around polices to limit the awarding of aid will benefit students by ensuring that they receive all the Federal aid they are entitled to. This will likely result in a small increase in transfers from the Department to students as they receive aid that would otherwise have been withheld by the school. Research shows that increased ability to borrow can increase completed credits and improve grade point average, completion, post-college earnings, and loan repayment for some students.[64]

The expanded requirements for who signs a PPA as spelled out in § 668.14(a)(3) provides similar benefits for students. Requiring outside investors to be jointly and severally liable for any liabilities not paid for by the institution should encourage more cautious approaches to institutional management and investment. Such approaches discourage the kind of aggressive recruitment that has resulted in schools misrepresenting key elements of postsecondary educations to students, giving grounds for the approval of borrower defense to repayment claims. Institutions that also took less cautious approaches have also exhibited signs of financial struggle if they cannot maintain enrollment, including instances of sudden closures that left students without clear educational options.

## States

States will benefit from the language in § 668.14(b)(32) that requires institutions to abide by State laws related to institutional closures. As discussed already, college closures are disruptive for students, often often mean the end of their educational journey, and can result in unreimbursed costs for the student. Closures can also be burdensome on States that step in and try to manage options for students, especially if the institution closes without a teach-out agreement in place or a plan for record retention. Under current regulations, a State is not always able to enforce its own laws related to the closure of postsecondary institutions for places that do not have a physical presence in their State. Ensuring States

can enforce laws related to institutional closure for their students regardless of where the school is physically located will allow States to better protect the people living in their borders, if they choose to do so. At the same time, because the State has the option to choose whether to have laws in this area, and what the content of those laws say, they have flexibility to determine how much work applying these provisions will mean for them.

## Costs

The regulations create some costs for the Federal Government, students, States, and institutions.

### Federal Government

The regulations create some modest administrative costs for the Department. These consist of staffing costs to monitor the additional conditions added to PPAs, as well as any increase in changes to an institution's certification status. Beyond these administrative costs, the Department could see a slight increase in costs in the title IV, HEA programs that come in the form of greater transfers to students who would otherwise have received less financial aid under the conditions prohibited in § 668.14(b) (35). As discussed in the benefits section, greater aid could help students finish their programs.

### Students

The Department is not anticipating that these regulations will have a significant cost for students, especially on an ongoing basis. The greatest cost for students could be for those who are in the process of choosing an institution as the regulations go into effect. These students may incur some costs to expand or otherwise continue their school search if it turns out a program they were considering did not have necessary approvals, was subject to a growth restriction, or some other condition that meant they could not enroll in that institution. However, these costs would be more than offset by the benefits received by a student from enrolling in a program where they will be able to obtain necessary licensure or certification or enrolling in an institution that is not as risky.

### States

Ensuring States can enforce their laws related to institutional closures regardless of whether the school is physically located in their borders could have some additional administrative costs for States. The extent of these costs would be dependent on how States structure their laws. For instance, if States chose to expand their laws to

---

[62] sr.ithaka.org/publications/solving-stranded-credits.

[63] sr.ithaka.org/publications/stranded-credits-a-matter-of-equity.

[64] www.aeaweb.org/articles?id=10.1257/pol.20180279; www.nber.org/papers/w24804.

subject more institutions to requirements for teach-outs, record retention, surety bonds, or tuition recovery funds, then they would see added administrative costs to enforce the expanded requirements. However, if States make no changes or choose to not apply requirements to online schools not located in their borders, then they would not see added costs. This provision thus gives States the option to choose how much added work to take on or not.

Institutions

Some institutions will see increased administrative costs or costs in the form of reduced transfers from the Department, but the nature and extent will vary significantly. Many institutions will see no change in their transfers, as they are not affected by provisions like the ones that cap program length, require having necessary approvals for licensure or certification, or do not offer distance programs outside their home State. For other institutions, the nature and extent of costs will vary depending on how much they must either engage in administrative work to come into compliance with the regulations or otherwise reduce enrollment that is supported by title IV, HEA funds. For instance, an institution that enrolls many students who are in States where the program does not have necessary approvals for licensure or certification will either face administrative costs to make their program eligible or see a reduction in transfers because they no longer enroll students from those locations. Similarly, programs that need to be shortened because they are longer than State requirements will either generate administrative costs to come into compliance or stop offering those programs. For institutions offering distance education, the costs will also depend upon whether they are enrolling significant numbers of students in States that have rules around institutional closures or not and how much it costs to comply with those rules. This includes issues like whether the institution must provide more surety bonds or contribute money into a tuition recovery fund.

Institutions that are placed on provisional status will incur other administrative expenses. This can come from submitting additional information for reporting purposes or applying for recertification after a shorter period, which requires some staff time. Institutions that are asked to provide a teach-out plan or agreement will also incur administrative expenses to produce those documents.

The highly varied nature of these effects means it is not possible to model these costs for institutions. For instance, the Department does not currently have data from institutions on which programs are more than 100 percent of the required length set by the State. Nor do we know how many programs enroll students from States where they do not have the necessary approvals for graduates to obtain licensure or certification. The same is true of several other provisions. This makes it impossible to estimate how many institutions would have to consider adjustments. We also do not know how extensive any necessary modifications would be or how many students are affected—two issues that affect the administrative costs and potential costs in the form of reduced transfers.

Overall, however, we believe that the benefits to the Federal Government and students will exceed these costs. For example, a program that lacks the necessary approvals for a graduate to become licensed or certified is not putting graduates in a position to use the training they are paying for. Even if there are costs to the institution to modify or cease enrolling students in that program, the benefits to students from not paying for courses that cannot lead them to achieve their educational goals makes the cost versus benefit analysis worthwhile.

*Ability To Benefit*

The HEA requires students who are not high school graduates to fulfill an ATB alternative and enroll in an eligible career pathway program to gain access to title IV, HEA aid. The three ATB alternatives are passing an independently administered ATB test, completing six credits or 225 clock hours of coursework, or enrolling through a State process.[65] Colloquially known as ATB students, these students are eligible for all title IV, HEA aid, including Federal Direct loans. The ATB regulations have not been updated since 1994. In fact, the current Code of Federal Regulations has no mention of eligible career pathway programs. Changes to the statute have been implemented through sub regulatory guidance laid out in Dear Colleague Letters (DCLs). DCL GEN 12–09, 15–09, and 16–09 explained the implementation procedures for the statutory text. Due to the changes over the years the Department updates, clarifies, and streamlines the regulations related to ATB.

---

[65] As of January 2023, there are six States with an approved State process.

Benefits

The regulations will provide benefits to States by more clearly establishing the necessary approval processes. This helps more States have their applications approved and reduces the burden of seeking approval. This is particularly achieved by creating an initial and subsequent process for applications. Currently, States that apply are required to submit a success rate calculation under current § 668.156(h) as a part of the first application. Doing so is very difficult because the calculation requires that a postsecondary institution is accepting students through its State process for at least one year. This means that a postsecondary institution needs to enroll students without the use of title IV aid for one year to gather enough data to submit a success rate to the Department. Doing so may be cost prohibitive for postsecondary institutions.

The regulations also benefit institutions by making it easier for them to continue participating in a State process while they work to improve their results. More specifically, reducing the success rate calculation threshold from 95 percent to 85 percent, and allowing struggling institutions to meet a 75 percent threshold for a limited number of years, gives institutions additional opportunities to improve their outcomes before being terminated from a State process. This added benefit does not come at the expense of costs to the student from taking out title IV, HEA aid to attend an eligible career pathway program. This is because the Department incorporates more guardrails and student protections in the oversight of ATB programs, including documentation and approval by the Department of the eligible career pathway program. That means regulatory oversight is not decreased overall.

Institutions that are maintaining acceptable results also benefit from these regulations. Under current regulations, the success rate calculation includes all institutions combined. The result is that an institution with strong outcomes could be combined with those that are doing worse. Under the final regulations, the State calculates the success rate for each individual participating institution, therefore allowing other participating institutions that are in compliance with the regulations to continue participation in the State process.

Costs

The regulatory changes impose additional costs on the Department, postsecondary institutions, and entities that apply for the State process.

The regulations will break up the State process into an initial and subsequent application that must be submitted to the Department after two years of initial approval. This increases costs to the State and participating institutions. This new application process will be offset because the participating institutions will no longer need to fund their own State process without title IV, HEA program aid to gain enough data to submit a successful application to the Department.

In the initial application, the State will have to calculate the withdrawal rate for each participating institution. This increases costs to the State and participating institutions. The increased administrative costs associated with the new outcome metric will be minimal because a participating institution already know how to calculate the withdrawal rate as it is already required under Administrative Capability regulations.

The Department is placing additional reporting requirements on States, including information on the demographics of students. This increases administrative burden costs to the State and participating institutions. There is a lack of data about ATB and eligible career pathway programs, and the new reporting means the Department will be able to analyze the data and may be able to report trends publicly.

The minimum documentation requirements in § 668.157 prescribe what all eligible career pathway programs will have to meet in the event of an audit, program review, or review and approval by the Department.

Currently the Department does not approve eligible career pathway programs, therefore, the regulation increases costs to any postsecondary institutions that provide an eligible career pathway program. For example, § 668.157(a)(2) requires a government report demonstrate that the eligible career pathway program aligns with the skill needs of industries in the State or regional labor market. Therefore, if no such report exists the program would not be title IV, HEA eligible. Further, in § 668.157(b) and (c) the Department approves at least one eligible career pathway program at each postsecondary institution that offers such programs. We believe that benefits of the new documentation standards outweigh their costs because the regulations increase program integrity and oversight and could stop title IV, HEA aid from subsidizing programs that do not meet the statutory definition. Institutions currently use their best faith to comply with the statute which means there are likely many different interpretations of the HEA. These regulations will set clear expectations and standardize the rules.

Elsewhere in this section under the Paperwork Reduction Act of 1995, we identify and explain burdens specifically associated with information collection requirements.

**5. Net Budget Impacts**

We do not estimate that the regulations on Financial Responsibility, Administrative Capability, Certification Procedures, and ATB will have a significant budget impact. This is consistent with how the Department has treated similar changes in recent regulatory changes related to Financial Responsibility and Certification Procedures. The Financial Responsibility triggers are intended to

identify struggling institutions and increase the financial protection the Department receives. While this may increase recoveries from institutions for certain types of loan discharges, affect the level of closed school discharges, or result in the Department withholding title IV, HEA funds, all items that would have some budget impact, we have not estimated any savings related to those provisions. Historically, the Department has not been able to obtain much financial protection from closed schools and existing triggers have not been widely used. Therefore, we will wait to include any effects from these provisions until indications are available in title IV, HEA loan data that they meaningfully reduce closed school discharges or significantly increase recoveries. We did run some sensitivity analyses where these changes did affect these discharges, as described in Table 5.1. We only project these sensitivity analyses affecting future cohorts of loans. This approach reflects our assumption that much of the liabilities associated with past cohorts of loans due to closed school discharges and borrower defense is either already known or will be tied to institutions that are closed thus there will not be a way to obtain financial protection. Concerns with the inability to have sufficient financial protection in place prior to the generation of liabilities is one of the reasons the Department is issuing this final rule as we hope to prevent such situations from repeating in the future. The results in Table 5.1 differ from those in the NPRM which included the effect of the GE provisions which are now in the baseline for this analysis. We are including the estimate of the financial responsibility sensitivities without the GE provisions from the NPRM in Table 5.1 for comparison.

TABLE 5.1—FINANCIAL RESPONSIBILITY SENSITIVITY ANALYSIS

| Scenario | Cohorts 2024–2033 Outlays ($ in millions) | |
|---|---|---|
| | NPRM | Final |
| Closed School Discharges Reduced by 5 percent | −284 | −247 |
| Closed School Discharges Reduced by 25 percent | −1,500 | −1,254 |
| Borrower Defense Discharges Reduced by 5 percent | −70 | −56 |
| Borrower Defense Discharges Reduced by 15 percent | −230 | −173 |

**6. Accounting Statement**

As required by OMB Circular A–4, we have prepared an accounting statement

showing the classification of the benefits, costs, and transfers associated with the provisions of these regulations.

TABLE 6.1—ACCOUNTING STATEMENT FOR PRIMARY SCENARIO

| | Annualized impact (millions, $2023) | |
|---|---|---|
| | Discount rate = 3% | Discount rate = 7% |
| **Benefits** | | |
| Consolidation of all financial responsibility factors under subpart L ........ | 0.12 Not quantified | 0.12 |
| **Costs** | | |
| Information submission that may be required of provisionally certified institutions, initially certified nonprofit institutions, and those that undergo a change in ownership ........ | 0.02 | 0.02 |
| Required financial aid counseling to students and families to accept the most beneficial type of financial assistance and strengthened requirement for institutions to develop and follow procedures to validate high school diplomas ........ | 2.88 | 2.89 |
| Information submission that any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized ........ | 0.72 | 0.72 |
| Compliance with approval requirements for State process for ATB ........ | 0.16 | 0.16 |
| Documentation requirements for Eligible Career Pathways program ........ | 0.50 | 0.50 |
| Increased reporting of financial responsibility triggers and requirement that some public institutions provide documentation from a government entity that confirms that the institution is a public institution and is backed by the full faith and credit of that government entity to be considered as financially responsible ........ | 0.08 | 0.08 |
| **Transfers** | | |
| None in primary estimate. | | |

*Financial Responsibility Triggers*

We conducted several sensitivity analyses to model the potential effects of the Financial Responsibility triggers if they did result in meaningful increases in financial protection obtained that can offset either closed school or borrower defense discharges. We modeled these as reductions in the number of projected discharges in these categories. This would not represent a reduction in benefits given to students, but a way of considering what the cost would be if the Department was reimbursed for a portion of the discharges. These are described above in Net Budget Impacts.

**7. Alternatives Considered**

The Department considered the following items in response to public comments submitted on the NPRM. Many of these are also discussed in the preamble to this final rule.

*Financial Responsibility*

We considered adopting a materiality threshold but declined to do so. Materiality is a concept often attested to by auditors based upon representations made by management. We are concerned that such an approach would undercut the discretion of the Department and that the time it would take for auditors to provide an assessment of materiality would result in it taking too long to seek financial protection when needed.

We also considered adopting a formal appeals process related to the imposition of letters of credit but

decided that maintaining the current practice of having back and forth discussions with institutions while we work to understand the nature of the triggering event would be more effective and efficient for both parties. The purpose of the trigger is to quickly seek financial protection when there are concerns about how the triggering event may affect the financial health of the institution. An appeals process could result in dragging out that process so long that closures could still occur with no protection in place.

*Administrative Capability*

The Department considered adopting a suggestion from commenters to not require institutions to verify high school diplomas that might be questionable if they came from a high school that was licensed or registered by the State. However, we are concerned that those terms could be read to allow obtaining a business license that is unrelated to education as exempting high schools from consideration.

*Certification Procedures*

We considered removing all supplementary performance measures in § 668.13(e) but decided to only remove the items related to debt-to-earnings and earnings premium. Providing institutions notice that measures such as withdrawal rates, licensure passage rates, and the share of spending devoted to marketing and recruitment could be considered during the institutional certification and

recertification process gives greater clarity to the field.

We also considered adopting suggestions by commenters to only apply the signature requirement to individuals. However, we decided to keep applying the requirements to corporations or entities because that better reflects the structure of most ownership groups for institutions of higher education and thus better matches our goal of ensuring taxpayers have greater protections against possible liabilities.

The Department considered suggestions from commenters to entirely remove requirements that institutions certify they abide by certain State laws specifically related to postsecondary education as well as to expand the types of education-specific laws covered by that provision. We ultimately felt that limiting this provision to specific items related to protecting students from institutional closures struck the best balance between giving clear expectations to the field with protecting students from the circumstances we are most worried about.

For certification requirements related to professional licensure, we considered suggestions from commenters to maintain the current regulations that require disclosures to students. However, we are concerned that students who use Federal aid to pay for programs where graduates will be unable to work in their desired field sets students up for financial struggles and is likely to be a waste of taxpayer resources. Accordingly, we think the

stronger certification requirement will better protect students and lessen the risk of paying for programs that cannot lead to employment in the related field.

