# In the United States District Court for the Eastern District of Missouri
## at Hannibal

Hannibal-LaGrange University,
      Plaintiff,

vs.

Linda McMahon, et al.
      Defendants.

Case No. 2:25-cv-00042-HEA

## Suggestions in Support of Plaintiff's Motion for <u>Preliminary Injunction</u>

Law Offices of
Jonathan R. Whitehead LLC
Jonathan R. Whitehead Mo. 56848
229 S.E. Douglas St., Ste. 210
Lee's Summit, Mo 64063
816.398.8305 - Phone
816.278.9131 - Fax

Attorney for Plaintiff
Hannibal-LaGrange University

i

# TABLE OF CONTENTS

Table of Contents ........................................................................................... i

Table of Authorities....................................................................................... iii

Introduction..................................................................................................... 1

Factual Background ........................................................................................ 2

    I.   HLGU is an autonomous Baptist Institution affiliated with local churches. ...................... 2

    II.  HLGU has long participated in Title IV and recently expanded its prison education program. ............................................................................................ 3

    III. The Department now imposes a new co-signature mandate requiring changes in HLGU's religious relationships. ............................................................... 3

    IV. HLGU is already suffering irreparable harm from lost Pell funding and blocked program growth. ................................................................................ 4

    V.  Immediate relief is needed to prevent additional damage and preserve the *status quo*. .......................................................................................................... 5

Legal Standard................................................................................................. 5

Argument ......................................................................................................... 6

    I.   HLGU has a strong likelihood of success on the merits. ................................................... 6

        A.  The Department's Co-Signature Mandate breaks Federal Law. ................................. 6

        B.  The Co-Signature Mandate substantially burdens HLGU's religious exercise, making it likely HLGU will prevail on its RFRA claim. ...................... 10

        C.  The Department's stated rationale for § 668.14(a)(3) is not compelling and is not particularized. ..................................................................................... 12

        D.  Third, the Department's regulation violates the First Amendment. ........................... 17

    II.  Without an injunction, HLGU will continue to suffer irreparable harm. ......................... 20

i

III. The equities heavily favor preserving the *status quo* for HLGU and serves the public interest by protecting religious freedom, education, and prisoner education and rehabilitation...................................................................................................................... 22

IV.  HLGU asks this Court to issue a narrow preliminary injunction. .................................... 22

Conclusion ……………………………………………………………………………… 23

Certificate of Service……………………………… **Error! Bookmark not defined.**

## TABLE OF AUTHORITIES

### CASES

*66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. 1999) (*en banc*) ................................................................................................ 14

*Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) ... 21

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ..................................................... 10

*Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014) ................................... 11, 14

*Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n,* 605 U.S. ___, 145 S. Ct. 1583 (2025) .................................................................................... 19

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996 (8th Cir. 2012) ........................................................................... 22

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ...................... 19

*Deckard v. Comm'r of Internal Revenue*, 155 T.C. 118(2020) ................................... 8

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................................... 21

*Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 593 (Mo. 2013).................... 2, 8

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ................................. 2, 11, 12, 18

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418 (2006) ... 11, 12, 15, 17, 21

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171(2012) ................................................................................................................ 18

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94 (1952) .................................................................................. 18

*Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) (*en banc*) ........................................................................................................ 6

*Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024) ....................................... 6

*Neb. Press Ass'n v. Stuart*, 423 U.S. 1327 (1975) ...................................... 21

*New Doe Child #1* v. *United States*, 901 F.3d 1015 (8th Cir. 2018) ........................... 11

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020) ................. 2, 10

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) ............................. 21

*S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) .................. 19

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976) ........................... 18

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ............................................... 5

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ................................... 5

*United States v. Bestfoods*, 524 U.S. 51 (1998) ........................................... 7

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ...................................... 10

Wildhawk Invs., LLC v. Brava I.P., LLC, 27 F.4th 587 (8th Cir. 2022) .................. 6

Wisconsin v. Yoder, 406 U.S. 205 (1972) ............................................. 15, 17

### STATUTES

§ 355.066, RSMo. (2023) ......................................................... 2, 3, 8, 19

§ 355.606, RSMo. (2023) ......................................................................... 8

18 U.S.C. § 152 ...................................................................................... 14

20 U.S.C. § 1094(A)(1) (2022) (Higher Education Act § 487) ............................. 6

20 U.S.C. §1094(c)(1)(B) .......................................................................... 10

42 U.S.C. § 2000bb-4, et seq. (Religious Freedom Restoration Act of 1993) ...10, 17

### Other Authorities

11A Wright & Miller, Federal Practice and Procedure § 2948.1 .................... 21

Fed. R. Civ. P. 65(c) ............................................................................... 23

Internal Revenue Serv., U.S. Dep't of the Treasury, Exempt Organizations Annual
Reporting Requirements – Form 990, Schedule R: Meaning of Control for
Organizations Without Owners, IRS.gov, https://www.irs.gov/charities-non-
profits/exempt-organizations-annual-reporting-requirements-form-990-
schedule-r-meaning-of-control-for-organizations-without-owners (l .................. 9

Joseph Mead & Michael Pollack, Courts, Constituencies, and the Enforcement of
Fiduciary Duties in the Nonprofit Sector, 77 U. Pitt. L. Rev. 281, 289 (2016) ..... 9

### Regulations

34 C.F.R. § 668.175 (2024) .................................................................. 14, 16

*Program Integrity and Institutional Accountability*, 88 Fed. Reg. 74634 (Oct. 31, 2023)
(to be codified at 34 C.F.R. pt 668, *et al*.). .............................................. 12

## Introduction

Hannibal-LaGrange University ("HLGU") seeks a preliminary injunction allowing it to keep participating in federal student-aid programs while it challenges a new Department of Education rule that forces its sponsoring Baptist churches to co-sign its Program Participation Agreement.