We also considered adopting recommendations from commenters to allow GE programs to be as long as 150 percent of State maximum hour requirements. However, we are concerned that allowing programs to exceed the time necessary to receive State certification or licensure risks students taking on greater amounts of loan debt that will not result in appreciably higher earnings. That could risk students ending up with loans that would have been more affordable at the shorter program lengths. Accordingly, we think a cap related to 100 percent of the required State length is more appropriate.

*Ability To Benefit*

The Department considered suggestions from commenters to reduce the success rate to as low as 75 percent. However, we are concerned that level would expose the State process to unacceptable levels of performance and poor student outcomes. We also considered adopting larger caps on the number of students that could enroll in eligible career pathways programs in the initial two years of the State process or not having any cap at all. Given that the caps are only in place for two years, we think that starting small and ensuring models are successful is better than allowing programs to start at larger sizes before determining if they can serve students well.

## 8. Regulatory Flexibility Act Analysis

This section considers the effects that the final regulations will have on small entities in the Educational Sector as required by the Regulatory Flexibility Act (RFA, 5 U.S.C. *et seq.*, Pub. L. 96–354) as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA). The purpose of the RFA is to establish as a principle of regulation that agencies tailor regulatory and informational requirements to the size of entities, consistent with the objectives of a particular regulation and applicable statutes. The RFA generally requires an agency to prepare a regulatory flexibility analysis of any rule subject to notice and comment rulemaking requirements under the APA or any other statute unless the agency certifies that the rule will not have a ''significant impact on a substantial number of small entities.'' As noted in the RIA, the Department does not expect that the regulatory action will have a significant budgetary impact, but there are some costs to small

institutions that are described in this Final Regulatory Flexibility Analysis.

*Description of the Reasons That Action by the Agency Is Being Considered*

These final regulations address four areas: financial responsibility, administrative capability, certification procedures, and ATB. The financial responsibility regulations will increase our ability to identify high-risk events that are likely to have a significant adverse effect on the financial condition of the institution and require the financial protection we believe is needed to protect students and taxpayers. We strengthened institutional requirements in the administrative capability regulations at §668.16 to improve the administration of the title IV, HEA programs and address concerning practices that were previously unregulated. The certification procedures regulations will create a more rigorous process for certifying institutions to participate in the title IV, HEA programs. Finally, we amended regulations for ATB at §§668.156 and 668.157, which will clarify student eligibility requirements for non-high school graduates and the documentation requirements for eligible career pathway programs.

*Succinct Statement of the Objectives of, and Legal Basis for, the Regulations*

The objective of the financial responsibility regulations is to ensure institutions meet minimum standards of financial responsibility on an ongoing basis while identifying changes in condition that warrant safeguards such as increased financial protection. Doing so increases the Department's ability to identify high-risk events and require the financial protection we believe is needed to protect students and taxpayers. We are strengthening requirements in the administrative capability regulations to improve the administration of the title IV, HEA programs and address concerning practices that were previously unregulated.

Our goal of the certification procedures regulations is to create a more rigorous process for certifying institutions to participate in the title IV, HEA programs. We expect all of these regulations to better protect students and taxpayers.

Finally, our objective for the ATB regulations is to clarify student eligibility requirements for non-high school graduates and the documentation requirements for eligible career pathway programs so that more students can access postsecondary education and succeed.

The Department's authority to pursue the financial responsibility regulations is derived from section 498(c) of the HEA. HEA section 498(d) authorizes the Secretary to establish certain requirements relating to institutions' administrative capacities. The Secretary's authority around institutional eligibility and certification procedures is derived primarily from HEA section 498. Section 487(a) of the HEA requires institutions to enter into an agreement with the Secretary, and that agreement conditions an institution's participation in title IV programs on a list of requirements. Furthermore, as discussed elsewhere in the preamble, HEA section 487(c)(1)(B) authorizes the Secretary to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV, HEA programs in matters not governed by specific program provisions, and that authorization includes any matter the Secretary deems necessary for the sound administration of the student aid programs. The Department's authority for the ATB regulations comes from section 498(d) of the HEA, which outlines how a student who does not have a certificate of graduation from a school providing secondary education, or the recognized equivalent of such certificate, can be eligible for Federal student aid.

*Description of and, Where Feasible, an Estimate of the Number of Small Entities to Which the Regulations Will Apply*

The Small Business Administration (SBA) defines ''small institution'' using data on revenue, market dominance, tax filing status, governing body, and population. Most entities to which the Office of Postsecondary Education's (OPE) regulations apply are postsecondary institutions, however, which do not report data on revenue that is directly comparable across institutions. As a result, for purposes of this NPRM, the Department proposes to continue defining ''small entities'' by reference to enrollment, to allow meaningful comparison of regulatory impact across all types of higher education institutions.

The enrollment standard for small less-than-two-year institutions (below associate degrees) is less than 750 full-time-equivalent (FTE) students and for small institutions of at least two but less-than-4-years and 4-year institutions,

less than 1,000 FTE students.[66] As a result of discussions with the Small Business Administration, this is an update from the standard used in some prior rules, such as the NPRM associated with this final rule, "Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)," published in the **Federal Register** May 19, 2023,[67] the final rule published in the **Federal Register** on July 10, 2023, for the

"Improving Income Driven Repayment" rule,[68] and the final rule published in the **Federal Register** on October 28, 2022, on "Pell Grants for Prison Education Programs; Determining the Amount of Federal Education Assistance Funds Received by Institutions of Higher Education (90/10); Change in Ownership and Change in Control." [69] Those prior rules applied an enrollment standard for a small two-year institution of less than 500 full-time-equivalent (FTE) students and for a small 4-year institution, less than 1,000

FTE students.[70] The Department consulted with the Office of Advocacy for the SBA and the Office of Advocacy has approved the revised alternative standard for this rulemaking. The Department continues to believe this approach most accurately reflects a common basis for determining size categories that is linked to the provision of educational services and that it captures a similar universe of small entities as the SBA's revenue standard.[71]

TABLE 8.1—SMALL INSTITUTIONS UNDER ENROLLMENT-BASED DEFINITION

| | Small | Total | Percent |
|---|---|---|---|
| Proprietary | 2,114 | 2,331 | 91 |
| 2-year | 1,875 | 1,990 | 94 |
| 4-year | 239 | 341 | 70 |
| Private not-for-profit | 997 | 1,831 | 54 |
| 2-year | 199 | 203 | 98 |
| 4-year | 798 | 1,628 | 49 |
| Public | 524 | 1,924 | 27 |
| 2-year | 461 | 1,145 | 40 |
| 4-year | 63 | 779 | 8 |
| Total | 3,635 | 6,086 | 60 |

Source: 2020–21 IPEDS data reported to the Department.

Table 8.1 summarizes the number of institutions affected by these final regulations. As seen in Table 8.2, the

average total revenue at small institutions ranges from $3.0 million for

proprietary institutions to $16.5 million at private institutions.

TABLE 8.2—AVERAGE AND TOTAL REVENUES AT SMALL INSTITUTIONS

| | Average | Total |
|---|---|---|
| Proprietary | 2,959,809 | 6,257,035,736 |
| 2-year | 2,257,046 | 4,231,961,251 |
| 4-year | 8,473,115 | 2,025,074,485 |
| Private not-for-profit | 16,531,376 | 16,481,781,699 |
| 2-year | 3,664,051 | 729,146,103 |
| 4-year | 19,740,145 | 15,752,635,596 |
| Public | 11,084,101 | 5,808,068,785 |
| 2-year | 8,329,653 | 3,839,969,872 |
| 4-year | 31,239,665 | 1,968,098,913 |
| Total | 7,853,339 | 28,546,886,220 |

As noted in the net budget estimate section, we do not anticipate that the Financial Responsibility, Administrative Capability, Certification

Procedures, and ATB components of the regulation will have any significant budgetary impact, or an impact on a substantial number of small entities. We

have, however, run a sensitivity analysis of what an effect of the Financial Responsibility provisions could be on offsetting the transfers of certain loan

---

[66] In regulations prior to 2016, the Department categorized small businesses based on tax status. Those regulations defined "non-profit organizations" as "small organizations" if they were independently owned and operated and not dominant in their field of operation, or as "small entities" if they were institutions controlled by governmental entities with populations below 50,000. Those definitions resulted in the categorization of all private nonprofit organizations as small and no public institutions as small. Under the previous definition, proprietary institutions were considered small if they are independently owned and operated and not dominant in their field

of operation with total annual revenue below $7,000,000. Using FY 2017 IPEDs finance data for proprietary institutions, 50 percent of 4-year and 90 percent of 2-year or less proprietary institutions would be considered small. By contrast, an enrollment-based definition applies the same metric to all types of institutions, allowing consistent comparison across types.

[67] 88 FR 32300.

[68] 88 FR 43820.

[69] 87 FR 65426.

[70] In those prior rules, at least two but less-than-four-years institutions were considered in the broader two-year category. In this iteration, after

consulting with the Office of Advocacy for the SBA, we separate this group into its own category.

[71] The Department uses an enrollment-based definition since this applies the same metric to all types of institutions, allowing consistent comparison across all types. For a further explanation of why the Department proposes this alternative size standard, please see "Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program (Borrower Defense)" proposed rule published July 31, 2018 (83 FR 37242).

discharges from the Department to borrowers by obtaining additional funds from institutions. We elected to use a sensitivity analysis to reflect the uncertainty of how this rule, as well as final rules around GE & borrower defense may deter the behavior that in the past led to liabilities against institutions. These sensitivities reduced borrower defense claims by 5 percent and 15 percent and closed school claims by 5 percent and 25 percent. Using the sensitivities, we estimated there could be a reduction in the budget impact of closed school discharges or borrower defense of $0.5 to $1.5 billion for loan cohorts through 2033 from all types of institutions, not just small institutions. Since these amounts scale with the number of students, we anticipate the impact to be much smaller at small entities.

While we do not anticipate a significant budget impact from these provisions, the RIA identifies some potential costs to institutions that may also affect small institutions. The Department has not quantified these costs because they are specific to individual institutions' circumstances. The largest are the costs associated with providing financial protection. Some of these are administrative costs in the form of fees paid to banks or other financial institutions to obtain a letter of credit. These are costs that an institution bears regardless of whether a letter of credit is collected upon. The exact amount of this fee will vary by institution and at least partly reflect the assessment of the institution's riskiness by the financial institution. Institutions do not report the costs of obtaining a letter of credit to the Department.

In addition to the potential cost of financial protection, institutions could see increased costs to improve their financial aid information, strengthen their career services, improve their procedures for verifying high school diplomas, and providing clinical opportunities and externships. The extent of these costs will vary across institutions, with some not requiring

any changes and others facing costs that could range from small one-time charges to tweak financial aid communications to ongoing expenses to have the staff necessary for career services or findings spots for clinical and externship opportunities. Potential costs associated with reviewing high school diplomas will also vary greatly based on institutions' existing procedures.

The certification provisions could also result in administrative expenses or costs in the form of reduced transfers from the Department, but the nature and extent will vary significantly. Many institutions will see no change in their transfers, as they are not affected by provisions like the ones that cap the length of gainful employment programs, require having necessary approvals for licensure or certification, or do not offer distance programs outside their home State. For other institutions, the nature and extent of costs will vary depending on how much they must either engage in administrative work to come into compliance with the regulations or otherwise reduce enrollment that is supported by title IV, HEA funds. Institutions that are placed on provisional status will incur other administrative expenses. This can come from submitting additional information for reporting purposes or applying for recertification after a shorter period, which requires some staff time. Institutions that are asked to provide a teach-out plan or agreement will also incur administrative expenses to produce those documents.

The ability to benefit provisions will impose additional costs on small entities that apply for the State process. The regulations will break up the State process into an initial and subsequent application that must be submitted to the Department after two years of initial approval. This increases costs to the State and participating institutions. This new application process will be offset because the participating institutions will no longer need to fund their own State process without title IV, HEA program aid to gain enough data to

submit a successful application to the Department. There are also additional reporting costs associated with the ATB and eligible career pathways program requirements that are described in the following section of this analysis.

*Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Regulations, Including an Estimate of the Classes of Small Entities That Will Be Subject to the Requirements and the Type of Professional Skills Necessary for Preparation of the Report or Record*

As detailed in the Paperwork Reduction Act of 1995 section of this preamble, institutions in certain circumstances will be required to submit information to the Department. The final regulations require provisionally certified institutions at risk of closure to submit to the Department acceptable teach-out plans, and acceptable record retention plans. For provisionally certified institutions at risk of closure, are teaching out or closing, or are not financially responsible or administratively capable, the change requires the release of holds on student transcripts. Other provisions require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available to enrolled students and strengthen the requirement to evaluate the validity of students' high school diplomas. The final regulations also require information about relevant foreign ownership, the State process for ability to benefit qualification, eligible career pathways programs, financial responsibility trigger events, and, for some institutions, confirmation that they are public institutions backed by the full faith and credit of that government entity to be considered as financially responsible. Based on the share of institutions considered small entities, we have estimated the paperwork burden of these provisions in Table 8.3.

TABLE 8.3—ESTIMATED PAPERWORK BURDEN ON SMALL ENTITIES

| OMB control No. | Regulatory section | Information collection | Hours | Estimated cost | Average hours per institution | Average amount per institution | As % of average revenue |
|---|---|---|---|---|---|---|---|
| 1845–0022 ...... | § 668.14 ........ | Amend § 668.14(e) to establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions, such as the submission of a teach-out plan or agreement. Amend § 668.14(g) to establish conditions that may apply to an initially certified nonprofit institution, or an institution that has undergone a change of ownership and seeks to convert to nonprofit status. | 258 | $12,398 | 10 | 481 | 0.01 |

TABLE 8.3—ESTIMATED PAPERWORK BURDEN ON SMALL ENTITIES—Continued

| OMB control No. | Regulatory section | Information collection | Hours | Estimated cost | Average hours per institution | Average amount per institution | As % of average revenue |
|---|---|---|---|---|---|---|---|
| 1845–0022 ...... | § 668.15 ........ | Remove and reserve § 668.15 thereby consolidating all financial responsibility factors, including those governing changes in ownership, under part 668, subpart L. | (1,493) | (70,576) | (1) | (46) | 0.00 |
| 1845–0022 ...... | § 668.16 ........ | Amend § 668.16(h) to require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available.<br>Amend § 668.16(p) to strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma. | 34,518 | 1,658,590 | 11 | 529 | 0.01 |
| 1845–0022 ...... | § 668.23 ........ | Amend § 668.23(d) to require that any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized. | 8,640 | 416,305 | 40 | 1,917 | 0.02 |
| 1845–0176 ...... | § 668.156 ...... | Amend § 668.156 to clarify the requirements for the approval of a State process. The State process is one of the three ATB alternatives that an individual who is not a high school graduate could fulfill to receive title IV, Federal student aid to enroll in an eligible career pathway program. | 1,920 | 92,256 | 320 | 15,376 | 0.20 |
| 1845–0175 ...... | § 668.157 ...... | Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs. | 6,000 | 288,300 | 10 | 481 | 0.01 |
| 1845–0022 ...... | § 668.171 ...... | Amend § 668.171(f) to revise the set of conditions whereby an institution must report to the Department that a triggering event, described in § 668.171(c) and (d), has occurred.<br>Amend § 668.171(g) to require some public institutions to provide documentation from a government entity that confirms that the institution is a public institution and is backed by the full faith and credit of that government entity to be considered as financially responsible. | 948 | 45,551 | 2 | 103 | 0.001 |

*Identification, to the Extent Practicable, of All Relevant Federal Regulations That May Duplicate, Overlap or Conflict With the Regulations*

The regulations are unlikely to conflict with or duplicate existing Federal regulations.

*Alternatives Considered*

As described in section 7 of the Regulatory Impact Analysis above, "Alternatives Considered," we evaluated several alternative provisions and approaches. For financial responsibility, we considered adopting a materiality threshold and a formal appeals process related to the imposition of letters of credit. In the administrative capability regulations, the Department considered not requiring institutions to verify high school diplomas that might be questionable if they came from a high school that was licensed or registered by the State. We considered removing all supplementary performance measures in the certification procedures, as well as only applying the signature requirement to individuals. The Department considered suggestions from commenters to entirely remove requirements that institutions certify they abide by certain State laws specifically related to postsecondary education as well as to expand the types of education-specific laws covered by

that provision. For certification requirements related to professional licensure, we considered suggestions from commenters to maintain the current regulations that require disclosures to students. We also considered adopting recommendations from commenters to allow GE programs to be as long as 150 percent of State maximum hour requirements. In the ATB regulations, we considered suggestions from commenters to reduce the success rate to as low as 75 percent.