Hannibal-LaGrange University ("HLGU") is a small Baptist university in northeastern Missouri. Local churches, through the Missouri Baptist Convention ("MBC"), elect its board, a demonstration of the Baptist belief that congregations are the highest religious authority. HLGU's students receive Title IV, federal student aid under a contract called a Program Participation Agreement. Until now, the Department of Education's PPA only dealt with HLGU, as the law has always required.

Through April 2024, the Department treated HLGU like any other private college. That changed in May 2024. In the waning days of the Biden Administration, the Department took a new position, under a new 34 C.F.R. § 668.14(a)(3). The Department says the MBC is now an "owner" of HLGU and must enter the PPA contract. Or else HLGU must cut the churches out of trustee selection. Until one of these happens, the Department has frozen any new aid programs. And it will throw HLGU out of all student-aid programs in 2026.

But the MBC has no ownership stake in HLGU, no claim on HLGU's money, and no role in HLGU's day-to-day management. Missouri law says the MBC is not an owner of HLGU. What is more, the Department's is misinterpreting its own rule. The text speaks only to entities with "ownership," those who can dominate a school's governance and might try to avoid liabilities for profit. Congress never authorized a rule aimed at church groups that decide which Baptists should be HLGU's trustees.

Even more fundamentally, the First Amendment bars the federal government from meddling in how a religious school chooses its leaders. By tying money to a forced change in church governance, the Department is pressuring HLGU to abandon a core faith practice. That

1

interference violates both the Constitution and RFRA. *See Fulton v. City of Philadelphia*, 593 U.S. 522 (2021); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020).

New Department officials remain bound by the regulation. Accordingly, HLGU asks for a preliminary injunction that stops the Department from enforcing this new rule while the lawsuit moves forward. With no relief, HLGU school is already losing $500,000 in Pell Grant-supported tuition for its prison-education program. And now it faces a rapid loss of students, programs, and possibly its very survival. Time is of the essence.

## Factual Background

### I.    HLGU is an autonomous Baptist Institution affiliated with local churches.

Hannibal-LaGrange University ("HLGU") was founded in 1858 and has always answered to the local Baptist churches that created it. (Compl. ¶¶ 1, 4, 13-16, 20–33, 105.) Those churches meet annually through the Missouri Baptist Convention ("MBC"). The MBC holds no equity in the college and does not direct HLGU's daily affairs. Missouri courts say this is "membership," and not "ownership." *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 593 (Mo. 2013)*;* § 355.066(21), RSMo. (2023); (Compl. ¶¶ 20–25, 68.)

The MBC is an incorporated association of approximately 1,500 churches. (Compl. ¶ 68.) It meets only two days a year, in a town-hall style meeting. (Compl. ¶ 68.) "Messengers" from local churches conduct church business, including electing trustees for each MBC-affiliated ministry like HLGU. (Compl. ¶¶ 21, 24.) The Convention itself holds no assets, other than its rights as a 'member' of other ministries. (Compl. ¶ 68.) By its own charter, MBC '[gives] full authority' over operations to each board. So the Convention never touches HLGU's day-to-day work (Compl. ¶¶ 106-08)[1] Any "profit" generated by HLGU stays with HLGU, and does not flow to MBC.

---

[1] MBC Const. Art. VII, § 4, available at https://media.mobaptist.org/public/executive-office/governing-docs/constitution-of-the-mbc-2022.pdf

This right to select HLGU's trustees makes MBC a statutory "member," § 355.066(21), RSMo. (2023), a status long held by courts to be distinct from "ownership." (Compl. ¶¶ 8, 52 106-8.) HLGU's independence is reflected in its corporate documents, financial records, and daily operations. (Compl. ¶¶ 1, 20–33.)

## II.    HLGU has long participated in Title IV and recently expanded its prison education program.

Building on that history, for more than half a century HLGU has relied on federal student-aid programs administered by the Department of Education. Its compliance record remained clean when, in 2021, the University opened "Freedom on the Inside," a degree track for incarcerated students. Compl. ¶¶ 88, et seq.) In 2023, Congress reinstated Second Chance Pell Grants for prisoner education. In April 2024, HLGU asked the Department to update its Program Participation Agreement ("PPA"), so that the program would be eligible. [2] (Compl. ¶¶ 86–95.)

## III.    The Department now imposes a new co-signature mandate requiring changes in HLGU's religious relationships.

Suddenly, in May 2024, the Department declined to process HLGU's PPA update. (Compl. ¶¶ 54-6.) For the first time, it asserted that MBC has "ownership" because it selects HLGU's trustees. And, according to new policies, the MBC must sign the PPA alongside HLGU or have a designee sign on its behalf. (Compl. ¶¶ 54-60, 96.) Either way, the MBC will be bound to an agreement with the Department and subject to new liabilities. (Compl. ¶ 60.) The Department justified this unprecedented demand by asserting MBC "owns" HLGU because it participates in the Trustee selection process. (Compl. ¶¶ 57-8.)

In a May 30, 2024, letter, the Department explained that its ruling relied on a single fact: the MBC's ability to elect and remove trustees. The Department stated, "[e]ven if MBC's powers

---

[2]    A copy of HLGU's current PPA is publicly available at https://studentaid.gov/sites/default/files/ppa/hannibal-lagrange-university-ppa.pdf.

were restricted to just electing HLGU's Trustees," the Department would impose liability. "[A]s the sole member, MBC would still have indirect control over HLGU through these Trustees," it claimed. (Compl. ¶ 58.)