## 9. Paperwork Reduction Act of 1995

As part of its continuing effort to reduce paperwork and respondent burden, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This helps ensure that the public understands the Department's collection instructions, respondents can provide the requested data in the desired format, reporting burden (time and financial resources) is minimized, collection instruments are clearly understood, and the Department can properly assess the impact of collection requirements on respondents.

Sections 668.14, 668.15, 668.16, 668.23, 668.156, 668.157, and 668.171

of the final regulations contain information collections requirements.

Under the PRA, the Department has or will at the required time submit a copy of these sections and Information Collection requests to OMB for its review. A Federal agency may not conduct or sponsor a collection of information unless OMB approves the collection under the PRA and the corresponding information collection instrument displays a currently valid OMB control number. Notwithstanding any other provision of law, no person is required to comply with, or is subject to penalty for failure to comply with, a collection of information if the collection instrument does not display a currently valid OMB control number. In these final regulations, we display the control numbers assigned by OMB to any information collection requirements proposed in the NPRM and adopted in the final regulations.

*Section 668.14—Program Participation Agreement*

*Requirements:* The final rule redesignates current § 668.14(e) as § 668.14(h). The Department also includes a new paragraph (e) that outlines a non-exhaustive list of conditions that we may opt to apply to provisionally certified institutions. The final rule also requires that institutions at risk of closure must submit an

acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency. Institutions at risk of closure must also submit an acceptable records retention plan that addresses title IV, HEA records, including but not limited to student transcripts, and evidence that the plan has been implemented, to the Department.

The final rule also requires that an institution at risk of closure that is teaching out, closing, or that is not financially responsible or administratively capable, release holds on student transcripts. Other conditions for institutions that are provisionally certified and may be applied by the Secretary are also included.

*Burden Calculations:* Section 668.14 will add burden to all institutions, domestic and foreign. The change in § 668.14(e) will require provisionally certified institutions at risk of closure to submit to the Department acceptable teach-out plans and record retention plans. For provisionally certified institutions that are at risk of closure, are teaching out or closing, or are not financially responsible or administratively capable, the change requires the release of holds on student transcripts.

This type of submission will require 10 hours for each institution to provide the appropriate material or take the required action under the final regulations. As of January 2023, there were a total of 863 domestic and foreign institutions that were provisionally certified. We estimate that of that figure 5 percent or 43 provisionally certified institutions may be at risk of closure. We estimate that it will take private non-profit institutions 250 hours (25 × 10 = 250) to complete the submission of information or required action. We estimate that it will take proprietary institutions 130 hours (13 × 10 = 130) to complete the submission of information or required action. We estimate that it will take public institutions 50 hours (5 × 10 = 50) to complete the submission of information or required action.

The estimated § 668.14(e) total burden is 430 hours with a total rounded estimated cost for all institutions of $20,663 (430 × $48.05 = $20,661.50).

STUDENT ASSISTANCE GENERAL PROVISIONS—OMB CONTROL NUMBER 1845–0022

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private non-profit | 25 | 25 | 250 | $12,013 |
| Proprietary | 13 | 13 | 130 | 6,247 |
| Public | 5 | 5 | 50 | 2,403 |
| Total | 43 | 43 | 430 | $20,663 |

*Section 668.15—Factors of Financial Responsibility*

*Requirements:* This section is being removed and reserved.

*Burden Calculations:* With the removal of regulatory language in § 668.15 the Department will remove the associated burden of 2,448 hours under OMB Control Number 1845–0022.

STUDENT ASSISTANCE GENERAL PROVISIONS—OMB CONTROL NUMBER 1845–0022

| Affected entity | Respondent | Responses | Burden hours | Cost $−48.05 per institution |
|---|---|---|---|---|
| Private non-profit | −866 | −866 | −816 | −$39,209 |
| Proprietary | −866 | −866 | −816 | $39,209 |
| Public | −866 | −866 | −816 | $39,209 |
| Total | −2,598 | −2,598 | −2,448 | $117,627 |

*Section 668.16—Standards of Administrative Capability*

*Requirements:* The Department amends § 668.16 to clarify the characteristics of institutions that are administratively capable. The final rule amends § 668.16(h) which will require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available to enrolled students. This includes clear information about the cost of attendance, sources and amounts of each type of aid separated by the type of aid, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts.

Institutions also must provide students with information about the institution's cost of attendance, the source and type of aid offered, whether it must be earned or repaid, the net price, and deadlines for accepting, declining, or adjusting award amounts.

The final rule also amends § 668.16(p) which strengthens the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education. The Department updates the references to high school completion in existing regulations to high school diploma which will set specific requirements to the existing procedural requirement for adequate evaluation of the validity of a student's high school diploma.

*Burden Calculations:* Section 668.16 adds burden to all institutions, domestic and foreign. The changes in § 668.16(h) require an update to the financial aid communications provided to students.

We estimate that this update will require 8 hours for each institution to review their current communications and make the appropriate updates to the material. We estimate that it will take private non-profit institutions 15,304 hours (1,913 × 8 = 15,304) to complete the required review and update. We estimate that it will take proprietary institutions 12,032 hours (1,504 × 8 =

12,032) to complete the required review and update. We estimate that it will take public institutions 14,504 hours (1,813 × 8 = 14,504) to complete the required review and update. The estimated § 668.16(h) total burden is 41,840 hours with a total rounded estimated cost for all institutions of $2,010,412 (41,840 × $48.05 = $2,010,412).

The changes in § 668.16(p) add requirements for adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Department has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education.

This update will require 3 hours for each institution to review their current policy and procedures for evaluating high school diplomas and make the appropriate updates to the material. We estimate that it will take private non-profit institutions 5,739 hours (1,913 × 3 = 5,739) to complete the required review and update. We estimate that it will take proprietary institutions 4,512 hours (1,504 × 3 = 4,512) to complete the required review and update. We estimate that it will take public institutions 5,439 hours (1,813 × 3 = 5,439) to complete the required review and update. The estimated § 668.16(p) total burden is 15,690 hours with a total rounded estimated cost for all institutions of $753,905 (15,690 × $48.05 = $753,904.50).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.16 is 57,530 hours with a total rounded estimated cost of $2,764,317.

### STUDENT ASSISTANCE GENERAL PROVISIONS—OMB CONTROL NUMBER 1845–0022

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private non-profit | 1,913 | 3,826 | 21,043 | $1,011,116 |
| Proprietary | 1,504 | 3,008 | 16,544 | 794,940 |
| Public | 1,813 | 3,626 | 19,943 | 958,261 |
| Total | 5,230 | 10,460 | 57,530 | 2,764,317 |

### Section 668.23—Compliance Audits

*Requirements:* The Department adds § 668.23(d)(2)(ii) that requires an institution, domestic or foreign, that is owned by a foreign entity holding at least a 50 percent voting or equity interest to provide documentation of its status under the law of the jurisdiction under which it is organized, as well as basic organizational documents. The submission of such documentation will better equip the Department to obtain appropriate and necessary documentation from an institution which has a foreign owner or owners with 50 percent or greater voting or equity interest which will provide a clearer picture of the institution's legal status to the Department, as well as who exercises direct or indirect ownership over the institution.

*Burden Calculations:* The regulatory language in § 668.23(d)(2)(ii) adds burden to foreign institutions and certain domestic institutions to submit documentation, translated into English as needed.

We estimate this reporting activity will require an estimated 40 hours of work for affected institutions to complete. We estimate that it will take private non-profit institutions 13,520 hours (338 × 40 = 13,520) to complete the required documentation gathering and translation as needed. We estimate that it will take proprietary institutions 920 hours (23 × 40 = 920) to complete the required footnote activity. The estimated § 668.23(d)(2)(ii) total burden is 14,440 hours with a total rounded estimated cost for all institutions of $693,842 (14,440 × $48.05 = $693,842).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.23 is 14,440 hours with a total rounded estimated cost of $693.842.

### STUDENT ASSISTANCE GENERAL PROVISIONS—OMB CONTROL NUMBER 1845–0022

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private non-profit | 338 | 338 | 13,520 | $649,636 |
| Proprietary | 23 | 23 | 920 | 44,206 |
| Total | 361 | 361 | 14,440 | 693,842 |

### Section 668.156—Approved State Process

*Requirements:* The changes to § 668.156 clarify the requirements for the approval of a State process. Under § 668.156, a State must apply to the Secretary for approval of its State process as an alternative to achieving a passing score on an approved, independently administered test or satisfactory completion of at least six credit hours (or its recognized equivalent coursework) for the purpose of determining a student's eligibility for title IV, HEA programs. The State process is one of the three ATB alternatives that an individual who is not a high school graduate could fulfill to receive title IV, HEA, Federal student aid to enroll in an eligible career pathway program.

The monitoring requirement in redesignated § 668.156(c) provides a participating institution that has failed to achieve the 85 percent success rate up to three years to achieve compliance.

The redesignated § 668.156(e) requires that States report information on race, gender, age, economic circumstances, and education attainment. Under § 668.156(h), the Secretary may specify in a notice published in the **Federal Register** additional information that States must report.

*Burden Calculation:* We estimate that it will take a State 160 hours to create and submit an application for a State Process to the Department under § 668.156(a) for a total of 1,600 hours (160 hours × 10 States).

We estimate that it will take a State an additional 40 hours annually to monitor the compliance of the institution's use of the State Process under § 668.156(c) for a total of 400

hours (40 hours × 10 States). This time includes the development of any Corrective Action Plan for any institution the State finds not be complying with the State Process.

We estimate that it will take a State 120 hours to meet the reapplication requirements in § 668.156(e) for a total of 1,200 hours (120 hours × 10 States). The total hours associated with the change in the regulations as of the effective date of the regulations are estimated at a total of 3,200 hours of burden (320 hours × 10 States) with a total estimated cost of $153,760.00 in OMB Control Number 1845–0176.

## APPROVED STATE PROCESS—1845–0176

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| State | 10 | 30 | 3,200 | $153,760 |
| Total | 10 | 30 | 3,200 | 153,760 |

*Section 668.157—Eligible Career Pathway Program*

*Requirements:* The final rule amends subpart J by adding § 668.157 to clarify the documentation requirements for eligible career pathway program. This new section dictates the documentation requirements for eligible career pathway programs for submission to the Department for approval as a title IV eligible program. Under § 668.157(b), for career pathways programs that do not enroll students through a State process as defined in § 668.156, the Secretary will verify the eligibility of the first eligible career pathway program offered by an institution for title IV, HEA program purposes pursuant to § 668.157(a). The Secretary will have the discretion required to verify the eligibility of programs in instances of rapid expansion or if there are other concerns. Under § 668.157(b), we will also provide an institution with the opportunity to appeal any adverse eligibility decision.

*Burden Calculations:* Section 668.157 adds burden to institutions to participate in eligible career pathway programs. Section 668.157 requires institutions to demonstrate to the Department that the eligible career pathways programs being offered meet the regulatory requirements for the first one or two programs offered by the institution.

We estimate that 1,000 institutions will submit the required documentation to determine eligibility for a career pathway program. We estimate that this documentation and reporting activity will require an estimated 10 hours per program per institution. We estimate that each institution will document and report on one individual eligible career pathways program for a total of 10 hours per institution. We estimate it will take private non-profit institutions 3,600 hours (360 institutions × 1 program = 360 programs × 10 hours per program = 3,600) to complete the required documentation and reporting activity. We estimate that it will take proprietary institutions 1,300 hours (130 institutions × 1 program = 130 programs × 10 hours per program = 1,300) to complete the required documentation and reporting activity. We estimate that it will take public institutions 5,100 hours (510 institutions × 1 program = 510 programs × 10 hours per program = 5,100) to complete the required documentation and reporting activities. The total estimated increase in burden to OMB Control Number 1845–0175 for § 668.157 is 10,000 hours with a total estimated cost of $480,500.00.

## ELIGIBLE CAREER PATHWAYS PROGRAM—1845–0175

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private non-profit | 360 | 360 | 3,600 | 172,980 |
| Proprietary | 130 | 130 | 1,300 | 62,465 |
| Public | 510 | 510 | 5,100 | 245,055 |
| Total | 1,000 | 1,000 | 10,000 | 480,500 |

*Section 668.171—General*

*Requirements:* The final rule amends § 668.171(f) by adding several new events to the existing reporting requirements, and expanding others, that must be reported generally no later than 21 days following the event. Implementation of the reportable events will make the Department more aware of instances that may impact an institution's financial responsibility or stability. The reportable events are linked to the financial standards in § 668.171(b) and the financial triggers in § 668.171(c) and (d) where there is no existing mechanism for the Department to know that a failure or a triggering event has occurred. Notification regarding these events allows the Department to initiate actions to either obtain financial protection, or determine if financial protection is necessary, to protect students from the negative consequences of an institution's financial instability and possible closure.

The final rule also amends § 668.171(g) by adding language which requires an institution seeking eligibility as a public institution for the first time, as part of a request to be recognized as a public institution following a change in ownership, or otherwise upon request by the Department to provide to the Department a letter from an official of the government entity or other signed documentation acceptable to the Department. The letter or documentation must state that the institution is backed by the full faith and credit of the government entity. The Department also includes similar amendments to apply to foreign institutions.

*Burden Calculations:* The regulatory language in § 668.171(f) adds burden to institutions regarding evidence of financial responsibility. The regulations in § 668.171(f) require institutions to demonstrate to the Department that it met the triggers set forth in the

**Federal Register** / Vol. 88, No. 209 / Tuesday, October 31, 2023 / Rules and Regulations **74693**

regulations. We estimate that domestic and foreign institutions have the potential to hit a trigger that will require them to submit documentation to determine eligibility for continued participation in the title IV programs. The overwhelming majority of reporting will likely stem from the mandatory triggering event on GE programs that are failing with limited reporting under additional events. We estimate that this documentation and reporting activity will require an estimated 2 hours per institution. We estimate it will take private non-profit institutions 100 hours (50 institutions × 2 hours = 100) to complete the required documentation and reporting activity. We estimate that it will take proprietary institutions 1,300 hours (650 institutions × 2 hours = 1,300) to complete the required documentation and reporting activity.

The regulatory language in § 668.171(g) adds burden to public institutions regarding evidence of financial responsibility. The regulations in § 668.171(g) require institutions in two specific circumstances or upon request from the Department to demonstrate that the public institution is backed by the full faith and credit of the government entity. We estimate that 36 public institutions (two percent of the currently participating public institutions) will be required to recertify in a given year. We further estimate that it will take each institution 5 hours to procure the required documentation from the appropriate governmental agency for a total of 180 hours (36 institutions × 5 hours = 180 hours).

The total estimated increase in burden to OMB Control Number 1845–0022 for § 668.171 is 1,580 hours with a total rounded estimated cost of $775,919.

### STUDENT ASSISTANCE GENERAL PROVISIONS—OMB CONTROL NUMBER 1845–0022

| Affected entity | Respondent | Responses | Burden hours | Cost $48.05 per institution |
|---|---|---|---|---|
| Private non-profit .................................................................................... | 50 | 50 | 100 | $4,805 |
| Proprietary ............................................................................................... | 650 | 650 | 1,300 | 62,465 |
| Public ....................................................................................................... | 36 | 36 | 180 | 8,649 |
| Total ................................................................................................. | 736 | 736 | 1,580 | 75,919 |

Consistent with the discussions above, the following chart describes the sections of the final regulations involving information collections, the information being collected and the collections that the Department will submit to OMB for approval and public comment under the PRA, and the estimated costs associated with the information collections. The monetized net cost of the increased burden for institutions and students, using wage data developed using Bureau of Labor Statistics (BLS) data.

For individuals, we used the median hourly wage for all occupations, $22.26 per hour according to BLS (*bls.gov/oes/current/oes_nat.htm#=0000*). For institutions, we used the median hourly wage for Education Administrators, Postsecondary, $48.05 per hour according to BLS (*bls.gov/oes/current/oes119033.htm*).

### COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $48.05 Institutional $22.26 Individual unless otherwise noted |
|---|---|---|---|
| § 668.14 ............ | Amend § 668.14(e) to establish a non-exhaustive list of conditions that the Secretary may apply to provisionally certified institutions, such as the submission of a teach-out plan or agreement. Amend § 668.14(g) to establish conditions that may apply to an initially certified non-profit institution, or an institution that has undergone a change in ownership and seeks to convert to nonprofit status. | 1845–0022, +430 hrs ...................................................... | +20,663 |
| § 668.15 ............ | Remove and reserve § 668.15 thereby consolidating all financial responsibility factors, including those governing changes in ownership, under part 668, subpart L. | 1845–0022, −2,448 hrs .................................................. | −117,627 |
| § 668.16 ............ | Amend § 668.16(h) to require institutions to provide adequate financial aid counseling and financial aid communications to advise students and families to accept the most beneficial types of financial assistance available. Amend § 668.16(p) to strengthen the requirement that institutions must develop and follow adequate procedures to evaluate the validity of a student's high school diploma. | 1845–0022 +57,530 hrs ................................................ | +2,764,317 |
| § 668.23 ............ | Amend § 668.23(d) to require that any domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized. | 1845–0022, +14,440 hrs ............................................... | +693,842 |
| § 668.156 ......... | Amend § 668.156 to clarify the requirements for the approval of a State process. The State process is one of the three ATB alternatives that an individual who is not a high school graduate could fulfill to receive title IV, Federal student aid to enroll in an eligible career pathway program. | 1845–0176, +3,200 ........................................................ | +153,760 |
| § 668.157 ......... | Add a new § 668.157 to clarify the documentation requirements for eligible career pathway programs. | 1845–0175, +10,000 ...................................................... | +480,500 |

COLLECTION OF INFORMATION—Continued

| Regulatory section | Information collection | OMB control No. and estimated burden | Estimated cost $48.05 Institutional $22.26 Individual unless otherwise noted |
|---|---|---|---|
| § 668.171 ......... | Amend § 668.171(f) to revise the set of conditions whereby an institution must report to the Department that a triggering event, described in § 668.171(c) and (d), has occurred. Amend § 668.171(g) to require some public institutions to provide documentation from a government entity that confirms that the institution is a public institution and is backed by the full faith and credit of that government entity to be considered as financially responsible. | 1845–0022, +1,580 hrs  ................................................... | +75,919 |

The total burden hours and change in burden hours associated with each OMB Control number affected by the final regulations follows: 1845–0022, 1845–0176, and 1845–0175.

| Control No. | Total burden hours | Change in burden hours |
|---|---|---|
| 1845–0022 ................................................................................................................. | 2,621,280 | +71,532 |
| 1845–0176 ................................................................................................................. | 3,200 | +3,200 |
| 1845–0175 ................................................................................................................. | 10,000 | +10,000 |
| Total ................................................................................................................. | 2,634,480 | 346,232 |

To comment on the information collection requirements, please send your comments to the Office of Information and Regulatory Affairs in OMB, Attention: Desk Officer for the U.S. Department of Education. Send these comments by email to *OIRA_DOCKET@omb.eop.gov* or by fax to (202) 395–6974. You may also send a copy of these comments to the Department contact named in the **ADDRESSES** section of the preamble.

We have prepared the Information Collection Request (ICR) for these collections. You may review the ICR which is available at *www.reginfo.gov*. Click on Information Collection Review. These collections are identified as collections 1845–022, 1845–0175, 1845–1076.

**Intergovernmental Review**

This program is subject to Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive Order is to foster an intergovernmental partnership and a strengthened federalism. The Executive order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for this program.

**Assessment of Educational Impact**

In the NPRM we requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available. Based on the response to the NPRM and on our review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Federalism**

Executive Order 13132 requires us to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. "Federalism implications" means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. The final regulations do not have federalism implications.

*Accessible Format:* On request to one of the program contact persons listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register.** You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects in 34 CFR Part 668**

Administrative practice and procedure, Aliens, Colleges and universities, Consumer protection, Grant programs-education, Incorporation by reference, Loan programs-education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

**Miguel A. Cardona,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends part 668 of title 34 of the Code of Federal Regulations as follows:

# PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 1. The authority citation for part 668 continues to read as follows:

**Authority:** 20 U.S.C. 1001–1003, 1070g, 1085, 1088, 1091, 1092, 1094, 1099c, 1099c–1, 1221e–3, and 1231a, unless otherwise noted.

Section 668.14 also issued under 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a–3, 1099c, and 1141.

Section 668.41 also issued under 20 U.S.C. 1092, 1094, 1099c.

Section 668.91 also issued under 20 U.S.C. 1082, 1094.

Section 668.171 also issued under 20 U.S.C. 1094 and 1099c and 5 U.S.C. 404.

Section 668.172 also issued under 20 U.S.C. 1094 and 1099c and 5 U.S.C. 404.

Section 668.175 also issued under 20 U.S.C. 1094 and 1099c.

■ 2. Section 668.2 is amended in paragraph (b) by adding definitions of "Eligible career pathway program" and "Financial exigency" in alphabetical order to read as follows:

## § 668.2 General definitions.

\* \* \* \* \*

(b) \* \* \*

*Eligible career pathway program:* A program that combines rigorous and high-quality education, training, and other services that—

(i) Align with the skill needs of industries in the economy of the State or regional economy involved;

(ii) Prepare an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the "National Apprenticeship Act"; 50 Stat. 664, chapter 663; 29 U.S.C. 50 *et seq.*);

(iii) Include counseling to support an individual in achieving the individual's education and career goals;

(iv) Include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;

(v) Organize education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;

(vi) Enable an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and

(vii) Help an individual enter or advance within a specific occupation or occupational cluster.

\* \* \* \* \*

*Financial exigency:* A status declared by an institution to a governmental entity or its accrediting agency representing severe financial distress that, absent significant reductions in expenditures or increases in revenue, reductions in administrative staff or faculty, or the elimination of programs, departments, or administrative units, could result in the closure of the institution.

\* \* \* \* \*

■ 3. Section 668.13 is amended by:
■ a. Removing paragraph (b)(3).
■ b. Revising paragraphs (c)(1)(i)(C) and (D).
■ c. In paragraph (c)(1)(i)(E), removing the word "or" at the end of the paragraph.
■ d. Revising paragraph (c)(1)(i)(F).
■ e. Adding paragraph (c)(1)(i)(G).
■ f. Revising paragraph (c)(1)(ii).
■ g. Adding paragraph (c)(1)(iii).
■ h. Revising paragraph (c)(2) and (d)(2)(ii).
■ i. Adding paragraph (e).
The revisions and addition read as follows:

## § 668.13 Certification procedures.

\* \* \* \* \*

(c) \* \* \*

(1) \* \* \*

(i) \* \* \*

(C) The institution is a participating institution that is applying for a renewal of certification—

(*1*) That the Secretary determines has jeopardized its ability to perform its financial responsibilities by not meeting the factors of financial responsibility under subpart L of this part or the standards of administrative capability under § 668.16;

(*2*) Whose participation has been limited or suspended under subpart G of this part; or

(*3*) That voluntarily enters into provisional certification;

(D) The institution seeks to be reinstated to participate in a title IV, HEA program after a prior period of participation in that program ended;

\* \* \* \* \*

(F) The Secretary has determined that the institution is at risk of closure; or

(G) The institution is under the provisional certification alternative of subpart L of this part.

(ii) An institution's certification becomes provisional upon notification from the Secretary if—

(A) The institution triggers one of the financial responsibility events under § 668.171(c) or (d) and, as a result, the Secretary requires the institution to post financial protection; or

(B) Any owner or interest holder of the institution with control over that

institution, as defined in 34 CFR 600.31, also owns another institution with fines or liabilities owed to the Department and is not making payments in accordance with an agreement to repay that liability.

(iii) A proprietary institution's certification automatically becomes provisional at the start of a fiscal year if it did not derive at least 10 percent of its revenue for its preceding fiscal year from sources other than Federal educational assistance funds, as required under § 668.14(b)(16).

(2) If the Secretary provisionally certifies an institution, the Secretary also specifies the period for which the institution may participate in a title IV, HEA program. Except as provided in paragraph (c)(3) of this section or subpart L of this part, a provisionally certified institution's period of participation expires—

(i) Not later than the end of the first complete award year following the date on which the Secretary provisionally certified the institution for its initial certification;

(ii) Not later than the end of the third complete award year following the date on which the Secretary provisionally certified an institution for reasons—

(A) Related to substantial liabilities owed or potentially owed to the Department for discharges related to borrower defense to repayment or false certification, or arising from claims under consumer protection laws; or

(B) As a result of a change in ownership, recertification, reinstatement, automatic re-certification, or a failure under § 668.14(b)(32); and

(iii) If the Secretary provisionally certified the institution as a result of its accrediting agency losing recognition, not later than 18 months after the date that the Secretary withdrew recognition from the institution's nationally recognized accrediting agency.

\* \* \* \* \*

(d) \* \* \*

(2) \* \* \*

(ii) The revocation takes effect on the date that the Secretary transmits the notice to the institution.

\* \* \* \* \*

(e) *Supplementary performance measures.* In determining whether to certify, or condition the participation of, an institution under this section and § 668.14, the Secretary may consider the following, among other information at the program or institutional level:

(1) *Withdrawal rate.* The percentage of students who withdrew from the institution within 100 percent or 150 percent of the published length of the program.

(2) *Educational and pre-enrollment expenditures.* The amounts the institution spent on instruction and instructional activities, academic support, and support services, compared to the amounts spent on recruiting activities, advertising, and other pre-enrollment expenditures.

(3) *Licensure pass rate.* If a program is designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, and the institution is required by an accrediting agency or State to report passage rates for the licensure exam for the program, such passage rates.

\* \* \* \* \*

■ 4. Section 668.14 is amended by:
■ a. Adding paragraph (a)(3).
■ b. Revising paragraphs (b)(5), (17), (18), and (26).
■ c. In paragraph (b)(30)(ii)(C), removing the word ''and'' at the end of the paragraph.
■ d. In paragraph (b)(31)(v), removing the period and adding a semicolon in its place.
■ e. Adding paragraphs (b)(32) through (35).
■ f. Redesignating paragraphs (e) through (h) as paragraphs (h) through (k), respectively.
■ f. Adding new paragraphs (e) through (g).

The revisions and additions read as follows:

**§ 668.14 Program participation agreement.**

(a) \* \* \*

(3) An institution's program participation agreement must be signed by—

(i) An authorized representative of the institution; and

(ii) For a proprietary or private nonprofit institution, an authorized representative of an entity with direct or indirect ownership of the institution if that entity has the power to exercise control over the institution. The Secretary considers the following as examples of circumstances in which an entity has such power:

(A) If the entity has at least 50 percent control over the institution through direct or indirect ownership, by voting rights, by its right to appoint board members to the institution or any other entity, whether by itself or in combination with other entities or natural persons with which it is affiliated or related, or pursuant to a proxy or voting or similar agreement.

(B) If the entity has the power to block significant actions.

(C) If the entity is the 100 percent direct or indirect interest holder of the institution.

(D) If the entity provides or will provide the financial statements to meet any of the requirements of 34 CFR 600.20(g) or (h) or subpart L of this part.

(b) \* \* \*

(5) It will comply with the provisions of subpart L of this part relating to factors of financial responsibility;

\* \* \* \* \*

(17) The Secretary, guaranty agencies, and lenders as defined in 34 CFR part 682, nationally recognized accrediting agencies, Federal agencies, State agencies recognized under 34 CFR part 603 for the approval of public postsecondary vocational education, State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, and State attorneys general have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the title IV, HEA programs or any information on fraud, abuse, or other violations of law;

(18) It will not knowingly—

(i) Employ in a capacity that involves the administration of the title IV, HEA programs or the receipt of funds under those programs, an individual who has been:

(A) Convicted of, or pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds;

(B) Administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(C) An owner, director, officer, or employee who exercised substantial control over an institution, or a direct or indirect parent entity of an institution, that owes a liability for a violation of a title IV, HEA program requirement and is not making payments in accordance with an agreement to repay that liability; or

(D) A ten-percent-or-higher equity owner, director, officer, principal, executive, or contractor at an institution in any year in which the institution incurred a loss of Federal funds in excess of 5 percent of the participating institution's annual title IV, HEA program funds; or

(ii) Contract with any institution, third-party servicer, individual, agency, or organization that has, or whose owners, officers or employees have—

(A) Been convicted of, or pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds;

(B) Been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(C) Had its participation in the title IV programs terminated, certification revoked, or application for certification or recertification for participation in the title IV programs denied;

(D) Been an owner, director, officer, or employee who exercised substantial control over an institution, or a direct or indirect parent entity of an institution, that owes a liability for a violation of a title IV, HEA program requirement and is not making payments in accordance with an agreement to repay that liability; or

(E) Been a 10 percent-or-higher equity owner, director, officer, principal, executive, or contractor affiliated with another institution in any year in which the other institution incurred a loss of Federal funds in excess of 5 percent of the participating institution's annual title IV, HEA program funds;

\* \* \* \* \*

(26) If an educational program offered by the institution on or after July 1, 2024, is required to prepare a student for gainful employment in a recognized occupation, the institution must—

(i) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student; and

(ii) Demonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to the greater of—

(A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement or as established by any Federal agency; or

(B) Another State's required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, if the institution documents, with substantiation by a certified public accountant who prepares the institution's compliance audit report as required under § 668.23 that—

(*1*) A majority of students resided in that State while enrolled in the program during the most recently completed award year;

(2) A majority of students who completed the program in the most recently completed award year were employed in that State; or

(3) The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the most recently completed award year, stated in writing that they intended to work in that other State; and

(iii) Notwithstanding paragraph (a)(26)(ii) of this section, the program length limitation does not apply for occupations where the State entry level requirements include the completion of an associate or higher-level degree; or where the program is delivered entirely through distance education or correspondence courses;

* * * * *

(32) In each State in which: the institution is located; students enrolled by the institution in distance education or correspondence courses are located, as determined at the time of initial enrollment in accordance with 34 CFR 600.9(c)(2); or for the purposes of paragraphs (b)(32)(i) and (ii) of this section, each student who enrolls in a program on or after July 1, 2024, and attests that they intend to seek employment, the institution must determine that each program eligible for title IV, HEA program funds—

(i) Is programmatically accredited if the State or a Federal agency requires such accreditation, including as a condition for employment in the occupation for which the program prepares the student, or is programmatically pre-accredited when programmatic pre-accreditation is sufficient according to the State or Federal agency;

(ii) Satisfies the applicable educational requirements for professional licensure or certification requirements in the State so that a student who enrolls in the program, and seeks employment in that State after completing the program, qualifies to take any licensure or certification exam that is needed for the student to practice or find employment in an occupation that the program prepares students to enter; and

(iii) Complies with all State laws related to closure, including record retention, teach-out plans or agreements, and tuition recovery funds or surety bonds;

(33) It will not withhold official transcripts or take any other negative action against a student related to a balance owed by the student that resulted from an error in the institution's administration of the title IV, HEA programs, or any fraud or misconduct by the institution or its personnel;

(34) Upon request by a student, the institution will provide an official transcript that includes all the credit or clock hours for payment periods—

(i) In which the student received title IV, HEA funds; and

(ii) For which all institutional charges were paid or included in an agreement to pay at the time the request is made; and

(35) It will not maintain policies and procedures to encourage, or that condition institutional aid or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including Federal loan funds, that the student receives, except that the institution may provide a scholarship on the condition that a student forego borrowing if the amount of the scholarship provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow.