HLGU had never previously been treated as subject to third-party dominance, and the Department had approved prior PPAs without requiring any MBC involvement. Alternatively, the Department suggested HLGU could cut off the MBC's role. The Department warned HLGU not to proceed unless MBC signs the PPA or steps aside from electing trustees. (Compl. ¶¶ 51–70, 75–80.)

## IV.    HLGU is already suffering irreparable harm from lost Pell funding and blocked program growth.

HLGU could not satisfy either Department demand consistent with its beliefs (Compl. ¶¶ 6, 113-18), and the fallout was immediate. Because the PPA update stalled, Pell funds for the prison program were frozen. This has caused HLGU to lose more than $500,000 so far and roughly $250,000 each additional semester. (Compl. ¶¶ 88–101.) Without injunctive relief, HLGU will lose these funds for past semesters, and may not be able to continue in its relationship with the Missouri Department of Corrections. (Compl. ¶¶ 86, 88–101, 117.)

More, HLGU's current PPA expires in June 2026 (Compl. ¶¶ 28, 86). This deadline is causing a practical "phase-out" now. (Ex. A). HLGU cannot promise students they will qualify for aid past the expiration. Already, HLGU has encountered frustrated students and parents who would otherwise qualify for multi-year grants but cannot obtain it at HLGU because of the Department's position. (Ex.A.)Students may lose trust and goodwill in HLGU, as they face increasing uncertainty. Applied to all Title IV funds, the outcome would be financially catastrophic for HLGU. (Compl. ¶ 117.) Students would leave by the hundreds, programs would close, and the University's long-term survival would be in doubt.

**V.    Immediate relief is needed to prevent additional damage and preserve the *status quo*.**

Looking ahead, besides the concrete losses today, HLGU's current Title IV eligibility expires in June 2026 (Compl. ¶¶ 28, 86); the PPA would renew without controversy, but-for this interpretation of the regulation. Under present Department policy, no updates or new program approvals can occur unless MBC participates in the federal funding process—something the Convention's structure and beliefs prevent. (Compl. ¶¶ 6, 67-69.) The MBC will only meet once, for two days in October 2025, before HLGU's PPA expires. Even if HLGU asks, it expects the MBC will refuse to enter a new agreement with the government. (Compl. ¶¶ 67-69.) Without preliminary injunctive relief, HLGU suffers more financial harm and loses mission-critical programs. (Compl. ¶ 124.)

Additionally, HLGU understands the same requirements will be imposed on other MBC affiliated schools, and many religious schools elsewhere, compounding this situation's urgency. (Compl. ¶¶ 119-122.)

## Legal Standard

At the threshold, HLGU meets all three elements to show it has standing:

1.  it has suffered an injury in fact;

2.  the injury is traceable to the challenged regulation; and

3.  the injury is likely to be redressed by a favorable decision.

*See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–61 (2014) (a credible enforcement threat can establish standing).

As a result, HLGU seeks a preliminary injunction for immediate protection. The Eighth Circuit applies the familiar four-factor test when evaluating motions for preliminary injunctions. A court considers:

- whether the movant faces a threat of irreparable harm;

- the balance between harm and any injury the injunction may cause the opposing party;
- the movant's probability of success on the merits; and
- the public interest.

*Missouri v. Biden*, 112 F.4th 531, 536 (8th Cir. 2024). While no single factor is dispositive, the Eighth Circuit emphasizes "the probability of success factor is the most significant." *Id*. When a plaintiff shows a likely violation of First Amendment rights, the other injunction factors are typically presumed satisfied. *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (*en banc*).

At bottom, the purpose of a preliminary injunction is to preserve the *status quo* and prevent irreparable harm. This lets the court considers the merits and afford complete relief. *Missouri v. Biden*, 112 F.4th at 536. HLGU needs preliminary relief.

<h3 align="center">ARGUMENT</h3>

**I.    HLGU has a strong likelihood of success on the merits.**

The Department's co-signature mandate is unlawful as applied to HLGU and MBC. It conflicts with the regulation's text, RFRA, the Higher Education Act, and the First Amendment. HLGU will show far more than a mere "fair chance of prevailing" in asserting the elements of its claim(s). *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022).

**A.    The Department's Co-Signature Mandate breaks Federal Law.**

**1.    Only Institutions may sign Program Participation Agreements.**

At its core, the Department's regulation violates the authority given to the Department by Congress. Congress only authorized two parties to Program Participation Agreements (PPA): the Department and the Institution. 20 U.S.C. § 1094(A)(1) (2022) (Higher Education Act § 487). The Department cannot require a third party to this kind of agreement. The Department cannot punish HLGU for failing to meet this unlawful requirement.

2.    The regulation only applies to Institutions with "Ownership" who also exercise control over HLGU.

Moreover, the Department is not applying the regulation as it is written. 34 C.F.R. § 668.14(a)(3) only applies to entities with "direct or indirect ownership *if that entity has the power to exercise control* over the institution." (emph. added). Thus, there is an ownership test and a control test. And the control test is only triggered if an entity has "ownership."

Conversely, MBC meets neither prong of these two tests. As explained below, MBC does not own HLGU, so the regulation does not apply to this situation. And MBC does not exercise any kind of "control" that might allow the Department to impose automatic liability on MBC for HLGU's actions.

In its letter to HLGU, the Department conflates the tests. The Department asserts the *sole* factor that gives MBC "ownership" over HLGU is that MBC has the power to select HLGU's Trustees. The Department stated, "[e]ven if MBC's powers were restricted to just electing HLGU's Trustees," the Department would impose liability. "[A]s the sole member, MBC would still have indirect control over HLGU through these Trustees." (Compl. ¶ 58.) But the Regulation says the power to elect trustees is evidence of *control*, not ownership. The Department is supposed to test for "ownership," but never squarely considers this prong of the text. A plain reading of the regulation requires separate tests for "ownership" first, then "control."