* * * * *

(e) If an institution is provisionally certified, the Secretary may apply such conditions as are determined to be necessary or appropriate to the institution, including, but not limited to—

(1) For an institution that the Secretary determines may be at risk of closure—

(i) Submission of an acceptable teach-out plan or agreement to the Department, the State, and the institution's recognized accrediting agency; and

(ii) Submission to the Department of an acceptable records retention plan that addresses title IV, HEA records, including but not limited to student transcripts, and evidence that the plan has been implemented;

(2) For an institution that the Secretary determines may be at risk of closure, that is teaching out or closing, or that is not financially responsible or administratively capable, the release of holds on student transcripts;

(3) Restrictions or limitations on the addition of new programs or locations;

(4) Restrictions on the rate of growth, new enrollment of students, or title IV, HEA volume in one or more programs;

(5) Restrictions on the institution providing a teach-out on behalf of another institution;

(6) Restrictions on the acquisition of another participating institution, which may include, in addition to any other required financial protection, the posting of financial protection in an amount determined by the Secretary but not less than 10 percent of the acquired institution's title IV, HEA volume for the prior fiscal year;

(7) Additional reporting requirements, which may include, but are not limited to, cash balances, an actual and protected cash flow statement, student rosters, student complaints, and interim unaudited financial statements;

(8) Limitations on the institution entering into a written arrangement with another eligible institution or an ineligible institution or organization for that other eligible institution or ineligible institution or organization to provide between 25 and 50 percent of the institution's educational program under § 668.5(a) or (c); and

(9) For an institution found to have engaged in substantial misrepresentations to students, engaged in aggressive recruiting practices, or violated incentive compensation rules, requirements to hire a monitor and to submit marketing and other recruiting materials (*e.g.,* call scripts) for the review and approval of the Secretary; and

(10) Reporting to the Department, no later than 21 days after an institution receives from any local, State, Tribal, Federal, or foreign government or government entity a civil investigative demand, a subpoena, a request for documents or information, or other formal inquiry that is related to the marketing or recruitment of prospective students, the awarding of Federal financial aid for enrollment at the school, or the provision of educational services for which Federal aid is provided.

(f) If a proprietary institution seeks to convert to nonprofit status following a change in ownership, the following conditions will apply to the institution following the change in ownership, in addition to any other conditions that the Secretary may deem appropriate:

(1) The institution must continue to meet the requirements under § 668.28(a) until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years in which the institution meets the requirements of paragraph (b)(16) of this section under its new ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(2) The institution must continue to meet the gainful employment requirements of subpart S of this part until the Department has accepted, reviewed, and approved the institution's financial statements and compliance

audits that cover two complete consecutive fiscal years under its new ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(3) The institution must submit regular and timely reports on agreements entered into with a former owner of the institution or a natural person or entity related to or affiliated with the former owner of the institution, so long as the institution participates as a nonprofit institution.

(4) The institution may not advertise that it operates as a nonprofit institution for the purposes of title IV, HEA until the Department approves the institution's request to convert to nonprofit status.

(g) If an institution is initially certified as a nonprofit institution, or if it has undergone a change in ownership and seeks to convert to nonprofit status, the following conditions will apply to the institution upon initial certification or following the change in ownership, in addition to any other conditions that the Secretary may deem appropriate:

(1) The institution must submit reports on accreditor and State authorization agency actions and any new servicing agreements within 10 business days of receipt of the notice of the action or of entering into the agreement, as applicable, until the Department has accepted, reviewed, and approved the institution's financial statements and compliance audits that cover two complete consecutive fiscal years following initial certification, or two complete fiscal years after a change in ownership, or until the Department approves the institution's request to convert to nonprofit status, whichever is later.

(2) The institution must submit a report and copy of the communications from the Internal Revenue Service (IRS) or any State or foreign country related to tax-exempt or nonprofit status within 10 business days of receipt so long as the institution participates as a nonprofit institution.

*    *    *    *    *

§ 668.15   [Removed and Reserved]

■ 4. Section 668.15 is removed and reserved.

■ 5. Section 668.16 is amended by:
■ a. Revising the introductory text and paragraphs (h), (k), and (m).
■ b. Redesignating paragraph (n) as paragraph (v).
■ c. Adding a new paragraph (n).
■ d. Removing the word "and" at the end of paragraph (o)(2).
■ e. Revising paragraph (p).

■ f. Adding paragraphs (q) through (u).
■ g. Revising newly redesignated paragraph (v).
■ h. Removing the parenthetical authority citation at the end of the section.

The revisions and additions read as follows:

§ 668.16   Standards of administrative capability.

To begin and to continue to participate in any title IV, HEA program, an institution must demonstrate to the Secretary that the institution is capable of adequately administering that program under each of the standards established in this section. The Secretary considers an institution to have that administrative capability if the institution—

*    *    *    *    *

(h) Provides adequate financial aid counseling with clear and accurate information to students who apply for title IV, HEA program assistance. In determining whether an institution provides adequate counseling, the Secretary considers whether its counseling and financial aid communications advise students and families to accept the most beneficial types of financial assistance available to them and include information regarding—

(1) The cost of attendance of the institution as defined under section 472 of the HEA, including the individual components of those costs and a total of the estimated costs that will be owed directly to the institution, for students, based on their attendance status;

(2) The source and amount of each type of aid offered, separated by the type of the aid and whether it must be earned or repaid;

(3) The net price, as determined by subtracting total grant or scholarship aid included in paragraph (h)(2) of this section from the cost of attendance in paragraph (h)(1) of this section;

(4) The method by which aid is determined and disbursed, delivered, or applied to a student's account, and instructions and applicable deadlines for accepting, declining, or adjusting award amounts; and

(5) The rights and responsibilities of the student with respect to enrollment at the institution and receipt of financial aid, including the institution's refund policy, the requirements for the treatment of title IV, HEA program funds when a student withdraws under § 668.22, its standards of satisfactory progress, and other conditions that may alter the student's aid package;

*    *    *    *    *

(k)(1) Is not, and has not been—

(i) Debarred or suspended under Executive Order (E.O.) 12549 (3 CFR, 1986 Comp., p. 189) or the Federal Acquisition Regulations (FAR), 48 CFR part 9, subpart 9.4; or

(ii) Engaging in any activity that is a cause under 2 CFR 180.700 or 180.800, as adopted at 2 CFR 3485.12, for debarment or suspension under E.O. 12549 (3 CFR, 1986 Comp., p. 189) or the FAR, 48 CFR part 9, subpart 9.4; and

(2) Does not have any principal or affiliate of the institution (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or previously exercised substantial control over the institution as defined in § 668.174(c)(3), who—

(i) Has been convicted of, or has pled nolo contendere or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, Tribal, or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving those funds; or

(ii) Is a current or former principal or affiliate (as those terms are defined in 2 CFR parts 180 and 3485), or any individual who exercises or exercised substantial control as defined in § 668.174(c)(3), of another institution whose misconduct or closure contributed to liabilities to the Federal Government in excess of 5 percent of its title IV, HEA program funds in the award year in which the liabilities arose or were imposed;

*    *    *    *    *

(m)(1) Has a cohort default rate—

(i) That is less than 25 percent for each of the three most recent fiscal years during which rates have been issued, to the extent those rates are calculated under subpart M of this part;

(ii) On or after 2014, that is less than 30 percent for at least two of the three most recent fiscal years during which the Secretary has issued rates for the institution under subpart N of this part; and

(iii) As defined in 34 CFR 674.5, on loans made under the Federal Perkins Loan Program to students for attendance at that institution that does not exceed 15 percent;

(2) Provided that—

(i) If the Secretary determines that an institution's administrative capability is impaired solely because the institution fails to comply with paragraph (m)(1) of this section, and the institution is not subject to a loss of eligibility under § 668.187(a) or § 668.206(a), the Secretary allows the institution to continue to participate in the title IV, HEA programs. In such a case, the

Secretary may provisionally certify the institution in accordance with § 668.13(c) except as provided in paragraphs (m)(2)(ii) through (v) of this section;

(ii) An institution that fails to meet the standard of administrative capability under paragraph (m)(1)(ii) of this section based on two cohort default rates that are greater than or equal to 30 percent but less than or equal to 40 percent is not placed on provisional certification under paragraph (m)(2)(i) of this section if it—

(A) Has timely filed a request for adjustment or appeal under § 668.209, § 668.210, or § 668.212 with respect to the second such rate, and the request for adjustment or appeal is either pending or succeeds in reducing the rate below 30 percent;

(B) Has timely filed an appeal under § 668.213 after receiving the second such rate, and the appeal is either pending or successful; or

(C)(*1*) Has timely filed a participation rate index challenge or appeal under § 668.204(c) or § 668.214 with respect to either or both of the two rates, and the challenge or appeal is either pending or successful; or

(*2*) If the second rate is the most recent draft rate, and the institution has timely filed a participation rate challenge to that draft rate that is either pending or successful;

(iii) The institution may appeal the loss of full participation in a title IV, HEA program under paragraph (m)(2)(i) of this section by submitting an erroneous data appeal in writing to the Secretary in accordance with and on the grounds specified in § 668.192 or § 668.211 as applicable;

(iv) If the institution has 30 or fewer borrowers in the three most recent cohorts of borrowers used to calculate its cohort default rate under subpart N of this part, we will not provisionally certify it solely based on cohort default rates; and

(v) If a rate that would otherwise potentially subject the institution to provisional certification under paragraphs (m)(1)(ii) and (m)(2)(i) of this section is calculated as an average rate, we will not provisionally certify it solely based on cohort default rates;

(n) Has not been subject to a significant negative action or a finding as by a State or Federal agency, a court, or an accrediting agency, where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive, and the institution has not lost eligibility to participate in another Federal educational assistance program due to

an administrative action against the institution;

\* \* \* \* \*

(p) Develops and follows adequate procedures to evaluate the validity of a student's high school diploma if the institution or the Secretary has reason to believe that the high school diploma is not valid or was not obtained from an entity that provides secondary school education, consistent with the following requirements:

(1) Adequate procedures to evaluate the validity of a student's high school diploma must include—

(i) Obtaining documentation from the high school that confirms the validity of the high school diploma, including at least one of the following—

(A) Transcripts;

(B) Written descriptions of course requirements; or

(C) Written and signed statements by principals or executive officers at the high school attesting to the rigor and quality of coursework at the high school;

(ii) If the high school is regulated or overseen by a State agency, Tribal agency, or Bureau of Indian Education, confirming with, or receiving documentation from that agency that the high school is recognized or meets requirements established by that agency; and

(iii) If the Secretary has published a list of high schools that issue invalid high school diplomas, confirming that the high school does not appear on that list; and

(2) A high school diploma is not valid if it—

(i) Did not meet the applicable requirements established by the appropriate State agency, Tribal agency, or Bureau of Indian Education in the State where the high school is located;

(ii) Has been determined to be invalid by the Department, the appropriate State agency in the State where the high school was located, or through a court proceeding; or

(iii) Was obtained from an entity that requires little or no secondary instruction or coursework to obtain a high school diploma, including through a test that does not meet the requirements for a recognized equivalent of a high school diploma under 34 CFR 600.2;

(q) Provides adequate career services to eligible students who receive title IV, HEA program assistance. In determining whether an institution provides adequate career services, the Secretary considers—

(1) The share of students enrolled in programs designed to prepare students

for gainful employment in a recognized occupation;

(2) The number and distribution of career services staff;

(3) The career services the institution has promised to its students; and

(4) The presence of institutional partnerships with recruiters and employers who regularly hire graduates of the institution;

(r) Provides students, within 45 days of successful completion of other required coursework, geographically accessible clinical or externship opportunities related to and required for completion of the credential or licensure in a recognized occupation;

(s) Disburses funds to students in a timely manner that best meets the students' needs. The Secretary does not consider the manner of disbursements to be consistent with students' needs if, among other conditions—

(1) The Secretary is aware of multiple valid and relevant student complaints;

(2) The institution has high rates of withdrawals attributable to delays in disbursements;

(3) The institution has delayed disbursements until after the point at which students have earned 100 percent of their eligibility for title IV, HEA funds, in accordance with the return to title IV, HEA requirements in § 668.22; or

(4) The institution has delayed disbursements with the effect of ensuring the institution passes the 90/10 ratio;

(t) Offers gainful employment (GE) programs subject to subpart S of this part and at least half of its total title IV, HEA funds in the most recent award year are not from programs that are "failing" under subpart S of this part;

(u) Does not engage in substantial misrepresentations, as defined in subpart F of this part, or aggressive and deceptive recruitment tactics or conduct, including as defined in subpart R of this part; and

(v) Does not otherwise appear to lack the ability to administer the title IV, HEA programs competently.

\* \* \* \* \*

■ 6. Section 668.23 is amended by revising paragraphs (a)(4) and (5) and (d)(1) and (2) to read as follows:

**§ 668.23  Compliance audits and audited financial statements.**

(a) \* \* \*

(4) *Submission deadline.* Except as provided by the Single Audit Act, chapter 75 of title 31, United States Code, an institution must submit annually to the Department its compliance audit and its audited

financial statements by the date that is the earlier of—

(i) Thirty days after the later of the date of the auditor's report for the compliance audit and the date of the auditor's report for the audited financial statements; or

(ii) Six months after the last day of the institution's fiscal year.

(5) *Audit submission requirements.* In general, the Department considers the compliance audit and audited financial statements submission requirements of this section to be satisfied by an audit conducted in accordance with 2 CFR part 200, or the audit guides developed by and available from the Department of Education's Office of Inspector General, whichever is applicable to the entity, and provided that the Federal student aid functions performed by that entity are covered in the submission.

*   *   *   *   *

(d) * * *

(1) *General.* To enable the Department to make a determination of financial responsibility, an institution must, to the extent requested by the Department, submit to the Department a set of acceptable financial statements for its latest complete fiscal year (or such fiscal years as requested by the Department or required by this part), as well as any other documentation the Department deems necessary to make that determination. For fiscal years beginning on or after July 1, 2024, financial statements submitted to the Department must match the fiscal year end of the entity's annual return(s) filed with the IRS. Financial statements submitted to the Department must include the Supplemental Schedule required under § 668.172(a) and section 2 of appendices A and B to subpart L of this part, and be prepared on an accrual basis in accordance with generally accepted accounting principles (GAAP), and audited by an independent auditor in accordance with generally accepted government auditing standards (GAGAS), issued by the Comptroller General of the United States and other guidance contained in 2 CFR part 200; or in audit guides developed by and available from the Department of Education's Office of Inspector General, whichever is applicable to the entity, and provided that the Federal student aid functions performed by that entity are covered in the submission. As part of these financial statements, the institution must include a detailed description of related entities based on the definition of a related entity as set forth in Accounting Standards Codification (ASC) 850. The disclosure requirements

under this paragraph (d)(1) extend beyond those of ASC 850 to include all related parties and a level of detail that would enable the Department to readily identify the related party. Such information must include, but is not limited to, the name, location and a description of the related entity including the nature and amount of any transactions between the related party and the institution, financial or otherwise, regardless of when they occurred. If there are no related party transactions during the audited fiscal year or related party outstanding balances reported in the financial statements, then management must add a note to the financial statements to disclose this fact.

(2) *Submission of additional information.* (i) In determining whether an institution is financially responsible, the Department may also require the submission of audited consolidated financial statements, audited full consolidating financial statements, audited combined financial statements, or the audited financial statements of one or more related parties that have the ability, either individually or collectively, to significantly influence or control the institution, as determined by the Department.

(ii) For a domestic or foreign institution that is owned directly or indirectly by any foreign entity holding at least a 50 percent voting or equity interest in the institution, the institution must provide documentation of the entity's status under the law of the jurisdiction under which the entity is organized, including, at a minimum, the date of organization, a current certificate of good standing, and a copy of the authorizing statute for such entity status. The institution must also provide documentation that is equivalent to articles of organization and bylaws and any current operating or shareholders' agreements. The Department may also require the submission of additional documents related to the entity's status under the foreign jurisdiction as needed to assess the entity's financial status. Documents must be translated into English.

*   *   *   *   *

■ 7. Section 668.32 is amended by revising the section heading and paragraphs (e)(2), (3), and (5) to read as follows:

### § 668.32  Student eligibility.

*   *   *   *   *

(e) * * *

(2) Has obtained a passing score specified by the Secretary on an independently administered test in

accordance with subpart J of this part, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2;

(3) Is enrolled in an eligible institution that participates in a State process approved by the Secretary under subpart J of this part, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2;

*   *   *   *   *

(5) Has been determined by the institution to have the ability to benefit from the education or training offered by the institution based on the satisfactory completion of 6 semester hours, 6 trimester hours, 6 quarter hours, or 225 clock hours that are applicable toward a degree or certificate offered by the institution, and either—

(i) Was first enrolled in an eligible program before July 1, 2012; or

(ii) Is enrolled in an eligible career pathway program as defined in § 668.2.