But HLGU's right to elect directors is not evidence of "control" or "ownership."

As to control, the Supreme Court says it is "hornbook law" that normal shareholder actions, like electing directors, do not show any "control" that creates liability. *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998). In *Bestfoods*, the Supreme Court said the EPA could not demand a parent company pay for a subsidiary's environmental liability merely because it could name directors. *Id*. That logic applies even more strongly to nonprofits. Non-profit members elect trustees but cannot profit from the organization like shareholders.

Like a mere shareholder in *Bestfoods,* MBC's legal rights with respect to HLGU are incidental to MBC's role as a "member." The rights are not a kind of "control" that makes MBC

liable for HLGU's actions or debts. MBC's rights stem from Missouri's nonprofit corporation law, not any ownership rights. *See* § 355.066 (21-23), RSMo. (2023) (membership rights are given in articles, bylaws); § 355.606, RSMo. (2023) (statutory right to approve charter changes).

Because MBC's legal rights are merely incident to its role as HGLU's member, it does not exercise any "control" that might let the Department hold MBC liable for HLGU's actions. Congress said nothing about creating liability for church groups that select trustees of religious colleges. "[A]gainst this venerable common-law backdrop, the congressional silence is audible." *Bestfoods*, 524 U.S. at 62. The Department's interpretation exceeds any fair reading of its Congressional authorization.

MBC does not exercise "control" over HLGU, and so § 668.14(a)(3) should not be applied in this situation.

3.      Nonprofits do not have owners, as a matter of law.

Neither does MBC have "ownership" in HLGU. Because no one holds the unified interests of control and profit in a charity, "[n]onprofit corporations are not generally considered to have owners." *Deckard v. Comm'r of Internal Revenue*, 155 T.C. 118, 126 (2020). Missouri's Supreme Court has held plainly "[n]on-profit corporations do not have owners," *Farrow v. Saint Francis Med. Ctr.,* 407 S.W.3d 579, 593 (Mo. 2013). In the same case, it held a non-profit corporation's "member" rights to name directors do not make them owners. *Id.*

Although this may seem counterintuitive on first reading, it reflects important legal differences between government, charity, and business organizations. The legal possessor of property is not always the "owner." It is a similar non-sequitur to say voters "own" the government. Voters exercise "control" in a remote sense, but voting does not make voters liable as "owners."

And so, under bedrock, common-law principles, a firm's "ownership" consists of people with simultaneous interests in profits and control. Nonprofits do not have any group with

"ownership." Courts, scholars, and the IRS agree on this principle. *See* Henry Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835, 838 (1980), *as cited in Austin v. Mich. Chamber of Com.*, 494 U.S. 652, 675 n.6 (1990) (Brennan, J., concurring) (the "primary" difference between charities and nonprofits is that a group with ownership is absent). Nonprofits, where profit and control are not unified, do not have "owners." *See* Philip T. Hackney, *What We Talk About When We Talk About Tax Exemption*, 33 Va. Tax Rev. 115, 121 (2013) ("There are no 'owners' of a nonprofit organization; consequently we cannot use a pass-through taxation system like we do for partnerships where it is clear who owns the firm."); Joseph Mead & Michael Pollack, *Courts, Constituencies, and the Enforcement of Fiduciary Duties in the Nonprofit Sector*, 77 U. Pitt. L. Rev. 281, 289 (2016) ("[N]onprofits do not have owners[.]").

The Internal Revenue Service, the Department's sister agency in the Executive Branch, shares this view. For example, the IRS offers guidance about how to determine control in "organizations without owners." Internal Revenue Serv., U.S. Dep't of the Treasury, *Exempt Organizations Annual Reporting Requirements – Form 990, Schedule R: Meaning of Control for Organizations Without Owners*, IRS.gov, https://www.irs.gov/charities-non-profits/exempt-organizations-annual-reporting-requirements-form-990-schedule-r-meaning-of-control-for-organizations-without-owners (last visited June 18, 2025).

Thus, MBC does not have "ownership" in HLGU, and so § 668.14(a)(3) does not apply here at all. MBC may have rights as a member, but those are not indicative of ownership or control.

At first glance, § 668.14(a)(3) seems to recognize this difference. The structure of the text demands that "ownership" is something other than "control." The test for significant control applies *only* if there is an entity with "ownership." The Department cannot treat the "ownership" prong in the text as mere surplusage. But in application, the Department has repeatedly asserted that MBC's limited, statutory governance rights are akin to "ownership."

This reading would grant the Department greater collection powers than the IRS or EPA, a sweeping change not authorized by Congress. The Biden-era Education Department was intent on going past the words of Congress or even its own regulation. But "Congress," Justice Scalia

9

wryly observed, "does not … hide elephants in mouseholes. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Congress gave the Department authority to regulate <u>Institutions</u>, not owners, and certainly not non-profit members. 20 U.S.C. §1094(c)(1)(B). The regulations applicable to Institutions may consider "pertinent" actions of "owners, shareholders or persons exercising control." But this modest authority over Institutions was not a sweeping power to pre-emptively "pierce the veil." If shareholders cannot be held liable by the EPA for electing directors, members cannot be held liable by the Education Department for selecting trustees. Nowhere did Congress use language that would clearly grant the Department authority over non-profit members, upsetting settled common law.

MBC does not have "ownership" over HLGU, and so § 668.14(a)(3) should not be applied in this situation.

### B.    The Co-Signature Mandate substantially burdens HLGU's religious exercise, making it likely HLGU will prevail on its RFRA claim.

1.    RFRA requires religious exceptions when federal law burdens religious practice, unless the law is already narrowly tailored to a compelling interest.