*   *   *   *   *

■ 8. Section 668.43 is amended by revising paragraphs (a)(5)(v) and (c)(1) and (2) to read as follows:

### § 668.43  Institutional and programmatic information.

(a) * * *

(5) * * *

(v) If an educational program is designed to meet educational requirements for a specific professional license or certification that is required for employment in an occupation, or is advertised as meeting such requirements, a list of all States where the institution has determined, including as part of the institution's obligation under § 668.14(b)(32), that the program does and does not meet such requirements; and

*   *   *   *   *

(c)(1) If the institution has made a determination under paragraph (a)(5)(v) of this section that the program's curriculum does not meet the State educational requirements for licensure or certification in the State in which a prospective student is located, or if the institution has not made a determination regarding whether the program's curriculum meets the State educational requirements for licensure or certification, the institution must provide notice to that effect to the student prior to the student's enrollment in the institution in accordance with § 668.14(b)(32).

(2) If the institution makes a determination under paragraph (a)(5)(v)

of this section that a program's curriculum does not meet the State educational requirements for licensure or certification in a State in which a student who is currently enrolled in such program is located, the institution must provide notice to that effect to the student within 14 calendar days of making such determination.

\* \* \* \* \*

■ 9. Section 668.156 is revised to read as follows:

**§ 668.156  Approved State process.**

(a)(1) A State that wishes the Secretary to consider its State process as an alternative to achieving a passing score on an approved, independently administered test or satisfactory completion of at least six credit hours or its recognized equivalent coursework for the purpose of determining a student's eligibility for title IV, HEA program funds must apply to the Secretary for approval of that process.

(2) A State's application for approval of its State process must include—

(i) The institutions located in the State included in the proposed process, which need not be all of the institutions located in the State;

(ii) The requirements that participating institutions must meet to offer eligible career pathway programs through the State process;

(iii) A certification that, as of the date of the application, each proposed career pathway program intended for use through the State process constitutes an ''eligible career pathway program'' as defined in § 668.2 and as documented pursuant to § 668.157;

(iv) The criteria used to determine student eligibility for participation in the State process; and

(v) For an institution listed for the first time on the application, an assurance that not more than 33 percent of the institution's undergraduate regular students withdrew from the institution during the institution's latest completed award year. For purposes of calculating this rate, the institution must count all regular students who were enrolled during the latest completed award year, except those students who, during that period—

(A) Withdrew from, dropped out of, or were expelled from the institution; and

(B) Were entitled to and actually received in a timely manner, a refund of 100 percent of their tuition and fees.

(b) For a State applying for approval for the first time, the Secretary may approve the State process for a two-year initial period if—

(1) The State's process satisfies the requirements contained in paragraphs (a), (c), and (d) of this section; and

(2) The State agrees that the total number of students who enroll through the State process during the initial period will total no more than the greater of 25 students or 1.0 percent of enrollment at each institution participating in the State process.

(c) A State process must—

(1) Allow the participation of only those students eligible under § 668.32(e)(3);

(2) Monitor on an annual basis each participating institution's compliance with the requirements and standards contained in the State's process, including the success rate as calculated in paragraph (f) of this section;

(3) Require corrective action if an institution is found to be in noncompliance with the State process requirements;

(4) Provide a participating institution that has failed to achieve the success rate required under paragraphs (e)(1) and (f) up to three years to achieve compliance;

(5) Terminate an institution from the State process if the institution refuses or fails to comply with the State process requirements, including exceeding the total number of students referenced in paragraph (b)(2) of this section; and

(6) Prohibit an institution from participating in the State process for at least five years after termination.

(d)(1) The Secretary responds to a State's request for approval of its State process within six months after the Secretary's receipt of that request. If the Secretary does not respond by the end of six months, the State's process is deemed to be approved.

(2) An approved State process becomes effective for purposes of determining student eligibility for title IV, HEA program funds under this subpart—

(i) On the date the Secretary approves the process; or

(ii) Six months after the date on which the State submits the process to the Secretary for approval, if the Secretary neither approves nor disapproves the process during that six-month period.

(e) After the initial two-year period described in paragraph (b) of this section, the State must reapply for continued participation and, in its application—

(1) Demonstrate that the students it admits under that process at each participating institution have a success rate as determined under paragraph (f) of this section that is within 85 percent of the success rate of students with high school diplomas;

(2) Demonstrate that the State's process continues to satisfy the requirements in paragraphs (a), (c), and (d) of this section; and

(3) Report information to the Department on the enrollment and success of participating students by eligible career pathway program and by race, gender, age, economic circumstances, and educational attainment, to the extent available.

(f) The State must calculate the success rate for each participating institution as referenced in paragraph (e)(1) of this section by—

(1) Determining the number of students with high school diplomas or equivalent who, during the applicable award year described in paragraph (g)(1) of this section, enrolled in the same programs as students participating in the State process at each participating institution and—

(i) Successfully completed education or training programs;

(ii) Remained enrolled in education or training programs at the end of that award year; or

(iii) Successfully transferred to and remained enrolled in another institution at the end of that award year;

(2) Determining the number of students with high school diplomas or equivalent who, during the applicable award year described in paragraph (g)(1) of this section, enrolled in the same programs as students participating in the State process at each participating institution;

(3) Determining the number of students calculated in paragraph (f)(2) of this section who remained enrolled after subtracting the number of students who subsequently withdrew or were expelled from each participating institution and received a 100 percent refund of their tuition under the institution's refund policies;

(4) Dividing the number of students determined under paragraph (f)(1) of this section by the number of students determined under paragraph (f)(3) of this section; and

(5) Making the calculations described in paragraphs (f)(1) through (4) of this section for students who enrolled through a State process in each participating institution.

(g)(1) For purposes of paragraph (f) of this section, the applicable award year is the latest complete award year for which information is available.

(2) If no students are enrolled in an eligible career pathway program through a State process, then the State will receive a one-year extension to its initial approval of its State process.

(h) A State must submit reports on its State process, in accordance with deadlines and procedures established and published by the Secretary in the

**Federal Register**, with such information as the Secretary requires.

(i) The Secretary approves a State process as described in paragraph (e) of this section for a period not to exceed five years.

(j)(1) The Secretary withdraws approval of a State process if the Secretary determines that the State process violated any terms of this section or that the information that the State submitted as a basis for approval of the State process was inaccurate.

(i) If a State has not terminated an institution from the State process under paragraph (c)(5) of this section for failure to meet the success rate, then the Secretary withdraws approval of the State process, except in accordance with paragraph (j)(1)(ii) of this section.

(ii) At the Secretary's discretion, under exceptional circumstances, the State process may be approved once for a two-year period.

(iii) If 50 percent or more participating institutions across all States do not meet the success rate in a given year, then the Secretary may lower the success rate to no less than 75 percent for two years.

(2) The Secretary provides a State with the opportunity to contest a finding that the State process violated any terms of this section or that the information that the State submitted as a basis for approval of the State process was inaccurate.

(3) If the Secretary upholds the withdrawal of approval of a State process, then the State cannot reapply to the Secretary for a period of five years.

(Approved by the Office of Management and Budget under control number 1845–0049)

■ 10. Section 668.157 is added to read as follows:

### § 668.157  Eligible career pathway program.

(a) An institution demonstrates to the Secretary that a student is enrolled in an eligible career pathway program by documenting that—

(1) The student has enrolled in or is receiving all three of the following elements simultaneously—

(i) An eligible postsecondary program as defined in § 668.8;

(ii) Adult education and literacy activities under the Workforce Innovation and Opportunity Act as described in 34 CFR 463.30 that assist adults in attaining a secondary school diploma or its recognized equivalent and in the transition to postsecondary education and training; and

(iii) Workforce preparation activities as described in 34 CFR 463.34;

(2) The program aligns with the skill needs of industries in the State or regional labor market in which the institution is located, based on research the institution has conducted, including—

(i) Government reports identifying in-demand occupations in the State or regional labor market;

(ii) Surveys, interviews, meetings, or other information obtained by the institution regarding the hiring needs of employers in the State or regional labor market; and

(iii) Documentation that demonstrates direct engagement with industry;

(3) The skill needs described in paragraph (a)(2) of this section align with the specific coursework and postsecondary credential provided by the postsecondary program or other required training;

(4) The program provides academic and career counseling services that assist students in pursuing their credential and obtaining jobs aligned with skill needs described in paragraph (a)(2) of this section, and identifies the individuals providing the career counseling services;

(5) The appropriate education is offered, concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster through an agreement, memorandum of understanding, or some other evidence of alignment of postsecondary and adult education providers that ensures the education is aligned with the students' career objectives; and

(6) The program is designed to lead to a valid high school diploma as defined in § 668.16(p) or its recognized equivalent.

(b) For a postsecondary institution that offered an eligible career pathway program prior to July 1, 2024, the institution must—

(1) Apply to the Secretary to have one of its career pathway programs determined to be eligible for title IV, HEA program purposes by a date as specified by the Secretary; and

(2) Affirm that any career pathway program offered by the institution meets the documentation standards in paragraph (a) of this section.

(c) For a postsecondary institution that does not offer an eligible career pathway program prior to July 1, 2024, the institution must—

(1) Apply to the Secretary to have its program determined to be an initial eligible career pathway program; and

(2) Affirm that any subsequent career pathway program offered by the institution, initiated only after the approval of the initial eligible career pathway program, will meet the documentation standards outlined in paragraph (a) of this section.

(d) The Secretary provides an institution with the opportunity to appeal an adverse eligibility decision under paragraphs (b) and (c) of this section.

(e) The Secretary maintains the authority to require the approval of additional eligible career pathway programs offered by a postsecondary institution beyond the requirements outlined in paragraphs (b) and (c) of this section for any reason, including but not limited to—

(1) A rapid increase, as determined by the Secretary, of eligible career pathway programs at the institution; or

(2) The Secretary determines that other eligible career pathway programs at the postsecondary institution do not meet the documentation standards outlined in this section.

■ 11. Section 668.171 is amended by revising paragraphs (b) introductory text, (b)(3), and (c) through (i) to read as follows:

### § 668.171  General.

\*    \*    \*    \*    \*

(b) *General standards of financial responsibility.* Except as provided in paragraph (h) of this section, the Department considers an institution to be financially responsible if the Department determines that—

\*    \*    \*    \*    \*

(3) The institution is able to meet all of its financial obligations and provide the administrative resources necessary to comply with title IV, HEA program requirements. An institution is not deemed able to meet its financial or administrative obligations if—

(i) It fails to make refunds under its refund policy, return title IV, HEA program funds for which it is responsible under § 668.22, or pay title IV, HEA credit balances as required under § 668.164(h)(2);

(ii) It fails to make repayments to the Department for any debt or liability arising from the institution's participation in the title IV, HEA programs;

(iii) It fails to make a payment in accordance with an existing undisputed financial obligation for more than 90 days;

(iv) It fails to satisfy payroll obligations in accordance with its published payroll schedule;

(v) It borrows funds from retirement plans or restricted funds without authorization; or

(vi) It is subject to an action or event described in paragraph (c) of this section (mandatory triggering events), or

an action or event that the Department has determined to have a significant adverse effect on the financial condition of the institution under paragraph (d) of this section (discretionary triggering events); and

\*    \*    \*    \*    \*

(c) *Mandatory triggering events.* (1) Except for the mandatory triggers that require a recalculation of the institution's composite score, the mandatory triggers in this paragraph (c) constitute automatic failures of financial responsibility. For any mandatory triggers under this paragraph (c) that result in a recalculated composite score of less than 1.0, and for those mandatory triggers that constitute automatic failures of financial responsibility, the Department will require the institution to provide financial protection as set forth in this subpart, unless the institution demonstrates that the event is resolved or that insurance covers the loss in accordance with paragraph (f)(3) of this section. The financial protection required under this paragraph is not less than 10 percent of the total title IV, HEA funding in the prior fiscal year. If the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger. For automatic triggers, the Department will consider whether the financial protection can be released following the institution's submission of two full fiscal years of audited financial statements following the Department's notice that requires the posting of the financial protection. In making this determination, the Department considers whether the administrative or financial risk caused by the event has ceased or been resolved, including full payment of all damages, fines, penalties, liabilities, or other financial relief. For triggers that require a recalculation of the composite score, the Department will consider whether the financial protection can be released if subsequent annual submissions pass the Department's requirements for financial responsibility.

(2) The following are mandatory triggers:

(i) *Legal and administrative actions.* (A) For an institution or entity with a composite score of less than 1.5, other than a composite score calculated under 34 CFR 600.20(g) and § 668.176, that has entered against it a final monetary judgment or award, or enters into a monetary settlement which results from a legal proceeding, including from a lawsuit, arbitration, or mediation, whether or not the judgment, award or

settlement has been paid, and as a result, the recalculated composite score for the institution or entity is less than 1.0, as determined by the Department under paragraph (e) of this section;

(B) On or after July 1, 2024, the institution or any entity whose financial statements were submitted in the prior fiscal year to meet the requirements of 34 CFR 600.20(g) or this subpart, is sued by a Federal or State authority to impose an injunction, establish fines or penalties, or to obtain financial relief such as damages, or in a qui tam action in which the United States has intervened, but only if the Federal or State action has been pending for 120 days, or a qui tam action has been pending for 120 days following intervention by the United States, and—

(*1*) No motion to dismiss, or its equivalent under State law has been filed within the applicable 120-day period; or

(*2*) If a motion to dismiss or its equivalent under State law, has been filed within the applicable 120-day period and denied, upon such denial;

(C) The Department has initiated action to recover from the institution the cost of adjudicated claims in favor of borrowers under the borrower defense to repayment provisions in 34 CFR part 685 and, the recalculated composite score for the institution or entity as a result of the adjudicated claims is less than 1.0, as determined by the Department under paragraph (e) of this section; or

(D) For an institution or entity that has submitted an application for a change in ownership under 34 CFR 600.20 that has entered against it a final monetary judgment or award, or enters into a monetary settlement which results from a legal proceeding, including from a lawsuit, arbitration, or mediation, or a monetary determination arising from an administrative proceeding described in paragraph (c)(2)(i)(B) or (C) of this section, at any point through the end of the second full fiscal year after the change in ownership has occurred, and as a result, the recalculated composite score for the institution or entity is less than 1.0, as determined by the Department under paragraph (e) of this section. This trigger applies whether the judgment, award, settlement, or monetary determination has been paid.

(ii) *Withdrawal of owner's equity.* (A) For a proprietary institution whose composite score is less than 1.5, or for any proprietary institution through the end of the first full fiscal year following a change in ownership, and there is a withdrawal of owner's equity by any means, including by declaring a

dividend, unless the withdrawal is a transfer to an entity included in the affiliated entity group on whose basis the institution's composite score was calculated; or is the equivalent of wages in a sole proprietorship or general partnership or a required dividend or return of capital; and

(B) As a result of that withdrawal, the institution's recalculated composite score for the entity whose financial statements were submitted to meet the requirements of § 668.23 for the annual submission, or 34 CFR 600.20(g) or (h) for a change in ownership, is less than 1.0, as determined by the Department under paragraph (e) of this section.

(iii) *Gainful employment.* As determined annually by the Department, the institution received at least 50 percent of its title IV, HEA program funds in its most recently completed fiscal year from gainful employment (GE) programs that are "failing" under subpart S of this part. (iv) *Institutional teach-out plans or agreements.* The institution is required to submit a teach-out plan or agreement, by a State, the Department or another Federal agency, an accrediting agency, or other oversight body for reasons related in whole or in part to financial concerns.

(v) [Reserved]

(vi) *Publicly listed entities.* For an institution that is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, the entity is subject to one or more of the following actions or events:

(A) *SEC actions.* The U.S. Securities and Exchange Commission (SEC) issues an order suspending or revoking the registration of any of the entity's securities pursuant to section 12(j) of the Securities Exchange Act of 1934 (the "Exchange Act") or suspends trading of the entity's securities pursuant to section 12(k) of the Exchange Act.

(B) *Other SEC actions.* The SEC files an action against the entity in district court or issues an order instituting proceeding pursuant to section 12(j) of the Exchange Act.

(C) *Exchange actions.* The exchange on which the entity's securities are listed notifies the entity that it is not in compliance with the exchange's listing requirements, or its securities are delisted.

(D) *SEC reports.* The entity failed to file a required annual or quarterly report with the SEC within the time period prescribed for that report or by any extended due date under 17 CFR 240.12b–25.