A second reason for injunctive relief is HLGU's absolute right to select religious leaders for itself, without government interference. The Religion Clauses of the First Amendment afford "broad" protection for the "principle of church autonomy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). This guarantees religious groups' "independence in matters of faith and doctrine and in closely linked matters of internal government." *Id*. State attempts to dictate or even influence such matters "obviously" "constitute one of the central attributes" of a First Amendment violation. *Id*. at 746.

To protect free exercise, Congress passed the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-4, *et seq*. RFRA "operates as a kind of super statute, displacing the normal operation of other … laws." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). Under RFRA, a person whose religious exercise is burdened by federal rule – even a general one – is "<u>entitled to</u>

10

an exemption." *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 694–95 (2014); *New Doe Child #1* v. *United States*, 901 F.3d 1015, 1025 (8th Cir. 2018). The only exception to this right is when the rule is already "the least restrictive means" of furthering a "compelling governmental interest." *Id*. In effect, RFRA subjects neutral federal rules to First Amendment strict scrutiny as applied to that individual's free exercise. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430 (2006). RFRA encourages exemptions in the form of injunctive relief, as Congress has "determined that courts should strike sensible balances" in this area. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 439 (2006).

HLGU is likely to succeed on its RFRA claim, as explained below. This is because (1) it shows the Department's rule is a substantial burden on religious exercise, (2) that the Department's proffered interests are not compelling or even advanced by this rule in this situation, and (3) that the "co-signature mandate" is not the least restrictive means of achieving any compelling interest.

> 2.    § 668.14(a)(3) imposes a substantial burden by conditioning Title IV funds on HLGU abandoning Baptist governance.

HLGU meets its burden under RFRA. It can show § 668.14(a)(3) imposes a substantial right on its sincere, religious free exercise. The Department says § 668.14(a)(3) forces HLGU to choose between Title IV eligibility and its historic, religious relationship with the MBC. The Department insists that MBC enter a Program Participation Agreement (PPA), either as a co-signer or through an agent. If MBC declines to enter the contract, the Department demands HLGU restructure its board governance — contrary to HLGU's religious commitments and governing documents. So where HLGU wants to keep the relationship it currently has, the Department threatens to penalize HLGU unless it adopts a relationship HLGU does not want.

This burdens HLGU's religious actions, plain and simple. *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) held that government substantially burdens religion when it conditions public programs on changes to faith-based relationships. The Department's mandate here mirrors the

one rejected in *Fulton*: it demands HLGU sever or restructure her theologically grounded governance relationships to qualify for a public benefit.

These government-approved relationships are contrary to HLGU's Baptists beliefs. HLGU's trustee-selection process is no mere formality. It reflects HLGU's core, Baptist convictions about congregationalism and cooperative governance. The Department's demand tramples both HLGU's institutional integrity and its religious autonomy.

§ 668.14(a)(3) substantially burdens HLGU's religious exercise for First Amendment and RFRA purposes. It puts HLGU to a choice between full access to student aid programs and the religious relationships that manifest HLGU's beliefs.

### C.   The Department's stated rationale for § 668.14(a)(3) is not compelling and is not particularized.

Having shown a federal-government burden on its sincere religious exercise, HLGU is "entitled to an exemption," says *Hobby Lobby*, 73 U.S. 682, 694–95 (2014). That is, unless the Department can prove § 668.14(a)(3) advances a compelling governmental interest in this circumstance and uses the least restrictive means to further it. The Department must show more than plausible defenses; the Department's "burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006).

In the published regulation, the Department gave the following rationale for § 668.14(a)(3):

Requiring signatures from owner entities allows the Department to ensure that owners are not using multiple layers of corporate entities to shield resources from repayment actions if liabilities are established and the institution does not satisfy them.[3]

The Department supported this rationale with reference to 1991 testimony by the Department's Inspector General, who described a recurring problem with "corporate proprietary

---

[3] *Program Integrity and Institutional Accountability*, 88 Fed. Reg. 74634 (Oct. 31, 2023) (to be codified at 34 C.F.R. pt 668, *et al.*).

schools" where "owners are [] able to escape with large personal profits while the taxpayer and the students are left to pay the bill."[4] The co-signature mandate does not advance these purposes in this circumstance.

      1.    The Department cannot show its stated interest is advanced by application of the Co-Signature Mandate to HLGU and MBC in this situation.

To defeat HLGU's right to exemption, the Department would first need to show a compelling interest that is advanced by this rule in this particular situation. *Hobby Lobby*, 73 U.S. 682, 694–95 (2014). Then it would have to show the rule is the least restrictive way to advance the interest. *Id*. The Department would have to show at least three things are more likely than not to occur here, to show this is even a situation where its stated interests are advanced:

1. HLGU is likely to incur an unpaid liability,
2. MBC would improperly shield institutional assets, and
3. MBC's co-signature would offer greater recourse than existing collection tools.

The Department cannot prove any of these elements will be advanced here. So it cannot show that applying the regulation to HLGU will advance the government's stated interest, "compelling" or not.

HLGU is not likely to close and leave behind an unpaid debt to the Department, unless the Department triggers HLGU's collapse with this regulation. HLGU has experienced financial distress in the past, but it is currently meeting all its obligations to the Department and expects to meet them.

Nor can the Department show the Missouri Baptist Convention will, more likely than not, improperly shift assets away from HLGU. The MBC does not hold its own assets. The MBC does not claim to own HLGU's assets. MBC cannot divert funds to itself, because it cannot instruct

---

4 Hearings on the Reauthorization of the Higher Education Act of 1965: Program Integrity, Hearings Before the Subcommittee on Postsecondary Education of the Committee on Education and Labor, House of Representatives, 102nd Congress, First Session, May 21, 29, and 30, 1991, p.313–314

HLGU's Trustees on how to use their assets. Under MBC Constitution Article VII, "Each governing board has full authority over the internal operation of the Entity…."