(E) *Foreign exchanges or oversight authority.* The entity is subject to an event, notification, or condition by a

foreign exchange or oversight authority that the Department determines is equivalent to those identified in paragraphs (c)(2)(vi)(A) through (D) of this section.

(vii) *Non-Federal educational assistance funds.* For its most recently completed fiscal year, a proprietary institution did not receive at least 10 percent of its revenue from sources other than Federal educational assistance, as provided under § 668.28(c). The financial protection provided under this paragraph (c)(3)(viii) will remain in place until the institution passes the 90/10 revenue requirement under § 668.28(c) for two consecutive years.

(viii) *Cohort default rates.* The institution's two most recent official cohort default rates are 30 percent or greater, as determined under subpart N of this part, unless—

(A) The institution files a challenge, request for adjustment, or appeal under subpart N of this part with respect to its rates for one or both of those fiscal years; and

(B) That challenge, request, or appeal remains pending, results in reducing below 30 percent the official cohort default rate for either or both of those years or precludes the rates from either or both years from resulting in a loss of eligibility or provisional certification.

(ix) [Reserved]

(x) *Contributions and distributions.* (A) An institution's financial statements required to be submitted under § 668.23 reflect a contribution in the last quarter of the fiscal year, and the entity that is part of the financial statements then made a distribution during the first two quarters of the next fiscal year; and

(B) The offset of such distribution against the contribution results in a recalculated composite score of less than 1.0, as determined by the Department under paragraph (e) of this section.

(xi) *Creditor events.* As a result of an action taken by the Department, the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart is subject to a default or other adverse condition under a line of credit, loan agreement, security agreement, or other financing arrangement.

(xii) *Declaration of financial exigency.* The institution declares a state of financial exigency to a Federal, State, Tribal, or foreign governmental agency or its accrediting agency.

(xiii) *Receivership.* The institution, or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause

the direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law, or has entered against it an order appointing a receiver or appointing a person of similar status under foreign law.

(d) *Discretionary triggering events.* The Department may determine that an institution is not able to meet its financial or administrative obligations if the Department determines that a discretionary triggering event is likely to have a significant adverse effect on the financial condition of the institution. For those discretionary triggers that the Department determines will have a significant adverse effect on the financial condition of the institution, the Department will require the institution to provide financial protection as set forth in this subpart. The financial protection required under this paragraph (d) is not less than 10 percent of the total title IV, HEA funding in the prior fiscal year. If the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger. The Department will consider whether the financial protection can be released following the institution's submission of two full fiscal years of audited financial statements following the Department's notice that requires the posting of the financial protection. In making this determination, the Department considers whether the administrative or financial risk caused by the event has ceased or been resolved, including full payment of all damages, fines, penalties, liabilities, or other financial relief. The following are discretionary triggers:

(1) *Accrediting agency and government agency actions.* The institution's accrediting agency or a Federal, State, local, or Tribal authority places the institution on probation or issues a show-cause order or places the institution in a comparable status that poses an equivalent or greater risk to its accreditation, authorization, or eligibility.

(2) *Other defaults, delinquencies, creditor events, and judgments.* (i) Except as provided in paragraph (c)(2)(xi) of this section, the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart is subject to a default or other adverse condition under a line of credit, loan agreement, security agreement, or other financing arrangement;

(ii) Under that line of credit, loan agreement, security agreement, or other financing arrangement, a monetary or nonmonetary default or delinquency or other event occurs that allows the creditor to require or impose on the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart, an increase in collateral, a change in contractual obligations, an increase in interest rates or payments, or other sanctions, penalties, or fees;

(iii) Any creditor of the institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart takes action to terminate, withdraw, limit, or suspend a loan agreement or other financing arrangement or calls due a balance on a line of credit with an outstanding balance;

(iv) The institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart enters into a line of credit, loan agreement, security agreement, or other financing arrangement whereby the institution or entity may be subject to a default or other adverse condition as a result of any action taken by the Department; or

(v) The institution or any entity included in the financial statements submitted in the current or prior fiscal year under 34 CFR 600.20(g) or (h), § 668.23, or this subpart has a judgment awarding monetary relief entered against it that is subject to appeal or under appeal.

(3) *Fluctuations in title IV volume.* There is a significant fluctuation between consecutive award years, or a period of award years, in the amount of Direct Loan or Pell Grant funds, or a combination of those funds, received by the institution that cannot be accounted for by changes in those programs.

(4) *High annual dropout rates.* As calculated by the Department, the institution has high annual dropout rates.

(5) *Interim reporting.* For an institution required to provide additional financial reporting to the Department due to a failure to meet the financial responsibility standards in this subpart or due to a change in ownership, there are negative cash flows, failure of other financial ratios, cash flows that significantly miss the projections submitted to the Department, withdrawal rates that increase significantly, or other indicators of a significant change in the financial condition of the institution.

(6) *Pending borrower defense claims.* There are pending claims for borrower relief discharge under 34 CFR 685.400 from students or former students of the institution and the Department has formed a group process to consider claims under 34 CFR 685.402 and, if approved, those claims could be subject to recoupment.

(7) *Discontinuation of programs.* The institution discontinues academic programs that enroll more than 25 percent of its enrolled students who receive title IV, HEA program funds.

(8) *Closure of locations.* The institution closes locations that enroll more than 25 percent of its students who receive title IV, HEA program funds.

(9) *State actions and citations.* The institution, or one or more of its programs, is cited by a State licensing or authorizing agency for failing to meet State or agency requirements, including notice that it will withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement.

(10) *Loss of institutional or program eligibility.* The institution or one or more of its programs has lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution or its programs.

(11) *Exchange disclosures.* If an institution is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, the entity discloses in a public filing that it is under investigation for possible violations of State, Federal or foreign law.

(12) *Actions by another Federal agency.* The institution is cited and faces loss of education assistance funds from another Federal agency if it does not comply with the agency's requirements.

(13) *Other teach-out plans or agreements not included in paragraph (c) of this section.* The institution is required to submit a teach-out plan or agreement, including programmatic teach-outs, by a State, the Department or another Federal agency, an accrediting agency, or other oversight body.

(14) *Other events or conditions.* Any other event or condition that the Department learns about from the institution or other parties, and the Department determines that the event or condition is likely to have a significant adverse effect on the financial condition of the institution.

(e) *Recalculating the composite score.* When a recalculation of an institution's most recent composite score is required by the mandatory triggering events described in paragraph (c) of this section, the Department makes the recalculation as follows:

(1) For a proprietary institution, debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) since the end of the prior fiscal year incurred by the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) through the end of the first full fiscal year following a change in ownership incurred by the entity whose financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, increasing expenses and decreasing adjusted equity by that amount.

(ii) For the equity ratio, decreasing modified equity by that amount.

(iii) For the net income ratio, decreasing income before taxes by that amount.

(2) For a nonprofit institution, debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) since the end of the prior fiscal year incurred by the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and debts, liabilities, and losses (including cumulative debts, liabilities, and losses for all triggering events) through the end of the first full fiscal year following a change in ownership incurred by the entity whose financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, increasing expenses and decreasing expendable net assets by that amount.

(ii) For the equity ratio, decreasing modified net assets by that amount.

(iii) For the net income ratio, decreasing change in net assets without donor restrictions by that amount.

(3) For a proprietary institution, the withdrawal of equity (including cumulative withdrawals of equity) since the end of the prior fiscal year from the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23 or this subpart, and the withdrawal of equity (including cumulative withdrawals of equity) through the end of the first full fiscal year following a change in ownership from the entity whose financial statements were submitted for 34 CFR 600.20(g) or (h), will be adjusted as follows:

(i) For the primary reserve ratio, decreasing adjusted equity by that amount.

(ii) For the equity ratio, decreasing modified equity and modified total assets by that amount.

(4) For a proprietary institution, a contribution and distribution in the entity whose financial statements were submitted in the prior fiscal year to meet the requirements of § 668.23, this subpart, or 34 CFR 600.20(g) will be adjusted as follows:

(i) For the primary reserve ratio, decreasing adjusted equity by the amount of the distribution.

(ii) For the equity ratio, decreasing modified equity by the amount of the distribution.

(f) *Reporting requirements.* (1) In accordance with procedures established by the Department, an institution must timely notify the Department of the following actions or events:

(i) For a monetary judgment, award, or settlement incurred under paragraph (c)(2)(i)(A) of this section, no later than 21 days after either the date of written notification to the institution or entity of the monetary judgment or award, or the execution of the settlement agreement by the institution or entity.

(ii) For a lawsuit described in paragraph (c)(2)(i)(B) of this section, no later than 21 days after the institution or entity is served with the complaint, and an updated notice must be provided 21 days after the suit has been pending for 120 days.

(iii) [Reserved]

(iv) For a withdrawal of owner's equity described in paragraph (c)(2)(ii) of this section—

(A) For a capital distribution that is the equivalent of wages in a sole proprietorship or general partnership, no later than 21 days after the date the Department notifies the institution that its composite score is less than 1.5. In response to that notice, the institution must report the total amount of the wage-equivalent distributions it made during its prior fiscal year and any distributions that were made to pay any taxes related to the operation of the institution. During its current fiscal year and the first six months of its subsequent fiscal year (18-month period), the institution is not required to report any distributions to the Department, provided that the institution does not make wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year, less any distributions that were made to pay any

taxes related to the operation of the institution. However, if the institution makes wage-equivalent distributions that exceed 150 percent of the total amount of wage-equivalent distributions it made during its prior fiscal year less any distributions that were made to pay any taxes related to the operation of the institution at any time during the 18-month period, it must report each of those distributions no later than 21 days after they are made, and the Department recalculates the institution's composite score based on the cumulative amount of the distributions made at that time;

(B) For a distribution of dividends or return of capital, no later than 21 days after the dividends are declared or the amount of return of capital is approved; or

(C) For a related party receivable or other assets, no later than 21 days after that receivable/other assets are booked or occur.

(v) For a contribution and distribution described in paragraph (c)(2)(x) of this section, no later than 21 days after the distribution.

(vi) For the provisions relating to a publicly listed entity under paragraph (c)(2)(vi) or (d)(11) of this section, no later than 21 days after the date that such event occurs.

(vii) For any action by an accrediting agency, Federal, State, local, or Tribal authority that is either a mandatory or discretionary trigger, no later than 21 days after the date on which the institution is notified of the action.

(viii) For the creditor events described in paragraph (c)(2)(xi) of this section, no later than 21 days after the date on which the institution is notified of the action by its creditor.

(ix) For the other defaults, delinquencies, or creditor events described in paragraphs (d)(2)(i), (ii), (iii), and (iv) of this section, no later than 21 days after the event occurs, with an update no later than 21 days after the creditor waives the violation, or the creditor imposes sanctions or penalties, including sanctions or penalties imposed in exchange for or as a result of granting the waiver. For a monetary judgment subject to appeal or under appeal described in paragraph (d)(2)(v) of this section, no later than 21 days after the court enters the judgment, with an update no later than 21 days after the appeal is filed or the period for appeal expires without a notice of appeal being filed. If an appeal is filed, no later than 21 days after the decision on the appeal is issued.

(x) For the non-Federal educational assistance funds provision in paragraph (c)(2)(vii) of this section, no later than 45 days after the end of the institution's fiscal year, as provided in § 668.28(c)(3).

(xi) For an institution or entity that has submitted an application for a change in ownership under 34 CFR 600.20 that is required to pay a debt or incurs a liability from a settlement, arbitration proceeding, final judgment in a judicial proceeding, or a determination arising from an administrative proceeding described in paragraph (c)(2)(i)(B) or (C) of this section, the institution must report this no later than 21 days after the action. The reporting requirement in this paragraph (f)(1)(xi) is applicable to any action described in this section occurring through the end of the second full fiscal year after the change in ownership has occurred.

(xii) For a discontinuation of academic programs described in paragraph (d)(7) of this section, no later than 21 days after the discontinuation of programs.

(xiii) For a failure to meet any of the standards in paragraph (b) of this section, no later than 21 days after the institution ceases to meet the standard.

(xiv) For a declaration of financial exigency, no later than 21 days after the institution communicates its declaration to a Federal, State, Tribal, or foreign governmental agency or its accrediting agency.

(xv) If the institution, or an owner or affiliate of the institution that has the power, by contract or ownership interest, to direct or cause the direction of the management of policies of the institution, files for a State or Federal receivership, or an equivalent proceeding under foreign law, or has entered against it an order appointing a receiver or appointing a person of similar status under foreign law, no later than 21 days after either the filing for receivership or the order appointing a receiver or appointing a person of similar status under foreign law, as applicable.

(xvi) The institution closes locations that enroll more than 25 percent of its students no later than 21 days after the closure that meets or exceeds the thresholds in this paragraph (f)(1)(xvi).

(xvii) If the institution is directly or indirectly owned at least 50 percent by an entity whose securities are listed on a domestic or foreign exchange, and the entity discloses in a public filing that it is under investigation for possible violations of State, Federal, or foreign law, no later than 21 days after the public filing.

(xviii) For any other event or condition that is likely to have a significant adverse condition on the financial condition of the institution, no later than 21 days after the event or condition occurs.

(2) The Department may take an administrative action under paragraph (i) of this section against an institution, or determine that the institution is not financially responsible, if it fails to provide timely notice to the Department as provided under paragraph (f)(1) of this section, or fails to respond, within the timeframe specified by the Department, to any determination made, or request for information, by the Department under paragraph (f)(3) of this section.

(3)(i) In its timely notice to the Department under this paragraph (f), or in its response to a determination by the Department that the institution is not financially responsible because of a triggering event under paragraph (c) or (d) of this section that does not have a notice requirement set forth in this paragraph (f), in accordance with procedures established by the Department, the institution may—

(A) Show that the creditor waived a violation of a loan agreement under paragraph (d)(2) of this section. However, if the creditor imposes additional constraints or requirements as a condition of waiving the violation, or imposes penalties or requirements under paragraph (d)(2)(ii) of this section, the institution must identify and describe those penalties, constraints, or requirements and demonstrate that complying with those actions will not significantly affect the institution's ability to meet its financial obligations;

(B) Show that the triggering event has been resolved, or for obligations resulting from monetary judgments, awards, settlements, or administrative determinations that arise under paragraph (c)(2)(i)(A) or (D) of this section, that the institution can demonstrate that insurance will cover all of the obligation, or for purposes of recalculation under paragraph (e) of this section, that insurance will cover a portion of the obligation; or

(C) Explain or provide information about the conditions or circumstances that precipitated a triggering event under paragraph (d) of this section that demonstrates that the triggering event has not had, or will not have, a significant adverse effect on the financial condition of the institution.

(ii) The Department will consider the information provided by the institution in its notification of the triggering event in determining whether to issue a determination that the institution is not financially responsible.

(g) *Public institutions.* (1) The Department considers a domestic public

institution to be financially responsible if the institution—

(i) Notifies the Department that it is designated as a public institution by the State, local, or municipal government entity, Tribal authority, or other government entity that has the legal authority to make that designation; and

(ii) Provides a letter or other documentation acceptable to the Department and signed by an official of that government entity confirming that the institution is a public institution and is backed by the full faith and credit of the government entity in the following circumstances—

(A) Before the institution's initial certification as a public institution;

(B) Upon a change in ownership and request to be recognized as a public institution; or

(C) Upon request by the Department, which could include during the recertification of a public institution;

(iii) Is not subject to a condition of past performance under § 668.174; and

(iv) Is not subject to an automatic mandatory triggering event as described in paragraph (c) of this section or a discretionary triggering event as described in paragraph (d) of this section that the Department determines will have a significant adverse effect on the financial condition of the institution.

(2) The Department considers a foreign public institution to be financially responsible if the institution—

(i) Notifies the Department that it is designated as a public institution by the country or other government entity that has the legal authority to make that designation; and

(ii) Provides a letter or other documentation acceptable to the Department and signed by an official of that country or other government entity confirming that the institution is a public institution and is backed by the full faith and credit of the country or other government entity. This letter or other documentation must be submitted before the institution's initial certification, upon a change in ownership and request to be recognized as a public institution, and for the first re-certification of a public institution after July 1, 2024. Thereafter, the letter or other documentation must be submitted in the following circumstances—

(A) When the institution submits an application for re-certification following any period of provisional certification;

(B) Within 10 business days following a change in the governmental status of the institution whereby the institution is

no longer backed by the full faith and credit of the government entity; or

(C) Upon request by the Department;

(iii) Is not subject to a condition of past performance under § 668.174; and

(iv) Is not subject to an automatic mandatory triggering event as described in paragraph (c) of this section or a discretionary triggering event as described in paragraph (d) of this section that the Department determines will have a significant adverse effect on the financial condition of the institution.