Finally, even if MBC could somehow shift HLGU's assets improperly, the law provides many less restrictive tools for recovering them. The Department has several regulations that it might use to require HLGU to provide security for debts. *See* 34 C.F.R. § 668.175 (2024). And if those did not suffice, criminal and civil relief is available. Federal statutes include the Uniform Fraudulent Transfer Act and 18 U.S.C. § 152(1), (7). State law principles include the Uniform Fraudulent Conveyance Act, and general corporate law claims like "piercing the veil*." See 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32, 40 (Mo. 1999) (*en banc*) (recognizes veil piercing under Missouri law).

Indeed, the MBC does not own any assets, including HLGU's assets. In this situation, then, the Government's interference with HLGU's free exercise would create no benefit to the Government at all. No new assets would be secured by application of this rule in this situation.

> 2.      The Department cannot show its stated interest is compelling, as the Department allows evasion of the mandate through other governance structures that do not increase financial security.

Additionally, the rule itself, and the Department's actions, show that the claimed interest is not compelling. The Department is willing to let any institution proceed without a co-signature, with a government-approved structure. Those structures do not necessarily make the Government more secure financially. The Department has even suggested that MBC schools might avoid the co-signature requirement by removing the MBC as a member. This contradicts any claim that the Department has a *compelling* interest in making collections easier. The Department allows the co-signature rule to be evaded, without regard to financial security or ease of collections.

The Department cannot show this regulation is more likely than not to advance the Government's stated interest in this situation. And it does not treat that interest as compelling. Thus, it will not be able to defeat HLGU's right to an exemption from a rule that burdens its religious exercise. *Hobby Lobby,* 73 U.S. 682, 694–95 (2014).

14

       3.      Less restrictive alternatives are already in use.

Even if the Department had a compelling interest, it cannot show its co-signature mandate is the least restrictive means to advance it. RFRA calls for narrow consideration of the specific situation, not sweeping applications. *O Centro*, 546 U.S. at 431 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972)).Less restrictive means are obviously available. The Department is willing to give up a co-signature for *every* institution, including HLGU — if it adopts a Department-approved governance. The Department requires no co-signer for:

- Institutions where the board selects its own successors, and

- Institutions that allow an individual to appoint the board, and

- Institutions that allow the government to appoint the board, and

- Institutions that give multiple groups the right to appoint the board (with no group selecting a majority).

The rule allows many Institutions to proceed without co-signers at all, in ways that do not make collections more secure. Individuals, governments, and groups of charities with appointment rights might have incentives to hide assets in insolvency, too. If the Department accepts many schools without a co-signer, it must accept HLGU's religiously motivated request for an exemption.

Moreover, the Department already deploys a graduated set of fiscal oversight tools, that would not interfere with HGLU's relationship with the MBC. These are less restrictive of HLGU's free exercise. Under its cash-management regulations, the Department may alter ordinary payments, by imposing Heightened Cash Monitoring Levels One or Two. It may also institute a "full Reimbursement method." Each step requires the institution to front its own money and to clear progressively more exacting documentation reviews before federal funds are

released. These alternatives give the Department real-time leverage over schools that pose financial or compliance risk. The most recent public list shows 418 institutions under HCM.[5]

Even more, the Department can demand irrevocable letters of credit ("LOCs") or cash deposits instead of governance changes. Under 34 C.F.R. § 668.175, an institution that posts collateral equal to 10–50 percent of its prior-year Title IV volume may continue to participate. The Department's latest Financial Protection Report shows it held more than $580 million in LOCs from over 310 institutions. These LOCs give the Department an immediate fund to satisfy liabilities if a school collapses or fails to make required refunds, without intruding on internal governance.

And if these items are insufficient, the Department has a raft of tools, including fines, limitations, revocation, and termination.[6]

Taken together, the cash-monitoring ladder and Letter of Credit rules give the Department targeted, data-driven safeguards to protect the Treasury and students. These mechanisms address financial instability without meddling in religiously motivated board structures. They represent obviously less-restrictive means than the Department's novel "co-signature" mandate. And arguably, these other tools are better at achieving their stated purpose. These tools foreclose any argument that forcing a Baptist denomination to sign the PPA is the least-restrictive way to assure fiscal responsibility. The MBC's signature on a PPA is not necessary to assure fiscal responsibility here.

---

5 *See* Fed. Student Aid, U.S. Dep't of Educ., Federal Student Aid Posts New Quarterly Reports to the FSA Data Center (Dec. 20, 2023), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2023-12-20/federal-student-aid-posts-new-quarterly-reports-fsa-data-center (last visited July 6, 2025).

6 *See* https://studentaid.gov/data-center/enforcement/actions

4.    HLGU is entitled to an exemption under RFRA, because bureaucratic uniformity is not a ground for denying relief under RFRA.

As shown above, HLGU is entitled to an exemption under RFRA. This is because the Department's rule burdens HLGU's religious exercise, and the Department's rule is not the least restrictive way to obtain any compelling government interest.

HLGU anticipates the Department may argue it cannot grant HLGU an exemption without undermining broader regulatory enforcement. In essence, the Department might say that § 668.14(a)(3) makes collections easier in some instances, even if it cannot be proven in this instance.

But RFRA expressly rejects such logic, and it is no bar to relief here. "[C]ourts must look beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions." *O Centro*, 546 U.S. at 431 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972)).

RFRA demands more than administrative convenience or uniformity. It demands proof that denying HLGU an exemption in this specific instance is necessary to protect a legitimate, concrete interest. On this record, the Department cannot make a showing that defeats an exemption.