(h) *Audit opinions and disclosures.* Even if an institution satisfies all of the general standards of financial responsibility under paragraph (b) of this section, the Department does not consider the institution to be financially responsible if the institution's audited financial statements—

(1) Include an opinion expressed by the auditor that was an adverse, qualified, or disclaimed opinion, unless the Department determines that the adverse, qualified, or disclaimed opinion does not have a significant bearing on the institution's financial condition; or

(2) Include a disclosure in the notes to the institution's or entity's audited financial statements about the institution's or entity's diminished liquidity, ability to continue operations, or ability to continue as a going concern, unless the Department determines that the diminished liquidity, ability to continue operations, or ability to continue as a going concern has been alleviated. The Department may conclude that diminished liquidity, ability to continue operations, or ability to continue as a going concern has not been alleviated even if the disclosure provides that those concerns have been alleviated.

(i) *Administrative actions.* If the Department determines that an institution is not financially responsible under the standards and provisions of this section or under an alternative standard in § 668.175, or the institution does not submit its financial statements and compliance audits by the date and in the manner required under § 668.23, the Department may—

(1) Initiate an action under subpart G of this part to fine the institution, or limit, suspend, or terminate the institution's participation in the title IV, HEA programs;

(2) For an institution that is provisionally certified, take an action against the institution under the procedures established in § 668.13(d); or

(3) Deny the institution's application for certification or recertification to

participate in the title IV, HEA programs.

■ 13. Section 668.174 is amended by:
■ a. Revising paragraph (a)(2) and (b)(2)(i).
■ b. Adding paragraph (b)(3).
■ c. Revising paragraph (c)(1).
The revisions and addition read as follows:

**§ 668.174 Past performance.**

(a) * * *
(2) In either of its two most recently submitted compliance audits had a final audit determination or in a Departmentally issued report, including a final program review determination report, issued in its current fiscal year or either of its preceding two fiscal years, had a program review finding that resulted in the institution's being required to repay an amount greater than five percent of the funds that the institution received under the title IV, HEA programs during the year covered by that audit or program review;

*      *      *      *      *

(b) * * *
(2) * * *
(i) The institution notifies the Department, within the time permitted and as provided under 34 CFR 600.21, that the person or entity referenced in paragraph (b)(1) of this section exercises substantial control over the institution; and

*      *      *      *      *

(3) An institution is not financially responsible if an owner who exercises substantial control, or the owner's spouse, has been in default on a Federal student loan, including parent PLUS loans, in the preceding five years, unless—

(i) The defaulted Federal student loan has been fully repaid and five years have elapsed since the repayment in full;

(ii) The defaulted Federal student loan has been approved for, and the borrower is in compliance with, a rehabilitation agreement and has been current for five consecutive years; or

(iii) The defaulted Federal student loan has been discharged, canceled, or forgiven by the Department.

(c) * * *
(1) An ownership interest is defined in 34 CFR 600.31(b).

*      *      *      *      *

■ 14. Section 668.175 is amended by:
■ a. Revising paragraphs (b), (c), (d), and (f)(1) and (2); and
■ b. Adding paragraph (i).
The revisions and addition read as follows:

**§ 668.175    Alternative standard and requirements.**

* * * * *

(b) *Letter of credit or cash escrow alternative for new institutions.* A new institution that is not financially responsible solely because the Department determines that its composite score is less than 1.5, qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Department, or providing other financial protection described under paragraph (h)(2)(i) of this section, for an amount equal to at least one-half of the amount of title IV, HEA program funds that the Department determines the institution will receive during its initial year of participation. A new institution is an institution that seeks to participate for the first time in the title IV, HEA programs.

(c) *Financial protection alternative for participating institutions.* A participating institution that is not financially responsible, either because it does not satisfy one or more of the standards of financial responsibility under § 668.171(b), (c), or (d), or because of an audit opinion or disclosure about the institution's liquidity, ability to continue operations, or ability to continue as a going concern described under § 668.171(h), qualifies as a financially responsible institution by submitting an irrevocable letter of credit that is acceptable and payable to the Department, or providing other financial protection described under paragraph (h)(2)(i) of this section, for an amount determined by the Department that is not less than one-half of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this paragraph (c) does not apply to a public institution. For purposes of a failure under § 668.171(b)(2) or (3), the institution must also remedy the issue(s) that gave rise to the failure to the Department's satisfaction.

(d) *Zone alternative.* (1) A participating institution that is not financially responsible solely because the Department determines that its composite score under § 668.172 is less than 1.5 may participate in the title IV, HEA programs as a financially responsible institution for no more than three consecutive years, beginning with the year in which the Department determines that the institution qualifies under the alternative in this paragraph (d).

(i)(A) An institution qualifies initially under this alternative if, based on the institution's audited financial statements for its most recently completed fiscal year, the Department determines that its composite score is in the range from 1.0 to 1.4; and

(B) An institution continues to qualify under this alternative if, based on the institution's audited financial statements for each of its subsequent two fiscal years, the Department determines that the institution's composite score is in the range from 1.0 to 1.4.

(ii) An institution that qualified under this alternative for three consecutive years, or for one of those years, may not seek to qualify again under this alternative until the year after the institution achieves a composite score of at least 1.5, as determined by the Department.

(2) Under the zone alternative, the Department—

(i) Requires the institution to make disbursements to eligible students and parents, and to otherwise comply with the provisions, under either the heightened cash monitoring or reimbursement payment method described in § 668.162;

(ii) Requires the institution to provide timely information regarding any of the following oversight and financial events—

(A) Any event that causes the institution, or related entity as defined in Accounting Standards Codification (ASC) 850, to realize any liability that was noted as a contingent liability in the institution's or related entity's most recent audited financial statements; or

(B) In accordance with Accounting Standards Update (ASU) No. 2015–01 and ASC 225 and taking into account the environment in which the entity operates, any losses that are unusual in nature, meaning the underlying event or transaction should possess a high degree of abnormality and be of a type clearly unrelated to, or only incidentally related to, the ordinary and typical activities of the entity, taking into account the environment in which the entity operates; infrequently occur, meaning the underlying event or transaction should be of a type that would not reasonably be expected to recur in the foreseeable future; or both;

(iii) May require the institution to submit its financial statement and compliance audits earlier than the time specified under § 668.23(a)(4); and

(iv) May require the institution to provide information about its current operations and future plans.

(3) Under the zone alternative, the institution must—

(i) For any oversight or financial event described in paragraph (d)(2)(ii) of this section for which the institution is required to provide information, in accordance with procedures established by the Department, notify the Department no later than 10 days after that event occur; and

(ii) As part of its compliance audit, require its auditor to express an opinion on the institution's compliance with the requirements under the zone alternative in this paragraph (d), including the institution's administration of the payment method under which the institution received and disbursed title IV, HEA program funds.

(4) If an institution fails to comply with the requirements under paragraph (d)(2) or (3) of this section, the Department may determine that the institution no longer qualifies under the alternative in this paragraph (d).

* * * * *

(f) * * *

(1) The Department may permit an institution that is not financially responsible to participate in the title IV, HEA programs under a provisional certification for no more than three consecutive years if—

(i) The institution is not financially responsible because it does not satisfy the general standards under § 668.171(b), its recalculated composite score under § 668.171(e) is less than 1.0, it is subject to an action or event under § 668.171(c), or an action or event under paragraph (d) of this section has a significant adverse effect on the institution as determined by the Department, or because of an audit opinion or going concern disclosure described in § 668.171(h); or

(ii) The institution is not financially responsible because of a condition of past performance, as provided under § 668.174(a), and the institution demonstrates to the Department that it has satisfied or resolved that condition; and

(2) Under the alternative in this paragraph (f), the institution must—

(i) Provide to the Department an irrevocable letter of credit that is acceptable and payable to the Department, or provide other financial protection described under paragraph (h) of this section, for an amount determined by the Department that is not less than 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, except that this paragraph (f)(2)(i) does not apply to a public institution that the Department determines is backed by the full faith and credit of the State or equivalent governmental entity;

(ii) Remedy the issue(s) that gave rise to its failure under § 668.171(b)(2) or (3) to the Department's satisfaction; and

(iii) Comply with the provisions under the zone alternative, as provided under paragraph (d)(2) and (3) of this section.

\*    \*    \*    \*    \*

(i) *Incorporation by reference.* The material listed in this paragraph (i) is incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. This incorporation by reference (IBR) material is available for inspection at U.S. Department of Education and at the National Archives and Records Administration (NARA). Contact U.S. Department of Education at: Office of the General Counsel, 400 Maryland Avenue SW, Room 2C–136, Washington, DC 20202; phone: (202) 401–6000; *https://www2.ed.gov/about/offices/list/ogc/index.html?src=oc.* For information on the availability of this material at NARA, visit *www.archives.gov/federal-register/cfr/ibr-locations* or email *fr.inspection@nara.gov.* The material may be obtained from the Financial Accounting Standards Board (FASB), 401 Merritt 7, P.O. Box 5116, Norwalk, CT 06856–5116; (203) 847–0700; *www.fasb.org≤.*

(1) Accounting Standards Codification (ASC) 850, Related Party Disclosures, Updated through September 10, 2018.

(2) [Reserved]

### § 668.176 [Redesignated as § 668.177]

■ 15. Section 668.176 is redesignated as § 668.177.

■ 16. A new § 668.176 is added to read as follows:

### § 668.176 Change in ownership.

(a) *Purpose.* To continue participation in the title IV, HEA programs during and following a change in ownership, institutions must meet the financial responsibility requirements in this section.

(b) *Materially complete application.* To meet the requirements of a materially complete application under 34 CFR 600.20(g)(3)(iii) and (iv)—

(1) An institution undergoing a change in ownership and control as provided under 34 CFR 600.31 must submit audited financial statements of its two most recently completed fiscal years prior to the change in ownership, at the level of the change in ownership or the level of financial statements required by the Department, that are prepared and audited in accordance with the requirements of § 668.23(d); and

(2) The institution must submit audited financial statements of the institution's new owner's two most recently completed fiscal years prior to the change in ownership that are prepared and audited in accordance with the requirements of § 668.23 at the highest level of unfractured ownership or at the level required by the Department.

(i) If the institution's new owner does not have two years of acceptable audited financial statements, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year;

(ii) If the institution's new owner only has one year of acceptable financial statements, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of 10 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year; or

(iii) For an entity where no individual new owner obtains control, but the combined ownership of the new owners is equal to or exceeds the ownership share of the existing ownership, financial protection in the form of a letter of credit or cash to the Department in the amount of 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, based on the combined ownership share of the new owners, except for any new owner that submits two years or one year of acceptable audited financial statements as described in paragraphs (b)(2)(i) and (ii) of this section.

(3) The institution must meet the financial responsibility requirements in this paragraph (b)(3). In general, the Department considers an institution to be financially responsible only if it—

(i) For a for-profit institution evaluated at the ownership level required by the Department for the new owner—

(A) Has not had operating losses in either or both of its two latest fiscal years that in sum result in a decrease in tangible net worth in excess of 10 percent of the institution's tangible net worth at the beginning of the first year of the two-year period. The Department may calculate an operating loss for an institution by excluding prior period adjustment and the cumulative effect of changes in accounting principle. For purposes of this section, the calculation of tangible net worth must exclude all related party accounts receivable/other assets and all assets defined as intangible in accordance with the composite score;

(B) Has, for its two most recent fiscal years, a positive tangible net worth. In applying the standard in this paragraph (b)(3)(ii)(B), a positive tangible net worth occurs when the institution's tangible assets exceed its liabilities. The calculation of tangible net worth excludes all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(C) Has a passing composite score and meets the other financial requirements of this subpart for its most recently completed fiscal year.

(ii) For a nonprofit institution evaluated at the ownership level required by the Department for the new owner—

(A) Has, at the end of its two most recent fiscal years, positive net assets without donor restrictions. The Department will exclude all related party receivables/other assets from net assets without donor restrictions and all assets classified as intangibles in accordance with the composite score;

(B) Has not had an excess of net assets without donor restriction expenditures over net assets without donor restriction revenues over both of its two latest fiscal years that results in a decrease exceeding 10 percent in either the net assets without donor restrictions from the start to the end of the two-year period or the net assets without donor restriction in either one of the two years. The Department may exclude from net changes in fund balances for the operating loss calculation prior period adjustment and the cumulative effect of changes in accounting principle. In calculating the net assets without donor restriction, the Department will exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(C) Has a passing composite score and meets the other financial requirements of this subpart for its most recently completed fiscal year.

(iii) For a public institution, has its liabilities backed by the full faith and credit of a State or equivalent governmental entity.

(4) For a for-profit or nonprofit institution that is not financially responsible under paragraph (b)(3) of this section, provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

(c) *Acquisition debt.* (1) Notwithstanding any other provision in

this section, the Department may determine that the institution is not financially responsible following a change in ownership if the amount of debt assumed to complete the change in ownership requires payments (either periodic or balloon) that are inconsistent with available cash to service those payments based on enrollments for the period prior to when the payment is or will be due.

(2) For a for-profit or nonprofit institution that is not financially responsible under this section, provide financial protection in the form of a letter of credit or cash in an amount that is not less than 10 percent of the prior year title IV, HEA funding or an amount determined by the Department, and follow the zone requirements in § 668.175(d).

(d) *Terms of the extension.* To meet the requirements for a temporary provisional program participation agreement following a change in ownership, as described in 34 CFR 600.20(h)(3)(i), an institution must meet the following requirements:

(1) For a proprietary institution or a nonprofit institution—

(i) The institution must provide the Department a same-day balance sheet for a proprietary institution or a statement of financial position for a nonprofit institution that shows the financial position of the institution under its new owner, as of the day after the change in ownership, and that meets the following requirements:

(A) The same-day balance sheet or statement of financial position must be prepared in accordance with generally accepted accounting principles (GAAP)

published by the Financial Accounting Standards Board and audited in accordance with generally accepted government auditing standards (GAGAS) published by the U.S. Government Accountability Office (GAO);

(B) As part of the same-day balance sheet or statement of financial position, the institution must include a disclosure that includes all related-party transactions, and such details as would enable the Department to identify the related party in accordance with the requirements of § 668.23(d). Such information must include, but is not limited to, the name, location, and description of the related entity, including the nature and amount of any transaction between the related party and the institution, financial or otherwise, regardless of when it occurred;

(C) Such balance sheet or statement of financial position must be a consolidated same-day financial statement at the level of highest unfractured ownership or at a level determined by the Department for an ownership of less than 100 percent;

(D) The same-day balance sheet or statement of financial position must demonstrate an acid test ratio of at least 1:1. The acid test ratio must be calculated by adding cash and cash equivalents to current accounts receivable and dividing the sum by total current liabilities. The calculation of the acid test ratio must exclude all related party receivables/other assets and all assets classified as intangibles in accordance with the composite score;

(E) A proprietary institution's same-day balance sheet must demonstrate a positive tangible net worth the day after the change in ownership. A positive tangible net worth occurs when the tangible assets exceed liabilities. The calculation of tangible net worth must exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(F) A nonprofit institution's statement of financial position must have positive net assets without donor restriction the day after the change in ownership. The calculation of net assets without donor restriction must exclude all related party accounts receivable/other assets and all assets classified as intangible in accordance with the composite score; and

(ii) If the institution fails to meet the requirements in paragraphs (d)(1)(i) of this section, the institution must provide financial protection in the form of a letter of credit or cash to the Department in the amount of at least 25 percent of the title IV, HEA program funds received by the institution during its most recently completed fiscal year, or an amount determined by the Department, and must follow the zone requirements of § 668.175(d); and

(2) For a public institution, the institution must have its liabilities backed by the full faith and credit of a State, or by an equivalent governmental entity, or must follow the requirements of this section for a proprietary or nonprofit institution.

[FR Doc. 2023–22785 Filed 10–30–23; 8:45 am]

**BILLING CODE 4000–01–P**