**D.    Third, the Department's regulation violates the First Amendment.**

While HLGU focuses on RFRA in this motion, HLGU stresses that the Department also violates the First Amendment. RFRA merely invokes strict scrutiny whether or not the rule is neutral and generally applicable.

The First Amendment requires strict scrutiny of the Department's regulation here, on two grounds.

1.    The Department's rule interferes with church governance and autonomy, violating the First Amendment.

The first ground for strict scrutiny is that the regulation interferes with HLGU's religious government. "Freedom to select the clergy, where no improper methods of choice are proven," is

"part of the free exercise of religion" protected by the First Amendment. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 186 (2012), *citing Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952). If civil courts "violate the First Amendment" by "prob[ing]" too deeply into matters of "church polity," *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976), then the Department certainly cannot pressure HLGU to alter its religious polity to make hypothetical collections easier. The Department must "accept" the Church's determinations of any "religious issues of doctrine or polity before them."

Just as teachers at religious schools are "ministers" under the First Amendment, so are HLGU's Trustees, who oversee HGLU's Christian education mission. It is imperative, then, that those Trustees be judged by those with the highest authority in Baptist polity, local churches. Baptists reject any authority higher than the local church.[7] Thus HLGU does not pretend to have greater religious authority than the churches cooperating with it. It allows those churches the final say in discerning which Trustees will best fulfill the school's religious mission. The Department's regulation, by which it imposes severe penalties on religious schools for selecting leaders in a disfavored way, is subject to strict scrutiny.

> 2.    The Regulation is not "neutral or generally applicable," and so is subject to strict scrutiny.

Additionally, the Regulation is subject to strict scrutiny because the Department's rule is not "neutral or generally applicable." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021). A law is not generally applicable if it includes "'a mechanism for individualized exemptions" or decisions. *Id.* 34 C.F.R. § 668.14(a)(3)'s "control" test depends on individualized assessments of each school's governance. It cannot evade strict scrutiny.

---

[7] *See* Randy C. Davis, *There Is Absolutely No SBC Hierarchy*, *Christian Index* (Dec. 7, 2020), https://christianindex.org/stories/there-is-absolutely-no-sbc-hierarchy,5006.

Moreover, a rule is not "neutral" when it is applied inconsistently, or in a way that favors some religious groups over others. It appears that 34 C.F.R. § 668.14(a)(3)'s application has been inconsistent among religious groups. For example, Texas Baptist institution Howard Payne University allows that state's Baptists to elect most of its Trustees. According to published reports, the Department declined to impose the co-signature mandate on Howard Payne, because Howard Payne does not call the Texas Convention a "member."[8] While MBC is a "member" of HLGU, this should have been a distinction without a difference, according to the Department's letter to HLGU. Indeed, Missouri law says MBC would be a statutory "member" no matter what the Articles call the relationship. A member is anyone with the right to elect Trustees, "without regard to what a person is called in the articles or bylaws." § 355.066(21), RSMo. (2023). According to the Department's statements to HLGU, Howard Payne should have been subject to the co-signature requirement. But it was not.

This inconsistent application between schools of two different Baptist groups triggers strict scrutiny. It signals 'subtle departures from neutrality,'" "'religious gerrymander[ing],'" or "impermissible targeting" of religion. *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021)(statement of Gorsuch, J.), *citing Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 –35 (1993).

Whatever justification the Department might invent to treat Texas Baptists differently than Missouri Baptists, it violates the First Amendment. Just days ago, the Supreme Court unanimously affirmed, the Establishment Clause's "clearest command" is that the government may not prefer one denomination over another. *Cath. Charities Bureau, Inc. v. Wisc. Lab. & Indus. Rev. Comm'n*, 605 U.S. ___, 145 S. Ct. 1583, 1591 (2025).

---

[8] Ken Camp, *Howard Payne University Receives DOE Clarification*, Baptist Press (Sept. 25, 2024), https://www.baptistpress.com/resource-library/ news/howard-payne-university-receives-doe-clarification/

Thus, HLGU is likely to prevail on its First Amendment claim. The Regulation interferes with church autonomy, is not generally applicable, and has not been applied neutrally. This means the regulation will receive strict scrutiny. And, as shown above, the regulation does not meet strict scrutiny. HLGU is likely to prevail on its claim for relief under the First Amendment.

## II.    Without an injunction, HLGU will continue to suffer irreparable harm.

The Department's co-signature mandate is causing serious and irreversible harm to HLGU now. Most concretely, the Department has blocked Pell Grant funding for HLGU's prison education program. This has cost the University more than $500,000 in lost revenue—and the number grows each semester.

But the harm here goes beyond finances. Beyond today's dollar losses, the Department has made it clear HLGU will not be able to renew its PPA in June 2026, without the MBC's agreement. This deadline is causing a "phase-out" now. Dr. Matz, HLGU's president, addresses the harms to HLGU's goodwill, reputation, academic, religious and charitable missions, and its ability to serve students, in a Declaration attached as Exhibit A.

Already, HLGU has encountered frustrated students and parents who qualify for grants but cannot obtain them at HLGU because of the Department's position. (Ex. A at ¶ ¶ 5-14). For example, one student has disclosed their intention to teach in a high-need area, and to pursue a TEACH Grant. (Ex. A at ¶¶ 7-9.) Without relief, the student will be unable to receive the entire grant. (Ex. A at ¶ ¶ 8.)

Similarly, HLGU has recently begun an online Masters in Counseling program. (Ex. A at ¶ ¶ 10-13.) Because the Department will not process a PPA update without the MBC's signature, Title IV benefits, including federal Direct Loans, are unavailable to students in the program. (Ex. A at ¶ 11.) HLGU discloses this limitation on its program webpage. (Ex. A at ¶ 11.) HLGU's admissions counselors have reported several prospective students who did not enroll after learning that federal loans are unavailable. (Ex. A at ¶ 12.) Those students were provided private-loan options but ceased further communication. (Ex. A at ¶ 12.)

HLGU cannot know how many students have made similar plans that would be upset by the loss of Title IV eligibility, or will choose some other Institution. (Ex. A at ¶ 12.) HLGU knows only that it will increasingly lose trust and goodwill among students, as they face increasing uncertainty about their aid. (Ex. A at ¶ 5.) Dr. Matz notes the loss of confidence will damage HLGU's relationships, erode goodwill among alumni and donors, and undermines HLGU's witness as a reliable steward of Christian higher education. (Ex. A at ¶ 14.) Applied to all Title IV funds, the outcome would be relationally and financially catastrophic. Students would leave by the hundreds, programs would close, and the University's long-term survival would be in doubt. These harms cannot be easily measured, and courts consistently recognize that threats to Title IV eligibility justify injunctive relief. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012).

And, of course, the Department's position here forces HLGU to choose between federal funding and its religious identity. The new rule tries to override HLGU's governance and pressure it to sever religious ties. This is a direct and ongoing burden on HLGU's religious exercise, which cannot easily be measured by damages

The Supreme Court is clear: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); accord 11A Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. Apr. 2020 update). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). "[A]ny First Amendment infringement that occurs with each passing day is irreparable." *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975). RFRA provides similar protection against substantial government-imposed burdens on religion. *See O Centro*, 546 U.S. 418, 428–29 (2006).

Each day the Department refuses to approve HLGU's updated PPA without the MBC's agreement deepens the financial, relational, and constitutional harm. The Court should enjoin enforcement now to preserve the *status quo* and prevent further injury while the case proceeds.

**III.    The equities heavily favor preserving the *status quo* for HLGU and serves the public interest by protecting religious freedom, education, and prisoner education and rehabilitation.**

The remaining two factors of the preliminary injunction test—the public interest and whether other interested persons would be benefited—also favor granting relief given a "likely First Amendment violation." *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,* 690 F.3d 996, 1004 (8th Cir. 2012).

As between the Department and HLGU, the equities favor HLGU. On one side of the ledger, the Department suffers no cognizable harm. On the other side of the ledger, HLGU may cease to exist.

And the public interest is strongly upheld by granting HLGU's injunction. Upholding constitutional and religious freedom rights are always in the public interest. And here, the injunction would allow prisoners to be educated, consistent with Congress's explicit policy. Also, the public benefits from the continuing education; the public will receive no benefit from the Department insisting on an MBC co-signature or 'dismemberment.'

All of the equities favor entry of a preliminary injunction protecting HLGU.

**IV.    HLGU asks this Court to issue a narrow preliminary injunction.**

Plaintiff could seek a broader preliminary injunction here. It will seek a broader permanent injunction at trial. But to preserve the *status quo* and prevent irreparable harm, HLGU respectfully asks for a narrowly tailored preliminary injunction limited to HLGU and the MBC.

Plaintiff asks the Court to prohibit Defendants from conditioning any action on the Missouri Baptist Convention's signature, designation, or agreement. The relevant actions include, but are not limited to, Program Participation Agreement updates, amendments, renewals, and Title IV eligibility for HLGU**.**

Plaintiff also asks the Court to order the Department to accept HLGU's pending PPA updates without MBC's signature. It should also require the Department to assess and approve

the *Freedom on the Inside* prison education program without imposing any requirement on MBC. The Department should be required to maintain HLGU's current Title IV eligibility, including disbursements, through final judgment or the Court's later order.

Finally, no bond should be ordered under Fed. R. Civ. P. 65(c). In this case, the Government is adequately secured against costs and damages. First, HLGU provides adequate security to the Department concerning its use of Title IV funds. If the MBC did not select HLGU's Trustees, the Department would say HLGU is providing enough security. Moreover, because the Missouri Baptist Convention does not hold assets, any bond at all would provide *more* security than the Co-Signature Mandate. The MBC long functioned as an unincorporated association; in recent years it incorporated just to protect its membership rights in affiliates. Financial gifts to the MBC's affiliates do not flow through the MBC corporation.

Because the Government would receive no additional security under its rule, and because HLGU provides adequate assurances to the Department, the Court should not add more security. Or, in the alternative, the Court should order nominal security of $1.

## Conclusion

HLGU asks this Court to preserve the *status quo* and protect its rights. The Department's new interpretation of 34 C.F.R. § 668.14(a)(3) interferes with HLGU's religious autonomy. It forces a choice between following its faith and participating in Title IV. That burden triggers strict scrutiny under RFRA and the First Amendment. And on this record, the Department cannot show this rule advances compelling interests or is narrowly tailored.

Without relief, HLGU will suffer escalating harm: both lost federal funds, and the collapse of its prison education program. Its full eligibility hangs in the balance. These harms are real and unfolding today.

A narrowly tailored injunction will prevent these harms while this case proceeds. It will not impair the Department's legitimate enforcement efforts. But it will protect HLGU and MBC from unlawful pressure to sever its religious ties.

For these reasons, the Court should grant HLGU's motion for a preliminary injunction.

Respectfully submitted,

LAW OFFICES OF
JONATHAN R WHITEHEAD LLC
s/Jonathan R. Whitehead
Mo. Bar 56848
229 S.E. Douglas St., Ste. 210
Lee's Summit, Mo 64063
816.398.8305 – Phone
816.278.9131 – Fax
jon@whiteheadlawllc.com

ATTORNEY FOR PLAINTIFF
HANNIBAL-LAGRANGE UNIVERSITY